301361

STATE OF MICHIGAN

IN THE SEVENTH DISTRICT COURT FOR THE COUNTY OF VAN BUREN

FILED

MAY 17 2010

TINA LEARY
Van Buren County Clerk

THE PEOPLE OF THE STATE OF MICHIGAN,

                Plaintiff,

v

IVORY SHAVER,

                Defendant.

_____/

DISTRICT COURT CASE
NO. 09001237FY

10-17030

THE PEOPLE OF THE STATE OF MICHIGAN,

                Plaintiff,

v

SCOTTIE SHAVER,

                Defendant.

_____/

DISTRICT COURT CASE
NO. 09001238FY

10

RECEIVED

JUN 25 2012

COURT OF APPEALS, THIRD DISTRICT
LARRY S. ROYSTER, CHIEF CLERK

THE PEOPLE OF THE STATE OF MICHIGAN,

                Plaintiff,

v

EDWARD FOSTER,

                Defendant.

_____/

DISTRICT COURT CASE
NO. 09001240FY

10-17033

THE PEOPLE OF THE STATE OF MICHIGAN,

                Plaintiff,

v

SHEVOLIER GILL,

                Defendant.

_____/

DISTRICT COURT CASE
NO. 09001239FY

10-17032

PRELIMINARY EXAMINATION
(Volume I of II)
BEFORE THE HONORABLE ARTHUR H. CLARKE III, DISTRICT JUDGE

THURSDAY, MARCH 11, 2010 - PAW PAW, MICHIGAN

APPEARANCES:

For the Attorney General:    MR. DENNIS PHENEY (P48825)
                             Assistant Attorney General
                             Michigan Attorney General
                             P.O. Box 30218
                             Lansing, Michigan   48909


For Defendant I. Shaver:     MR. DAVID SETH RODLUND (P65171)
                             Attorney at Law
                             221 Oak Street
                             Paw Paw, Michigan   49079


For Defendant S. Shaver:     MR. DONALD SAPPANOS (P43542)
                             Attorney at Law
                             1595 W. Centre, Ste. 100
                             Portage, MI   49024


For Defendant E. Foster:     MR. JASON RONNING (P64770)
                             Attorney at Law
                             P.O. Box 140505
                             Grand Rapids, MI   49514


For Defendant S. Gill:       MS. NICHOLE DUNFIELD (P61668)
                             Attorney at Law
                             226 ½ East Michigan Avenue
                             Paw Paw, MI   49079



RECORDED BY:                 Susan L. Klein, CER #3482
                             Certified Electronic Recorder

TABLE OF CONTENTS

WITNESSES:                                          PAGE


SCOTT BOLING
      Direct examination by Mr. Pheney              11
      Cross-examination by Mr. Sappanos            24
      Cross-examination by Ms. Dunfield            26
      Cross-examination by Mr. Ronning             27
      Cross-examination by Mr. Rodlund             29

ADRIENNE BURNETT
      Direct examination by Mr. Pheney             38
      Cross-examination by Mr. Sappanos            91
      Cross-examination by Ms. Dunfield           119
      Cross-examination by Mr. Ronning            131
      Cross-examination by Mr. Rodlund            142

WALDEMAR PALUTKE
      Direct examination by Mr. Pheney            158
      Cross-examination by Ms. Dunfield           173

SHARON MARTINEZ
      Direct examination by Mr. Pheney            177
      Cross-examination by Mr. Sappanos           207

TRACY DEANNA HUGHES
      Direct examination by Mr. Pheney            218
      Cross-examination by Ms. Dunfield           241
      Cross-examination by Mr. Rodlund            242



EXHIBITS:                          MARKED      RECEIVED


      PX #1 - Map                    04           --

Paw Paw, Michigan

Thursday, March 11, 2009 - at 11:41 a.m.

(Court, counselors and all parties present)

(Volume I of II)

(At 8:30 a.m., prior to commencement of proceedings PX #1 marked)

PROCEEDINGS

THE COURT: Okay. As we begin, there's a couple of things that I want to go over before I actually call the case. First off, any delays or any reason why it's twenty minutes to twelve that goes back on my shoulders, that doesn't go back on anybody sitting up here in the front or anybody else involved. Maybe I should ask the question, maybe I shouldn't have asked the question, so, my apologies to all of you that have been very patient with us today in coming back a couple of hours later, but, that all rests on me and on nobody else.

As you folks see, we do have, because of the nature of the charges in this matter, we do have extra security, there's a couple of basic ground rules that I want to go over that we're going--that's going to happen during this proceeding today.

First off, I'm expecting that there will not be any outbreaks, noise, shouts, any kind of outbreaks from both people sitting at the tables, people sitting in the galley. If there is, we will ask security to either remove the individual and if that's not a practical thing to do then I will clear the courtroom and proceed without people sitting in the galley. So, I do ask for your

4

cooperation on that folks.

Everybody has been checked with the metal detector as we've--as you've entered the courtroom. If you happen to leave because you need to go some place, you need to go to the bathroom or whatever, uhm, you will not be allowed back in until we take a break. I just want to keep things moving without there being a disturbance and because of security. We will not allow people to enter the courtroom as of this moment until we take our next break because, as you see, I think we've probably filled up each and everyone of the seats and we're not going to have people standing, it's a security question. So, with those things in mind folks, we're going to proceed today.

I am going to call the cases and then we'll start with some preliminary questions for the parties in this matter.

I have files 09001237, People of the State of Michigan versus Ivory Lee Shaver. Mr. Shaver is here. Mr. Rodlund, are you ready to proceed, sir?

MR. RODLUND: We are, Your Honor.

THE COURT: Thank you. I have file 09001238, People of the State of Michigan versus Scottie Shaver. Mr. Sappanos, are you ready to proceed?

MR. SAPPANOS: We are, Your Honor. I don't know if I speak for everybody here, but in light of the circumstances here and severity of this case, and the importance of preserving whatever notes we can, I would ask that my client be allowed to take notes and give me the notes because as you can see Judge, we have four defendants and

5

we are not going to be able to listen to him, listen to the witness. I know it's a homicide matter but I don't think there's any concerns about their hands being free as long as they're sitting at the table. I think it's fair that they be able to take notes.

THE COURT: I will address that issue in just a moment. Thank you.

I have file 09001239, in the name of Shevolier Gill. Ms. Dunfield, are you ready?

MS. DUNFIELD: Yes, Your Honor.

THE COURT: Thank you. And we have file 09001240, People of the State of Michigan versus Edward Foster. Mr. Ronning, are you ready?

MR. RONNING: Yes, Your Honor.

THE COURT: Thank you. Going back, my next process or part of the procedure is to ask if there are any preliminary matters. Mr. Sappanos you brought one up, I am leaving the issue of security being ankle bracelets, handcuffs, up to the security officers in this matter. So, I am not ordering them to take off the bracelets. I am allowing that to be handled by those that are in charge of security.

MR. SAPPANOS: Who do we ask then?

THE COURT: Uhm--

MR. SAPPANOS: Mr. Bonter?

THE COURT: The gentleman right behind you; Greg, your thoughts?

DEPUTY STRAKA: That's why they didn't put them in belly

6

chains, we put them in cuffs so they can write with their cuffs on.

MR. SAPPANOS: They're not all--

THE COURT: Can we do a cuff that they can bring their hands up to there--

MR. SAPPANOS: Or at least one?

THE COURT: --to the wrist on that? We can adjust so that they can have their writing hand available.

MR. SAPPANOS: Thank you, Your Honor.

MR. RODLUND: My client, also?

THE COURT: I will leave that up to security.

MR. RODLUND: Okay. He was brought here by other officers.

THE COURT: Right. He's been handed over to the custody of the Sheriff's Department so it will be up to the Sheriff's Department. Yeah, if he can have one hand free for writing I would appreciate it. Thank you.

And Ms. Gill, you're able to write with the one?

(Ms. Gill acknowledges)

THE COURT: Thank you, ma'am. Thank you, Deputy Straka.

We've taken care of that issue as we begin, are there any preliminary matters that the Court needs to address Mr. Pheney, as far as you're concerned?

MR. PHENEY: I have none, Judge. Thank you.

THE COURT: Thank you. Mr. Sappanos, are there any other preliminary matters? I think it's just as easy, for a while, I'm going to start from my right and work down the aisle here.

7

MR. SAPPANOS: Again, Your Honor, I don't know if I speak for everybody, but preliminarily you and I and the other attorneys including Mr. Pheney had discussed a severance motion. And you had indicated that that was not going to happen, I just want to put on the record that we did have that discussion in case somebody is looking over our shoulder down the road, that that's a fair and accurate statement that we did discuss that and for various reasons you said this is the way we're going to do it and we all agreed at that point.

THE COURT: Would you agree to that summary before I make by statement, Mr. Pheney?

MR. PHENEY: Your Honor, I would. Before Mr. Sappanos was retained there had been a motion filed, I did respond, Mr. Sappanos was then retained, we all agreed that that issue was moot. So, I would agree.

THE COURT: Ms. Dunfield, would you agree with the summary of Mr. Sappanos?

MS. DUNFIELD: That is correct, Your Honor. I also contacted your office and requested that and was basically informed of the decision.

THE COURT: Thank you. And that is correct. That's a true statement. Mr. Ronning, would you concur with the other statements?

MR. RONNING: I do, Your Honor. I have been more recently brought into this case, but I had discussed the matter and I would agree with that statement.

THE COURT: Thank you. And Mr. Rodlund?

MR. RODLUND: I would agree with that statement.

THE COURT: Thank you. I do agree that on prior occasions and probably at least--not at the initial arraignment, but at the initial pre-exam conferences in these matters and/or when the motion was filed by your predecessor Mr. Sappanos, and a recent message from Ms. Dunfield that there would be discussion regarding a severance motion. My decision on any motion for severance would be not to sever these matters and proceed today as a group preliminary examination and allow the proceedings that we have to continue today at this point in time with all four co-defendants.

MR. SAPPANOS: I understand, Your Honor. The only other issue that I discussed with the attorneys is the sequestration of the witnesses that are going to testify today.

THE COURT: Thank you. And I'm assuming all the defense attorneys agree to a sequestration and Mr. Pheney you agree to a sequestration except for your investigating officer?

MR. PHENEY: That's right, Your Honor. None of the witnesses that we will be calling are in the courtroom and frankly none are in the building at this time and they will brought over one at a time.

THE COURT: Thank you. And what I would also instruct, that anybody that is intended to be called as a witness, if there would be conversation between whoever gets them and brings them back, to make sure that they do not discuss their testimony that they've given or the testimony with a potential other witness so that everybody has

9

testified independently.

MR. PHENEY: Thank you.

THE COURT: Thank you. Anything else, sir?

MR. SAPPANOS: Not on my behalf.

THE COURT: Thank you. Ms. Dunfield, any preliminary matters?

MS. DUNFIELD: None that I can think of, Your Honor.

THE COURT: Mr. Ronning?

MR. RONNING: We've already handled them, Your Honor.

THE COURT: Thank you, sir. Mr. Rodlund?

MR. RODLUND: No, Your Honor.

THE COURT: Thank you. Then if we've covered all the preliminary matters that we need to at this time I believe we're to the point where you may proceed, Mr. Pheney with your first witness.

MR. PHENEY: Thank you, Your Honor. I call Scott Boling.

THE COURT: Thank you. Scott Boling. Mr. Boling, if you'd do me a favor and come up to the witness stand sir, and before you have a seat if you would stop and raise your right hand?

MR. BOLING: Yes.

THE COURT: Do you swear or affirm that the testimony you will give today in regards to this proceeding will be the truth, the whole truth, and nothing but the truth?

MR. BOLING: I do.

THE COURT: Thank you, you may have a seat. All I'm going to do is that microphone records it doesn't amplify, so you just need

10

to be sure to speak loud enough so that anybody sitting at the two tables in front of you can hear, sir.

THE WITNESS: Yes, sir.

THE COURT: Thank you. And you may inquire.

MR. PHENEY: Thank you.

SCOTT BOLING

called by the People at 11:49 a.m., sworn by the Court, testified:

DIRECT EXAMINATION

BY MR. PHENEY:

Q Sir, can you tell us please how you're presently employed?

A I'm presently employed with Kalamazoo City.

Q As a police officer?

A As a police officer.

Q And specifically in April of 1998 sir, how were you employed at that time?

A I was employed with Covert Township Police Department.

Q As a police officer?

A Yes.

Q I'll turn your attention specifically to April 26, 1998, at 2:34 a.m., on that date and time were you on duty?

A I was.

Q And were you dispatched to a specific location?

A I was.

Q And this would have been Sunday morning, could you tell us please where were you dispatched?

11

A   To the area of the Blue Star Lounge.

Q   Specifically the Blue Star Lounge and also Blue Star Highway?

A   Yes.

Q   And that particular location is that within Covert Township?

A   It is.

Q   Van Buren County?

A   Yes.

Q   State of Michigan?

A   Yes.

Q   Do you recall why you were sent to that location?

A   Uh, a report of a woman hit by a vehicle.

Q   And were you the first officer that responded?

A   I was.

Q   Could you tell us please sir, what did you find?

A   I arrived on scene and found a woman laying the road in the northbound lane.

Q   At 2:34 in the morning, was it dark?

A   It was.

Q   And she's in the northbound lane of Blue Star Highway?

A   Yes.

Q   How far from the Blue Star Lounge was this woman located?

A   I recall being north of the entrance.

Q   Within in a mile?

A   Yes.

Q   Short distance from the entrance to the bar?

12

A Yes.

Q Her actual location, you say she was in the northbound, was the entire body in the northbound or how did you actually find her?

A Her entire body was in the northbound lane.

Q Once you located this woman in the northbound lane did you go out there to check for vitals?

A Yes, I did.

Q Could you tell me sir, what did you find?

A That her pulse was, I would say, a weak pulse along with difficulty breathing.

Q Were her eyes open?

A At the time I found her I believe she was face down.

Q Did you notice any injuries to her?

A I noticed that there was blood in the region of her head and it appeared that there were some lacerations.

Q There appear to be a lot of blood or a small amount?

A I would say a fair amount, yes.

Q Was there anyone else in the area when you found this woman?

A There were still several people in the area and when I arrived on the scene there was people leaving.

Q Now in the area, I mean was there anyone by this woman rendering her aid or comfort or anything like that?

A I don't recall specifically.

Q This woman, was she clothed?

A Yes.

13

Q Do you recall what, if anything, about her clothing stood out?

A Uh, I recalled that her, the back of her jacket was ripped and also that I believe she was missing her shoes.

Q When you were there sir and you were taking her vitals at any point did she try to say anything or did you hear her say anything?

A Yes.

Q What was that?

A She was I would say gasping asking if she was going to die.

Q And were you able to have a conversation with her or was she just making statements?

A She was saying as I attempted to comfort her, but kind of took it as a one side, it was kind of her repeated gasp.

Q And when you found the woman in this manner did you call for an ambulance?

A Yes, I did.

Q And did they respond quickly?

A Yes.

Q How long did it take for them to get there?

A I don't recall the approximate time. If I could refer to my notes I might be able to.

Q Sure. I believe even your first page, actually.

(At 11:53 a.m., witness reviewing notes)

A Yeah. I have in my notes, 2:43.

Q After you responded and found the woman in this manner did you stay with her until the ambulance arrived?

14

A   Yes, I did.

Q   So I know you mentioned there were some other folks possibly not far away but you didn't make any contact with those folks at the time?

A   I was dealing with her first, she was my priority.

Q   And when you say 'dealing with' what were you doing--

A   Uh--

Q   --providing first-aid of any kind?

A   I was providing C-spine, trying to do basic first-aid at that time.

Q   Once the ambulance personnel arrived did you turn her care over them?

A   Yes, I did.

Q   And did they load her up and transport her?

A   Yes.

Q   Did you go with her?

A   No, I didn't.

Q   What did you do next?

A   I stayed on scene and tried to collect evidence and also at that time arrangements were made to contact the chief of police.

Q   Did you do, I think you said you were locating the scene, what if anything did you do to document the scene?

A   At that time that--that basically was searching for evidence at the scene locating blood spots. Later when the chief came out we did a measurement but at the time earlier that night there was a rain and at that time it turned into a heavy downpour.

Q   The downpour, was that going on when you were dealing with the lady in the road or did that take place after she was transported?

15

A   Uh, the real heavy downpour happened after she left.

Q   At the time you located her in the road way it raining?

A   It was raining at that time.

Q   Were you able to get photographs of the scene?

A   I know that Chief Winans took photographs; I don't know if they turned out.

Q   At this point now that the lady has been transported, let me ask you, at some point that morning were you able to identify who that lady was?

A   Yes.

Q   Who was that?

A   Deborah Boothby.

Q   Deborah Boothby. I don't think I asked you this specifically, could you describe this woman in terms of was she white? Was she black? Was she Hispanic?

A   White female.

Q   White female. And let me clarify, when you found her there was no one else in her proximity?

A   I don't recall anybody.

Q   Now you indicated that you took some efforts in regards to the scene, did you actually try to locate witnesses?

A   I did.

Q   Did you actually speak to anybody at that time?

A   I spoke with several people.

Q   Do you recall their names?

16

A  That Heath Oats, I believe Jones and Black the last name, I'd have to refer to my notes for the first.

Q  There were some folks there that spoke to you?

A  Yes.

Q  Were there other folks that did not speak to you?

A  Yes.

Q  Were there folks that left before you had an opportunity to speak to them?

A  Yes, there were.

Q  What, if anything, did you notice about the folks that you actually had contact with?

A  I noted that there was a smell of intoxicants with the people I talked with.

Q  Alcohol?

A  Yes.

Q  At some point that morning did you end up clearing the scene?

A  Yes.

Q  Did you end up going to the hospital?

A  Yes, I did.

Q  Did you have an opportunity to speak to Ms. Boothby at the hospital?

A  No.

Q  Why is that?

A  Because when I arrived at the hospital I was informed that she had died.

Q  Approximately what time was that that you were informed that she was

17

dead?

A   I believe I was informed that she died around zero-three-sixteen.

Q   At 3:16 a.m.?

A   Yes.

Q   So between 2:34 when you responded to 3:16 is when you were told she was dead?  Or around 3:16 is when you were told she had died?

A   Correct.

Q   All right.  Was there anyone at the hospital that you actually made contact with or perhaps spoke to?

A   Yes, there was.

Q   Do you recall who that was?

A   I would have to look at my notes for the exact name.

Q   I believe that would be page 4.

A   Uh, Philip Thornton.

Q   After your trip to the hospital, assuming at some point you cleared the scene at the hospital?

A   Yes.

Q   Did you ever go back to the scene later in the day as it got lighter out to re-examine the scene?

A   Yes, I did.

Q   Tell me, please what did you notice at the scene then?

A   At that time I did some further checking and that collected several pieces of evidence.

Q   The blood spot that you mentioned to us earlier was it still readily apparent at the scene at this point?

18

A I don't recall if.

Q Sir, on that day in the afternoon of April 26, 1998, did you happen to have contact with any of the defendants in this case?

A That I believe I spoke with Ivory Shaver.

Q Ivory Shaver. And where did you make contact with Mr. Ivory Shaver?

A I don't recall the exact location I believe it was someplace in South Haven Township.

Q And how did you come to speak to Mr. Shaver, Ivory Shaver on that day?

A That--that due to a previous statement by Mr. Thornton that doing a follow-up investigation.

Q That's how you got the name?

A Yes.

Q When you went to speak to Mr. Shaver, let me ask before we go any further, do you see him in the courtroom at this time?

A I believe I recognize him.

Q Has it been a while?

A It's been probably over 12 years.

Q Nineteen-ninety-eight being the last time you and Mr. Shaver had a conversation?

A As I recall.

Q As you look around the courtroom do you believe that you recognize who Ivory Shaver is in the courtroom?

A I believe I do.

Q Why don't you tell us who you believe it is?

A I believe it's the gentleman sitting at the end of the table.

Q Okay. But you're not 100 percent accurate?

A I'm not 100 percent sure, it's been a long time.

Q This conversation you had with Ivory Shaver was he in custody at the time, did you arrest him?

A No, he was not.

Q Did you ask if he would speak to you?

A That--

Q A voluntary thing that you and he engaged in?

A It was voluntary.

Q Did he agree to speak to you?

A Yes.

Q Did you indicate to him that you wanted to speak about the death of Deborah Boothby?

A Yes.

Q And what, if anything, did Mr. Shaver have to say about that?

A He informed me that he was at the Blue Star Lounge. That he was also there with his brother, Scottie Shaver. That Boothby had been inside the bar, he informed me that--that she caused a disturbance, there was an argument and she was escorted out of the bar.

Q Did he indicate whether he noticed if she had been under the influence of intoxicating liquor at the time?

A I believe he stated that she had been drinking.

Q So he indicated that there was a confrontation between himself and Ms. Boothby within the bar?

A Yes.

Q Was that a verbal confrontation or physical?

A Uh, I believe I took it as a verbal at that.

Q And he indicated that she was removed?

A Yes.

Q All right. Did he indicate that he had any idea how she ended up dead in the street?

A No, he said he didn't know.

Q He didn't know. Sir, turning your attention to April 27, 1998, did you have the occasion to attend the autopsy that was performed on Deborah Boothby?

A I did.

Q And where did that take place?

A At Metropolitan Hospital.

Q Was that autopsy performed by Dr. Waldemar Palutke?

A I believe that is the doctor, yes.

Q Were there photographs taken that would document the autopsy as it progressed?

A Yes.

Q And you were present for that?

A Yes.

Q So you were actually able to observe the body while this autopsy was taking place?

A Yes.

Q Is part of your function in being there did you actually fill the doctor in as to what you were aware of in regard to your investigation

Q  up to that time?

A  Yes.

Q  And how much was that at the time?

A  It was very little.

Q  Very little.  Dr. Palutke once he was finished with the autopsy were you provided anything by way of physical evidence?

A  Clothing.

Q  Clothing.  When Ms. Boothby was sent for the autopsy was she still clothed?

A  Yes, I believe she was still clothed at that time.

Q  And the clothing then had to be removed for purposes of the autopsy?

A  Right.

Q  And that clothing was provided to you?

A  Yes.

Q  And you folks being Covert Township Police Department personnel you took that and brought it back to the department--

A  Yes.

Q  --and logged it as evidence?

A  Placed in the safe, yes.

Q  Thank you, sir.  Turning your attention then to June 10, 1998, while working, still in your capacity of a Covert Township PD, did you and another officer have contact with a lady by the name of Adrian Burnett?

A  Yes.

Q  And what officer was with you at that time?

22

A   Officer VanZile.

Q   Do you recall why you and Officer VanZile had contact with Ms. Burnett on June 10 of 1998?

A   Uh, reference information received of a possible suspect vehicle.

Q   Did you folks actually have a search warrant in your possession at that time?

A   Uh--

Q   I'll direct your attention to page 8 of your report, Section--

A   A--which--which date was that?  Because I believe there was--

Q   That is June 10?

A   June 10, yes.

Q   June 10, specially, so you and Officer VanZile did you folks have a search warrant?

A   Yes.

Q   For a vehicle?

A   Yes.

Q   And do you recall what type of vehicle?

A   It was a Chevrolet Celebrity.

Q   Chevy Celebrity?

A   Yeah.

Q   And you actually served that search warrant and you took that vehicle?

A   Yes, that vehicle was taken.

Q   Ultimately did personnel from Michigan State Police Crime Lab do some work, some investigation on that vehicle?

A   I was informed that they did.

23

Q You weren't present when that happened?

A No.

Q Thank you, sir, that's all I have.

THE COURT: We'll start this witness with Mr. Sappanos and then the next one I may just move down the aisle a little bit.

MR. SAPPANOS: Thank you.

CROSS-EXAMINATION

BY MR. SAPPANOS:

Q Just a couple of questions, sir. Stretch your memory here.

A Okay.

Q Who gave you the initial call, was that a dispatch you received over your car radio?

A Yes.

Q And what time did you get that dispatch?

A I don't know the exact time.

Q Would you have that in your report?

A I believe that the initial time of the dispatch would be at 2:34.

Q Two-thirty-four--

A Right.

Q --okay. And are you aware of whether or not--and did that come from the county dispatch or did that come from Covert PD?

A That came from the county.

Q County, okay. You're not aware of whether or not there was a nine-eleven call or anything along those lines?

A I'm not aware of that.

24

Q All right. And then you think the--and then what time did you get to the scene where you found Ms. Boothby?

A Approximately 2:42.

Q And then the ambulance arrived ten minutes after that?

A That ambulance arrived after that, uh, a short time after that, I don't know the specific. I think I have 2:43.

Q Is when the ambulance got there or when you got there?

A Looking back on my report I have the ambulance arrived at 2:43.

Q Okay. And you would have got there shortly before that?

A Yes.

Q Okay. Now you went to the autopsy?

A Correct.

Q And you provided the pathologist with the information you had at that point?

A Yes.

Q And how many days after you found Ms. Boothby was the autopsy performed?

A I don't recall the exact amount of time?

Q Short time?

A Yes.

Q And I believe that's why you indicated you didn't have much information to give the pathologist at the time, is that correct?

A Correct.

Q Now I take it that Covert PD didn't discontinue its investigation after the autopsy?

25

A  Correct.

Q  How long did you continue to work with Covert PD?

A  That--that, uh, officers continued to investigate it, later, several months later I left the department.

Q  And the investigation was ongoing?

A  Correct.

Q  And did you ever provide any follow-up information to the pathologist?

A  No, I didn't.

Q  Did anybody in your department?

A  I'm unaware if they did or not.

Q  And based on your investigation you don't know what caused Ms. Boothby's death, do you?

A  Based on mine, no.

Q  Okay.  Thank you.

MR. SAPPANOS:  I have no further questions, Your Honor.

THE COURT:  Thank you.  Ms. Dunfield?

MS. DUNFIELD:  Thank you.

THE COURT:  You're welcome.

CROSS-EXAMINATION

BY MS. DUNFIELD:

Q  Sir, you said at the time you went to the autopsy you provided him with information that you had at time.  What information did you have at that time?

A  At that time basically that it was believed that she was hit by a vehicle.

Q Okay. And you said you did have an opportunity however to interview at least three people prior to that, is that correct--or four I believe it was? Mr. Owen, Mr. Thornton, Ms. Jones and--

A Black.

Q --Ms. Black?

A Yes.

Q And they didn't give you any further information other than she was hit by a car?

A The information I received was very limited.

Q Okay. And you personally don't know if anyone ever gave any more information as to what may have happened to her but do you believe that someone would have been responsible for giving that information?

A I'd be speculating at that point.

Q All right. Thank you.

MS. DUNFIELD: I have no further questions, Your Honor.

THE COURT: Thank you. Mr. Ronning.

MR. RONNING: Thank you.

CROSS-EXAMINATION

BY MR. RONNING:

Q Sergeant? Officer--

A Yes.

Q Sergeant, I believe you indicated on the night in question that you noticed or observed obvious signs of alcohol or intoxication on the part of some of the people at the scene, is that correct?

A Yes.

Q Going back to what you said a little bit earlier, you said--you sound like you had a little difficulty remembering some of the details, it's been ten years, correct?

A It's been more like 12 years.

Q More than ten years. And were you drinking on the date that you went out to the scene in question?

A Was I drinking?

Q Were you drinking?

A No.

Q Were you intoxicated at all?

A No.

Q And you still have some difficultly remembering?

A Yes.

Q Okay. When you got to the scene I think you indicated there was some cars in the parking lot, some cars were leaving?

A Yes.

Q Did you make any notes or do you recall any description of any of the cars that were in the parking lot?

A Uh, my primary focus was the care of the victim.

Q So as of this point you couldn't say what--you can't recall what cars were there and what cars weren't there?

A What--

Q At the scene?

A Correct.

Q And do you have any notes to that effect that would help you?

28

A No, I don't.

Q And lastly, I know it's been 12 years so things were a little different then, but was your car equipped with one those dash-mounted cameras or in-car cameras?

A No, it wasn't.

Q Did you have any audio recording devices on your person when you got out of the car?

A No.

Q Thank you.

MR. RONNING: No further questions, Your Honor.

THE COURT: Thank you. Attorney Rodlund?

CROSS-EXAMINATION

BY MR. RODLUND:

Q You said you collected some evidence in this case?

A Yes.

Q What evidence did you collect? Would you go over that again?

A That there was a pager that was recovered also a piece of white plastic that was recovered at the scene and I believe a piece of tire rubber was.

Q What's become of those items?

A I'm not sure on the disposition of those items.

Q What did you do with them at that--that evening?

A That they were taken back and logged into evidence and placed in the evidence holding in Covert Township PD.

Q You mentioned blood spatter, blood drops, correct?

A The blood on the roadway.

Q Yes. Was there any analysis of that done?

A Not that I'm aware of.

Q Did you collect any samples of it?

A No, I did not.

Q How many times have you met my client, just on the one interview?

A I only recall the one.

Q And you came to see him because a Philip Thornton told you that he might be somebody to talk to?

A That there was an argument between Boothby and himself along with the fact that there was a past relationship.

Q An argument on the night of this, when this occurred or?

A On the night that it occurred.

Q Do you happen to know what or how he is--what his relationship with Boothby was, Deborah?

A I believe at the time I was told that it was an ex-girlfriend.

Q But he was at the hospital and that's where you got Ivory's name, correct?

A Uh, Philip Thornton?

Q I can repeat that. Philip was at the hospital?

A Yes.

Q And you went there and that's where you got Ivory's name from, correct?

A From--at that point, yes.

Q Do you happen to recall what he indicated my client's involvement was

30

and was there--or did he have any involvement in her death is what I'm trying to say. Did he indicate that?

A Did he? I don't recall. I said I recall that he said that there was an argument and that she was placed out of the bar and that he said that he had no other contact.

Q To your knowledge was Philip actually at the location of the bar when things happened?

A I'm unsure of that.

Q In any event, you did go and see my client to follow-up on that?

A Yes.

Q And how many days after being at the hospital did that take place?

A I don't recall exactly. I believe it was shortly after that.

Q When you say shortly, the same day, a few days later?

A I believe it was the following day.

Q Do you remember what time of the day it was when you saw him?

A No, I don't.

Q Do you remember how long the conversation with him lasted?

A No.

Q Do you remember any of the questions that you asked him when you came and spoke with him?

A Uh, other than basic what was documented in the report that's basic-- all the questions I remember.

Q Did you have a chance to review your report before you came here to testify?

A I--I did.

Q At that time were you working on any kind of a theory of the case? Do you have an idea--did you have a basic idea of what was going on?

A Uh--

Q What you imagined was going on?

A At that time, like I said, it was initially a hit and run, uhm, that when it was brought up that there was an argument--that--it was further investigated to see if there was anything else. Later in the investigation that we had also received some anonymous tips about foul play.

Q The anonymous tips, did they involve my client?

A That it was mentioned the Shaver Brothers.

Q So your recall about talking to Ivory isn't extremely vivid at this point?

A No.

Q So you don't--you can't remember your line of questioning him, can you remember what you did ask him when you did see him?

A You know, uh, do you mind if I review my report again?

Q That's fine with me, take your time.

A Okay. At that time it appears to be just basically questions about the incident, if he knew about it at the time of the report, it was an unfortunate event, uh, described incidents in the evening which I've already stated reference to the argument and then--and then him being or her being placed out of the bar.

Q I heard you call what happened in the bar a disturbance, correct?

A I may have said it was a disturbance.

Q Attorney--Mr. Pheney called it an argument--

A Yeah.

Q What did you recall Mr. Shaver telling you what happened? Was it a disturbance or was there actually an argument?

A I don't recall if it was disturbance or an argument.

Q At that time when you interviewing Mr. Shaver do you--did you have any--did you see him as a suspect in Deborah's death?

A I believe at that time it was, uh, that we were investigating all avenues.

Q What I'm getting at basically, because I asked you the same question several times, did you collect any kind of evidence from Mr. Shaver at that point?

A No.

Q Just, uh, just his statement, you just got his statements basically?

A Correct.

Q You mentioned later on, you talked about pulling Adrian Burnett over--

A Didn't--

Q --June 10, 1998?

A I don't think I stated pulled over.

Q Okay. You were there when she was pulled over?

A That--

Q You interviewed her on June 10, 1998?

A (No audible response)

Q You were with another officer?

A I was with Officer VanZile.

33

Q Okay.

A Yes.

Q You mentioned a suspect vehicle?

A Yes.

Q What do you call a suspect vehicle, why was it--what was the--what was the suspect--how was it suspected of being involved in something?

A Uh, that I believe Chief Winans and Officer VanZile developed information that it was possibly involved in the incident.

Q What do you know, uhm, in what way was it involved?

A Are you asking me to speculate?

Q Well, you call it a suspect vehicle--

A Right.

Q What was reported--what was the involvement of the vehicle? Because the vehicles here are going to be very important.

A That there was damage, I believe, to the vehicle.

Q Do you know whose vehicle that was?

A I believe the vehicle was actually, uh, it might have been registered to a Fern Burnett.

Q Okay. At this point I have no further questions. Thank you.

A Thank you.

THE COURT: Mr. Pheney, do you have any other questions of this witness, sir?

MR. PHENEY: No, thank you, Judge.

THE COURT: Now because I have four attorneys I'm going to go back down the line because there may have been an area and I just

34

want to give each one an opportunity to do their examination. So, I am going to run back down starting with Mr. Sappanos.

MR. SAPPANOS: Nothing further, Your Honor.

THE COURT: Ms. Dunfield?

MS. DUNFIELD: Nothing further, Your Honor.

THE COURT: Mr. Ronning?

MR. RONNING: Nothing further, Your Honor.

THE COURT: Thank you. Then at this point in time may this witness be excused, Mr. Pheney?

MR. PHENEY: No objection, definitely.

THE COURT: Anybody object to this witness leaving or being excused?

MS. DUNFIELD: No, Your Honor.

MR. RONNING: No, Your Honor.

MR. SAPPANOS: No objection.

MR. RODLUND: No objection.

THE COURT: Thank you. That means you're free to leave and go about your business or you may remain, your choice.

THE WITNESS: Thank you, sir.

THE COURT: Thank you.

(At 12:18 p.m., witness excused)

THE COURT: Before you leave Officer, how do you spell your last name again?

MR. BOLING: It's B-o-l-i-n-g, sir.

THE COURT: B-o-l-i-n-g?

35

MR. BOLING: Yes.

THE COURT: Okay, great. Thank you. Folks just because of--this would normally be the hour that we would take our lunch break and I think I came in and told everybody that I hoped you had a good brunch because we were getting started late so we're not going to take any kind of break, we're going to continue to run through where we are today and just keep going as long as we have to today. So, unless--if anybody at any point needs a break and I haven't given you a break let me know and we will take a break but I'm going to continue going as long as we can.

MR. RODLUND: Your Honor, could you repeat that? I was talking to my client.

THE COURT: Yes. We're not taking a lunch break.

MR. RODLUND: Okay.

THE COURT: We're going to continue going until our normal ending hour subject to the normal afternoon breaks. But if anybody needs a break before I do that for any reason let me know and we will take one.

Ma'am, if you would do me a favor and come up to the witness stand? And your next witness is?

MR. PHENEY: Yes, Your Honor, this is Adrienne Burnett.

THE COURT: Thank you. If you would do me a favor and raise right hand?

(Ms. Burnett complies)

THE COURT: Do you swear or affirm that the testimony you

36

will give today in regards to this proceeding will be the truth, the whole truth, and nothing but the truth?

MS. BURNETT: Yes, I do.

THE COURT: Thank you. Ma'am, I just want to advise you that that microphone is a recording system it is not an amplifying system.

THE WITNESS: Okay.

THE COURT: So you need to speak loud enough to answer the questions that are put to you so that anybody sitting at the two tables can hear.

Mr. Sappanos, before I begin are you able to see? If there's a blocked view, I--we don't have any objection to you sliding around a little bit so you can see if you need.

MR. SAPPANOS: I probably will move.

THE COURT: But if--if--

MR. SAPPANOS: I can see the top of the heads, I can hear, but I can't see faces. So, I will probably move around--

THE COURT: Well, I will allow you to--

MR. SAPPANOS: Appreciate it, Judge.

THE COURT: --Ms. Dunfield is your angle sufficient?

MS. DUNFIELD: Yeah.

THE COURT: Okay. Thank you. I was doing housecleaning matters. Okay, you may inquire.

MR. PHENEY: Thank you, Judge.

ADRIENNE BURNETT

called by the People at 12:18 p.m., sworn by the Court, testified:

DIRECT EXAMINATION

BY MR. PHENEY:

Q    A-d-r-i-e-n-n-e; Burnett, B-u-r-n-e-t-t.

MR. SAPPANOS:  Your Honor, could you instruct the witness to speak up.  We cannot hear her.

THE WITNESS:  Do you want me to repeat it?

THE COURT:  Speak up.  That--that--you don't have to redo the spelling of your name.  That just records, so you've gotta do the-

THE WITNESS:  The talking, okay.

THE COURT:  You have to do the talking--

THE WITNESS:  Okay.

THE COURT:  --you've got to make it louder.

THE WITNESS:  All right.

THE COURT:  Thank you.  You may continue.

MR. PHENEY:  Thank you.

BY MR. PHENEY:

Q    Ms. Burnett, are you charged with a number of counts in the death of Deborah Boothby initially, and those being Count I, Homicide-Open Murder and Count II, Prosecutor's Investigative Subpoena Life Offense for Perjury?

A    Yes.

Q    And that perjury charge, Count II, that stemmed from your testimony under an investigate subpoena from December 19, 2007?

A    Yes.

Q The Homicide, Count I, in regard to the death of Deborah Boothby that had taken place between April 25 and April 26 of 1998?

A Yes.

Q Now Ms. Burnett, November 2nd of 2009, did you appear in front of the Circuit Court Bench in Van Buren County and enter a plea in an amended felony information to added Counts III and IV; Count III being Murder in the Second Degree and Count IV being Prosecutor's Investigative Subpoena Perjury a non-capital offense?

A Yes.

Q Okay. I'll show you the amended felony information. If you can just look at that. These are the original two counts, do you recognize those?

A Yes.

Q Okay. And we have the additional Counts III and IV as I mentioned them. Do you recognize those?

A Yes.

Q Okay. The additional Counts III and IV, that's what you plead guilty to?

A Uh-huh.

Q Is that a yes?

A Yes.

Q Thank you. Ms. Burnett prior to that plea on November 2, 2009, did you, yourself, and your attorney, Attorney Olson have an opportunity to meet and actually go over what the, the filled out and provided for the Court, referred to as a special consideration form?

A   Yes.

Q   Let me show you that, if I could.  On the back of that form we'll talk about the specifics, but does that bear your signature, Adrienne Burnett?

A   Yes.

Q   Dated November 2, 2009?

A   Yes.

Q   Attorney Jessie Olson, as well?

A   Yes.

Q   And I recognize my signature, but I signed that as well?

A   Yep.

Q   In regard to this form, not only does it set out that you were going to enter the plea as we've described, that being Murder in the Second Degree, a Non-Capital Perjury Prosecutor's Investigative Subpoena. Does the agreement also require that you give truthful testimony in any particular hearings in regard to the murder of Deborah Boothby?

A   Yes.

Q   Specifically, does it require you to give truthful testimony in any hearings involving co-defendants Ivory Shaver, Scottie Shaver, Shevolier Gill and Ed Foster?

A   Yes.

Q   And also, in chatting about what would constitute the truthful testimony, when you met with myself, your attorney, and I believe Detective Oppenheim as well, did you indicate for us that the statements that you were attesting to their truthfulness would have

40

been the statement you gave April 22, 2009, as modified by statement of October 19, 2009?

A  Yes.

Q  Ultimately Ms. Burnett, you plead guilty to Murder in the Second Degree and Non-Capital Perjury of an Investigative Subpoena, is it the understanding that you have that the sentence that you're going to receive as a result of that, you've not been sentenced, will be an eight year minimum to a 20 year maximum with the Michigan Department of Corrections?

A  Yes.

Q  Now Ms. Burnett, we chatted about the co-defendants that you agreed to testify truthfully against and I'm going to ask you, do you see Ivory Shaver in the courtroom?

A  Yes.

Q  Could you tell us where he is and describe what he's wearing?

A  The blue and orange suit.

MR. PHENEY:  Your Honor, if the record could reflect the identification of Ivory Shaver?

THE COURT:  It will be so noted.

BY MR. PHENEY:

Q  Now ma'am, Scottie Shaver.  Do you see Scottie Shaver in the courtroom?

A  Yep.

Q  Could you point him out and tell us what he's wearing and where he is, approximately?

41

A Green jumpsuit over here.

Q There are a number of folks in that green jump suits?

A Next to the lady in the red.

MR. PHENEY: If the record could reflect the identification of Scottie Shaver, Your Honor.

THE COURT: It will be so noted.

MR. PHENEY: Thank you.

BY MR. PHENEY:

Q Shevolier Gill, and by the way, does Ms. Gill go by something other than Shevolier?

A Shevy.

Q Shevy. So Shevolier/Shevy Gill, do you see her in the courtroom?

A Yes.

Q Same routine. Point her out and describe what she's wearing?

A Next to the lady in the red, also.

MR. PHENEY: If the record could reflect the identification of Ms. Gill, Your Honor.

THE COURT: It will be so noted.

BY MR. PHENEY:

Q Finally Ed Foster, do you see him in the courtroom?

A Yes.

Q Can you tell us where he is and what he's wearing?

A A green jumpsuit in between the two gentlemen in the black?

MR. PHENEY: Your Honor, if the record could reflect the identification of Ed Foster?

THE COURT: It will be so noted.

MR. PHENEY: Thank you very much.

BY MR. PHENEY:

Q    Ms. Burnett, I want to turn your attention specifically then to Saturday, April 25, 1998. On that date did you happen to the Blue Star Lounge?

A    Yes.

Q    And where is that located?

A    In Covert.

Q    Covert Township?

A    Uh-huh.

Q    Is that a yes?

A    Yes.

THE COURT: He's going to ask you questions and I have to have a yes or no.

THE WITNESS: Okay.

THE COURT: So that if we have to transcribe this I know exactly what you said.

THE WITNESS: Okay.

THE COURT: Thank you, ma'am.

BY MR. PHENEY:

Q    The Blue Star Lounge, is that also referred to or was it at the time as Brackens?

A    Yes.

Q    Is that the type of establishment that served alcoholic beverages?

43

A    Yes.

Q    On that particular night, Saturday, April 25, 1998, do you recall, who did you go with?

A    Uh, one of my friends from work.

Q    Do you know what her name was?

A    Aveda.

Q    Aveda.    And what time did you get to the establishment on that day, ma'am?

A    Uh, probably between 11:30 and twelve o'clock.

Q    Eleven-thirty p.m.?

A    Uh-huh, yes.

Q    Twelve o'clock midnight?

A    Yes.

Q    Okay.    And how did you get to that establishment on that night?

A    I drove.

Q    And what did you drive?

A    A white Chevy Celebrity.

Q    White Chevy Celebrity.    Who owned that vehicle?

A    My mom.

Q    And your mother's name is?

A    Fern.

Q    Fern Burnett?

A    Yes.

Q    And your mother allowed you to use that vehicle?

A    She was out of town at the time.

Q So whether or not she allowed it you were--

A Right.

Q --using it. Okay. Had you made any plans to meet up with anyone at that establishment?

A Uh, yeah, a friend of ours from work, Michelle Jackson.

Q Michelle Jackson. Does she go by something else, now?

A Uh, Michelle, I don't know her last name.

Q Okay. Is she married and has a different last name?

A Yeah.

Q All right. When you were in the club that night ma'am, Saturday, April 25th, did you happen to notice Deborah Boothby?

A When she came, yes.

Q So you were already there?

A Uh-huh.

Q Is that a yes?

A Yes.

Q When you got into the club ma'am, did you meet up with some friends and start socializing?

A Uhm, Michelle was about the only one.

Q Was there a particular place in the bar that you folks congregated that--

A We were by the bar.

Q By the bar. Were you consuming alcoholic beverages?

A Yeah, yes.

Q Do you recall what kind?

45

A    I don't know the drink, something with alcohol in it.

Q    Something with alcohol?

A    Uhm.

Q    Did you have more than one?

A    Uhm, probably a couple.

Q    Two, three?

A    Two, three.

Q    Do you recall, at any point during the evening, did you feel you were becoming intoxicated?

A    Uhm, not drunk, but you know I could feel the affects.

Q    Had a buzz going?

A    Yeah, yes.

Q    Now Deborah Boothby, was that someone that you were friendly with or had you made any plans to meet up here?

A    Didn't know her.

Q    Didn't know her.  Could you describe Deborah for me?

A    Uhm, I don't know how tall she was, I think she had long blonde hair.

Q    Was she white?  Black?  Hispanic?

A    She was white, uh-huh.

Q    White.  And on that particular night did she stand out for that reason in the bar?

A    Uhm, possibly.

Q    How was it that you happened to notice her?

A    Uhm, there was an altercation.  She had some words, uh, between Shevy and Ivory and, uhm, a drink was thrown.

46

Q Let me stop you there. You say she had words between Shevy and Ivory.

A Uh-huh.

Q Did you see Ivory Shaver in the bar?

A Yes.

Q Did you see Shevy Gill in the bar?

A Yes.

Q Did they appear to be together?

A Yes.

Q Ms. Boothby, how did she happen to have this altercation, did she have to go up to them?

A Yes.

Q And where were they located within the bar?

A Uhm, probably like down at the end of the bar a little further from--

Q Oh, so, at the bar the same as you?

A Uh-huh.

Q Did the setup of this establishment; there's a door that you come in and then what would be to the left of the door?

A (No audible response)

Q Would that be the DJ?

A The DJ would be to the right.

Q Okay.

A Wait. No, the DJ would be to the left.

Q DJ to the left. And is there then a dance floor?

A Uh-huh, yes.

Q Yes. And then past the dance floor would there be a bar?

47

A    Yep, yes.

Q    So you were at the bar?

A    Uh-huh, yes.

Q    Yes.  Ivory and Shevy you think were at the bar?

A    Yes, close to the bar, yes.

Q    Close to the bar.  And Debby approached them?

A    Yes.

Q    You say an altercation, could you describe it for us, please?

A    Uhm, it was just verbal.  I couldn't hear words, but you could tell that it was something going on.

Q    Now I'm assuming when you say altercation this was not a pleasant exchange?

A    No.

Q    Did the parties seem angry with each other?

A    Yes.

Q    Okay.  You say a drink was thrown, by whom and on whom?

A    Deb threw the drink in Ivory and Shevy's direction where it landed, you know, I can't honestly say.

Q    So the drink by Debby was thrown in the location--

A    Uh-huh.

Q    --of Ivory and Shevy?

A    Yes.

Q    You don't know if it landed on any of them?

A    Why I'm sure it did, but who else it landed I'm not sure.

Q    What happened at that point?

A Uhm, it started getting more serious and that's when the lights came on and everybody went outside.

Q You say 'more serious,' in what way?

A Uhm, other people started getting involved and, you know, basically it was just a big argument back and forth and.

Q Who else got involved?

A Uhm, I don't know who else, but it was just a bunch of people.

Q A bunch of people?

A Yeah.

Q People affiliated with Ivory and Shevy?

A Yes.

Q Affiliated in what way?

A Family.

Q Family. Had you seen Scottie Shaver in the club?

A Yes.

Q Was Scottie involved at this point?

A Yes.

Q Now you say it got worse. Did it get worse verbally or was there any physical action?

A Uhm, it was pushing and shoving, you know, between Shevy and Ms. Boothby and, you know, everybody, but it didn't get physical until, you know, it was mainly outside in the parking lot that's when it got more physical.

Q Okay. This altercation has now gotten louder, it's gotten--

A Yes.

49

Q --more folks are involved.

A Yes.

Q Did you say that the lights then went on?

A Uh-huh.

Q Is that a yes?

A Yes.

Q And was that typically a signal for something?

A That was a signal for everybody to get out.

Q Okay. So the lights go on and that means get out?

A Yes.

Q And when the lights went on was there any announcement made or did people seem to react appropriately and start leaving?

A People seemed to react appropriate and start leaving.

Q Did you leave?

A Yep, yes.

Q Did you happen to see or were you paying attention to where Debby Boothby was?

A Uhm, no, I didn't pay attention to where she was at that time I was just on may way out the door like everybody else.

Q How about Ivory Shaver or Shevy Gill?

A No, everybody was just on their way out the door.

Q Do you recall when you left the bar where did you go?

A Uhm, you mean when I left the bar parking lot or when I left--

Q When you walked out, did you walk out of the bar?

A Oh, yes to the parking lot.

Q   To the parking lot. And did you go to any vehicle in particular or did you just congregate in the parking lot?

A   Well, my vehicle was right in front of, you know, where the altercation was at so I stopped at my vehicle first for a minute.

Q   Let me stop you. At this point were talking, the altercation that we talked about specifically was inside the bar?

A   Right.

Q   Everyone then leaves the bar?

A   Exactly.

Q   And did there happen another altercation outside?

A   Yes.

Q   And where was that physically located?

A   In the parking lot.

Q   In the parking lot. Now you had parked your car and my understanding, correct me if I'm wrong, but you turn into the Blue Star Lounge off of Blue Star Highway--

A   Right.

Q   --is there sort of a long parking area leading up to the bar?

A   Yes.

Q   And would you have parked closer to the bar or the street?

A   The bar.

Q   The altercation in the parking lot that you've referred to where was that in context to where your vehicle was?

A   Well, my car was here and then the altercation was like right.

Q   Okay. Let me ask you this, did you park closer to the bar than the

Q    street and I think you said yes?

A    Yes.

Q    Would you have parked say in the middle of the parking lot or in closer to the bar?

A    Closer to the bar.

Q    The altercation in the parking lot would it have been say in the middle of the parking lot, closer to the bar, closer to the street?

A    Uhm, it might have been--well, it was in between maybe the bar and the middle.

Q    Now, you've described that there is this altercation going on in the parking lot, was this verbal, was it physical, can you tell us what it was that was going on?

A    Well, it was verbal at first and then it got physical.

Q    Verbal at first with who?

A    Between Deb, and Ivory and Shevy.

Q    So you noticed Debby outside the bar?

A    Yes.

Q    Was she acting in a particular way?

A    She--

Q    Was she saying anything?  Was she acting--

A    She was upset, I mean that was clear.

Q    Do you recall what, if anything, she was saying?

A    Yeah, she was throwing, you know, racial slurs around and, you know, back and forth they were saying different things to each other.

Q    So Debby was out, she's yelling racial slurs?

52

A     Uh-huh.

Q     Is that a yes?

A     Yes, sorry.

Q     Is she shouting at anyone in particular or just the moon and the sky?

A     At this point I think it was just anybody particular because, you know, it basically was her against a lot of other people, so.

Q     So Debby is screaming and did anyone else come up and confront her?

A     Confront Deb?

Q     Yes.

A     Uhm, yeah, she was standing there arguing with Ivory and Shevy and, you know, then it got physical.

Q     And how did it get physical?

A     They started fighting.

Q     When you say 'they started fighting?'

A     Yeah, Shevy pushed her, Ivy (sic) hit her a couple of times.

Q     Shevy pushed Debby?

A     Yep.

Q     Ivory hit Debby?

A     Uh-huh.

Q     Is that right?

A     Yes.

Q     Was anyone else becoming involved?

A     Uhm, yeah. Some of her family members or some of Scottie and Ivory's family members were throwing beer on her.

Q     Now this is the Shaver family members you're referring to?

A   Yes.

Q   You've described physical contact of pushing from Shevy, punching from Ivory, did anyone else physically touch Debby Boothby at this point?

A   Ed did.

Q   I'm sorry?

A   Ed Foster.

Q   Ed Foster. Was Debby standing--let me stop you. When Ivory pushed her--or excuse me--when Shevy pushed Debby, when Ivory punched Debby was she standing?

A   Uh-huh, yes.

Q   Yes. Was she attempting to defend herself?

A   Yeah, she was.

Q   At some point did she end up, was she ever not standing?

A   Yes.

Q   How did that happen?

A   Ed hit her.

Q   Ed hit her and that's Ed Foster, the gentleman in the courtroom?

A   Yes.

Q   And where did he hit her?

A   In her face.

Q   In her face. Using what?

A   His fist.

Q   And that knocked her to the ground?

A   Yes.

Q   Was Scottie Shaver involved in this?

A    Yes.

Q    And what was he doing?

A    He also was punching and hitting her also.

Q    When she was standing or down?

A    Both.

Q    Both. So let me, I'm going to try to be real specific here--

A    Uh-huh.

Q    There were two different parts. There was the part where Debby is standing and the part where Debby is on the ground?

A    Exactly.

Q    Let me ask you specifically, who was striking Debby while she was standing?

A    Shevy hit her, Ivory hit her, Scottie hit her a couple of times, uhm, and basically at this point after, you know, beer was thrown and she was trying to defend herself that's when Ed came up and hit her and she fell.

Q    So when she's standing and you've described this hitting, is that with fists?

A    Yes.

Q    To what part of her body?

A    Anywhere, punches landing no specific.

Q    Were punches landing in her face?

A    Yes.

Q    Punches landing say in her chest?

A    Uh-huh, yes.

Q On her arms?

A Yep, yes.

Q Were these playful taps or were these hard punches?

A No, they were hard punches. It wasn't--they weren't joking.

Q You've indicated at one point after Ed Foster hits her she ends up on the ground?

A Yes.

Q Did it simply stop at that point?

A Yes.

Q Nobody touched her when she was on the ground?

A Well, they were kicking her and punching her, yes.

Q Okay. You say, 'they' lets get very specific. Who is the 'they' that is--

A The main people that were doing this altercation to her was Ivory, Shevy and Scottie.

Q Ivory, Shevy, Scottie?

A Yeah.

Q Those were the main actors?

A Uh-huh, yes.

Q Is that a yes?

A Yes.

Q Now you've already indicated Ed Foster hit her hard enough at one point to put her on the ground?

A Yep.

Q Was he involved in anyway striking, kicking her while she was on the

Q ground?

A No.

Q So that was it for Ed?

A Yep.

Q Was he still in the area?

A Yes.

Q Were other folks getting involved or getting some free shots as well?

A Uhm, there was a lot of pulling and tugging but for the most part after Ed hit her and she fell to the ground that was just about it.

Q Other than what you've described--

A Right.

Q --that Ivory, Shevy and Scottie--

A Exactly.

Q Is that right?

A (No audible response)

Q When Debby is on the ground and she's being struck in the manner that you've described is she trying to defend herself or cover?

A She's trying but, you know, it's quite hard to defend yourself when it's just you against, you know, five or six other people.

Q How far were you from this?

A My car was, I could see what was going on it wasn't far.

Q So you had a clear view of what was happening?

A Yes.

Q At any point while this was going on was Shevy saying anything?

A No.

57

Q Was Ivory saying anything?

A You mean when they were fighting?

Q When they were assaulting Ms. Boothby as you've described?

A Oh, not really saying anything it was--no.

Q Do you recall any of the four individuals you've named saying anything while Ms. Boothby is being kicked, struck?

A No.

Q So you have a clear view. What did you think was happening at this point? Did you think that Ms. Boothby was injured?

A Yeah.

Q Did you think that there was a chance she'd been seriously injured?

A Yes.

Q At some point did this stop? Did they stop kicking and fighting?

A Yes.

Q And when that happened did Ms. Boothby simply get up and dust herself off?

A No.

Q What happened?

A Uhm, after, uhm, after they finished fighting or whatever the only reason they finished fighting was because the boss and the bouncer said that they were going to call the police.

Q Do you remember who that was?

A The boss?

Q Whoever made this statement that you're referring to?

A Uhm, Glover.

Q Glover is the boss?

A Uh-huh.

Q And that's Glover Dandridge?

A Yes.

Q He owned the bar?

A Yes.

Q Did he come outside the bar to make this statement or did he yell from inside?

A He yelled from inside and then Sam which is Keith Owens he came outside and said the police were being called and.

Q Sam is who?

A He was a bouncer.

Q Sam, do you know his name?

A Keith Owens.

Q Keith Owens. And Sam, is that his nickname?

A Yep.

Q SamBam?

A Uh-huh.

Q Is that a yes?

A Yes.

Q So Glover yelled something from inside and then Sam came out and reiterated the police have been called?

A Yes.

Q And once--let me ask you--while this is happening is there a crowd of people watching?

A  While Deb is getting--

Q  While Deb is being assaulted--

A  Yeah.

Q  --both standing and--

A  Yeah.

Q  Was it a lot of folks?

A  Yes.

Q  More than 20?

A  Oh, yeah.

Q  More than 50?

A  Yes.

Q  A lot of people?

A  Yes.

Q  Standing around watching?

A  Yes.

Q  Was anyone trying to help her?

A  I seen a couple people trying to stop it and, you know, pull her away but, you know, it didn't help she was just down on the ground.

Q  When this declaration about the police was made did people start leaving?

A  Yeah, real quick.

Q  And when I say leave, did they go to cars and drive off?

A  Uh-huh.

Q  Is that a yes?

A  Yes.

Q   Debby still on the ground?

A   Uh, yes.

Q   Did she remain on the ground?

A   For a little while.

Q   And then what happened?

A   At this particular time she kind of got up and got to her knees or whatever but she still kind of wobbling between the fighting and, you know, she had been drinking; everybody in the parking lot just about left and that's when Ivory, and Scottie, and Ed, and Shevy walked to Shevy's car and proceeded to put Deb inside the car.

MR. SAPPANOS:  Your Honor, we couldn't hear that last.

MR. PHENEY:  I'm going to ask her to clarify.

THE COURT:  Would you repeat that last statement.  I think what she said, and correct me if I'm wrong, is that's when Ivory, Scottie, Shevy and Ed put her in a car.

THE WITNESS:  Exactly.

THE COURT:  Now I'll let you clarify my answer--

THE WITNESS:  Okay.

THE COURT:  --if I've misspoken.

THE WITNESS:  Okay.

BY MR. PHENEY:

Q   You've indicated where you were parked, was Shevy parked in close proximity to you?

A   No.

Q   Where was she parked?  On the same side as you or on the other side?

A    On the other side.

Q    Closer to the bar or the street?

A    Closer to the street.

Q    Now you said four individuals went to Shevy's car and put Debby in it. Let me ask you specifically how was that accomplished? Did Debby walk to the car herself?

A    No.

Q    How did she get to that car?

A    They were holding her up.

Q    Okay. And you say, 'they' who specifically is they?

A    Uh, Scottie, Ivory, and Ed.

Q    Okay, so the three males, Scottie, Ivory, Ed?

A    Correct, yes.

Q    And how did they actually get her to the car?

A    They were each on one side and one side was on the other and they walked with her to the car.

Q    You say walked with her, was she going along voluntarily?

A    No.

Q    Were they carrying her?

A    They weren't carrying her but--

Q    Were they dragging her?

A    Basically.

Q    Basically. Were her feet on the ground?

A    Yeah, her feet were walking but, you know, she was getting help.

Q    Was she saying anything?

A   Uhm, not too much really, you know, she was saying she didn't want to go, you know, and she was trying to fight back but you can't fight with men.

Q   So she's being lead to that car, where is Shevy?

A   By her car already.

Q   By her car.  Was the car running at this point?

A   No.

Q   No.  And so Shevy is by the car, the three men are bringing Debby to that car, did they actually get her to Shevy's car?

A   Yes.

Q   What did they do in regard to that car?  Was Debby ever in that car?

A   Yes.

Q   And how did she get in that car?

A   They put her in the car.

Q   And when you say, 'they' is it the three men that you've referred to or--

A   The three men put her in the car, yes.

Q   Was Shevy assisting in any way?

A   No.

Q   No.  They put her in the car, was this a two-door or a four-door?

A   It was a four-door.

Q   Do you recall what kind?

A   Uhm, just a little midsize four-door car.

Q   And what part of the vehicle was Debby placed into?

A   The backseat.

Q Okay. Did anyone get in the back with her?

A Yes.

Q Who?

A Ed.

Q Ed. What happened to Ivory?

A He was in the front seat with Shevy.

Q So Shevy and Ivory are in the front seat?

A Yes.

Q Do you know who was driving or who had gotten into the driver's side?

A I believe Ivory was driving, but I'm not going to say it was 100 percent--

Q You know--

A --but I know--

Q --that Ivory and Shevy were in the front seat?

A Exactly.

Q But you can't tell us who was driving?

A Exactly?

Q Is that right?

A Exactly.

Q Now we've heard that Scottie Shaver was there, too; did he get into that car?

A No.

Q Where did Scottie go?

A He was in my car.

Q You were still standing at your car?

64

A Nope, I was in my car on my way out the driveway. I was waiting for people to continue to be pulling out.

Q But you were able to see this whole--

A Uh-huh.

Q --transaction with Debby being taken to Shevy's car, being placed in?

A Yes.

Q And you were trying to work your way and your vehicle out of the parking lot?

A Yes.

Q At some point I think you said Scottie made contact with you. How far had you gotten out of the parking lot?

A Uhm, not far, I was right there.

Q Now at this point we haven't really discussed it Ms. Burnett, but did you and Mr. Scottie Shaver have some kind of a relationship at that point?

A Uhm, me and Scottie started dealing (sic) with each other maybe about a week or so before that night, it wasn't serious it was just you know, dating.

Q Dating? Romantic relationship?

A Yes.

Q Had you thought there was a chance you might see Scottie there that night?

A Uhm, probably would see, yes.

Q You've mentioned that you met some friends there were they still with you?

A No, they went to their car, uhm, and they left.

Q And when you say 'they went to their car' would they have been with you while this assault was taking place in the parking lot or had they left--

A No, no, they were with me at that time, yes.

Q And when did they leave your side?

A Uhm, just when everybody else was getting ready to leave actually Aveda had her bag, her overnight bag in my car and she was staying the night with Michelle so they got their bag, she got her bag out of my car and her and Michelle left.

Q At around the time that Glover yelled out about the police?

A Yeah, everybody was just leaving out.

Q So then you were alone in your car and you were alone as you watched Debby getting dragged to Shevy's vehicle?

A Yes.

Q And you had started to leave the parking lot and Scottie came up to you?

A Uh-huh.

Q Did he actually get into your car?

A Yes.

Q And what part of the car?

A The passenger side.

Q The passenger side. Let me ask you, after what you'd seen in terms of how Debby was beaten and then dragged to her car, did you have anything to say to Scottie at that point? Did you have any questions

66

Q for him?

A No.

Q No. Did Scottie say anything to you at this point?

A Yes.

Q What did he say?

A He told me, I was getting ready to pull out to go take a right to my house and he told me to at this time, Shevy and them were in front of me, he told me to follow Shevy, Shevy's car.

Q And you say follow Shevy, you mean Shevy's vehicle?

A Yes.

Q Okay. You still don't know who's driving?

A Right.

Q Could you see anything going on in that vehicle--so you're behind Shevy's vehicle?

A Right.

Q Could you see anything happening inside that vehicle?

A No.

Q Now you say you were going to go right would that have been north to South Haven?

A Uh-huh, yes.

Q Is that a yes?

A Yes.

Q But you were asked to turn what direction?

A Left.

Q Towards, south towards Covert?

67

A    Yes.

Q    And you're following Shevy's vehicle?

A    Yes.

Q    And how far did Shevy's vehicle go while you were following it?  Where did she go?

A    Uhm, approximately, I don't know, maybe a mile or two and then we turned right to like a little dead-end.

Q    So you went south on Blue Star Highway towards Covert for you think maybe a mile, maybe two?

A    Yeah, yes.

Q    You took a right on the street?

A    Yes.

Q    And that is a street that has a dead-end?

A    Yes.  Well, it's like a little park or something, but it's a dead-end.

Q    And this particular location, you're telling us about, at some point have you driven with Detective Oppenheim and showed her specifically where this is?

A    Yes.

Q    How far down--did you go all the way to, you said a dead-end, did you go all the way to the end?

A    Not all the way to the dead-end, uhm, just like a little wrap-around area and there's like trees and stuff and it's right there.

Q    So Shevy's vehicle is in front and where did that vehicle stop?

A    Right in front of me.

Q    Right in front of you?

A   Uh-huh.

Q   And did you--where did you go, did you pull behind her or--

A   Yes.

Q   --did you park right there?

A   Behind her.

Q   Was this a well-lit area?

A   Uhm, no it wasn't well-lit but when the car door opened you can see.

Q   So the car--whose car door opened?

A   Shevy's car door opened, uh-huh.

Q   And which door in particular, do you know?

A   The passenger side.

Q   Front seat or backseat?

A   Backseat and the front seat.

Q   Okay, so both opened.  Did everyone get out of Shevy's vehicle?

A   Yes.

Q   So that would be Shevy, Ed, Ivory and how about Debby?

A   Yes.

Q   Did Debby get out by herself?

A   No.

Q   How did she get out?

A   She was pulled out?

Q   Pulled out, by whom?

A   The guys.

Q   So it was Ivory and Ed?

A   Uh-huh, Ivory, Ed.

Q Okay. You've now parked your vehicle?

A Uh-huh.

Q Is that right?

A Yes.

Q Did you turn your vehicle off?

A Yes.

Q Did you turn your lights off?

A Yes.

Q Did you get out of your vehicle?

A No.

Q Were you facing these folks? Were you able to see what they were doing from your vantage point in your vehicle?

A Yes.

Q Were you looking dead at them?

A Yes.

Q Did Scottie stay in the vehicle with you?

A No.

Q Where did he go when he got out?

A He went over with Shevy, and Ivory, and Ed.

Q Was Debby already out of the vehicle at this point?

A Yes.

Q Did you have your windows up or down?

A They were up.

Q Up. And you had your lights off, but the two car doors from Shevy you say were still open?

70

A    Yes.

Q    So the interior lights were still on?

A    Yes.

Q    And was that illuminating where these folks were?

A    Yes.

Q    How far did they pull Debby from the vehicle?

A    They pulled her, uhm, maybe a couple of feet.

MR. SAPPANOS:  That answer we couldn't hear.

THE WITNESS:  A couple of feet.

THE COURT:  He said how far did they pull Debby from the vehicle and the answer was a couple of feet.

MR. SAPPANOS:  Thank you, Your Honor.

THE COURT:  You're welcome.  Please do your best to keep the voice up, ma'am.

THE WITNESS:  Okay.

THE COURT:  Pardon me?  You don't have to--that just records.

THE WITNESS:  Okay.

THE COURT:  It doesn't amplify so you better--

THE WITNESS:  Yell?

THE COURT:  You gotta yell it out, young lady.

THE WITNESS:  Okay.

BY MR. PHENEY:

Q    Could you hear what was going on outside?

A    Yes.

Q Could you see what was going on?

A Yes.

Q The light was sufficient that you could see what was happening?

A Yes.

Q Debby has been pulled out of the vehicle by Ivory and Ed, did Shevy get out as well?

A Yes.

Q Was she by Debby?

A Yes.

Q Scottie got out of your vehicle, is he now by Debby?

A Yes.

Q Was Debby standing, sitting, what was she doing?

A Uhm, no, she wasn't standing, she was kind of like on her knees.

Q On her knees?

A Yes.

Q Could you hear, was she saying anything?

A Yep, she was crying.

Q Crying. Was she saying anything that you could understand?

A Yeah, she was scared, she wanted to know--wonder why they were doing this, she wanted to be left alone and you know she was scared.

Q Was she left alone?

A No.

Q What happened to her?

A They continued to beat her.

Q Let me stop you, specific, you say 'they' who is they?

72

A    Scottie, Ivory, Shevy, and Ed.

Q    What was Ivory doing specifically?

A    Hitting her.

Q    Hitting her.  What was Shevy doing?

A    Shevy choked her.

Q    Shevy choked her.  I asked you Ivory, I asked you Shevy, what was Scottie doing?

A    Hit her.

Q    Hit her.  What was Ed doing?

A    Hit her.

Q    Hit her.  She was on her knees, I think you said initially, did she remain on her knees the entire time?

A    No.  By that time, you know, after being hit, and shoved, and choked she was on the ground.

Q    Now you're saying, hit, choked, were they again, gentle--

A    No, they weren't gentle.

Q    Were these full punches?

A    Yes.

Q    Full strikes to Debby?

A    Yes.

Q    And you're saying someone choked her, who choked her?

A    Shevy.

Q    And what type of choke, like arm around--from behind with an arm around the neck?

A    Yes.

Q Was this done with some force?

A Yes.

Q At this point, I think you said Debby was knocked flat, was she moving?

A No.

Q What did you think happened?

A (No audible response)

Q Did you think she was alive?

A No.

Q No. And now that Debby is flat on the ground is she still being kicked, struck, choked, anything?

A No, they were trying to figure out a way of what to do with her at this time?

Q Do you recall any of them saying anything at this point now that Debby is flat on the ground motionless?

A Yes.

Q Okay, who?

A Shevy was, you know, 'what are we going to do we can't just leave her here.' Ivory had an idea of, 'okay, then we'll put her in the car and, you know, throw her out on the side and make it look like it was a hit and run.'

Q So that was Ivory's idea?

A Yes.

Q And did he actually say that out loud?

A Uhm, yeah.

Q Yeah. And did the others have any comment to that?

A Everybody was in agreement.

Q And did they show their agreement by their actions or did they say that sounds like a good idea?

A Showed their agreement by their actions.

Q What did they do?

A We left where we were at, the dead-end.

Q Well, let me stop you there. Before you left, was Debby simply left on the road or was she--was she left in this--on the ground?

A Oh, no, they put her back in the car.

Q And they, you say, 'they' who is they?

A Uhm, Shevy, Ivory, and Ed put her back in the car.

Q Shevy, Ivory, and Ed put her back in--

A Uh-huh.

Q --whose car?

A Shevy's car.

Q Shevy's car. And what part of the car?

A She was in the backseat.

Q Backseat. Scottie didn't help?

A No.

Q What did Scottie do?

A He got in my car.

Q Got in your car. At this point now that Debby--was she moving at this point while being placed in the car?

A No.

75

Q Did she have to be carried?

A Yes.

Q Or dragged?

A Yes.

Q Was it dragged or carried?

A A little bit of both.

Q Then what was the makeup of Shevy's vehicle at this point, who got in what part?

A It was the same, everybody that was in the car going was in the car.

Q Ed in the back?

A Yep.

Q Ivory and Shevy in the front?

A Yep.

Q Do you know who was driving?

A No, I can't say 100 percent.

Q You're driving your vehicle?

A Yes.

Q Scottie is in the passenger seat?

A Yes.

Q And at some point did you--did two vehicles leave that area and head somewhere else?

A Yes.

Q Who was leading and who was following?

A Shevy's car was leading.

Q And you were following?

A  Yes.

Q  Where did you go?

A  We returned back towards the Blue Star Lounge and at this time, uhm, Shevy's car pulled up, Ivory and Ed got Ms. Boothby out of the car, threw her on the side of the road.

Q  Now where were you parked?

A  I was getting ready to pull back into Brackets (sic) but I hadn't pulled all the way in yet.

Q  Okay.  Had you pulled partially in the driveway?

A  Yes, but I still could see.

Q  And why did you stop there?

A  Scottie told me to.

Q  So you stopped partially in the driveway, could you actually see what the other vehicle was doing?

A  Yes.

Q  You had them in your sights?

A  Yes.

Q  And where did that other vehicle go specifically?

A  Uh, to the side of the road.

Q  Northbound lane?

A  Yes.

Q  How far out from the driveway of the lounge?

A  Uhm, not far maybe a couple of feet, maybe 10 feet, 15 feet.

Q  And the vehicle, was it in the northbound lane, was it in the shoulder?

77

A It wasn't on the shoulder but it was like on the road but pulled over.

Q And so that vehicle then stopped?

A Yes.

Q And did any of those occupants get out?

A Yes.

Q Who?

A Ivory and Ed.

Q And Ivory and Ed get out and what did they do?

A They pulled Debby's body out of the car.

Q And where did they put her?

A On the side of the road.

Q On the side of the road like in the shoulder or in the road?

A Half her body was in the road half her body was on the shoulder.

Q And where was she placed in relation to the vehicle, was she in front of the vehicle, in the back of the vehicle?

A She was in like almost towards the back of the vehicle.

Q Almost towards the back?

A Uh-huh.

Q And once Debby was removed from the vehicle was she moving?

A No. After we left I hadn't seen Debby move from the time we got to the dead-end until the time they pulled her out.

Q So she's still not--

A No.

Q Was she placed, you know, face down or back down or on the side?

A I don't really remember how she was, face down, back down, but she was

78

on the--

Q  Could you see her face?

A  No, no.

Q  Now Debby had long hair?

A  Uh-huh.

Q  She had a lot of hair?

A  Yes.

Q  And after Ed and Ivory pulled Debby out of the car and placed her in this road what did they do?

A  Ran over her.

Q  Okay.  Let me ask you this.  They pulled her out of the vehicle did they then--

A  Oh, they got back in the car, yes.

Q  So they got back in Shevy's vehicle.  Same general locations they'd been before?

A  Yep.

Q  Ed in the backseat?

A  Yes.

Q  Ivory in the front?

A  Yes.

Q  Shevy didn't get out to help pull Debby out of the car?

A  No.

Q  And then after the three individuals are now fully in Shevy's vehicle you said they ran her over.  Tell me specifically what happened?  Debby is laying in the road and what happened?

A   They backed the car up over her and then forward again.

Q   Do you know who was driving?

A   No.

Q   No.   The people in the front seat though were?

A   Shevy and Ivory.

Q   Shevy and Ivory.   The vehicle backed over her?

A   Yes.

Q   Did you actually see that happen?

A   Yes.

Q   You saw the vehicle tires actually go over her?

A   Yes.

Q   Do you know if they dragged her at all?

A   No.

Q   So the vehicle--and did it back completely over her, all four tires?

A   No, just the back tires, just enough to--

Q   Back tires?

A   Yeah.

Q   So the back tires would have run over her?

A   Yes.

Q   Do you know what part of her body?

A   Her top part.

Q   Her top part.   And then after they backed over her what did they do then?

A   Ran back.

Q   They put the car in drive and went forward?

80

A    Yes.

Q    Over the body again?

A    Yes.

Q    Same general part of the body?

A    Yes.

Q    You saw that happen?

A    Yes.

Q    Scottie was with you?

A    Yes.

Q    After these folks backed over her and then drove over her what did you do?

A    Pulled in to Brackets (sic), uhm, Scottie got out and talked to Keith Owens for a couple of seconds.

Q    Okay. So Scottie got out and made contact with Keith, that's SamBam?

A    Yes.

Q    Do you know what they were doing?

A    Uh, yes.

Q    What were they doing?

A    Keith was getting drugs from Scottie.

Q    Okay. So Scottie got out to do a business transaction?

A    Exactly.

Q    And after Scottie finished that transaction did he leave for the evening or did you see him again?

A    Who?

Q    Scottie?

81

A No, he--

Q Did he get back in your car?

A Yes.

Q So you waited for him?

A Yes.

Q And when he got in your car what happened?

A Uh, we left and at that particular time he told me that's when he made the comment I need to drive the car over Deb, too.

Q Let me--I know what you're saying, but I want you to be specific. Scottie said who needed to drive over Deb?

A I needed to.

Q Okay, I meaning him or I meaning you?

A Oh, I meaning me.

Q Scottie told--and how specifically did he say that?

A Uhm, "You need to run..."--

Q Go ahead, we'll all adults.

A "You need to run this bitch over."

Q "You need to run this bitch over."

A Yes.

Q Scottie told you that from the passenger side?

A Yes.

Q And at that point are you still in the parking lot or had you already turned out?

A We were turning out of the parking lot.

Q And which way did you turn?

82

A   Going towards South Haven.

Q   Okay, so north?

A   Yes.

Q   Did you see Debby in the road?

A   Yes.

Q   And after Scottie made that statement did you then drive towards Debby?

A   Yes.

Q   Did you drive over Debby?

A   Yes.

Q   Was she standing, was she still lying?

A   She was still--she had not moved.

Q   She was lying motionless in the road?

A   Yes.

Q   And you drove over her?

A   Yes.

Q   When you left the parking lot was anyone else near you or any other vehicles perhaps?

A   Uhm, there were a couple other cars in the parking lot, yes.

Q   And did anyone, when you pulled out, turned northbound, did anyone else pull out and go northbound roughly the same time as you?

A   Uh, Tisha's car was behind me when I left.

Q   And Tisha is who?

A   Tisha Holland.

Q   Tisha Holland?

A Uh-huh.

Q So was she--I mean--as you're driving over Debby were you paying attention to any other vehicles? Did you see any other headlights?

A None other than Tisha's, I mean I knew she was right behind me.

Q Okay, so Tisha was right behind you?

A Yes.

Q How close was she to you when you ran over Debby?

A Uhm, not that close but, you know, not that far.

Q Was Debby still in the road, was she on the shoulder, where was her body when you ran over her?

A Uhm, it was still on the road but it was more closer to the shoulder.

Q Did you have to leave off the road to run her over?

A Uhm, well, actually as you're coming out of Bracket's (sic) parking lot you kind of go to the shoulder a little bit but yeah, I did.

Q And you specifically did that?

A Yes.

Q Steered your car in that direction so that you would run over Debby?

A Yes.

Q After you ran over Debby what did you do?

A Uhm, kept driving and went home.

Q And did you go home with Scottie Shaver?

A Yes.

Q Did he discuss anything about this with you?

A Yes.

Q What did he say?

A He told me that if I was to tell anybody what happened that night or mention anything that happened that night everything that Deb got I would get.

Q Did you believe him?

A Yes.

Q Okay. Anybody else that's now a witness in the courtroom at this point ever talk to you from that moment on about this case--

A Yeah.

Q --threaten you in any way?

A Yeah.

Q Who?

A Ivory.

Q Ivory. What did Ivory say?

A Uhm, not so much what he said it was just more of his actions. You know he would give me a look or something like that.

Q Did Mr. Foster ever tell you--

A Yes.

Q And when was that?

A Uhm, back in the Spring time.

Q Spring time of what year?

A Two-thousand-nine.

Q Two-thousand-nine, so recently?

A Yes.

Q Did you run into him face-to-face or was this a phone call?

A Phone.

Q  And who called who?

A  He called me.

Q  Okay. Were you surprised he had your number or is that something that's easily obtainable?

A  I mean you can get my number, I'm sure.

Q  And what did Ed have to say to you on the phone?

A  He told me I better keep my mouth shut.

Q  In the Spring of 2009?

A  Yes.

Q  All right. Now Ms. Burnett, I have a few things I need to go over with you.

A  Yep.

Q  During the course of this case from 1998 through today did you happen to speak to certain police officers and certain departments a number of times?

A  Yes.

Q  Okay. We had an officer in here a minute ago, Officer Boling who was with Covert Township PD, do you recall speaking to Covert Township PD on May 20, 1998 and June 10, 1998, does that sound accurate?

A  Uhm, I think so. Yeah.

Q  Do you recall, at that point did you acknowledge to them that you knew anything about this?

A  No.

Q  We've heard testimony that in June of 1998, they actually showed up with a search warrant took your mother's car?

A  Right.

Q  Do you recall that?

A  Yes.

Q  Now starting in 2007, Michigan State Police detectives were talking to witnesses.

A  Uh-huh.

Q  Do you recall speaking to Detective Oppenheim specifically twice in September of 2007?

A  Yes.

Q  Do you recall, did you tell her everything you've just told us today?

A  No.

Q  Okay. As a matter of fact during that time, September of 2007, did you give her some version about what happened?

A  Yes.

Q  And in those versions did you indicate that you were driving when you went over Debby or was someone else driving?

A  Uhm, I think at first I said I was driving.

Q  And did you change that?

A  Yes.

Q  To who?

A  Scottie.

Q  Scottie Shaver. And at some point during those conversations did you tell the detective that while Scottie was driving you don't actually know what was run over but you think something was run over?

A  Yes.

Q That's not true?

A That's not true.

Q Specifically, and this is what led to your plea in Count IV, on December 19, 2007, did you appear as part of an investigative subpoena, get sworn under oath and then provide testimony?

A Yes.

Q And during that time specifically, did you testify under oath, that it was Scottie Shaver that was driving?

A Yes.

Q That if Deborah Boothby was run over you didn't know that it was her but you felt some kind of bump?

A Yes.

Q And that you didn't know that Deborah was run over, but you figured it out later?

A Yes.

Q And as a matter of fact you also testified at that point that when Debby was moved to the vehicle and taken out of the parking lot you actually waited in the parking lot and did not leave?

A Yes.

Q None of those things were true?

A No.

Q In November 18, 2008, do you recall speaking to a different individual, Lt. Harris Edward also of Michigan State Police?

A When was this?

Q This would have been in November of 2008?

88

A   Lt. Harris?

Q   You don't--

A   I don't.

Q   If I told you that you gave a statement on November 18, 2008, to a Lt. Harris Edward do you dispute that or do you just not recall it?

A   I don't recall Lt. Harris--

Q   Harris Edward.

A   --Harris.

Q   I'm going to ask you though, my understanding of that statement is that you did give that statement and that you admitted that you had been driving when you went over Debby?

A   Yes.

Q   Is that about the time--

A   Yeah.

Q   --that you finally acknowledged that you had been driving?

A   Yes.

Q   At that time however, were you still claiming that you had waited in the Blue Star parking lot for Scottie Shaver?

A   Yes.

Q   That wasn't true?

A   No.

Q   Direct your attention now to two more interviews; November of 2008, specifically with Detective Oppenheim, February of 2009, Detective Oppenheim.   At that point two more statements, you now admitted that you were driving the vehicle that ran over Debby and that you went

89

Q with Scottie to the dead-end, is that what you recall?

A Yes.

Q But you specifically denied that Ed Foster was along?

A Yes.

Q And why was that?

A Uhm, I was scared.

Q You were scared of Mr. Foster?

A Yes.

Q You'd already mentioned Ivory Shaver, Shevy's and Scottie's involvement, why Ed Foster were you afraid of?

A Because I figured that I had enough people threatening me and the less people I had threaten me the better.

Q Now the statements that we've referred to are of April 22, 2009, and October 19, 2009, those are the statements that you've attested to. In those statements did you acknowledge that you were driving the vehicle that ran over Debby Boothby?

A Yes.

Q In those statements did you acknowledge that you left the Blue Star highway and went to that dead-end and witnessed what happened to Debby there?

A Yes.

Q And in those statements did you acknowledge the full involvement of Ivory Shaver, Scottie Shaver, Ed Foster and Shevolier Gill?

A Yes.

Q I'm going to ask you ma'am and I want you to explain. When you drove

90

to that dead-end and they pulled Debby out of the car and you saw what was happening to her did you still have the keys to your car?

A   Yes, I did.

Q   Could you have turned the car on and driven away?

A   I could have, but, uhm, seeing something like that my mind wasn't functioning to even think about that and even if I did drive off I could have went home but it's not like they don't know where I live.

Q   So these are all people you knew?

A   Right.

Q   These were all people you saw around?

A   Exactly.

Q   Same question ma'am, when you're in the parking lot of Blue Star Lounge after you seen Debby get run over on Blue Star Highway and Scottie gets out of the vehicle, could you have left at that point?

A   I could have but the same scenario, they know where I live so by me leaving, you know, would have done no good.

Q   Thank you, ma'am, that's all I have.  I'm sure these folks will have some questions.

            THE COURT:  Do you want to start Mr. Sappanos, please?

            MR. SAPPANOS:  Sure.

            THE COURT:  Thank you, sir.

                        CROSS-EXAMINATION

BY MR. SAPPANOS:

Q   Hello, Ms. Burnett.

A   Hello.

91

Q I'm going to see if--Ms. Burnett, how many statements did you give to police agencies regarding what you just said today?

A I can't recall.

Q More than ten?

A Possibly.

Q How many times regarding this incident did you testify under oath?

A Uhm, once.

MR. SAPPANOS: May we approach, Your Honor?

THE COURT: You may. Anybody that wants to approach, you may.

MS. DUNFIELD: I already know what it is.

(At 1:08 p.m., attorneys in conference at bench; off record)

(At 1:11 p.m., conference completed)

THE COURT: Do you want any statement on that effect on the record or?

MR. PHENEY: Judge, I can put my objection on the record and indicate--

THE COURT: If we get into that.

MR. SAPPANOS: If we get to that point.

THE COURT: If we get there.

MR. PHENEY: Okay.

BY MR. SAPPANOS:

Q So Ms. Barnett, it's your testimony--Burnett, right?

A Yes.

Q Your testimony is that you don't recall how many times you've given

statements to the police regarding the incident that you've just testified about?

A  I know it was quite a few times. I talked to several different officers.

Q  And you believe you gave sworn testimony once?

A  Uhm, when I talked to the prosecutor.

Q  The investigative subpoena?

A  Yes.

Q  Is that what you're--okay, okay. Would you agree that it's in excess of ten times, ten different statements?

A  Yes.

Q  And of those ten times would you also agree that you were not totally truthful in any of them?

A  Yes.

Q  And yet you're being truthful today?

A  Yes.

Q  And you would also agree that--that your position as well as the State's that you did not become truthful until you went from a First Degree-Life Offense down to eight years, is that correct?

A  No.

Q  That's when your truthfulness came out, is that correct?

A  No. My truthfulness came out back in, I think it was April.

Q  And that statement was never revised even--strike that. In that statement didn't you have to give another statement to correct the first truthful statement?

A      (No audible response)

Q      You tried to give a truthful statement, according to you, but then the police and the prosecutor pointed out discrepancies where then you gave another alleged truthful statement, do you remember that?

A      Before I took my plea my statement was truthful.

Q      But you attempted to give a truthful statement how many times?

A      I can't recall how many different times, but before I took my plea my statement was truthful that's why I got my plea.

Q      And that took you about ten years to get to the truthfulness?

A      That took me ten years to get to the truthfulness but yet I did it as well as others haven't.

Q      Okay. Okay. Your friend that you went to the bar with that night, her name was Aveda?

A      Yes.

Q      Is she still in the area?

A      I have no idea.

Q      You haven't talked to her recently?

A      No.

Q      What's her last name?

A      I can't even tell you that.

Q      Okay. And prior to going to the bar that night you were not romantically involved with Mr. Scottie Shaver, my client?

A      You said before going to the bar?

Q      Yes.

A      Yes, I said that I was.

Q Oh, you were? I thought you said you had been talking to him casually for a week?

A No, that's not what I said. I said we had been dating for about a week before we went to the bar.

Q So prior to going to the bar you and Mr. Scottie Shaver had been dating for about a week?

A Exactly.

Q What does dating consist of in your mind?

A Dating? I mean--

Q Talking on the telephone, going to the movies?

A I mean we've seen each other--

Q Having sex. I mean describe, we're talking about a murder here don't act like you don't know what dating means.

A I'm not saying that I don't know how dating is but I'm not sure why that is relevant. I mean--

Q You must--

THE COURT: Please go ahead and answer the question, ma'am.

THE WITNESS: We were dating.

BY MR. SAPPANOS:

Q I understand that.

A I mean--

Q What's your description--

A Are you asking me did we have a sexual--

Q No, I'm asking you what's your description of dating? You've got a vivid memory here now let's get vivid on everything.

A   Okay. Yes, we had sex if that's--

Q   No, now that's not all I'm asking. How do you remember that you were dating him for a week prior to the incident? Start with that key.

A   How do I remember?

Q   Yes.

A   (No audible response)

Q   When was the first time you went on a date with Mr. Shaver prior to this incident?

A   I don't know the exact date.

Q   Well, you remember how many punches, kicks. When was it--

A   Well, that was--that's more serious than dating. I can't tell you okay, on April 7th, that's when me and Scottie were dating. I can't, I don't.

Q   So prior to the night in question you had been dating, in your mind, approximately one week?

A   About a week.

Q   All right. And that included talking to each other on the phone?

A   Yes.

Q   Going to dinner, going to a movie?

A   Yes.

Q   Intercourse?

A   Yes.

Q   All right. And did you know Mr. Shaver was going to be at the Blue Star Lounge the night in question?

A   I mean normally everybody is at the Blue Star Lounge--

96

Q No--

A --so, yes.

Q No--

A Yes, it was a probability that he would be there.

Q A probability?

A I didn't know for sure 100 percent, no.

Q Did you and he talk and say, 'Hey Scottie, you going to be out at the club tonight?' or anything like that?

A No.

Q All right. So you hadn't planned on seeing him?

A No.

Q He wasn't your date that night?

A Nope.

Q All right. You didn't ride there with him and he didn't ride there with you?

A Nope.

Q You drove your mother's car with Aveda?

A Yes.

Q All right. Do you know how Scottie got to the bar that night?

A Nope.

Q Okay. Did you talk to Scottie Shaver in the bar prior to leaving that night?

A I probably said hi or something, yes.

Q Did you make plans for him to come to your home that night prior to leaving the bar?

97

A    No.

Q    All right. And at some point you decide to walk out of the bar, correct?

A    Yes.

Q    Where is Aveda?

A    She was with me.

Q    All right. And was Aveda going to ride home with you?

A    No.

Q    Why not?

A    She had plans to stay the night at our girlfriend's house.

Q    All right. And were you going home yourself?

A    Yes.

Q    All right. And then you walk out and you see an argument?

A    Yes.

Q    All right. And then why didn't you leave at that point?

A    Because I didn't.

Q    You didn't have any plans to be with Mr. Shaver at that time?

A    No.

Q    Why didn't you leave?

A    Everybody was just standing around.

Q    Okay. But you were in your car or you were standing outside your car?

A    I was standing outside my car.

Q    How far were you from the incident in the parking lot?

A    Uhm, not that far a couple feet, maybe.

Q    All right. And this pertains to my client only, okay. I don't want

you to answer questions about the other people if I--if you think that's what I'm asking I'm not, I'm just trying to ask about my client. You said a verbal confrontation ensued in the parking lot, correct?

A    Yes.

Q    And at some point Mrs. Boothby was knocked to the ground?

A    Yes.

Q    All right. And you're from me to you away, how far away are you?

A    Probably about from me to you.

Q    All right.

THE COURT:    And you would guesstimate that's how far, Mr. Sappanos?

MR. SAPPANOS:    Ten feet.

THE COURT:    Mr. Pheney, would you agree that that's a ballpark--

MR. PHENEY:    Sure, ballpark, yep.

BY MR. SAPPANOS:

Q    And there was about 50 people standing around you said earlier?

A    Uh-huh.

THE COURT:    That's a yes?

THE WITNESS:    Yes.

THE COURT:    Thank you.

BY MR. SAPPANOS:

Q    And were you--were there people between you and the incident or were you right on the inside of this 50 people so you could have a clear

view?

A   I could see what was going on, yes.

Q   All right. You identified all these people as being there, correct?

A   Yes.

Q   And you identified them all at some point touching Ms. Boothby?

A   Yes.

Q   But you also identified other people touching. Who else hit Ms. Boothby?

A   Uhm, not so much that they were touching, they were throwing beer on her.

Q   Glasses, cans?

A   Cans, pitcher.

Q   Pitcher of beer? You saw it go?

A   Uh-huh.

Q   Okay. Who did that?

A   Uhm, I remember a lady threw a pitcher of beer on her.

Q   A lady?

A   Lady.

Q   That's somebody's name?

A   Yes.

Q   Lady who?

A   Shamika.

Q   Lady Shamika is her full name?

A   Well, I don't know her last name.

Q   Okay. Was it a glass pitcher?

100

A No, it was a plastic pitcher from inside.

Q Did it hit her?

A No, she just poured it.

Q When you say throw it, she poured it?

A Uh-huh.

Q Who else touched her or threw something at Mrs. Boothby?

A Uhm, I don't know I can't tell you their exact names because I don't know them, I mean if I see faces maybe.

Q All right. And after Mrs. Boothby--prior to Mrs. Boothby being knocked down did Mr. Scottie Shaver based on what you saw, have any contact with her?

A After--

Q Physical, prior to her being knocked down, did Mr. Shaver have any contact?

A You mean before--yes, before she was knocked down.

Q Before she was knocked down--

A Yes.

Q --he touched her?

A Yes.

Q He did?

A Yes.

Q Where did he touch her?

A He punched her.

Q In the head? Her face?

A In her face.

Q Okay. What--did that knock her down?

A No.

Q Okay. So, you see Mr. Shaver--this Mr. Shaver--

A Yes.

Q --punch the female in the face but it doesn't knock her down, correct?

A No, it did not knock her down.

Q All right. And that was the only contact he had that you saw while she was on her feet?

A Yes.

Q Then she gets knocked down at some later point?

A Uh-huh.

Q And you're still standing there watching this?

A Everybody was--yes.

Q You don't go over and try to help the lady?

A No.

Q All right. You see her--the guy you've been romantically involved with did you ask, 'Hey Scottie, lets leave' or anything like that?

A No, that wasn't my situation and we weren't that--

Q Fair enough, I'm not--

A --that romantically involved like--

Q --asking you why, you just didn't ask him to leave?

A No.

Q All right. And then Ms. Boothby gets knocked down?

A Yes.

Q Do you see my client do anything to her on the ground?

102

A   No.

Q   So after she's on the ground, in the parking lot, this man sitting right here with the ugly beard and the ugly hair did not touch Mrs. Boothby at all that night in the parking lot of the Blue Star Lounge?

A   After she was knocked down?

Q   Yes.

A   No.

Q   And prior to that he'd only punched her, according to your testimony, one time?

A   Yes.

Q   And the punch didn't even--now the punch didn't even knock Ms. Boothby to the ground, is that correct?

A   No.

Q   All right. And I believe the next contact, physical contact, this Defendant, Mr. Scottie Shaver has, as you say, you see him and Ivory helping Mrs. Boothby walk to a car, correct?

A   Yes.

Q   All right. Was Mr. Shaver, this Shaver, punching her at the time?

A   Walking her to--no.

Q   Was he kicking her?

A   No.

Q   Slapping her?

A   No.

Q   Spitting on her?

A   No.

Q Dumping anything on her?

A No.

Q A matter of fact he was helping her walk, right?

A Yes.

Q All right. Now Boothby gets put in the car that you've testified you believe was at least occupied by Shevy?

A Yes.

Q And where does--what does Scottie do at that point?

A After she's in the car?

Q Yes.

A Gets in my car.

Q He gets in your car?

A Yes.

Q Are you in--are you in line to pull out of the bar at this time kind of waiting in your spot or are you still observing the goings-on outside your vehicle?

A No, I'm pulling out of the parking lot.

Q How many cars are in front of you?

A Uhm, I don't know not too, maybe one or two but they are on their way out.

Q So you couldn't go around, you had to wait your turn and go out?

A Exactly.

Q All right. And at this point Scottie what, walks over and gets in your car?

A Yes.

Q All right. And where is the car with Boothby in it?

A They're getting in front of me.

Q All right. And do they get in front you?

A Yes.

Q How are you--how are they able to get in front of you?

A Because the cars pulled out and as I was standing there and Scottie is getting in my car, my car is here and a couple of cars pulled out, they pulled in front of me.

Q All right. And they just take off?

A Yes.

Q And you follow them?

A Yes.

Q All right. And initially you told the police that, one of the stories that you told them, one of the lies, was that they followed you, correct?

A Yes.

Q But that was--that was a major lie, right?

A Yes.

Q Why would you tell the police that, that they followed you, 'they' being Shevy and the rest of these people? What benefit was that?

A No benefit.

Q That was just a thought that came to your mind?

A Yes.

Q All right. Now I think you testified when Mr. Pheney was asking you questions was anything said by Mr. Shaver when he got in your vehicle,

105

and I think and correct me if I'm wrong, nothing was said at this point?

A Only to follow Ivory's car or follow Shevy and Ivory in the car.

Q Oh, so Mr. Shaver tells you to follow them?

A Yes.

Q Did he say why?

A No.

Q All right. Do you just follow them?

A At first no, I didn't want to and he demanded "Follow that car."

Q Well, now, just a minute. You said that he didn't say anything else?

A No, he didn't. He said, "Follow that car."

Q Well, and you did?

A And I did.

Q Why?

A (No audible response)

Q You had only seen him now for about a week before this?

A Right.

Q You had just watched what you considered--

A Bad judgment call.

Q --a vicious beating--

A Bad judgment call.

Q Okay, fair enough. Fair enough. But he didn't demand that you follow the car, you just did?

A Right.

Q Were you about to lie again just there?

106

A No.

Q Well, you just said he demanded you follow?

A He did, he said, "Follow that car." That was a demand.

Q Oh, okay. All right. That was a demand. All right. And how far-- you go out of the Blue Star parking lot and make a left and go south towards Covert, correct?

A Uh-huh.

Q How far down there did you go, Ms. Burnett?

A I don't know, about a mile, mile and a-half.

Q About a mile to a mile and a-half? Are you sure of that?

A I'm not an expert, so no, I'm not sure.

Q But you at some point took the detective sitting right there to where you say this happened, correct?

A Right.

Q How could you--how could you--when was that? When did that happen?

A Uhm, last year some time.

Q All right. And how do you remember where nine years later it occurred that you think it's a mile or mile and a-half form Blue Star Lounge?

A How do I remember where I was at?

Q Yes.

A Well, if you witnessed something like that I'm sure you would remember.

Q Well, what were distinguishing characteristics of where you turned off of Blue Star highway--

A Be--

107

Q --was it just a dirt road?

A Yeah, it is.

Q Okay. Were there any buildings on Blue Star and whatever the road is?

A No.

Q Was there anything distinguishable right there on that corner where you turned?

A No.

Q All right. Is there a street name?

A I don't believe so.

Q So--okay. All right.

A Something like that you just don't forget.

Q Okay. And then the story goes that you follow the vehicle with Deborah Boothby in it down Blue Star heading south, mile or mile and a-half and you turn which way off Blue Star?

A Right.

Q All right. To a street you don't remember the name of, correct?

A Yes.

Q Okay. And you follow a car to the end of the cul-de-sac, correct? Is it a turn around?

A Yes.

Q All right. And you follow this car down that road at night and how-- and the car in front of you eventually comes to a stop, right?

A Uh-huh.

Q And you come to a stop?

A Yes.

108

THE COURT: I need you to say yes or no, ma'am.

THE WITNESS: Yes.

BY MR. SAPPANOS:

Q    And you come to a stop, right?

A    Yes.

Q    All right. And the length of this room, how close was your--the length of this room as a measuring stick, how close was the car that you were in to the car that Ms. Boothby was in?

A    They were right in front of me.

Q    They were right in front of you. So you pulled up right behind it?

A    Yep.

Q    Okay. And Mr. Shaver gets out of the car?

A    Yes.

Q    My client, Mr. Shaver?

A    Yes.

Q    Okay. And you're--you shut--he shuts the door?

A    Yes.

Q    And your windows are rolled up?

A    Yes.

Q    And you turn your car off?

A    Yes.

Q    All right. Is your radio on?

A    No.

Q    Okay. And you turn your exterior lights off, too, your headlights?

A    Yes.

Q   Okay. Did the other car have its headlights off?

A   I believe so.

Q   And what side does Ms. Boothby get out of?

A   The right side.

Q   The passenger side?

A   Yes.

Q   So that would be on the opposite of where you're sitting?

A   Yes.

Q   Because you're in the driver's seat, correct?

A   Yes.

Q   All right. And how far does she get from the car before this beating occurs?

A   Uhm--

Q   And just, from me to you, how far is she outside the car that she got out of?

A   She's not far. They're not far.

Q   This far?

A   Uhm, maybe about that far.

            THE COURT: Give me a guesstimate, Mr. Sappanos.

            MR. SAPPANOS: Twelve feet.

            THE COURT: Mr. Pheney?

            MR. PHENEY: Roughly 12.

            THE COURT: Okay. Thank you.

BY MR. SAPPANOS:

Q   Would you agree with this--okay. And she got out of the rear door,

110

right?

A    Yes.

Q    Is this a four-door vehicle?

A    Yes.

Q    Okay.

THE COURT:  She shook her head yes.

BY MR. SAPPANOS:

Q    Yes, okay.  So if your car is parked here where the podium is, okay, this being the podium, right.  And her car is parked right in front of you where kind of like where you are, right?

A    (No audible response)

Q    Like right here?

A    Uh-huh.

Q    And then she would have got out and been about where Mr. Pheney is, correct?  Where I am?

A    Yes.

Q    All right.  And--now, initially I think you testified that she's on her knees?

A    Yes.

Q    About where Mr. Pheney is, right?

A    Yes.

Q    All right.  And where is everybody positioned?  Which way is Deborah Boothby facing when she's on her knees?

A    I can see her.

Q    I know.  Which way is she facing?

111

A   She's facing me.  I can see her.

Q   Well, you can see what, the back of her head or--

A   No, I can see her face.

Q   Okay.  So she's--she's facing you?

A   Uh-huh, yes.

Q   Okay.  Where is everybody else?

A   Standing around her.

Q   Well, tell us where they're standing?

A   One is here, one is here, one is here, I mean they're just standing there.

Q   Around her in a circle?

A   Well, not necessarily a full circle but they're standing around her.

Q   All right.  How do you see her face then if they're standing around her?

A   She's facing me, they're not in front of her.  I can see her face.

Q   So, they commit this vicious beating but they're all standing behind her so you could watch--

A   Some are on the side, they're on the side of her, some are in the back, but I can see what's going on if that's what you're saying I can't see.  I can see her.

Q   The car was there and nobody was standing like this, if Mr. Pheney is her, nobody ever blocked your view?

A   No, I seen what happened.

Q   Okay.

A   I can see her.

112

Q All right. And in relation to my client, okay, at this time--how long does this whole situation take from the minute you put your car in park, turn the lights off; how long does the beating that you described take? Seconds? Minutes?

A Some minutes.

Q Okay. This is very important.

A I didn't sit there and time it.

Q I know but you have a vivid memory--

A Yes, but looking at that my--I wasn't thinking about how long I'm sitting here. I was--wasn't thinking about that.

Q Was it very quickly, ma'am?

A I mean--

Q Less than five minutes? Less than two minutes? Less than one minute?

A It might have been about maybe five minutes, maybe.

Q Okay.

A I wasn't timing it.

Q As it relates to Mr. Scottie Shaver, how, if I remember right now and correct me if I'm wrong, he doesn't punch her at this point?

A What do you mean?

Q Does Mr.--

A They all hit her.

Q Well, what do you mean they all hit her?

A They all hit her.

Q Well, where did my client hit her?

A They were all hitting her in the top part of her body.

113

Q Okay. Where did my client hit her?

A In her face.

Q Okay. With what hand?

A His fist.

Q What hand, his right or left?

A I don't know. He hit her. I mean I don't know his right or his left.

Q How many times did he hit her?

A Uhm, once.

Q Okay. And he hit her once and that was it?

A Yep.

Q Him?

A Uh-huh.

Q Okay.

THE COURT: Say yes.

THE WITNESS: Yes.

BY MR. SAPPANOS:

Q Then he comes back and gets in your car?

A After, you know, she's down on the ground and they put her back in Shevy's car, yes, then he comes and gets in my car.

Q He didn't put her back in Shevy's car though, right?

A No.

Q He didn't touch her, drag her, throw her, push her, carry her or anything to Shevy's car?

A No.

Q And then he comes and gets in your car?

114

A    Yes.

Q    Okay.  Then do you go back--okay, now you would be the lead car on the way out or?

A    No.

Q    How does it work?

A    They would be the lead car on the way out.  They were in front of me.

Q    But they would have been in front of you coming in too, right?

A    Yes.

Q    So they come around and go--

A    Yep.

Q    --that way and then you follow them around like that?

A    Uh-huh, yes.

Q    All right.  And you just follow them back to the bar?

A    Yes.

Q    All right.  And you don't pull into the bar parking lot but you pulled like on the road next to the bar entryway?

A    Yes.

Q    And you watched the body, Ms. Boothby, being thrown out on the road?

A    Yes.

Q    Right?

A    (No audible response)

Q    Does Scottie get out of the car at this point?

A    No.

Q    He stays in the car?

A    Yes.

115

Q Okay. And you watch whatever happened. Scottie has nothing to do with that, correct?

A No.

Q Okay. And then at some point you drive Scottie into the bar parking lot?

A Yes.

Q And you say he conducts some kind of transaction?

A Yes.

Q A drug transaction?

A Yes.

Q Although he didn't tell you that nor did Mr. SamBam, you just assume that, correct?

A Yes.

Q Okay. And after you--after you watch the vicious beating in the parking lot by these individuals, the vicious beating in the dead-end road by these individuals you find it--you find time to just wait there why he does a transaction, correct?

A Yes.

Q Okay. He didn't take your keys from you?

A No.

Q He didn't pull your spark plug wires off?

A No.

Q He didn't slice your tires?

A No.

Q Okay. And then you wait for him and you guys drive off?

116

A Yes.

Q And then your testimony is that you're still in control of the vehicle, correct?

A Yes.

Q And you run over Ms. Boothby, correct?

A Yes.

Q And then you go to your mom's house?

A Yes.

Q And does Mr. Shaver come with you?

A Yes.

Q And you guys spend the night together?

A Yes.

Q You guys make love that night?

A No.

Q Did you discuss the incident anymore?

A Just to the fact that I need to keep my mouth shut.

Q But he didn't say keep your mouth shut as to what I did, did he, referencing him?

A (No audible response)

Q Did he ever say don't tell them what I did or did he say don't tell them what happened?

A He said don't tell them what happened.

Q Okay. All right. And when in relation to you and Mr. Shaver staying the night together was the first time that you had contact with the police regarding this incident?

117

A Uhm--

Q The next day?

A No, I don't think it was the next day. Uhm, I don't know, it might have been couple days later or couple weeks later. I don't really quite remember.

Q Couple days or couple weeks later?

A Yeah.

MR. RODLUND: Could she speak up a little bit he's having trouble hearing.

THE COURT: Could you?

THE COURT: Yes.

BY MR. SAPPANOS:

Q And what was the first statement that you gave to the police? I'm not going to ask you about all ten or fifteen of them, but what was the first one?

A I believe I said when we left I was driving and Deb was still in the parking lot. I think that's what I said.

Q And then the second statement you changed it to Scottie was driving, correct?

A Yes.

Q All right. And you're going to ask people to believe you at a later point that you were afraid to death of Scottie, right?

A Yes.

Q And yet on the second time that you talked to the police you pinned it on Scottie as the one that drove over the body, correct?

118

A Yes.

MR. SAPPANOS: I have no further questions, Your Honor.

THE COURT: Thank you. Ms. Dunfield, would you wish to inquire?

MS. DUNFIELD: Yes, Your Honor.

THE COURT: Thank you.

CROSS-EXAMINATION

BY MS. DUNFIELD:

Q Good afternoon, Ms. Burnett.

A Hello.

Q When you were first in the bar and I think you testified that the-- there was an altercation or a verbal heated argument going on with my client, and Ivory, and Debby, is that correct?

A Yes.

Q And then you said that the lights went out and that was a signal that everyone was to leave, is that correct?

A The lights when on.

Q Or the lights went on, correct?

A Yes.

Q Do you know if there are any other altercations in the bar at that same time?

A No.

Q Could there have been some other altercations going on?

A I mean there could have been but I'm not aware of it.

Q Why did everyone know that the lights going on is a signal for it's

119

time to go?

A  Because that's usually what happens.

Q  So altercations at that bar are common?

A  Yes.

Q  Okay.  And what time did the lights go on?

A  Uhm, I don't know exactly what time, it was about one o'clock.  Maybe.

Q  So you think the lights went on at about one o'clock?

A  Maybe about one.  I can't be specific as to the time, no.

Q  Well, you stated that you got there between 11:30 and 12:00, is that correct?

A  Right.

Q  And you stated that you watched Ivory and Shevy arrive, is that correct?

A  No.

Q  Okay.  But you did see Debby arrive?

A  Yes.

Q  So Shevy and Ivory were there prior to you coming?

A  Yes.

Q  Okay.  And what time did Debby arrive?

A  After me, so.

Q  About how long?

A  I don't know I wasn't really paying attention.  I seen her when she walked in, exactly how long I was there before she walked in, you know, I wasn't really looking out for her so I don't know.

Q  But it was enough for you to notice everything that was going on,

correct?

A   Yeah, she, you know, I seen her when she walked in but I don't know how long I had been there or was even paying attention.

Q   Okay.  So you weren't paying attention to her at that time?

A   No.  As far as her walking in, yeah, I seen her but it's not like I knew her to be paying attention to what time she walked in or anything.  I don't know.

Q   Okay.  Could you guesstimate it was 15, 20, 30 minutes, 45, an hour?

A   I don't know, maybe 15 minutes, 20 minutes, I don't.

Q   Fifteen, 20 minutes after you got there--

A   Right.

Q   --you think she arrived?

A   Uh-huh.

Q   So if you got there at 11:30, 12:00 it was either 12:00 or 12:30, about then?

A   Okay.

Q   Does that sound fair?

A   Okay, yes.

Q   Okay.  And approximately how long was she there before the altercation began?

A   Uhm, she was right there.

Q   So the minute she walked in she started fighting?

A   Just about, yes.

Q   Okay.  And how long or how long was she there until the lights went on?

121

A Uhm, after she threw her drink and it was a verbal thing going on the lights came on. So, she had just gotten there, she wasn't there that long.

Q Okay. So if other people say that they saw lots of things happen before that they'd be wrong, correct?

A I can't tell you that because I don't know what they seen and I'm not them.

Q That's fair, that's fair. The lights went on, everybody started to leave, where were you when the lights went on?

A By the bar.

Q Okay. And where was Debby when the lights went on?

A By the bar.

Q Okay. And did you guys leave together?

A Who?

Q You and Debby? If you were both at the bar?

A What do you mean did we leave together?

Q The bar is--

A I mean I left.

Q Okay.

A So she was outside too, so I'm assuming, yeah, she left. We didn't leave together.

Q All right. And how many people were at the club that night?

A Uhm, I would say more than 100 people.

Q More than 100 people were there. Was it crowded?

A Uh, yeah.

122

Q When the lights went on did everybody or did just some people start to leave?

A Everybody left.

Q Okay. So you have approximately 100 people leaving at that time, is that correct?

A Uh-huh.

THE COURT: Yes?

THE WITNESS: Yes. I'm sorry.

BY MS. DUNFIELD:

Q And you proceed to exit the bar, was Debby already out of the club when you left or did she come out after you?

A Uhm, I don't quite remember if she came behind me or if she was in front of me. I was with a group of my friends so, you know, I remember her being in the middle of the driveway in the altercation but if she was in front of me or behind me I don't quite remember.

Q It's safe to say you weren't really paying to Debby at that point in time, is that correct?

A Not when she was leaving the bar, no.

Q All right. So you don't know what happened between the time that the lights went on and until this altercation that you testified to?

A I mean everybody was coming out of the club.

Q All right.

A So from the time she exited the bar until the time I walked to my car, no.

Q Okay. And it's safe to say that you had to go to your car and maybe

123

unlock it, get Aveda's overnight bag?

A    I didn't do that at that moment, no.

Q    You didn't?

A    No.

Q    Okay.  When you exited the club did you--I think you testified you went to your car, is that correct?

A    Yeah.

Q    Okay.  So you did go to your car.  At what point in time was it that you got to your car?  What time of night was that or day?

A    It was a couple of minutes after I left--I mean my car was at the bar.  What do you mean?

Q    Two o'clock in the morning, one o'clock in the morning, one-thirty?  What time was it?

A    I can't say exactly what time it was, I didn't--

Q    Can you give us an estimate?

A    No, because I don't know what time it was.  I wasn't--

Q    Okay.  And you say that you noticed an altercation going on with Debby and a bunch of people, is that correct?

A    (No audible response)

Q    A bunch of people around her, excuse me?

A    Yes.

Q    Okay.  And I think you testified that, and it pertains to my client, and I don't want to put words in your mouth, but that prior to coming out it was just words between my client and Debby, is that correct?  Prior to coming out of the bar?

124

A    Uh-huh, yes.

Q    Okay.  And after they exited the bar you said that Debby was shouting racial words, is that correct?

A    Yeah.

Q    And did you happen to take notice of her at that time?

A    Yes.

Q    Okay.  And did you go in towards the crowd or did you stay back?

A    I was by my car.

Q    You were still by your car at that time?

A    Uh-huh.

Q    And would you say that when she started throwing these racial words around that's when the crowd gathered around her?

A    Uh-huh, yeah.

Q    And yet you somehow made it through the crowd to be up front to have a good view, is that correct?

A    My view wasn't blocked.  I could see what was going on.

Q    Okay.  But didn't you testify that there were 50 to 60 people gathered around her?

A    No, I said there were about 50 people around but not necessarily blocking her in.  I could see what was happening, clearly.

Q    And how many people were actually doing things to her at this time?

A    Uhm, maybe about five.

Q    Okay.  So, just the four that are in the courtroom and maybe one other person?

A    Right.

Q Okay. So if you testified earlier that it was the people in the courtroom plus five or six other people you didn't mean to say that, is that correct?

A It was probably approximately them plus maybe two or three other people.

Q Okay. So now we're at them plus two and three other people. Are you sure that's the final number you want to give?

A Yes.

Q Okay. So we're at these four plus two or three?

A It wasn't the whole 50 no, it was just a couple of people.

Q So there was approximately six people picking on this girl?

A Right.

Q Okay. So we've got six people plus Debby, that's seven plus there were approximately 50 people around the parking lot and you're up towards the front of the bar, is that right? That's where your car is parked?

A Uhm, my car is closer to the bar but it was more in front of where they were at where I could see.

Q Okay. So, it's towards the front of the bar but it's--you're adamant you can see this all going on, right?

A Yes.

Q Okay. And who threw the first punch?

A I believe Shevy pushed her first, threw the first punch.

Q Shevy pushed her first?

A Uh-huh.

126

Q You're adamant that Debby never touched anyone prior to this?

A No.

Q And she never threw a beer on anyone, she never slapped anything out of anyone's hand?

A She threw her drink when we were in the bar, but I've already mentioned that.

Q Okay. But you also said that you didn't see Debby leave the bar, is that correct?

A (No audible response)

Q You just saw her when she was on the outside?

A Right.

Q But you're adamant that you saw who threw the very first punch?

A When I was outside? Yeah.

Q Okay.

A Yes.

Q And you're sure that none of these other people pushed her, or shoved her, or hit her, or threw a beer on her first to start the altercation?

A Not from what I seen, no.

Q Okay. And as far as Shevy goes, you said that she pushed her, I think you said?

A Yes.

Q And then after she pushed her other people started getting involved, correct?

A Yes.

127

Q   Okay, And at some point in time I think that you said that--after the pushing and shoving and altercation started did more and more people come to partake upon the crowd?  I think you might have termed it as a pack of dogs or a pack of people gathering around?

MR. PHENEY:  Your Honor, objection.  I've been in the courtroom the whole time and I've never heard that testimony.

THE COURT:  Ma'am, that statement hasn't been used today.  So--

MS. DUNFIELD:  Maybe not today.

THE COURT:  --we'll let you rephrase it or--

MS. DUNFIELD:  Yes.

THE COURT:  --reference it some other--

MS. DUNFIELD:  Yes.  I will ask away.

BY MS. DUNFIELD:

Q   What did the scene look like?

A   It was bad, it was a bunch of people ganging on one person.

Q   Okay.  A bunch of people ganging on one person.  And did--were there any just bystanders, people watching?

A   Yeah.

Q   Approximately how many?

A   It was about the same number of people that I said before.

Q   Have you ever described it to anyone as a how it looked?

A   Yes.

Q   How did you describe it?

A   It looked like a bunch of pack of dogs.

128

Q  Thank you.  All right.  And yet you had perfect view of everything at this time?

A  Yes.

Q  Okay.  You say that after this altercation happened I believe you said that my client, Shevy went to her car, is that correct?

A  Yes.

Q  And that the men helped Debby to that car?

A  Yes.

Q  And I think you stated that you could not testify as to who was driving, is that correct?

A  No.

Q  Okay.  Now when we get to this dead-end area that you have this really good view, uhm, you said that Debby was on her knees, is that correct?

A  Yes.

Q  Was she on her hands and knees or just on knees?

A  She was on her knees.

Q  So her hands were not on the ground?

A  No.

Q  Was she defending from any of the actions that were being taken place?

A  She couldn't really defend, no.

Q  Okay.  And when you saw Debby that night--I did forget to ask you this--approximately how tall was she?

A  I don't know.  Uhm, she was taller than me.

Q  Taller than you?  Okay.  And you stated that after that altercation at the dead-end that you didn't think that Debby was alive, is that

129

Q correct?

A Correct.

Q Okay. You stated that Shevy, Ivory, and Ed put her back in the car after that, was it like the last time where one person was on one side and one person was on the other? Were they walking her back to the car like at the bar?

A No, they were basically one had her upper part and the other one had her bottom part.

Q Okay. But you said three people were doing it? Was it the men doing the lifting or--

A The men were doing the lifting, yes.

Q Okay. And Shevy was basically walking back to the car?

A Yes.

Q Okay. And still to this day it is--you're truthfully testifying that you cannot say whether Ivy or Shevy was driving the car?

A I can't say truthfully, no.

Q Okay. Thank you.

MS. DUNFIELD: I have no further questions.

THE COURT: At this point in time folks, there's a need to take a break--

THE WITNESS: Yes.

THE COURT: So what we're going to do is I'm going to have you remove the witness, Trooper Gonyeau, number one. You can go ahead and do that now.

We're going to take a break and I'll have any of the

130

defendants removed to the conference room as necessary by the officers present. We're going to take probably I'm going to say ten minutes.

Folks, anybody that leaves the courtroom will have to be wand back in on the way back into the courtroom, but this is a good opportunity for people to stretch their legs and we'll be in recess for about 10-15 minutes.

(At 1:54 p.m., Court in recess)

(At 2:08 p.m., Court reconvenes; all parties present)

THE COURT: Okay, we're back on the record with our preliminary examination; everybody is back in, defendants back in, the attorneys are back in. I believe we had finished with Ms. Dunfield and we'll continue with Mr. Ronning.

MR. RONNING: Thank you.

CROSS-EXAMINATION

BY MR. RONNING:

Q    Good afternoon, Ms. Burnett.

A    Hello.

Q    Ms. Burnett, I just want to focus on a few things without going into or re-going over everything you've already talked about so far. Specifically focusing on Ed Foster, my client. Now, the night that you said all this went down, that this happened, when was the first time you saw, that you recall, seeing Ed Foster at the Blue Star Lounge/Brackens, whatever you call it?

A    He was in the bar.

Q    He was in the bar. Do you remember what time he arrived?

131

A    No.

Q    Did you see him arrive?

A    No.

Q    Was he there when you got there?

MR. SAPPANOS:  You guys, I can't hear the witness.

THE COURT:  Yeah, just a second.  I was going to say--

THE WITNESS:  Talk louder.

THE COURT:  --go back to projecting again--

THE WITNESS:  Okay.

THE COURT:  --so that the individuals sitting at the two tables in front of you ma'am, can hear.

THE WITNESS:  All right.

THE COURT:  Thank you.

BY MR. RONNING:

Q    Was he there when you arrived or were you there when he arrived?

A    Uh, he had to have been there when I arrived?

Q    Why did he have to be--

A    Well, he didn't have to, I didn't see him come in, so.

Q    And did you see him inside the bar?

A    Yes.

Q    Did you see who, if anybody, he was hanging out with?

A    No.

Q    Were you near the other co-defendants while inside the bar?  Were you kind of hanging out with them?

A    No.

132

Q You weren't anywhere near Scottie Shaver?

A No.

Q Now after everyone went outside did you actually see Ed Foster leave the bar?

A No.

Q And at some point I believe you testified that this thing was happening with Ms. Boothby and then you noticed that Ed Foster was out there, correct?

A Yes.

Q And I believe you indicated that he, according to your recollections, struck Ms. Boothby one time?

A Yes.

Q And she fell down?

A That was all it took.

Q Did you see anything in his hand? Did he have an object?

A No.

Q A weapon?

A No.

Q You didn't see one or he didn't have one?

A I didn't see one.

Q You're about ten feet away, right?

A Uh, yes.

Q That's what you testified to, about ten feet away?

A Yes.

Q And you were able to see clearly?

133

A    Yes.

Q    Was his back to you or was his side to you or how did that work?

A    Uhm, I seen him hit Deb so--

Q    Well, what do you mean--okay, you could see from a lot of different angles, let's just try to recall where you were standing in relation to Mr. Foster. Were you behind him or were you to the side of him?

A    No, I was behind him.

Q    So you saw his back?

A    Right.

Q    And so you say you would have seen his hand go backward and forward?

A    Right.

Q    Right or left hand?

A    I could not tell you that.

Q    You've indicated before that it was very traumatic and some things stick out in your mind, right?

A    Right or left hand it didn't stick out. A hand stuck out.

Q    When you look back in your mind and you see the event what do you see?

A    I see that he hit Ms. Boothby.

Q    With some random hand, either right or left?

A    Exactly.

Q    Well, lets--it's interesting that you say today that you actually saw Mr. Foster strike Ms. Boothby but you can't remember with what hand. You'd been asked earlier or mentioned earlier that you made a number of statements to law enforcement, is that correct?

A    (No audible response)

134

Q Is that a yes?

A Yes.

Q Starting shortly after the incident in 1998?

A Yes.

Q And within the next day after your first statement you had already made a statement against one of the other co-defendants, correct?

A Yes.

Q And you made a statement lets say approximately May of 1998, June of 1998, October of 1999, September of '07, September of '07, September of '07, November of '08, December of '08, going back again, November of '08, another one September of '08, December of '07, all those statements and all those times you made statements to law enforcement officers you never mentioned once Ed Foster's name, is that correct?

A Correct.

Q I believe you indicated earlier on direct examination, that at some point you had a conversation with Ed Foster on the telephone--

A Yes.

Q --in the Spring of 2009?

A Yes.

Q Do you remember what month that was?

A Uh, Spring time, March, April--

Q March, April of 2009?

A --around in there.

Q You had a phone conversation?

A Uh, yes.

135

Q   And I believe you indicated you called Mr. Foster--I'm sorry, Mr. Foster called you?

A   Yes.

Q   Do you recall that?  He actually called you, phone rang, you answered and he's on the other end?

A   Uh-huh.

Q   Is that a yes?

A   Yes.

Q   At some time in the Spring 2009, I believe you indicated on that phone call he made a threat, is that right?

A   Yes.

Q   So at that point you're now scared of Mr. Foster?

A   It wasn't at that point, it's always been.

Q   It was immediately or close to after that statement that you finally began to mention Ed Foster's alleged involvement in this, correct?

A   Uhm, no, I think I mentioned him before then.

Q   Before the conversation over the telephone?

A   Uh-huh.

Q   Is that a yes?

A   Yes.

Q   Well, lets go back and try to recall.  Who was the first person to bring up Ed Foster's name in the involvement of this?  Was it you or was it somebody from law enforcement?

A   Uhm, it was somebody from law enforcement.

Q   They specifically asked you if Ed Foster was involved in this,

correct?

A   Yes.

Q   They specifically asked you if you saw Ed Foster striking Ms. Boothby, is that correct?

A   Yes.

Q   And you say no, correct?

A   (No audible response)

Q   That you did not see Ed Foster strike Ms. Boothby?

A   I said that I did see Ed Foster strike Ms. Boothby.

Q   From the get-go?

A   No.

Q   From the moment--

A   No, at first no, I said no, he did not.

Q   At first you said no?

A   Right.

Q   So--and then you were asked again, right?

A   Yes.

Q   And you said no, again, didn't you?

A   I don't believe so.

Q   At some point you started to include Ed Foster's name in your statements to what had happened?

A   Yes.

Q   Twelve years after the incident, eleven years after the incident took place, correct?

A   Correct.

Q This road that you say you went down following the other vehicle I believe you said was a dead-end street or a no outlet type road?

A Yes.

Q How long--how far down that road did you drive before you met--your vehicle stopped, can you recall?

A Uhm, not far but there was like a little cul-de-sac thing that you can turn around in.

Q So not far, can you give me an estimation?

A Uhm, you mean miles?

Q Was it--was it over a mile?

A I don't think so.

Q Was it over half a mile?

A Yes.

Q Somewhere between half a mile and a mile is where you stopped?

A Uh-huh.

Q Is that a yes?

A Yes.

Q Were there any lights down that road?

A Uhm, no, not many, no.

Q After all this happened and you went back to the Blue Star and I believe you indicated on direct that Ed Foster stayed in the car and was in the car that ran over Ms. Boothby, is that correct?

A Yes.

Q And the car drove away?

A Yes.

138

Q  Did you ever see Ed Foster again that night?

A  No.

Q  Do you recall what, if any, vehicles were still in the parking lot, if you can recall, when you left the parking lot, the last time?

A  Uhm, yeah, there were a couple of cars.

Q  How many?

A  I don't know a couple, maybe three or four.

Q  Did you recognize any of those cars?

A  Uhm, yeah, I remember Tisha's car.

Q  Tisha's car.  Anybody else?

A  No

Q  So Tisha's car counts for one of the cars--

A  Uh-huh.

Q  There's what, maybe three other cars that you can't account for?

A  Right.

Q  Do you remember what kind of cars those were?

A  No.

Q  Are you familiar or do you know Ed Foster's, who used to be his wife, who passed away?

A  Yes.

Q  Were you friends with her?

A  Yes.

Q  And isn't it true that you actually called Ed Foster in the Spring of '09, after his wife passed away?

A  No.

139

Q You say he called her?

A Yeah, why would--

Q Do you--

A --why would I call him?

Q I don't know. Do you remember telling the police that you did because you were still friends with his now deceased wife?

A I've never told the police that.

Q Never told the police that?

A No.

Q So by what you're saying now if, say a police officer, have that in the report you're saying that he would be mistaken?

A Yes. I've never told a police officer that I called.

Q All right. At any point during the proceedings that evening, did you see Ed Foster driving any vehicle at all?

A No.

Q I want to talk to you briefly, I know you went over it on direct but I need to talk to you briefly about the plea bargain you've entered into that involved two convictions, is that correct?

A Yes.

Q Second Degree Murder conviction and the Perjury conviction.

A Uh-huh.

Q Is that a yes?

A Yes.

Q And the perjury conviction would acknowledge that you lied under oath?

A Yes.

Q So you are willing to lie under oath to protect yourself?

A Yes, I did lie under oath.

Q So you are willing to lie under oath to protect yourself?

A Yes, I did lie under oath.

Q And you lied a number of times when you were not under oath, correct? When you were giving statements to police when you were not under oath?

A Yes.

Q And the deal that you've worked out with the State of Michigan involved a definite sentence, correct? Meaning you knew, you have a number in your mind which is exactly what you're going to get?

A Yes.

Q Okay. And is that eight years again? Eight to 20?

A Yes.

Q And does that sentence, as far as you know, involve any consecutive sentences with the Perjury or anything like that?

A No.

Q So Perjury has no real impact on your sentence does it?

A I can't answer that.

Q As far as you know?

A As far as I know, but talk to my lawyer.

Q So you admitted to murder and perjury to get an eight to 20 year sentence?

A Yes.

Q And you had--to do that you had to testify against a number of other

141

people?

A Yes.

Q Assist in getting convictions against those people?

A Yes.

Q Thank you.

MR. RONNING: I have no further questions.

THE COURT: Thank you. Mr. Rodlund, do you wish to inquire?

(At 2:20 p.m., Attorney Rodlund and Attorney Sappanos in conference)

CROSS-EXAMINATION

BY MR. RODLUND:

Q I'm going to try to not cover too much of the same ground, but I do have to ask you about things in regards to my own client. Okay. One of the things I've been interested in knowing and I don't know if I heard the answer was how much had you had consumed that night as far as alcohol goes or drugs?

A I don't do drugs and I probably had maybe three drinks at the bar.

Q Do you remember what drinks those were?

A Had alcohol in them.

Q They had alcohol in them?

A (No audible response)

Q Okay. Do you remember what kind of drinks they were?

A No.

Q Beer, mixed drinks?

A Mixed drinks.

Q Do you think the drinking affected your ability to recall what happened that night?

A No, I was not so drunk where I couldn't remember.

Q But you had--you did make that statement at least once in your--

A That I had been drinking? Yeah, I had been drinking.

Q Okay. Other--more than just that, you--one of your statements you made back in 2007 you said you were intoxicated and you couldn't remember anything?

A Well--

Q Has that changed? Your answer to that changed?

A I was not drunk and I mean, I think we've already gone through I've made 11 statements, so they were not true. The last statement I made that was true was in April. So all those statements before then, yes, there probably is some things in there that's not true. So, if we're going to go down that road, you know, we've already--

Q How am I supposed to know--

A --established that.

Q --when you're telling the truth and not telling the truth? Are you going to tell me that?

A If you have my statement from April, that's the truth. Anything before that--

Q Okay. So as far as you're concerned, at this point in time, the truth is you weren't intoxicated that evening?

A Right.

Q You had three drinks, you had no drugs?

143

A   Don't do drugs.

Q   How did you get to the bar that night?

A   I drove.

Q   What vehicle did you drive in?

A   A white Chevy Celebrity.

Q   Was there anyone with you in the car?

A   Aveda.

Q   Where did she end up that night?

A   She stayed with a friend of ours.

Q   Okay, but how come you brought her there and she doesn't end up leaving with you?

A   That's something you'll have to ask her.

Q   Okay.  Fair enough.  When is the first time you see my client, Ivory?

A   He was at the bar.

Q   When you came in?

A   Yes.

Q   Okay.  And do you--how many times do you see him that night in the bar?

A   I mean he was there the whole night.

Q   Were you paying attention that he was there or did you just notice he was there?

A   I wasn't paying attention to him, no, but I knew he was there.

Q   And you noticed Debby at the same time?

A   No, she--I didn't notice her at the same time, no.

Q   Did you see them have any kind of argument?

144

A   Yes.

Q   Dispute?

A   Yes.

Q   What exactly did you see?

A   Well, they had an argument and they were having words back and forth.

Q   How far away from that argument were you?

A   I was right there at the bar.

Q   You were--

A   Close enough where I could see what was going on, yes.

Q   Right next to it or were you--

A   No, I was not right next to it but I can see what was going on.

Q   You stated you could see, about how far away were you, in feet?

A   I don't know maybe five-six feet.

Q   Could you hear the words that were being exchanged?

A   Uhm, not really, no between--over the music and the words, no.

Q   Anytime did you see Deborah take a drink and pour it on my client?

A   Yes, I did.

Q   What happened when that happened?

A   Uhm, the altercation got more serious and it looked like the pushing and shoving was about to ensue and that's when the lights came on.

Q   And you think that--you believe that the lights came on because of that incident?

A   That's the only reason why the lights came on.

Q   And you're--as far as your recollection goes you can't remember any other fights or disputes going on in the club at that time?

145

A Not that I know of, no.

Q Had you been to the club frequently?

A What do you mean?

Q Had to been there often? Was this your first time or had--

A No, it wasn't my first time.

Q It was your very first time?

A No.

Q No. Would frequently fights break out there and the lights would have to come on?

A Uh-huh, yes.

Q As far as you know your belief is because of the drink being spilled?

A Yes.

Q Did that get onto anybody else besides Ivory?

A I couldn't tell you that. I don't know.

Q You were watching, you were right there and you were watching?

A I mean I don't know where--that's the way the drink went. Now, if it was on somebody else, I don't know. I wasn't behind them to know--

Q Do the lights come on immediately or take a couple minutes?

A Took a couple of minutes and the lights came on.

Q Do you--

A It took a couple of minutes and the lights came on.

Q Okay. So you just kind of sat there and watched it happen?

A What do you mean, sat there and watched it happen?

Q Just kind of watched what was going on after the drink got poured and watched the argument continue?

A I mean--

Q Or did you take off or--

A I didn't leave the bar, no. I didn't leave the bar until the lights came on.

Q Did you take any notice of that? Did it seem interesting to you or did you just continue to drink?

A I mean I was just standing there drinking, you know.

Q So that didn't seem kind of different when someone poured beer on someone?

A That didn't have nothing to do with me.

Q I know but if you watched, did you watch it happen?

A I seen it when it happened, yes.

Q Okay.

A But I wasn't like all up into it because it's not my business.

Q But it was enough that they decided to turn the lights on?

A Exactly.

Q Did you leave right when the lights came on?

A Yes.

Q Okay. Were you paying any attention to what was happening between Ivory and Deborah at that point?

A No.

Q You got out in the parking lot, correct?

A Uh-huh, yes.

Q And you head to your car at that point?

A Yes.

Q When was the next time you see Ivory?

A In the parking lot arguing with Deb.

Q And was it just verbal or was it?

A It got physical.

Q It was physical?

A Yes.

Q Was there punching going on?

A Yes.

Q Kicking?

A Yes.

Q Hitting?

A Yes.

Q Everyone else has been asked how many times you saw that happen, basically, counted, you saw her get hit once or twice. How many times you think Ivory hit Deborah--

A Uhm--

Q --in that first incident?

A Once.

Q Just one time?

A Yeah.

Q One time hitting, one time kicking?

A Yeah.

Q Or--

A Both.

Q Do you think your memory is really good about what happened there?

148

A    Yes, it is.

Q    You're not making any of this up today?

A    What reason would I have to make it up?  I mean what good has it done me?

Q    Well, you are getting a benefit out of this, correct?

A    Yes, but I'm still going to jail for eight years.  So, what would I have to benefit?  I didn't know Deb.

Q    That goes on for a while?

A    Yes.

Q    Where are you watching this from?

A    My car.

Q    Are you in your car or outside of your car?

A    Outside of my car.

Q    Where are you sitting, on a hood or are you standing?

A    Standing.

Q    And you see, at some point you see Deb go down, correct?

A    Yes.

Q    Okay.  We've got that far along I really don't--I'll try not to take you through all this again but it seems like I need to a little bit, okay, so bear with me.  Okay, at some point she goes down on the ground and they all take her into a car?

A    Uh-huh, yes.

Q    They all take Deb in the car?

A    Yes.

Q    Whose car do they put her in?

A   Shevy's.

Q   What kind of car was that?

A   I can't recall the model of the car, it's just a four-door car.

Q   Do you know what it looked like?

A   Square, four doors.

Q   Color?

A   It was a dark color.

Q   It was  a dark color?

A   Uh-huh.

Q   This is Shevy's car?

A   Yes.

Q   Wasn't a van?

A   No.

Q   In some of the previous statements do you remember telling the police that it was a van?

A   The ones before April, like I said, those are the ones that weren't true if you go back to the one in April then those are the ones that are true.  So, if you keep going back to those yes, you're going to find some untruths.

Q   I'm trying to sort out though some of the stuff that may be true.  So, you mentioned a van?

A   Yes, I did.

Q   There was no van?

A   No.

Q   Was a small--

A    Yes.

Q    --dark colored car, squared, I believe it belonged to Shevy?

A    Yes.

Q    Okay.  Who was all in that car at that point?

A    Shevy, Ivory and Eddie.

Q    Shevy, Deborah--

A    And Deb, yes.

Q    And you don't know who was driving the car, right?

A    I believe it was Ivory but to say for 100 percent no, because I don't want it to come back and say I lied, so I'm not going to say 100 percent that it was him, but--

Q    Okay.  Then what makes you think it was Ivory?  What--what--why do you have that belief?

A    Because that's what I believed and remember but I don't want to say 100 percent for sure.

Q    Who would be sitting next to him?

Q    Shevy was in the front seat.

Q    And that would put Ed in the back next to Debby?

A    Yes.

Q    Now you saw this fight going out in the parking lot and you could see that very clearly who was hitting her and you remember that very clearly, correct?

A    Uh-huh.

Q    But you're having a real difficult time remembering who was driving.

A    You're right.

Q Do you see why I find that hard to believe?

MR. PHENEY: Objection, Your Honor. I frankly don't care what Mr. Rodlund believes.

THE COURT: Mr. Rodlund, question? Or response?

MR. RODLUND: No, no further question on that. I'll withdraw the question.

THE COURT: You'll withdraw the question.

BY MR. RODLUND:

Q So you followed--so you ended up following this car, you start following the car in front of you, correct?

A Yes.

Q It's Shevy, Ivory, Ed and Debby in it?

A Yes.

Q You end up in a dark, like a dark area at the end of a street, correct?

A Yes.

Q And then you've already explained what happened there?

A (No audible response)

Q Who gets the--when that's all over who drives that car back?

A The same people that were in that car.

Q In the same seats or did you see--

A Nope the same seats.

Q You watched them get into each of the doors?

A At that moment I really wasn't paying attention who was--I know who was in the front seat, Shevy and Ivory was. And I know who was in the

152

backseat. Now who was driving I don't remember.

Q Still can't say who was driving?

A No. I mean I don't--

Q You remember everything else very clearly?

A I said Ivory but to be 100 percent sure I don't want to say 100 percent sure.

Q Okay. But you remember everything else very clearly?

A Yep.

Q Correct?

A Uh-huh.

Q Just can't remember that one, one important detail?

A I don't know why that's so important it doesn't matter who was driving, does it?

Q It matters to a lot of people.

A I don't remember.

THE COURT: Well, you're starting to get into a back and forth banter and debate here--

MR. RODLUND: Sure, I understand.

THE COURT: You just answer the questions, ma'am, yes, no and that and Mr. Rodlund will keep asking the questions. Thank you.

BY MR. RODLUND:

Q I have a question for you. Everyone else got out of their cars when they were there do you remember why you didn't get out of the car?

A (No audible response)

Q Why would you stay in the car when everybody else get out?

153

A Why would I get in (sic) the car I didn't have anything to do with that?

Q You're watching it happen?

A I was put into a situation where I didn't have a choice. So yeah, I sat there, I didn't want to get out of the car. I was where I wanted to be, in the car.

Q Everyone else got out and was involved in--

A Yes.

Q --the assault on Deb, but you just watched it at that point, correct?

A Yes.

Q How times do you think--how many times do you state that Ivory hit Debby?

A Hit her a couple of times.

Q Couple of times being two, three, how many?

A About two.

Q About two times?

A (No audible response)

Q Where did he hit her at?

A In her face. In her head.

Q Huh?

A In her face and in her head.

Q Were they all doing this at the same time or did they take turns?

A No, it was about the same time.

Q And you don't remember exactly how long it took?

A About maybe five minutes no more.

154

Q  And now you do remember it was about five minutes?

A  It was about five, ten, no more.

Q  Then after that do you see him touch her any further?

A  Not until they put her in the car.

Q  You don't know if he was, in your opinion, was he driving when he ran her over?

A  As I stated I don't actually remember who was driving.

Q  You're not for certain who was driving at that point?

A  No.

Q  And that would be the dark colored car?

A  Exactly.

Q  I believe you made a statement that at some point in time you felt intimidated by my client?

A  Yes.

Q  Is that true?

A  Yes.

Q  Can you describe those circumstances?

A  Where I feel intimidated?

Q  Did he do something to make you feel intimidated?

A  Yeah, just little gestures and his comments.

Q  When did those take place?

A  Not long ago after it happened.

Q  Has there been any recent contact?

A  He's been in prison, no.

Q  All right.  That's all the questions I have.  Thank you.

155

THE COURT: Thank you, sir. Any further questions, Mr. Pheney?

MR. PHENEY: No redirect, Judge, thank you.

THE COURT: Thank you. I'll go back through to the questions. Mr. Sappanos, do you have any other questions of this witness?

MR. SAPPANOS: No, Your Honor.

THE COURT: Ms. Dunfield?

MS. DUNFIELD: No, Your Honor.

THE COURT: Mr. Ronning?

MR. RONNING: No, Your Honor.

THE COURT: Thank you. Okay. At this point in time then may this witness be excused, Mr. Pheney?

MR. PHENEY: No objection.

THE COURT: Defense Attorneys, may this witness be excused? Does anybody object? I'll start with that. That's the easiest response.

MR. RONNING: No, Your Honor.

MR. RODLUND: No objection.

MS. DUNFIELD: No, Your Honor.

(Attorney Sappanos in conference with his client)

MR. SAPPANOS: No, Your Honor.

THE COURT: Thank you. That means ma'am, you're free to leave.

THE WITNESS: Okay.

THE COURT: Actually, you're free to transport.

THE WITNESS: Thank you.

UNIDENTIFIED OFFICER: Thank you, sir.

THE COURT: Thank you, ma'am.

(At 2:36 p.m., witness excused)

THE COURT: We'll continue with your next witness, sir.

MR. PHENEY: Thank you. Your Honor, I would call Dr. Waldemar Palutke, if I can just have a moment.

THE COURT: How do you spell Palutke?

MR. PHENEY: I will do so, Your Honor.

THE COURT: The best you can?

MR. PHENEY: Hold on, p-a-l-u-t-k-e.

THE COURT: Thank you.

(At 2:36 p.m., Dr. Palutke enters courtroom)

THE COURT: Sir, if you would do me a favor and raise your right hand.

THE COURT: Do you swear or affirm that the testimony you will give today in regards to this proceeding will be the truth, the whole truth, and nothing but the truth?

DR. PALUTKE: I do.

THE COURT: Thank you. And you may have a seat, sir.

(Witness complies)

THE COURT: Sir, that microphone just records, it does not amplify so if you could be sure to speak loud enough so anybody sitting at the two tables here in front of you can hear. Okay? Thank

157

you, you may inquire.

MR. PHENEY: Thank you, Judge.

WALDEMAR A. PALUTKE

called by the People at 2:36 p.m., sworn by the Court, testified:

DIRECT EXAMINATION

BY MR. PHENEY:

Q    Would you state your name for us please, sir?

A    I'm sorry?

Q    Your name?

A    Waldemar Palutke. The first name is spelled w-a-l-d-e-m-a-r; the last name is spelled p-a-l-u-t-k-e.

Q    Thank you, sir.

MR. SAPPANOS: Your Honor, could we ask him to speak up?

THE COURT: Would you do us a favor and try to speak a little louder, sir, so that these folks over here can hear you?

THE WITNESS: Surely.

THE COURT: I can hear you just barely, so I'm sure that they are having trouble.

THE WITNESS: I'll try.

THE COURT: Thank you, sir.

BY MR. PHENEY:

Q    Now sir, when we chatted you've indicated to me that you were happily retired at this point, right?

A    Yes.

Q    Prior to the retirement though, how were you employed?

158

A I was employed as a forensic pathologist working mostly for an organization called Michigan Forensic Pathology based in Grand Rapids.

Q And sir, during the year of 1998 did you specifically conduct autopsies for the County of Van Buren?

A Yes.

Q Okay. Did you have some kind of arrangement with them that if they had a body that needed to be examined that you and your business would handle that?

A The arrangement was between the county and the organization, Michigan Forensic Medicine for which I was working.

Q Okay. And sir, in your history as a forensic pathologist, could you tell us please how many autopsies you've performed?

A Over 2,000.

Q Two thousand. Could you indicate for us please sir, what was your educational background?

A My undergraduate work was at the University of Michigan from 1955 to 1958, from '58 to '62, I attended Wayne State University School of Medicine and graduated in '62.

From 1962 to 1963, I had a rotating internship at the Presbyterian Hospital in Denver, Colorado.

From '63 to '67, I was involved in a residency program in Anatomic and Clinical Pathology at Wayne State University School of Medicine affiliated hospitals.

From 1967 to 1969, I served in the United States Public Health Service and from '69 forward I was on the faculty of the School

159

of Medicine at Wayne State University in the Department of Pathology and working at Receiving Hospital most of that time.

Q    In Detroit?

A    In Detroit.  And then in later years moved to Harper Hospital where I worked full time, also in Detroit in the Department of Pathology.

Q    And any board certifications, sir?

A    Yes.  In 1967, I was certified by the American Board of Pathology in Anatomic and Clinical Pathology.  In 1975, I was certified by the American Board of Pathology in Medical Microbiology and in 1992 I was certified by the American Board of Pathology and Forensic Pathology.

Q    Sir, could you indicate first please when did you retire?

A    In 2002.

Q    Two-thousand-two.  During the years that you were working sir as a forensic pathologist were you qualified as an expert in any Michigan Courts?

A    Yes.

Q    In District and Circuit?

A    No, I believe it was Circuit and perhaps some District.

Q    Approximately how many times, sir?

A    In all of the courts where I testified over 50.

Q    At this point, I know you're retired, but do you still have your medical license?

A    Yes.

            MR. PHENEY:  Your Honor, at this time I would move to qualify the witness as an expert in the field of forensic pathology.

THE COURT: Anyone wish to voir dire further?

MS. DUNFIELD: No, Your Honor.

MR. RONNING: No, Your Honor.

MR. RODLUND: No, Your Honor.

THE COURT: Okay, thank you. I will note that he's an expert, a certified expert in forensic pathology.

MR. PHENEY: Thank you very much, Your Honor.

THE COURT: You're welcome.

BY MR. PHENEY:

Q Doctor, turning your attention to April 27, 1998, on that day did you happen to perform an autopsy on the body of Deborah Boothby?

A Yes.

Q And where did that take place, sir?

A It took place in the autopsy facilities at Metropolitan Hospital in Grand Rapids where the organization Michigan Forensic Medicine had an agreement to use those facilities.

Q We've heard from one former Covert Township Police Officer that he indicated that he and partner attended the autopsy, was that typical that an officer would attend?

A It is typical, yes.

Q Do you recall officers from Covert Township police being at that particular autopsy?

A I can't remember distinctly, no.

Q When you're performing an autopsy sir, as part of your protocol, do you actually talk to the investigating officers if they are there and

161

Q get some background information?

A Yes, I do.

Q Is that information that you need for some purpose?

A Yes. In order to investigate a death which is sudden or unexpected, or violent, or suspected of being due to foul play the forensic pathologist takes into consideration not only the autopsy findings but all the information that can be provided to him by investigation.

Q Now sir, I'm going to get into the specifics. I've chatted with all the parties, I believe you prepared our Final Autopsy Report, is that right?

A Yes.

Q And as part of that report, we'll get into your specific findings with regard to injuries, but alcohol intoxication. Did Ms. Boothby have a blood alcohol concentration in her body at the time of point two seven?

A Yes.

Q And that's very, very high, is it not?

A Yes.

Q All right. Now sir, when you perform an autopsy I'm assuming you start with an external examination of the body?

A That's correct.

Q And if there's clothing on the body you have to remove it?

A Yes.

Q And you take photographs of the autopsy, pretty much every stage?

A That's correct.

162

Q We have photographs in this case, you and I have chatted about them, we're not going to get into them but you have photographs with Ms. Boothby both clothed and unclothed?

A Yes.

Q And photographs that would depict both the external and the internal investigation?

A Yes.

Q All right. Sir, could you please start for us please with your internal--excuse me--your external examination, describe it for us please, and what you found?

A Yes. The external examination, first of all, revealed a large amount of blood on the face and head areas of the decedent. The--the skin in many areas had abrasions which are scrapes and contusions which are bruises. These contusions and abrasions were about the head, and the face, and the back, also, the left hand and both lower extremities including the feet.

Some of these abrasions or scrapes had a specific pattern about them which we call a brush burn abrasion and this refers to multiple parallel lines that would be left on the skin if a body were dragged or somehow thrust on brush. Of course, leaves and twigs or pavement, or gravel and these brush burn abrasions on the body of the decedent were on large areas of the right upper-back primarily.

Q Doctor, you said these are injuries that would be consistent with say, being dragged along pavement or asphalt?

A Yes, that's right. And sir, let me also add that there were such

163

large abrasions also on the lateral or outside aspect of the left thigh. There were also specific kinds of abrasions or more properly, extremely superficial lacerations which we referred to as stretch marks or resembling stretch marks and these are fine, very superficial defects in the skin that are parallel. And the decedent had these stretch marks or marks consistent with stretch marks on the right-lower back and also in the left popliteal area. The popliteal area is that soft tissue area in the crook of the knee, in the back of the knee.

Q And those injuries would be consistent with what?

A Stretching of skin.

Q Stretching of skin. Also reviewing your report, did you also notice any evidence of therapy?

A Yes, I did.

Q And that would be what, sir?

A There were cardiac monitor patches or pads on the chest. These were used in taking tracings to see what kind of activity there was in the heart. There was also an endotracheal tube in place. This is a tube that is inserted by the medical responders into the mouth and into the trachea which is the upper part of the airway to facilitate artificial breathing. And there was an intravascular catheter, a needle and tube in the left antecubital fossa, which is the crook of the elbow.

Q This is something consistent with paramedics or first responders?

A Yes.

Q Now Doctor, after completing your external evaluation of the body I'm

assuming you're not able to come up with the cause of death at that point?

A   That's correct, however, I have just one more area of description--

Q   Certainly.

A   --to pass on about the external examination. There were also lacerations on the skin. Lacerations are tears of the skin. There were five such significant lacerations; one of them was on the top of the head, just to the left of the midline on the scalp situated in an anterior/posterior or forward/backward direction and this was two and a-half inches long and extended down to the skull surface.

Q   So down to the bone?

A   Down to the bone. Another less deep laceration was on the left area of the left temple, that being here where I'm indicating on the side of my head, that was one and a-quarter inches in length and was oriented in an up and down direction.

There was another such laceration, this one deep and down to the bone surface just to the left up the nose. So, it was on the front part of the left cheek.

Q   Was that down to the bone as well?

A   That was down to the bone. There was further a semi-circular shaped laceration, one and a-quarter inches--sorry, one and a-half inches in length on the front of the left side of the chin.

And finally there was a large, very deep laceration or tear of the skin on the lateral or outside aspect of the top of the left-- sorry, the right foot and that was four inches in length and gaping so

165

that it was two inches wide.

Q So quite a bit of extensive damage to the external body?

A That's correct. Am I speaking loud enough?

THE COURT: Can you hear okay?

MR. SAPPANOS: Some of it.

THE COURT: If you could go a little louder that would be fantastic. Thank you.

THE WITNESS: Okay.

BY MR. PHENEY:

Q Doctor, I'm going to turn your attention now to the internal examination. I'm assuming you start with the external and then move on to the internal?

A That's correct.

Q Could you describe the internal examination?

A Yes. I'll start with injuries of the head. What is done in the internal examination of the head is that the top of the skull is removed, exposing the brain and the internal surfaces of the cranial cavity. There were areas of hemorrhage. There was bleeding in the temporal bone on the left side--sorry--on the right side of the base of the skull. And a small area of hemorrhage on the right side of the base of the occipital bone. Just above these areas of hemorrhage in the bone there was a small contusion, again, the term refers to a bruise and this was a bruise within the brain tissue of a part of the temporal lobe of the brain called the hippocampus.

Q Doctor, let me ask you--

166

MR. SAPPANOS: I'm sorry. What was the last part of the brain tissue called?

THE WITNESS: Hippocampus.

MR. SAPPANOS: Thank you.

BY MR. PHENEY:

Q  Doctor, the injuries you've described to the head and the brain were these serious or severe injuries?

A  Any injury that results in bleeding or bruising in the brain tissue is by definition severe.

Q  Could it be ultimately fatal?

A  A small contusion of the brain in this case of and by itself would not be expected to be fatal.

Q  Doctor, could you indicate for us please what other injuries you noted in the internal examination?

A  Yes. The left clavicle that is the collarbone was fractured in its mid-portion and was depressed and obviously deformed.

The internal examination continued with the opening of the chest cavities and this revealed an accumulation or collection of 350 ml of blood in the right pleural space. And 300 ml of blood in the left pleural space.

Q  And what is the significance of that, Doctor?

A  The significance is that that is a very significant amount of blood which was lost from her circulatory system 'into chest cavities.

Q  That's internal bleeding then?

A  Yes.

167

Q So it wasn't where it was supposed to be?

A It was not where it was supposed to be, therefore, it could not function in doing what the blood stream is supposed to do and that is to provide oxygen to vital tissues.

Q That type of internal bleeding, is that severe?

A Yes.

Q Is that potentially fatal?

A Yes.

Q You indicated you were looking and did you notice any injuries to the ribs themselves?

A Yes. First of all, let me mention that there was internal bleeding about the clavicle or collarbone fracture as there would be expected to be. So, this is also blood that is lost from the circulatory system into surrounding soft tissue and therefore, is no longer functioning to carry oxygen.

The right first through fifth ribs were fractured laterally, that is on the outside aspect and posteriorly or back, back part of the chest cavity.

On the left side the first through eleven ribs were fractured similarly being on the lateral and posterior aspect. And some of the fractured ends, the sharp ends of the fractured ribs were protruding into the pleural spaces.

Q Could that have led to the internal bleeding?

A Not exactly because they were protruding but because intercostal, that is between the rib, blood vessels were disrupted by the fractures and

168

it was primarily those arteries between the ribs that were pumping blood into the pleural spaces.

Q Could you indicate for us please Doctor, what other injuries you noted?

A Yes. There was a fracture of the pubic bone in her right side of the pelvis and this was also associated with soft-tissue hemorrhage from the fractured bone.

Q What else? What other injuries, Doctor?

A Yes. So as far as internal injuries are concerned that essentially covers it.

Q Okay. The internal injuries that you've indicated to us taken altogether are those of a severe nature?

A Yes.

Q As a result of your examinations, both external and internal, were you able to develop, in your opinion, what was the cause of death of Ms. Boothby?

A Yes.

Q And what was that, sir?

A Multiple blunt force injuries.

Q What does that mean for those of us who aren't doctors?

A The injuries that I observed would have come from blunt force as opposed to cutting, or gunshot, or stabbing and they were very consistent with blunt force.

Q Blunt force. Can that be something like punches or kicks?

A Punches, kicks, uh, dropping of the body, uh, thrusting--

169

Q    Being driven over, perhaps?

A    Yes.

Q    You were able to rule out things such as heart attack or natural causes?

A    Yes.

Q    Doctor, at this time I know as part of the autopsy you've come to conclusions about the cause of death and then also you give an opinion as to manner of death. You've given us your cause of death, manner of death means what, sir?

A    Manner of death is why those--why that cause of death actually occurred and in forensic pathology we have a very limited number of choices. Manners of death are natural, or accident, or suicide, or homicide and in the absence of clear indications that we can be confident of to call a manner of death any one of those we have a category that is called undetermined.

Q    Undetermined. And Doctor, correct me if I'm wrong, at the time of this report when you authored it, the manner of death is listed as undetermined?

A    Yes.

Q    Okay. And can you explain to us why that manner of death at the time you did your report was undetermined?

A    Yes. At the time of the autopsy, the investigation by the various departments involved had not revealed to me a clear indication of why and how the blunt force injuries occurred. So, at that point various of the manners that I listed for you would have been possibilities

170

even in--

Q And which would have been possible at the time, Doctor?

A Accident would have been possible. Even suicide with a stretch of the imagination about perhaps a person running into a moving car. Homicide certainly was a consideration, natural was not.

Q Natural was not. Now Doctor, since the time that you authored this report in 1998, have you been provided further information about this particular case in terms of the investigation that was ongoing?

A Yes.

Q And Doctor, if I told you that we've had a witness already today testify that Deborah Boothby, prior to her death, on the day in question was--

MR. SAPPANOS: I'm going to object at this, Judge. I mean now Mr. Pheney is very confident and testifying.

MR. PHENEY: I'm providing the expert with the basis for an opinion. You're entitled to provide what's been admitted into evidence and this has been admitted into evidence.

MR. SAPPANOS: This witness can't provide--this--this attorney can't provide any witness with testimony. I mean basically he's providing the witness with testimony. Now, I think that we can get to where Mr. Pheney wants to get there--get to but this isn't the proper way to get to it, Judge. And I understand it's a prelim, but I can't--I don't think Mr. Pheney can tell one witness what another witness said in order to get to an expert opinion and I think we all agree on that.

171

MR. PHENEY: And Your Honor, I don't agree with that. 702 is quite clear as to what is necessary for an expert to make an opinion as to the evidence that's been admitted into the proceeding. We've had evidence admitted into the proceeding. I couldn't have called this witness first without any testimony being provided and then ask him to opine. Evidence has been admitted and I'm talking specifically by Ms. Burnett. The expert is certainly entitled to hear what the testimony that's been presented is and then give an opinion in regard.

MR. SAPPANOS: But Mr. Pheney, he already gave his--he already gave his opinion.

MR. PHENEY: He gave his opinion in 1998.

MR. SAPPANOS: Okay.

MR. PHENEY: I'm asking that he--

MR. SAPPANOS: He's given again to us attorneys before he heard the testimony.

THE COURT: Thank you. Anybody else wish to add then to the objection before I make my ruling?

(No response)

THE COURT: Thank you. I will allow you to continue and have the doctor give the basis based upon your question.

MR. PHENEY: Thank you.

THE COURT: Continue.

MR. PHENEY: Providing the testimony that's been presented?

THE COURT: Providing just the testimony that's been

172

presented up to this point.

MR. PHENEY: Thank you.

BY MR. PHENEY:

Q   Doctor, we've heard from a witness today who provided testimony that Ms. Boothby before dying was struck with fists and while on the ground she was kicked with feet. Ultimately, she was dropped in the road and driven over by one to two, possibly more vehicles. Knowing that, Doctor, would you at this point would that have any affect in regard to your opinion as to manner of death?

A   Yes.

Q   And what would that do to your opinion as to manner of death here?

A   The manner of death obviously, in my opinion, then would be homicide.

Q   Homicide. Now Doctor, the injuries that you've discussed in detail for us would those injuries that you've discussed that you found on the body, both externally and internally, of Ms. Boothby would those be consistent with that type of behavior? Strikes, kicks, being driven over by a vehicle?

A   Yes.

Q   Thank you, sir. That's all I have.

THE COURT: We're going to start with Ms. Dunfield this time.

MS. DUNFIELD: Thank you.

CROSS-EXAMINATION

BY MS. DUNFIELD:

Q   In your expert opinion, would someone striking a person with their

173

Q bare hand one time cause the injuries that you saw?

A No.

Q In your expert opinion, would someone kicking a person one time cause the injuries you saw?

A No.

Q In your expert opinion, would someone choking a person not to unconsciousness create the injuries that you saw?

A No.

Q In your opinion, do you believe the injuries that you saw more likely resemble a physical attack or something that took more--more power or more manipulation than just something a bare person's hands could do?

A In extreme circumstances, I believe--

MR. SAPPANOS: Your Honor, we can't hear back here.

THE COURT: Okay. I'll let you speak up a little bit, sir when you give your answer.

THE WITNESS: Yep.

MS. DUNFIELD: Maybe if I move back here that would help. Okay, we'll try that.

THE WITNESS: All right. In an extreme case, it's my opinion that fists alone with repeated blows and strong enough blows, alone, would be unlikely to cause all of these injuries.

BY MS. DUNFIELD:

Q All right. Thank you.

MS. DUNFIELD: I have no further questions, Your Honor.

THE COURT: Thank you. Mr. Ronning?

174

MR. RONNING: No. I have no further questions. Thank you, Your Honor.

THE COURT: Thank you. Mr. Rodlund?

MR. RODLUND: No questions.

THE COURT: Thank you. Mr. Sappanos?

MR. SAPPANOS: No additional questions, Your Honor.

THE COURT: Thank you. Mr. Pheney?

MR. PHENEY: Nothing Judge, thank you.

THE COURT: Thank you. Then at this time may this witness be--does anybody object, I guess this is the easiest way to ask this, to this witness being excused?

MS. DUNFIELD: No, Your Honor.

MR. RODLUND: No objection.

MR. RONNING: No objection.

MR. SAPPANOS: No objection.

THE COURT: Sir, that means you're excused and you're free to leave and go about your business or you may stay with us if you so choose.

THE WITNESS: I'll be retired again.

THE COURT: You may go back and be retired again.

THE WITNESS: Thank you, Your Honor.

THE COURT: Okay, thank you.

(At 3:05 p.m., witness excused)

MR. SAPPANOS: Dennis, who is next?

(At 3:06 p.m., Court in recess)

175

(At 3:23 p.m., Court reconvenes, all parties present)

THE COURT: Okay, we're back on the record with the murder prelim. At the time we took our recess we were ready for Mr. Pheney to call his next witness. Sir, if you would like to call your next witness?

MR. PHENEY: Yes, Your Honor. I will call Sharon Martinez.

THE COURT: Okay. Ma'am, if you'd do me a favor--

MS. MARTINEZ: Yes, sir.

THE COURT: --come over to the witness stand. And if you could put your purse up on the counter, please?

MS. MARTINEZ: Sure.

THE COURT: Thank you. Raise your right hand. Thank you. Do you swear or affirm that the testimony you will give today in regards to this proceeding will be the truth, the whole truth, and nothing but the truth?

MS. MARTINEZ: Yes, I do.

THE COURT: Thank you, you may have a seat. Now Ms. Martinez, we need to be sure your voice is loud enough so anybody sitting at the tables in front of you can hear. So, be sure to project, that just records.

THE WITNESS: Okay.

THE COURT: It doesn't amplify.

THE WITNESS: Okay.

THE COURT: You may inquire, sir.

MR. PHENEY: Thank you, Judge.

176

SHARON MARTINEZ

called by the People at 2:32 p.m., sworn by the Court, testified:

DIRECT EXAMINATION

BY MR. PHENEY:

Q   Ms. Martinez, can you spell your first and last name for the record, please?

A   S-h-a-r-o-n; M-a-r-t-i-n-e-z.

Q   Thank you very much. Ms. Martinez, March of 2009, did you happen to speak to a Michigan State Police Trooper by the Kyle Gorham about the death of Deborah Boothby, which was in 1998?

A   Yes, I did.

Q   I'm going to turn your attention then to that particular issue, ma'am. On Saturday, April 25, 1998, did you happen to go to the Blue Star Lounge?

A   Yes, I did.

Q   It's also known as Brackens?

A   Yes, it is.

Q   And that's in Covert Township?

A   Yes, it is.

Q   And do you remember, was that a club that you used to go to often?

A   Yes.

Q   And that's a place that served alcoholic beverages?

A   Yes.

Q   Yes. This particular night, ma'am, this Saturday that I've referred you to did you go to the club by yourself or with someone else?

177

A    I had friends with me.

Q    And who were they?

A    Shalamar and Trish.

Q    And what's Shalamar's name?

A    Shalamar Thomas.

Q    Thomas and Patricia?

A    Jones.

Q    Patricia Jones.  Do you recall--how did you get to the club?

A    I drove.

Q    You drove.  And did you pick the other two gals up or did you just meet them there?

A    Yes, I did.

Q    And when you got to the club can you tell us please, where did you park in relation to the club?

A    I always park up by the front door.

Q    Always park by the front door.  Easy access and you can get out fast?

A    Yeah.

Q    Now ma'am, do you recall what time approximately you got there that night?

A    Probably about 10:30-11:00 o'clock was the usual time.

Q    All right.  Now is the club really crowded at that point or does it pick up--

A    No, it picks up later.

Q    Were you meeting some other folks there or just the three of you going to socialize?

178

A  No, just the three of us we usually go and hang out.

Q  Do you recall where you spent most of your time in the bar that night?

A  Uhm, not exactly where but we usually sit kind of close towards the DJ.

Q  By the DJ and that's close to the front door?

A  No, that's on the other side.

Q  While you were in the bar, in the club, Ms. Martinez, did you have some alcoholic beverages?

A  Yes, I did.

Q  Do you recall what particularly you drank?

A  Not particularly that night.

Q  Was this like a mixed drink?

A  Uhm, yes, because I don't drink anything straight.

Q  And do you recall approximately how many you would have had?

A  Not that many because I had to drive.

Q  You were driving.  Okay.  At some point while you were in the club did you happen to see the person we know to be Deborah Boothby?

A  Yes.

Q  Were you in the club before she was?

A  Yes, I was.

Q  Did you notice her come in?

A  Yes.

Q  Is there a particular reason you noticed her coming in?

A  Because she was white and she stands out.

Q  Okay.  So she was a white female and you're saying that stood out in

the club?

A    Uh-huh.

THE COURT:   That was a yes?

THE WITNESS:   Yes.

THE COURT:   Thank you.

THE WITNESS:   I'm sorry.

BY MR. PHENEY:

Q    Were there a lot of white females in the club that night?

A    No.

Q    Do you recall anything else about Deborah when she came in?  Did you notice, was she having trouble walking?  Did she seem--

A    Uh, she seemed like she had already been drinking before she got there.

Q    Did she appear to be intoxicated when you saw her?

A    Uhm, she seemed like she was real close to it.

Q    Real close to it, all right.  Now when she came in the bar did you happen to see Deborah go up and speak to anybody or have a discussion with anyone?

A    Uhm, she got in an argument with somebody from across the--from where we were sitting she got in an argument with somebody at the bar.

Q    And how far away from you was this?

A    Uhm, that was some--it was some feet because the dance floor is in between where we were sitting and the bar.

Q    My understanding is the DJ booth is against one wall and there's a dance floor and then there's the bar?

A Yes.

Q Is that right?

A Yes.

A So you were by the DJ booth, she was across the dance floor at the bar?

A Yes.

Q Okay. Was the bar crowded at this time?

A Yes, it was.

Q How much later, I think you said you got there between 10:30 and 11:00, how much later did Debby get there?

A Uhm, most of the people started coming in about 12:00, 1:00 o'clock.

Q Now she's across the room from you and you see her having words?

A Yeah, it seemed like a little argument or something maybe.

Q Did it look like a pleasant conversation?

A No, it didn't look pleasant.

Q Was she having this contact with one person or multiple people?

A From across the room it seemed as though it was only one.

Q And was that a man or a woman?

A Seemed like it was a man.

Q And did you know who that person was?

A At that time I couldn't see who it was from across the room.

Q At some point were you able to see who she was talking to?

A Uhm, I didn't notice who she was talking to until we actually got outside.

Q Okay. So she's having this conversation across the bar, you know it's

Q   with a man, but you don't know who?

A   Right.

Q   Were you paying much attention to what was going on?

A   No.

Q   Was this the kind of thing that progressed beyond this argument?

A   Not until later on.

Q   You say not until later on.  So what happened later on?

A   Outside there was a big fight outside, a big gathering of people outside.

Q   Let me stop you there.  You're inside, you see Debby having an argument, you go about your business?

A   Uh-huh.

Q   Were there any other altercations inside the bar or arguments?

A   Not that I saw.

Q   Not that you saw.  At some point did you end up of leaving the bar?

MR. RODLUND:  Your Honor, I'm sorry to interrupt.  I apologize for this.  My client has had his hands free all the full hearing, I know there's a new officer in the courtroom, he would like to be able to take notes and he's not able to do that at this point because it's not the State Police at this point.

THE COURT:  We had Mr. Shaver one cuff?

MR. RODLUND:  Right, Judge, we turned--

MR. PHENEY:  He's staying the night now so he's turned over to the county.  So, it's--

THE COURT:  Oh, thank you.  Okay.

DEPUTY STRAKA: Your Honor, he's got regular cuffs on now, he can raise his hands over his head.

THE COURT: Okay. He's the same as Ms. Gill looks like at this point so I'm going to allow you to write with what you have on there, Mr. Shaver. Thank you, you may continue.

MR. PHENEY: Thank you, Judge.

BY MR. PHENEY:

Q Ms. Martinez, was there a reason you ended up leaving the bar that night?

A Uhm, the lights came on so that meant everybody had to leave early.

Q So that's universally known in the bar when the lights go on it means get out?

A Yes, it is.

Q Is this the type of place where that happens often?

A Yeah, it's happened before.

Q Okay. Is that why you park close?

A Uh-huh, yes it is.

Q All right. The lights went on, do you know why the lights went on?

A Uhm, there had to be some kind of altercation in order for the lights to come on.

Q When they went on what did you do in response?

A Uhm, we kind of just hung around for a minute cause I usually stick around and help out.

Q Do you know some of the folks that work there?

A Yes, I do. I know the owner and the barmaid.

183

Q The owner, Glover?

A Yes.

Q Did you help out inside for a little bit?

A Kind of straightened up a little bit before went out.

Q How much time passed before you went outside?

A Just a few minutes or so. Most of the people had went out already.

Q Most of the people had exited though?

A Yes.

Q When you got outside in the parking lot what did you do?

A Uhm, we kind of hung around our car for a while, on the car.

Q And why is that? Is that sort of a typical thing outside the bar?

A Just hanging out a little while before we leave.

Q So people congregate outside the bar once it closes?

A Yes, they do.

Q Were there a lot of folks in the parking lot?

A Yes, there was.

Q Now you're hanging out, are you're having pleasant conversations with folks?

A Yeah, laughing and joking.

Q Did something then take place in the parking lot that was not pleasant?

A Yes.

Q And where approximately was that in the parking lot?

A Probably the middle of the parking lot.

Q How far from where you had parked?

184

A Oh, uhm, it was maybe about half--between, uh, between the building itself and then the street, so it was right in the middle. It was a little ways from my car.

Q A little ways. How many folks were involved in this altercation, this commotion in the parking lot?

A Well, there were a lot of people crowded around. But in the center of the crowd there was a woman that was balled up and there were people that were kicking on her and stomping on her.

MR. SAPPANOS: I'm sorry, we can't hear back here.

THE COURT: Okay. Could you--would you give that answer again please, ma'am, a little louder?

THE WITNESS: Sure. There was a crowd surrounding a woman, the woman was laying down balled up, there were some people kicking and stomping on her.

BY MR. PHENEY:

Q Now this was taking place aways from you so did you walk over to--

A Yes, I did.

Q And was there a reason you went over there?

A Because I had family that was there so I wanted to make sure that they weren't in the middle of that altercation.

Q You were concerned that perhaps they were involved?

A Yes.

Q Did you actually find your family members that you were looking for?

A Yes, I did.

Q Were they involved?

185

A    No, they weren't.

Q    So after you made sure that your family members were not involved you then indicated what you saw. Who was the woman that was involved in this?

A    Deborah.

Q    Deborah?

A    Yes.

Q    This was the white female that you mentioned earlier?

A    Yes.

Q    And she was standing or on the ground?

A    She was on the ground.

Q    And you say she was--how was she on the ground?

A    Kind of balled up.

Q    Like arms above?

A    Like you were trying to protect yourself when you balled up, somebody kicking on you you gonna cover yourself up.

Q    So she was--she tried to wrap herself into a ball. Did she have her hands up protecting her head?

A    I couldn't see her hands but you could see that she was kind of balled up more or less in an almost like what they call fetus position, I guess you call it.

Q    And you say people were doing what to her?

A    Kicking her and stomping her.

Q    How many folks?

A    Uhm, I saw two.

186

Q   Okay, you say two in particular?

A   Yes.

Q   And who were they?

A   I saw Scottie and I saw Ivory.

Q   You saw Scottie and Ivory and do you know their last names?

A   I know Scottie's last name is Shaver. I'm not sure of Ivory's last name.

Q   Can you look around the courtroom for us please? Do you see either Scottie or Ivory here?

A   Uhm, I believe that's Scottie in the back and Ivory is sitting in the front.

Q   Okay, Ivory is--which one is Ivory?

A   In the blue and orange.

        MR. PHENEY: If the record could reflect the identification of Ivory Shaver, Your Honor.

        THE COURT: It will be so noted.

        MR. PHENEY: I know there's another Defendant seated in the back. I don't know if the witness needs to stand up or perhaps Mr. Sappanos' client can move closer.

        THE COURT: When you say the Defendant in the back there's an individual at that table and somebody behind, is that who you're referring to?

        THE WITNESS: Behind the table, yes.

        THE COURT: It will be noted she identified Scottie Shaver.

        MR. PHENEY: Thank you.

187

BY MR. PHENEY:

Q And what did you see Scottie Shaver and Ivory Shaver doing?

A They were kicking. Kicking and stomping on her.

Q Stomping?

A Yeah, kicking and stomping at her.

Q So there is stomping where the foot is raised and dropped?

A Yes.

Q And kick is where you rear back--

A Yes.

Q And lets start with Scottie, how many times did you see him do that?

A I didn't stick around long enough to really see how many times it was happening. I know I seen it a couple of times and that's when the crowd kind of really kind of formed around and I backed up off of it.

Q You didn't stick around to count it?

A No.

Q Did you see him do it more than one time?

A Uh, yes. Maybe twice before I backed up off of there.

Q How about Ivory?

A Same thing.

Q Did you see anybody else involved in this?

A No, I didn't see anybody else actually do that.

Q Did you see anybody else doing anything else?

A No, like I said I saw those two doing that and I backed up out of the crowd.

Q Backed up out of the crowd. And what did you think was happening at

Q   this point? Were you concerned for this woman's safety?

A   I didn't think anything was really going to happen too much more than that.

Q   These kicks, were they playful in nature or were they--were they pretty strong?

A   Well, I wouldn't think that's playful.

Q   So it didn't look playful to you?

A   No.

Q   Did you see the woman reacting to these stomps and kicks?

A   No more than her being balled up.

Q   Was she saying anything?

A   At that point I didn't hear her saying anything.

Q   Was anybody saying anything? Was the crowd screaming anything?

A   Oh, crowds always kind of geek things up.

Q   You moved away, where did you move back to?

A   Back towards my car.

Q   Back towards your car. And what did you do at your car, did you get in and leave immediately?

A   No, because the crowd was still in there.

Q   So what did you do? Were your friends with you at this point, Shalimar and Patricia?

A   Yes.

Q   And what did you folks do?

A   We kind of waited around by the car, we got in the car and we was trying to wait for the crowd to kind of disperse and then so we could

189

leave out there.

Q So you were sitting in your car?

A Uh-huh.

Q Is that a yes?

A Yes, I'm sorry.

Q Thank you. At some point did the crowd start to disperse?

A Yes, it did.

Q Do you know why that happened?

A I'm not sure why.

Q When the crowd dispersed did you see the woman again?

A Uhm, not until a little bit after everybody had cleared.

Q So everybody cleared and then you saw the woman?

A Yes.

Q Where was she?

A Uhm, she was being picked up.

Q Being picked up. Physically picked up?

A Yes, physically picked up.

Q She had been on the ground?

A Yes.

Q And someone picked her up?

A Yes.

Q Who picked her up?

A Scottie and Avery (sic) took her to the car.

Q Scottie and Ivory?

A Yes, Ivory, excuse me.

Q And they picked her up you say, did they then start leading her somewhere?

A To the car.

Q To the car. And where was this car located?

A It was parked on the opposite side of the parking lot where we were. So I would say, uhm, South Haven is which direction, uhm, is South Haven north or?

Q North.

A Okay. Then they were parked on the north side of the parking lot.

Q So you were on the south side, they were on the other side, the north side?

A Yes.

Q Okay. How far down was the vehicle that they took her to?

A Uhm, just a few feet from where the incident actually started at.

Q And do you know whose car that was?

A No, I do not.

Q Did you see anyone else at that vehicle?

A Uhm, there was a female at the vehicle.

Q Is this a female that you knew?

A I don't recall who that female was.

Q Do you, uh, if you saw that female now would you recognize her?

A No, I don't think I would it's been a long time.

Q Okay. This wasn't someone that was a friend of yours?

A No.

Q You indicate that Ivory and Scottie are taking Debby somewhere, could

191

Q you explain that? Was she going voluntarily? Was she cooperating?

A I don't think she was really cooperating, I don't think she really could do too much, you know, after being beat up like that most people don't really get up and walk on their own.

Q Well, was she--were her feet actually moving or was she being dragged?

A It appeared more like she was being dragged instead of walking on her own.

Q All right. So those two individuals--was anybody else around Scottie and Ivory when they were doing this?

A Uhm, I'm not understanding what the question is.

Q When Scottie and Ivory have a hold of Debby and they're walking her towards the car was anybody else in that area with them, with those two individuals, Scottie and Ivory?

A Not that I remember.

Q You didn't see any other males?

A Not that I remember, no.

Q Not that you remember, okay. This vehicle that you mentioned, do you recall what kind it was?

A Not right off hand, no.

Q Did they actually put her in the vehicle?

A Yes.

Q And what part of the vehicle?

A In the backseat.

Q In the backseat.

Q And did those gentlemen get into the car?

192

A    Yes, they did.

Q    Do you recall where?

A    In the backseat, also.

Q    Backseat.  Do you recall, was there anyone else in the front?

A    At that point in time there wasn't anyone else in the front.

Q    Did someone get in the front?

MR. SAPPANOS:  Can't hear.

MR. PHENEY:  Okay.

THE COURT:  She stated at that point in time there was no one else in the front and then we're going to get to the next question.

And please speak up, ma'am.

THE WITNESS:  Okay.

BY MR. PHENEY:

Q    At some point did someone get in the front of that vehicle?

A    Yes.

Q    And who was that?

A    A female got in the front.

Q    You don't know who that is?

A    No, I do not.

Q    Did you ever see the car start up?

A    Uhm, not start up, you don't see a car start up, but as we got ready to leave, you know, the car was still there.

Q    The car was still there?

A    Yes.

Q So you, Shalimar and Patricia you were able to begin leaving the parking lot?

A Yes.

Q And did you actually drive by that vehicle?

A Yes, I did.

Q Was it still parked?

A Yes, it was.

Q Do you know who was still inside the vehicle?

A I know Scottie, Deborah and Ivory were still in the car.

Q Okay. And the woman that you mentioned was she in it?

A She was in the front seat then.

Q Did you see anything going on in the car?

A Uhm, you could see a bunch of hands waving around in the back, you know, I don't know whether--I'm not sure what it was going on in the back but the hands were moving around in the back.

Q Hands were moving around. So you had driven right by this vehicle?

A Yes.

Q Were you able to continue on out of the parking lot?

A Yes.

Q And which way did you go?

A We went north.

Q Towards South Haven?

A Yes.

Q And where were you going?

A We went to Shalimar's house.

Q Shalimar's house. And when you got to Shalimar's house what did you do there?

A Uhm, we smoked.

Q And what did you smoke?

A Some marijuana.

Q Some marijuana. And was that inside or outside?

A Outside.

Q Okay. At some point did you go in Shalimar's house?

A Yes, we did.

Q And how long did you folks stay at Shalimar's?

A We were only there for a little while.

Q And you're there for a little while and at some point did you leave?

A Me and Trish left.

Q You and Patricia. And where did you folks go?

A We went back towards the bar.

Q And was that on your way home or was there a specific reason?

A She had forgot her glasses, she misplaced her glasses and we were going back to look for her glasses.

Q So your intent then was to go specifically back to the bar for Patricia's glasses?

A Yes.

Q So you would have been traveling southbound on Blue Star Highway?

A Yes.

Q Heading towards the bar?

A Yes.

Q At some point as you neared the bar did you see anything else in the roadway?

A There were headlights in the road.

Q Facing which direction?

A Facing north.

Q Facing north. The headlights, was this a moving vehicle or a stationary vehicle?

A The lights weren't coming any closer to us so I would say that it was stationary at that point.

Q Did you notice anything else around the vehicle?

A There was someone laying out in the road at that point.

Q There was someone laying in the road?

A Yes.

Q And who was the person laying in the road?

A That was the white lady, Deborah.

Q White lady, Debby. Where was she lying in the road in relation to that vehicle, was she close to the vehicle?

A Uhm, in front.

Q In front of the vehicle?

A Yes.

Q When you saw this did you stop or slow down?

A We kind of kept going trying not to be all off into everything. So, we kind of kept our pace that we were going at.

Q Were you able to look at the vehicle that you were driving by and see who was inside?

196

A    Yes.

Q    Did you actually see who was in the driver's seat?

A    Yes.

Q    Who was in the driver's seat?

A    Ivory.

Q    Ivory.  As you continued past--and how did you know it was Ivory?

A    I looked him in his face.

Q    Okay.  So he was looking in your direction and you were looking in his?

A    Yes.

Q    As you were driving past did you continue to watch what was going on with that vehicle?

A    Yes, we did.

Q    What did you see that vehicle do, if anything?

THE COURT:  Speak up please, ma'am.

THE WITNESS:  Oh, sorry.  As we drove past we were approaching the driveway to go back into the bar and as I looked back at the car you could see that the car had went forward--you see the taillights excuse me, the reverse lights came on.

BY MR. PHENEY:

Q    Now you're saying Debby is lying in the road and what's the first thing you saw the vehicle do?

A    It went forward.

Q    Drove forward?

A    Yes, it did.

197

Q   Over Debby?

A   Yeah, cause it didn't swerve no where and she was laying in front of the car.

Q   Did you see the vehicle rise up as if it had driven over something?

A   I couldn't tell that not from where I was at.

Q   How far forward did the vehicle go?

A   It didn't appear that far.

Q   Based on where the body had been when you saw it would it have been far enough to drive over the body?

A   Yes, I would imagine so, yes.

Q   You say then you continued to look and you saw brake lights?

A   Yes.

Q   And then the vehicle did what?

A   Then I saw the reverse lights come on.

Q   And how far did the vehicle then reverse?

A   I didn't see it actually reverse I saw the reverse lights come on as we were going into the driveway.

MR. RONNING:  I can't hear the last answer, Your Honor, I'm sorry.

THE WITNESS:  I saw the reverse lights come on as we went into the driveway.

MS. DUNFIELD:  Your Honor, if Mr. Pheney can move this way I think she might actually direct her voice this way.

MR. PHENEY:  I don't want to get too much that way, most of my witnesses are not terribly interested in looking in that direction

198

if they don't have to. So, that's why I'm standing here, Your Honor.

THE COURT: Wait, wait, wait, hey, hey, okay. Ma'am, just do me a favor and keep your voice up.

THE WITNESS: Yes, sir.

THE COURT: Thank you.

BY MR. PHENEY:

Q All right. Did you pull in the parking lot of the bar at that point?

A Yes, I did.

Q And did you make contact with anyone in there?

A Yes, I did.

Q And after seeing what you had seen what were you thinking at this point?

A Just didn't really know what to think at that point.

Q Were you calm at the time or not?

A No.

Q Did you and Patricia then get out of the car and make contact with anyone?

A Yes, we did.

Q And who was that?

A Talked to Sam.

Q Sam? Is that Keith Owen?

A I can't remember his real name.

Q Sam is what he went by?

A Yes, he was the door bouncer.

Q The bouncer at the bar?

A    (No audible response)

Q    Okay.  What--did you ask Sam to help you out and get some help or did you ask anyone to call anybody?

A    Yes.

Q    Were you asking for 9-1-1?

A    Yeah, need to call somebody.

Q    And after speaking to Sam did you speak to anybody else?

A    No, at that time, no.

Q    Did you and Patricia stick around very long?

A    Not that long, uh, there was another car that pulled in and someone else got out complained about the same thing that they need to call, you know, so at that point we got ready to go, we left.

Q    You got ready to go.  Did you and Patricia then get in the vehicle and proceed out?

A    Yes, we did.

Q    And which way did you go out of the parking lot?

A    We went south.

Q    South towards Covert?

A    Yes.

Q    Did you happen to look down to see if the body was still in the road?

A    Yes, we did look down.

Q    And was the body still there?

A    It was still there.

Q    Lying on the ground?

A    Yes.

200

Q  In the same location as where you had originally seen the body?

A  It wasn't laying in the same direction, no.

Q  Was it now closer to the bar or further from the bar?

A  Further.

Q  Okay, so further from the bar and further from where you had originally seen it?

A  Yes.

Q  When you originally saw the body, and I know I'm going back, how was it placed in the road, was it a completely in the northbound lane, was it in part of the shoulder?

A  It was mostly in the street.

Q  In the street. As you look back now and saw the body was it--could you explain to me was the body was completely in the northbound lane?

A  It didn't appear to be all the way in the street like it was.

Q  So it was a different location. While you were in the parking lot and I know we've already jumped ahead, but before you left did you happen to see--you've already testified about Scottie Shaver, did you see him in the parking lot?

A  When we got back, yes.

Q  And that's around the time you made contact with Sam?

A  Yes.

Q  What was Scottie doing in the parking lot?

A  Uhm, speaking to someone else.

MR. SAPPANOS:  We can't hear that, Your Honor.

THE COURT:  He was speaking with someone else in the parking

201

lot.

MR. SAPPANOS: Who?

MR. PHENEY: I guess we can ask.

BY MR. PHENEY:

Q    Do you know who he was speaking to in the parking lot?

A    He was speaking to Ed, I believe is his name.

Q    Ed? Do you see Ed in the courtroom at this time?

A    Well, I believe the gentleman here.

Q    The gentleman where?

A    With the glasses on.

Q    Glasses.

MR. PHENEY: Your Honor, if the record could reflect the identification of Mr. Foster?

THE COURT: White gentleman or black gentleman?

THE WITNESS: Black gentleman.

THE COURT: Okay--

THE WITNESS: Excuse me.

THE COURT: --it will be so noted.

BY MR. PHENEY:

Q    All right. Scottie was talking to Ed Foster in the parking lot?

A    Yes, sir.

Q    And were you paying much attention to what they were doing?

A    No.

Q    At some point did you see either one of them leave?

A    Yes, Scottie left.

Q How did Scottie leave?

A Uhm, he got in the passenger side of a car and that car pulled out.

Q Do you know who was driving?

A No, I do not.

Q And that vehicle that Scottie got into which direction did it go?

A It went north.

Q Okay. North, in the direction of where the body was?

A Yes.

Q Did the person that was driving the vehicle that Scottie got in was it a male or a female?

A Uhm, I couldn't see who was actually driving.

Q So you don't know who was driving?

A No, I do not.

Q Did any other vehicles follow out of that parking lot in close proximity to Scottie's vehicle?

A Yes, there was a Jeep I believe it was that left out afterwards.

Q And did that seem to be going in the same direction?

A No, it seemed it went in the opposite direction.

Q Do you know who is in that vehicle?

A Excuse me, uhm, Ed was in the vehicle.

Q Ed? That's Ed Foster, you saw him drive out?

A Yes, I didn't see him physically drive out, but the vehicle, he got in that vehicle and that vehicle left.

Q Now ma'am, we chatted about the statement that you gave to the trooper March 28, 2009, as part of that statement did you actually write out--

203

A    Yes, I did.

Q    --what you recalled?

A    Yes, I did.

Q    Let me show you, if I could.  Now if you could just review that.  Do you recognize the handwriting?

A    Yes, I do.

Q    And--

MS. DUNFIELD:  Your Honor, I'm going to object at this time. I don't believe the witness has stated that she can't remember anything in her report.  I think this is improper impeachment of his own witness.

MR. PHENEY:  Well, you're allowed to impeach your own witness.  You have to present them with the statement and then specifically ask them about it.

MR. RONNING:  I think you have to present another witness of who she made the statement to to ask whether she made the statement. If she's trying to refresh her memory, she never said she didn't have a memory.

MS. DUNFIELD:  She never said she couldn't remember.

MR. RODLUND:  She never said--

MR. SAPPANOS:  She never said she couldn't remember.

THE COURT:  One at a time.  Okay.  The question that you previously asked is, is that she made a statement?

MR. PHENEY:  Yes.

THE COURT:  And is this her statement?

204

MR. PHENEY: I asked her if she made a statement and as part of that statement she actually wrote down part of her statement. And I'm asking her now if this is indeed her statement, if she recognized the handwriting, if it is indeed her statement. So right now I'm just asking her to identify the statement.

THE COURT: At this point you can ask if she made that statement and if that's her statement and then I'm going to get to the objection.

MR. PHENEY: Okay.

THE COURT: So, go ahead and answer the question--

MR. PHENEY: Thank you.

THE COURT: Is that your statement, ma'am.

BY MR. PHENEY:

Q    Ma'am, is that your statement?

A    Yes, it is.

THE COURT: Okay, thank you. Now are you going to go any further than that?

MR. PHENEY: Yes.

THE COURT: Then--okay, then I'm going to just allow her to state that that's her statement at this point in time and I'll sustain the objection.

MS. DUNFIELD: Thank you, Your Honor.

MR. PHENEY: All right. Thank you, Judge.

THE COURT: You're welcome.

BY MR. PHENEY:

Q  Ma'am do you remember, and I know you've testified before, do you remember anyone other than Scottie and Ivory taking part in kicking or assaulting that woman in any way?

A  No, just those two.

Q  Do you remember--

MR. SAPPANOS:  Your Honor, it's really getting hard to follow along because we cannot hear.

THE COURT:  Well Mr. Sappanos, bring your client right up here in front of this table and slide up.

MR. SAPPANOS:  I mean should we ask the deputies first, Judge, because it was a big deal for us to be able to move here?

THE COURT:  Mr. Sappanos, bring your client right up here in front of these tables and slide up.

MR. SAPPANOS:  Thank you, Your Honor.

(At 3:50 p.m., Attorney Sappanos and Scottie Shaver moving up to another table)

THE COURT:  There you go.  Thank you.

MR. SAPPANOS:  This will block their view, Your Honor.

THE COURT:  They can see.  They're very capable of looking through the heads.  It's not a problem.  Go right ahead, sir.

MR. PHENEY:  Thank you.

THE COURT:  You're welcome.

BY MR. PHENEY:

Q  Ma'am, do you ever remember any other males involved in that assaultive part of the evening?

206

A    None.  No, I do not.

Q    Okay.

THE COURT:  Be sure to speak up.

MS. DUNFIELD:  Yeah, I can't hear now.

THE WITNESS:  No.  No, I don't.

MS. DUNFIELD:  Thank you.

BY MR. PHENEY:

Q    You don't recall any involved or you don't recall--were there other folks that were around or did you only see two people striking--

A    There were a lot of people that were around.

Q    Do you know that it was only two people that was striking her?

A    I can't say that there were only two, but those--I saw two.

Q    That's what you saw?

A    Yes.

Q    Okay.  Thank you, ma'am.

MR. PHENEY:  That's all I have.

THE COURT:  Okay, we'll start with Ms. Dunfield.

MS. DUNFIELD:  I have no questions, Your Honor.

THE COURT:  And Mr. Ronning?

MR. RONNING:  I have no questions, Judge.

THE COURT:  Thank you.  Then Mr. Rodlund?

MR. RODLUND:  No questions at this point.

THE COURT:  And that leaves you, Mr. Sappanos?

MR. SAPPANOS:  Thank you.

CROSS-EXAMINATION

BY MR. SAPPANOS:

Q    Good afternoon, ma'am.

A    Good afternoon.

Q    I'll move where everybody can see.  Were you employed by the Blue Star Lounge on the night in question?

A    No, I was not.

Q    You just chose to stand around and help out a little bit?

A    I always did that.

Q    All right.  Did you know Glover?

A    Yes, I did.

Q    Were you dating him at the time?

A    No, I was not.

Q    No you weren't, okay.  And after helping out you said you go out to chitchat with some friends by your car?

A    Yes.

Q    All right.  And then you say an altercation drew your attention?

A    Yes.

Q    And that altercation was about halfway between the bar and Blue Star Highway?

A    Yes, it was.

Q    Which would be close to the middle of the parking lot?

A    Yes.

Q    All right.  And how far were you from the altercation because you were up towards the bar, right?

A    Yes.

Q   I mean tell me when to stop walking?

A   You would have to probably go back a little bit further than what you actually can because you can't go outside the--

Q   Over to that building out the window?

A   Yes.

MR. SAPPANOS:  So Judge, if we could take judicial notice the witness has testified that from her spot at the witness stand to the building that houses the Prosecutor's Office I would say that's at least--wow--100 feet.

THE COURT:  No, sir, 36 feet from where she's sitting to the back wall and then we're going to add about another 20 feet, so we're going to get about 60 feet, sir.  Count your ceiling tiles.  Sixty feet.

MR. SAPPANOS:  Obviously you've got a lot of time on your hands if you've counted the ceiling tiles.

THE COURT:  I don't want to say when.

MS. DUNFIELD:  Give me that, Judge.

MR. SAPPANOS:  So, 60 feet Judge, would you take a judicial notice?

THE COURT:  I'll take a judicial notice of 60 feet.

MR. SAPPANOS:  Have you measured from this building to that building before, Judge?

THE COURT:  I'm taking a good guessimate of the size of this room to that room.

MR. SAPPANOS:  Wow.  Okay.

BY MR. SAPPANOS:

Q   And you said there was a large crowd of people?

A   Yes.

Q   All right.  And who were all the people?

A   I don't know all the people.

Q   Well, who did you see?

A   I know I found my cousins inside the crowd.

Q   Who else?

A   I also saw Mr. Shaver and I saw Ivory in the crowd.

Q   All right.  Who else?

A   I don't recall who else.

Q   So out of all those people that you saw you only recall your two cousins and the two Shavers?

A   Yes, my cousins were the whole point that I went to the crowd.

Q   Okay.  And in the report--you never get through the crowd to where the altercation is, do you?

A   Not correct.  I did get to the crowd to be able to see enough into the crowd.

Q   Okay.  When did you see--when did you see this Mr. Shaver from where you were standing, chitchatting with your friends, or from when you went to get your cousins?

A   From when I went to get my cousins in the crowd.

Q   All right.  And you remember being interviewed about this incident, correct?

A   Yes, I do.

Q And that was many years ago, right?

A No, I got interviewed just last year.

Q But you didn't give a statement back in '99?

A Ninety-nine?

Q Yep. No statements then?

A No.

Q Just in '09?

A Yes, '09.

Q Okay. And did you have a chance to review your statement?

A Uhm, I went over my statement once before.

Q Okay. All right. Did you have a copy of it?

A Yes, I did.

Q All right. And did you want to change anything in your statement now before I ask you questions?

A No.

Q All right. So it's your testimony today, that you walked up to the crowd to find your cousins and that's when you saw Mr. Scottie Shaver making these assaults, is that true?

A Yes, it is.

Q You did not tell the police on a previous occasion that you saw the altercation from where you were standing by your car?

A The altercation itself, yes, I saw it from my car.

Q What did you see?

A I saw the crowd gathering from my car. That indicates that there is an altercation.

211

Q Okay. You didn't see anybody having an altercation though from where you--

A No, not from my car.

Q Okay. Did you tell the police that, when you were interviewed, that you were not able to get to the front of the crowd?

A Excuse me, what do you mean the front of the crowd?

Q The--

A A crowd is in a circle, there is no front.

Q Did you tell the police ma'am, that you were not able to get to the front of the crowd?

A No, I did not.

Q Okay. So if that was in the statement that is in your police report that would not be true?

A No, that wouldn't be true because I didn't say that.

Q All right. Did you tell the police that even though you didn't get to the front of the crowd you see Scottie and Ivory Shaver and another black male beating and kicking the white female?

A Yes, I did.

Q All right. Who was the other black male?

A Ivory.

Q No, you say Scottie Shaver, Ivory Shaver and another black male?

A No.

Q So if that was in your statement you didn't say that either?

A I don't recall no other male.

Q Okay. So if it was in your statement it's not true?

A    No, I don't remember no third party.

Q    All right.  And now when you saw my client striking the white gal as your refer to her, Deborah we all know now, was Deborah on the ground or standing?

A    She was on the ground when I saw her.

Q    All right.  And was my client punching or kicking?

A    Kicking.

Q    Okay.  You're sure of that?

A    Kicking, yes.

Q    Positive?

A    Yes.

Q    All right.  And if another witness who plead guilty to murder testified just before you that my client never once touched the victim while on the ground, her story wouldn't be true, correct?

A    I have nothing to do with her.

Q    But if her story is that my client never touched the victim while on the ground but you're saying he repeatedly kicked her, somebody is not being accurate, correct?

A    Some--

            MR. PHENEY:  Your Honor, I object.  It's not for the witness to opine about the truthfulness of another.  She can indicate what--

            MR. SAPPANOS:  I'll rephrase it.

            MR. PHENEY:  --it is she saw.

            THE COURT:  Thank you.  I'll allow the question to be rephrased.

MR. SAPPANOS: Thank you.

BY MR. SAPPANOS:

Q You haven't received any plea bargain to testify today, right?

A No.

Q You haven't been charged with any crime, correct?

A No, I have not.

Q All right. And you have no dog in this fight, so to speak?

A No, I don't.

Q All right. Let me ask you a couple more questions. Are you positive that you saw this Shaver, with the afro and the beard--

A He didn't have a beard back then.

Q Okay, but he does now, right?

A Yes.

Q Are you positive that you saw him get in the vehicle that Deborah Boothby was put in?

A Yes, I am.

Q Without a doubt?

A Yes, I am.

Q And what kind of a vehicle was that?

A I don't remember what exact vehicle it was.

Q What color was it?

A I don't remember the exact color, it's been some years.

Q How many doors did it have?

A I don't remember that either.

Q Were the windows tinted or black?

A    I don't know. I have no idea on that.

Q    Okay. Thank you. I'm just asking. Just asking. And you're so positive because, not only did you see him walk the victim over to the car you then watched him get into the car that the victim was just placed in, correct?

A    Yes.

Q    And then--then is it also true that the car that my client was in pulls up past where you are to try exit the bar and you look in and see him in there again, correct?

A    Yes.

Q    Okay. You're sure about that, too?

A    Yes, I am.

Q    All right. And the car that you saw Scottie get into initially, Scottie Shaver, is that the same car that you saw him get into when he came back to the bar?

A    No.

Q    So it's two different cars?

A    Yes.

Q    Was it the same person driving the car that he got into when he came back to the bar?

A    I didn't see the driver of the car that he got into when he got back to the bar.

Q    Okay, thank you. Did you ever see Mr. Shaver when you came back to the bar, Mr. Scottie Shaver, talking to SamBam or Keith Olson? I mean Keith Owens?

215

A    I don't recall seeing him talking to him, no.

Q    But you recall seeing him and you recall seeing Keith?

A    Yes.

Q    All right.

MR. SAPPANOS:  No further questions.

THE COURT:  Thank you.  Mr. Pheney, any further questions?

MR. PHENEY:  I don't, Your Honor.  Thank you.

THE COURT:  Anybody else?  Mr. Ronning?

MR. RONNING:  No, thank you.

MR. RODLUND:  No, Your Honor.

THE COURT:  Thank you.  Ms. Dunfield?

MS. DUNFIELD:  No, Your Honor.

THE COURT:  Thank you.  May this witness be excused or does anybody object to this witness being excused?

MS. DUNFIELD:  No, Your Honor.

MR. PHENEY:  No objection.

MR. RODLUND:  No objection.

MR. SAPPANOS:  No, Your Honor.

MR. RONNING:  No, Your Honor.

THE COURT:  That means ma'am, you may leave.  You're free to leave and go about your business.

THE WITNESS:  Thank you, sir.

THE COURT:  Thank you.

(At 4:00 p.m., witness excused)

THE COURT:  Okay.  Do you have other witnesses?

216

MR. PHENEY: I believe I do, Your Honor.

THE COURT: Okay.

MR. PHENEY: I'll just check to see that the next witness has been brought.

THE COURT: Okay.

(Pause in record; waiting for witness)

THE COURT: Okay. Do you have another witness for us?

MR. PHENEY: I do, Your Honor, Tracy Hughes.

THE COURT: Ms. Hughes, if you would do me a favor ma'am and before you have a seat if you would raise your right hand?

(Ms. Hughes complies)

THE COURT: Do you swear or affirm that the testimony you will give today in regards to this proceeding will be the truth, the whole truth, and nothing but the truth?

MS. HUGHES: I do.

THE COURT: Thank you. Ms. Hughes, that microphone only records your voice, it does not make it any louder. You need to try to project your voice so anybody sitting at those two tables in front of you can hear you. Okay?

THE WITNESS: Yes.

THE COURT: That's better, thank you. Okay, you may inquire.

MR. PHENEY: Okay, thank you.

TRACY DEANNA HUGHES

called by the People at 4:02 p.m., sworn by the Court, testified:

217

DIRECT EXAMINATION

BY MR. PHENEY:

Q    Ms. Hughes, could you spell your first and last names for us, please?

A    Tracy, T-r-a-c-y, Deanna, D-e-a-n-n-a, Hughes, H-u-g-h-e-s.

Q    Ms. Hughes, you understand that you're here today and that you've been subpoenaed in regard to the murder of Deborah Boothby in April of 1998?

A    Yes.

Q    I'm going to ask you specifically, in May of 2009, did you happen to be in a vehicle that was stopped by a trooper and ultimately you gave a statement to him, that being Trooper Gorham?

A    Yes.

Q    And you, at that point was that statement in regard to what you recall happening in 1998 at the time Deborah Boothby was killed?

A    Yes.

Q    Moving on then to September 22, 2009, were you subpoenaed to appear and give testimony in regard to an investigative subpoena?

A    Yes.  Yes, I was.

Q    And that had to do with the, uh, providing information regarding the death of Deborah Boothby?

A    Yes.

Q    All right.  Now ma'am, we've been talking about the death of Deborah Boothby, do you recall being at the bar the night, in April of 1998, when Ms. Boothby ended up dead?

A    I was out there.

218

Q Did you actually encounter Ms. Boothby some days before that, as a matter of fact?

A Yes.

Q And where was that?

A We was out on 380 at a house we used to all hang out at on 380.

Q Okay. And you say, 'we all' that was you?

A Everybody, that was the hangout spot.

Q That was you and Ms. Boothby was there as well?

A Yeah, she was over there drinking.

Q And was there an altercation at that particular place?

A Yeah, some people had came up in a car and one of the guys got out and said something to her and she was like, "I ain't got it." and she got slapped and they was told to leave the property.

Q So somebody came up and had this exchange with Debby?

A Yes.

Q And who was that individual?

A It was, if I'm not mistaken, the day they came out to Mr. Dixson's house it was, uh, Ivory Shaver was one of the guys, but I don't recall--I don't know the two other people that was in the car.

Q Who actually had the argument with Debby that resulted in her being slapped?

A Ivory and Debby was arguing.

Q Okay. And who actually slapped Debby?

A He did.

Q Okay. And when you say 'he' are we talking about who in particular?

219

A    Ivory did.

Q    Ivory.  And that's who?  Can you tell us what he's wearing, where he's located?

A    He right there.

Q    Okay.  Wearing what, blue?

A    He--

Q    We're recording Ms. Hughes so I--

A    He got on state blue's.

Q    Okay.  Thank you very much.

MR. PHENEY:  If the record could reflect the identification of the Defendant, Ivory Shaver?

THE COURT:  It will be so noted.

MR. PHENEY:  Thank you very much.

BY MR. PHENEY:

Q    Do you recall what that argument was about?

A    It was something--well, what--what Debby told me, was told all over, it had something to do with drugs.

Q    How many days was this before Debby ended up dead?

A    Probably about a week and a-half later or something like that.

Q    A week and a-half?

A    Maybe about a week or some later.

Q    A week and a-half before--

A    And we ended up-- afterwards, it happened after that.

Q    I'm referring to when Ms. Boothby died?  This would have happened before she died?

220

A    Yes, yep, yep.

Q    You're saying about a week?

A    About a week or so after that we was out at the club, yeah.

Q    April 25, 1998, that was a Saturday night. Did you happen to be at the Blue Star Lounge?

A    I was there.

Q    Okay. Do you remember, how did you get there?

A    Drove.

Q    Did you go by yourself or did you bring some folks with you?

A    I had a few friends with me.

Q    Do you remember what time approximately you got there?

A    It was probably about I would have to say between 12:00, about 12:00, between 12:00 and 1:00, something like that.

Q    And when you got to the bar was it already crowded or were there still folks coming in?

A    When I first got there I went in. When I got in the club they was fighting. I was pregnant.

Q    Okay.

A    They was in there fighting and the fight got broke up so I made it back outside to where I was--to my car where I was at.

Q    You went in and you say 'they were fighting' who is they?

A    Who all was in the club, who all, they was fighting; Debby had got into it with some girl, which was Shevy and the drink got throwed and then broke--the drink got throwed, they got to fighting and they got them, they all went outside. I get back to my car and I'm like, I'm

221

getting ready to go and the next thing I know I seen just a bunch of crowded people and they just fighting.

Q  Let me stop you there, Ms. Hughes.  This situation you've described inside the bar, did you actually see that happen?

A  The drink being throwed, yeah.

Q  So that was Debby and who?

A  I guess it was Debby and that gal right there.

Q  That gal?

A  Shevy.

Q  Shevy, okay.

MR. PHENEY:  Your Honor, if the record could reflect the identification of Ms. Gill?

THE COURT:  It would be so noted.

BY MR. PHENEY:

Q  Where approximately in the bar was this taking place?

A  I was on my way to trying to get to the bathroom, I was pregnant at the time.  So, I was trying to get to the bathroom and the fight broke out which I never did make it all the way to the bathroom because they got to going and I made it back out in the parking lot.

Q  A drink was thrown by whom on whom?

A  If I'm not mistaken cause I--if I'm not mistaken, the drink got throwed on Scottie, if I'm not mistaken, got thrown on Scottie.

Q  And who threw the drink?

A  Debby did.

Q  And what happened after Debby threw the drink?  So Scottie, is that--

222

Scottie who?

A    Scottie.

Q    The gentleman here--

A    Shaver.   I believe the drink got threw in his face.

Q    All right.

MR. PHENEY:   Your Honor, if the record could reflect the identification of Scottie Shaver?

THE COURT:   Is it so noted.

BY MR. PHENEY:

Q    Did you see how--how did Scottie Shaver react to that?

A    He didn't do nothing.   He didn't do nothing.

Q    So Debby threw the drink--

A    Then her and Shevy got to fighting.

Q    So Debby and Shevy were--

A    And Shevy got to fighting in the club.

Q    And describe what you mean by that?

A    They was fighting and I left out.

Q    Pushing?

A    They were fighting, black people don't push.   They was fighting.

Q    Ms. Hughes, you'll have to bear with me I'm simply a white, Irish-Catholic male, you may have to help me out. I need you to be really descriptive about what kind of--what was done?

A    They was--I really--I can't really tell you what happened with the fight because I left out of the bar, I would be lying if I did.   I left out.

Q So you saw enough to know that you--

A I was intending to go--my first baby and I left on up out of there.

Q Okay. So you've now left the bar and where were you going? Were you planning on leaving and--

A No wait, I went and sat in the parking lot there and everybody came out.

Q Okay.

A They was coming out. So, I sat and I waited for a minute then they got back in the parking lot, just a crowd of people. Next thing I know a bunch of cars and stuff just started to line up so I said, 'hell, I'm going to follow this crowd', and I went the wrong way.

Q Well, the fight that was going on, was there a fight in the parking lot?

A They was out in the parking lot fighting, too.

Q Okay. Who was fighting?

A I can't tell you, I can't say who was fighting because it was dark and I'm not going to point no fingers at nobody because it was dark. Now, I'm just--I can't just point the finger and said I seen this one, and this one, and this one because it was dark.

Q Okay, so you're saying today you can't tell us who was fighting?

A They was in the parking lot.

Q And you didn't go up to see who was fighting?

A I was in my car.

MR. PHENEY: If I may have a moment, Your Honor.

THE COURT: You may, sir.

224

BY MR. PHENEY:

Q  Ms. Hughes, we discussed earlier that in September of 2009, you got subpoenaed to provide testimony in an investigation?

A  Uh-huh.

Q  And that was with me, I was there, you were there?

A  Uh-huh.

Q  Right?

A  Yes.

Q  And we were talking specifically about this incident?

A  Yes.

Q  And you were sworn in and you testified under oath?

A  Yes.

Q  And during that, do you recall being asked specifically who was fighting in the parking lot?

A  Yes, I do believe.

Q  Do you remember specifically indicating who it was?

A  It was--yeah, I do believe I remember telling you, yes.

Q  Okay.  And I'm asking you now do you recall who was fighting in the parking lot?

A  It was the Shavers.

Q  And I'm going to ask you very specifically to break down who is fighting with whom?  Who is doing what?  Was this people squared up one on one, was this--

A  No, this was a crowd fight.  This wasn't no one person beating that girl, it was a lot of them out there and I don't--I can't say who did

225

Q what but there was a crowd of them out there.

Q Now you say beating that girl, was somebody being beaten?

A Debby.

Q Debby was being beaten?

A Yes.

Q And that was in the parking lot?

A Yes.

Q And you're saying it was a number of folks that were doing this?

A Yeah, and I heard--it was like we heard like a thump, like say somebody hit somebody in the head with a baseball bat or something, it was a thump.

Q Okay.

A And I'm like, 'dam, let's go.'

Q Let me ask you specifically during your testimony in September you asked specifically who did you see striking Debby and you specifically indicated certain individuals?

A Now they was kicking and all, it was--yeah, it was--they know.

Q Okay. Well, I'm asking you. Who was hitting, who was kicking Deborah Boothby in the parking lot?

A The girl, from what I seen when they came off the club and where I was parked at I couldn't really see exactly who face--who was doing what but know I remember Shevy was fighting her.

Q And that means what?

A Out in the parking lot. When they got in the parking lot it was a free-for-all. There was so many people out there, they crowded around

that girl like she was a dog or something.

Q You're saying Shevy was involved?

A Yeah, she was there.

Q And what was she doing?

A I can't say I seen Shevy fight that girl outside but I know inside that club.

Q And Ms. Hughes, I'm talking specifically about outside?

A They fought outside. They did, they fought.

Q And you keep saying 'they', and I'm going to ask you specifically who is 'they?' Who was striking Deborah Boothby?

A Debby and Shevy ended up fighting again.

Q In the parking lot?

A In the parking lot and everybody crowded around and next thing I know I heard a thump and everybody got in their vehicles and they left.

Q I'm going to ask you, other than Shevy, was anyone else fighting with Debby in that parking lot?

A You're seeing a bunch of--you're seeing a bunch of feet and hands and kicking and a bunch of one thump like that and it was all she wrote.

(At 4:13 p.m., witness hits one fist against her palm)

Q Okay. And again I'm going to ask you specifically ma'am, who was doing this?

A I see Shevy was fighting. Somebody went to the back of a truck or--or a back of a car or something and got a miniature baseball bat and whapped her in the head with it and the girl hit the ground.

Q Did you actually see that happen?

227

A    Yes, I'm--my cousin that was with me she was like, "Come on fool, we've got to go."

Q    Who specifically had the bat?

A    Uh, Ed Foster.

Q    Okay.  So you saw Ed Foster do that?

A    I can't say I seen him hit her because some--what I just told you somebody else told me that he was the one that hit her in the head with the bat.

Q    And I'm only asking--

MR. RONNING:  Objection, Your Honor.

THE COURT:  I understand your objection.

MR. RONNING:  Thank you, Your Honor.

THE WITNESS:  I'm just telling--

THE COURT:  I will sustain your objection from that.  And Mr. Pheney I think was cleaning it up to say I want to know--

MR. PHENEY:  Certainly attempt it.

THE COURT:  --specifically what you saw.

BY MR. PHENEY:

Q    Ms. Hughes, I only care about you saw.  So what did you see?  Did you see Ed Foster do anything?

A    I didn't see him hit her with no--I didn't see, no.

Q    What did you see him do?

A    What--what you mean, what did I see him do?  I didn't see him do anything.

Q    Did you see him in the area?

228

A    He was there.

Q    Okay.  Did you see-

A    He was there.

Q    --him doing anything in regard to Deborah Boothby?

A    No.

MR. PHENEY:  Your Honor, I'm going to need a moment because I'm going through this specifically.

THE COURT:  You may.

BY MR. PHENEY:

Q    Ma'am, I asked you specifically in September of 2009, if you saw who swung the bat and you said, "He's the one that swung the bat." meaning Ed, that you saw that happen?

A    No, wait a minute let me clarify you.

Q    Okay.  Please--

A    After that, after you asked me that before that testimony was finished you told me, "Is there anything in this that I need to know?" and I told you yes, and I told you--you asked me what and I told you that someone had told me second-hand person that told me that Ed Foster is the one that hit her in the head with the miniature White Sox bat. Don't you got that on there?  Because I got my papers.

Q    You specifically asked me ma'am, you pointed out at the time you didn't know his name was Ed Foster?

A    Ed Foster.  I didn't know who--right, exactly.

Q    But you're satisfied now that the person was Ed Foster?

A    Yeah, the person--

229

MR. SAPPANOS: I'm going to object, Your Honor, because we're satisfied what? We're satisfied that somebody else told her it was Ed Foster?

THE WITNESS: No, I was trying--

THE COURT: Well, I'm going to have you clarify exactly what--

MR. PHENEY: Yes.

THE COURT: --you're asking her.

BY MR. PHENEY:

Q I'm going to ask you specifically ma'am, you did, you said, "I want to point out, I didn't know who Ed Foster was in September of--April of 199..."--

A Right, right, right.

Q And we asked you, "Are you aware of who that person is now?"

A Yeah, because somebody had told me who it was.

Q Someone pointed him out and said, 'that's Ed Foster?'

A No, they didn't point him out they told me.

Q Who he was?

A I was--I was--I had asked the question and then it came out, they was like, well, uhm, Ed Foster the one that had the bat, and I'm like, 'that's who that was?' and that's how I found out about it.

Q The gentleman that you pointed out in the green with the glasses?

A Uh-huh.

MR. RONNING: Objection, Your Honor, I don't believe she pointed out anybody. And now I have a problem with in-court

230

identification.

MR. SAPPANOS: Yeah, absolutely.

THE COURT: Whoa, whoa, I understand--I understand.

THE WITNESS: Yes, I did. Yes, I did.

THE COURT: The first objection would be relying on what somebody may have told her that it was Ed Foster so I would sustain that objection.

And then we'll proceed from there because we haven't had any identification at this point.

BY MR. PHENEY:

Q    Ms. Hughes, do you know by sight who Ed Foster is today?

A    No.

Q    You don't?

A    No.

Q    Is there anyone in the courtroom at this point, look around, tell me if you recognize anybody else who was involved in what happened with Debby in the parking lot?

A    That one girl ain't here. There's one person missing.

Q    Okay. But if you look around--

A    A female--she not in here.

Q    All right. I'm talking about males, do you recognize any males that were involved in the altercation with Deborah?

A    No. Ain't nobody--what you mean? Am I--

Q    Your testimony is did you actually see anyone holding a bat in the parking lot?

231

A    Yeah, what you mean--yeah, you could see that he had a miniature White Sox bat.

Q    And was that a male or female?

A    It was a male.

Q    And looking around the courtroom do you see the person who had the bat in their hands now?

A    No.

Q    You do not?

A    No.

Q    Okay.  So, I think you've told us what you recall about who was involved in the altercation, the fight in the parking lot?

A    Right.

Q    At some point did people start leaving the parking lot?

A    (No audible response)

Q    Do you remember why that was?

A    I guess the police was on the way, I don't know.

Q    And when people started leaving did you see Debby in the parking lot still?

A    No.

Q    You didn't see--

A    I didn't see her at all.

Q    So you have no idea how she got out of that parking lot?

A    (No audible response)

Q    Didn't see her leave?

A    No, I didn't see her walk out of there.

232

Q    Did you see her get out of there any other way?

A    No.

Q    So you don't know how she left?

THE COURT:  She's shaking her head no.

MR. PHENEY:  If I could have a second, Your Honor?

THE COURT:  You may.

BY MR. PHENEY:

Q    Do you recall testifying that after this happened in the parking lot that you saw Debby lying on the ground?

A    She was on the ground.

Q    She was on the ground?

A    Yes, she was.

Q    So when the fight ended Debby is on the ground?

A    When--I've got to explain to you where you understand.  After all that went on, and I guess the police was on the way or whatever I'm not really for sure if the police was coming or not, when everybody started leaving out the parking lot I did not see that girl.  I got behind the cars cause myself was going to follow and see what the hell was going on but I went the wrong way.  I ended up in South Haven instead of up in Covert.

Q    Ms. Hughes I'm asking you specifically, did you recall testifying that you saw Debby Boothby lying on the ground after this fight in the parking lot of the Blue Star Lounge?

A    When all them cars started leaving she wasn't on the ground.

Q    She wasn't on the ground?

233

A    No, she was not on no ground.

Q    I think, uh, do you recall during that testimony I specifically asked you if Debby--if at some point while she was the ground what happened and you're answer being, "They put her ass in the back of a car." Do you remember that?

A    (No audible response)

THE COURT:  She's shaking her head yes.

THE WITNESS:  Oh, yes, yes.

BY MR. PHENEY:

Q    What does that mean?

A    That's the only--she wasn't on the ground so where does she go?  They had to put her in the car or something.  She wasn't on that ground.

Q    Well, who put her in the car?

MR. SAPPANOS:  Objection, Your Honor, she's--it's clear that she doesn't know.  She said if she wasn't on the ground somebody had to put her in the car.  Now, we're calling for pure speculation.  I think it's very clear.

THE COURT:  Anybody else?

MR. SAPPANOS:  We're leading her along here.

THE WITNESS:  Leading, I know you very well too, sir.

MR. RONNING:  I'll join that objection, Your Honor.

THE WITNESS:  Sapprano (sic).

MS. DUNFIELD:  Also, Your Honor.

THE COURT:  I'm going to allow the question.

MR. PHENEY:  Well, as I indicated Your Honor, you are

allowed to impeach your own witness and I'm using specific testimony that was sworn under oath.

THE COURT: You're using--

THE WITNESS: Right.

THE COURT: --prior testimony in this matter and you may ask the question.

MR. PHENEY: All right.

BY MR. PHENEY:

Q   And Ms. Hughes, I'm just going to cut to the chase. We've talked about the testimony, did you see anyone move her in that parking?

A   I seen, uhm, uhm, what if I just plead the fifth? What's going to happen to me?

UNIDENTIFIED PERSON: There you go.

THE WITNESS: I'm serious because I got a kid. I got kids, too. For real.

MR. PHENEY: Well, Your Honor, I explained to Ms. Hughes that she, when someone takes the fifth it's because they are intending not to incriminate themselves. If there's nothing that they can say that will incriminate themselves and they simply don't want to comply then--

THE WITNESS: I don't have nothing to do with--

MR. PHENEY: --that's an issue that they're going to have with the Court.

THE COURT: Anybody on the defense side want to chime in?

THE WITNESS: So wait, wait, wait.

THE COURT: At this point in time, ma'am, if you have or if you are not incriminating yourself involved in any criminal action then the Fifth would not apply--

THE WITNESS: Okay.

THE COURT: --and I'm instructing you to answer the question.

THE WITNESS: Okay.

BY MR. PHENEY:

Q Ms. Hughes, quite specifically I'm going to ask you, we're talking about the testimony you gave under oath, the investigative subpoena?

A Yes.

Q Did you see anyone move Deborah Boothby in that parking lot?

A I see somebody bend down and pick her up.

Q Okay.

A And put her in a car.

Q Male or female?

A It was males.

Q Okay. Males plural? Meaning more than one?

A Well, yeah.

Q And who was--

A I say one, two people--it was two or three of them.

Q Who were the males?

A It was dark in the parking lot.

Q So you're saying you don't know?

A I seen Ivory Shaver.

Q Okay.

236

A    That's the one person I do know I seen in the parking lot that night. They got her up, put her in a car and they took off that's what made me go behind the cars but I got behind the wrong car and went the opposite way than them.

Q    All right.  You say you saw Ivory, you mean just in the parking lot or was he involved in picking her up?

A    I seen him bend down and pick her up and they put her in the car and they took the fuck off.

Q    So Debby then was lying in the parking lot?

A    She was in the parking lot and when all the cars got ready to leave she wasn't out there no more, that's what made me follow the convey but it didn't happen.

Q    Ivory Shaver and others picked her up?  Physically picked her up?

A    And put her in the car.

Q    And did they carry her to the car?

A    She was out.  When she got hit with that bat.

Q    And you don't know who hit her with the bat?

A    No.

Q    Because it was dark?

A    It was dark and I had asked around and a certain friend of mine told me who the other guy was.

            MR. RONNING:  Objection, Your Honor.

BY MR. PHENEY:

Q    And Ms. Hughes, I don't care what anyone told you.

            THE COURT:  Thank you, I'll sustain that objection and we'll

proceed.

THE WITNESS: Okay.

BY MR. PHENEY:

Q I don't want to know what anyone else told you.

A Okay.

Q I want to know what you saw with the eyes of Tracy Hughes.

A Okay.

Q So we've narrowed it down to Ivory and there were other males, do you know who they were helping carry her to that car?

A No. I know Scottie was out there, was in the parking lot, too. But they left in different--they didn't all leave in the same vehicles.

Q Well, who left in the car with the female?

A Debby--uh, I would have to say it was the girls, it was girls--I can't think of that girl's name, Adrienne.

Q Adrienne?

A That. Her, she was there, too.

Q Adrienne Burnett was in?

A In the, yeah, she was.

Q So was Ivory Shaver in the vehicle?

A In the car that she was in, yeah.

Q And she is who?

A Debby Boothby.

Q All right. So Ivory is in the vehicle with Deborah Boothby, anybody else in that car?

A It was him, uh, Adrienne--

238

Q Adrienne Burnett?

A Yep, him, Adrienne and somebody else. I don't recall who the other person was.

Q Male or female?

A It was a female.

MR. PHENEY: Your Honor, may I have a moment again?

THE COURT: Yes, sir.

BY MR. PHENEY:

Q Do you recall who was driving that vehicle?

A No.

Q Man or woman?

A Driving the vehicle?

Q That Debby's in?

A It was a woman driving it.

Q And I asked you specifically if you recall who got in that vehicle?

A Yes.

Q Do you recall responding, "Shevy was in the car, Bonnie jumped in, Ivory..."--

A I don't think Bonnie was even there.

Q -- "...Ed Foster got in, too." Do you recall saying that?

A I don't remember no Bonnie.

Q I'm asking, do you recall saying that?

A No.

Q No. Do you know where Scottie went or do you know how he got out of the parking lot?

239

A No. They was just--they all jumped in cars. They all jumped in different cars.

Q The vehicle with Deborah Boothby did you see where it went?

A No, I thought they had went to the right but they didn't they must have went to the other way because I ended up in South Haven.

Q Okay. So you pulled out of the parking lot and went right toward South Haven?

A I thought I was going to Covert but I didn't, I ended up in South Haven.

Q Okay.

A If I would have went the way everybody else went I would have ended up in Covert, but I didn't I went the opposite way, listening to, God Bless her soul, who was with us.

Q Did you actually see which direction the vehicle that had Deborah Boothby went?

A I thought it went to the right, that's the reason why I went that way.

Q And I'm asking, do you--were you behind that vehicle, do you know that it went?

A I probably was about two cars behind it, at least two, two to three cars behind it.

Q So you're saying it went to the right?

A I thought it went to the right.

Q Did something prove that to be untrue?

A Yeah, I ended up in South Haven.

Q Okay.

240

THE COURT: I think the corollary to that is that the car that she was following did not end up in South Haven.

THE WITNESS: Right.

MR. PHENEY: All right, Ms. Hughes, that's all I have. Thank you. These folks may have some questions.

THE COURT: Ms. Dunfield?

MS. DUNFIELD: Thank you.

CROSS-EXAMINATION

BY MS. DUNFIELD:

Q    Good afternoon, Ms. Hughes.

A    Good afternoon.

Q    Thank you for coming today. I can gather by your tone and testimony you're probably not here because you want to be, is that right?

A    I don't want to be here. I don't.

Q    And in fact when you gave your investigative subpoena did you want to do that either?

A    Well, I had to go to it.

Q    You had to, didn't you?

A    Yeah.

Q    And you did your best to tell the truth that day, correct?

A    Yeah.

Q    And you're doing your best to tell the truth today?

A    Yeah.

Q    Okay. You understand that this is your opportunity to tell the truth, correct?

241

A  Right.

Q  Okay. Back when this happened did you know Shevy?

A  I'm going to put it to you like this, when that happened in April I was two and a-half months pregnant. I got locked up in July of '98 pregnant, I think if it was the second or the third Van Buren County Jail that's when I first--I was like, 'I know you from somewhere, where I know you from?'

Q  Okay. So that night you didn't know who Shevy Gill was?

A  No, no, no.

Q  All right. Thank you.

A  I met her in jail.

Q  All right.

A  In July of '98.

MS. DUNFIELD: Thank you, Your Honor. I have no further questions.

THE COURT: Mr. Ronning?

MR. RONNING: Nothing for this witness, Your Honor.

THE COURT: Mr. Rodlund?

CROSS-EXAMINATION

BY MR. RODLUND:

Q  How many times did you see Ivory Shaver--or do you know who Ivory Shaver is?

A  Yes, I do.

Q  Okay. When you asked--do you know where he's sitting?

A  Yeah.

242

Q Where was he sitting at? Where is he sitting?

A Right behind you.

Q And what is he wearing?

A State blue's.

Q On the night that this all happened did you see him a couple of times that night?

A Yeah, that man, yeah.

Q Did you ever see him hit or punch Debby in any way?

A What you mean--yeah, I seen it happen out on 380.

Q On 380? Okay, on that day but when you were in the bar did you see him hit Debby or argue with Debby?

A No.

Q Okay.

A No, I didn't.

Q As far as you testified here today, basically you saw Ivory help Debby up from the ground at some point and put her into a car?

A Yes.

Q Well then you're recalling that now at this point?

A Yes.

Q Do you remember him being involved in, I guess you would characterize it as a crowd fight. Do you remember seeing him specifically?

A I can't say--okay, you're saying that could I say it was him, specifically?

Q I can re-ask that again it's a little complicated.

A I ain't dumb. You trying to make me seem like I'm dumb now, man.

243

Q No, no. At one point you said there was a big fight going on in the parking lot and a lot of people were involved in that fight.

A True.

Q It was dark out. Did you actually see Ivory participating in that fight?

A I seen that there was so many people I seen and they was all out in the parking lot. Them the ones that got--came out the bar from out the bar and it escalated from the bar to the parking lot.

Q I represent Ivory so I'm interested in if you saw him, okay. But it sounds to me like you're not sure, is that--would that would be your answer?

A Oh, I'm sure.

Q You did see Ivory?

A Yes, I'm sure.

Q Was he participating in the melee?

A There was so many people out there that night I'm not going to say yes and I'm not going to say no. It was dark that night, I'm not going to point the finger and say this person did that and this person did that, I'm not going to do that.

Q When you saw Debby get put into the car--

A Ivory didn't--uhm.

Q Go ahead.

A That's who I seen putting her in the car.

Q Were there--was this just one car?

A There was a whole carload--there was all kind of cars and stuff up

244

there that night.

Q What kind of car do you remember--I know you may not remember specifically--

A I don't.

Q --do you remember was it a van possibly or was it a car that you remember--

A No, it wasn't no van.

Q It wasn't a van?

A No.

Q Do you remember what kind of a vehicle Scottie got into?

A No.

Q You don't remember? No recollection?

A No.

MR. RODLUND: I have no further questions, Your Honor. Thank you.

THE COURT: Mr. Sappanos?

MR. SAPPANOS: No questions, Your Honor.

THE COURT: Attorney Pheney?

MR. PHENEY: No questions.

THE COURT: Any other questions, Ms. Dunfield?

MS. DUNFIELD: None, Your Honor.

MR. RONNING: No, thank you.

THE COURT: Thank you. May this witness be excused?

MR. PHENEY: No objection.

MR. RONNING: No objection.

245

MS. DUNFIELD: No objection.

MR. RODLUND: No objection.

MR. SAPPANOS: No objection.

THE COURT: Ma'am, that means you're free to leave and go about your business.

THE WITNESS: Ain't going to be no mess, is it?

THE COURT: Pardon me?

THE WITNESS: Ain't going to be no mess is it?

THE COURT: Hey, you're free to go home right now.

THE WITNESS: Can I get my money back then?

THE COURT: Ma'am, I have no idea what you're talking about young lady.

THE WITNESS: They took that money from me.

(At 4:31 p.m., witness excused)

MR. PHENEY: Your Honor, could we all approach?

THE COURT: Yes. I'd like the attorneys to approach, please.

(At 4:33 p.m., conference at bench)

THE COURT: Okay, folks, at this point in time we've reached the end of what we're going to do for today. We have other witnesses but we need to bring those witnesses to the courthouse, they're not available at this point in time. So, based on that, we're going to take our evening adjournment. I'm going to start back up at 8:45 in the morning and then we'll finish with our last whatever witnesses by Mr. Pheney and then at that point in time it will be the defenses' opportunity and then we'll proceed from there. So, we'll be in

246

adjournment until 8:45 in the morning.

MR. PHENEY: Thank you, Judge.

THE COURT: Thank you.

MR. SAPPANOS: Your Honor, could we place on the record that--

THE COURT: Just one second. One second guys.

MR. SAPPANOS: Your Honor, could you place on the record that you're--I have another court tomorrow, I believe, in the morning Judge and you're ordering me to be here so that I can tell the other judge?

THE COURT: Absolutely.

MR. SAPPANOS: Yes.

THE COURT: I'm ordering you to be here.

MR. SAPPANOS: That's all I got to say.

THE COURT: Okay, thank you.

(At 4:34 p.m., Court in recess)

*    *    *

STATE OF MICHIGAN )
)
COUNTY FOF VAN BUREN)

I certify that this Volume I of II transcript consisting of 248 pages is a true, complete and correct transcript to the best of my ability of the proceedings taken in this matter on Thursday, March 25, 1010, by Susan L. Klein, CER #3482, Certified Electronic Recorder.

Dated: April 23, 2010

Susan L. Klein CER #3482
Certified Electronic Recorder