STATE OF MICHIGAN

IN THE SEVENTH DISTRICT COURT FOR THE COUNTY OF VAN BUREN

THE PEOPLE OF THE STATE OF MICHIGAN,

                Plaintiff,

v

IVORY SHAVER,

                Defendant.
_____/

FILED

MAY 17 2010

TINA LEARY
Van Buren County Clerk

DISTRICT COURT CASE
NO. 09001237FY

10 - 17030

THE PEOPLE OF THE STATE OF MICHIGAN,

                Plaintiff,

v

SCOTTIE SHAVER,

                Defendant.
_____/

DISTRICT COURT CASE
NO. 09001238FY

10 - 17031

THE PEOPLE OF THE STATE OF MICHIGAN,

                Plaintiff,

v

EDWARD FOSTER,

                Defendant.
_____/

DISTRICT COURT CASE
NO. 09001240FY

10 - 17033

THE PEOPLE OF THE STATE OF MICHIGAN,

                Plaintiff,

v

SHEVOLIER GILL,

                Defendant.
_____/

DISTRICT COURT CASE
NO. 09001239FY

10 - 17032

RECEIVED

JUN 25 2012

COURT OF APPEALS, THIRD DISTRICT
LARRY S. ROYSTER, CHIEF CLERK

PRELIMINARY EXAMINATION
(Volume II of II)
BEFORE THE HONORABLE ARTHUR H. CLARKE III, DISTRICT JUDGE

FRIDAY, MARCH 12, 2010 - PAW PAW, MICHIGAN

APPEARANCES:

For the Attorney General:    MR. DENNIS PHENEY (P48825)
Assistant Attorney General
Michigan Attorney General
P.O. Box 30218
Lansing, Michigan  48909

For Defendant I. Shaver:    MR. DAVID SETH RODLUND (P65171)
Attorney at Law
221 Oak Street
Paw Paw, Michigan  49079

For Defendant S. Shaver:    MR. DONALD SAPPANOS (P43542)
Attorney at Law
1595 W. Centre, Ste. 100
Portage, MI  49024

For Defendant E. Foster:    MR. JASON RONNING (P64770)
Attorney at Law
P.O. Box 140505
Grand Rapids, MI  49514

For Defendant S. Gill:    MS. NICHOLE DUNFIELD (P61668)
Attorney at Law
226 ½ East Michigan Avenue
Paw Paw, MI  49079

RECORDED BY:    Susan L. Klein, CER #3482
Certified Electronic Recorder

TABLE OF CONTENTS
(Volume II of II)

WITNESSES:                                                    PAGE


KEITH NICKERSON
        Direct examination by Mr. Pheney                        06
        Cross-examination by Mr. Ronning                        20
        Cross-examination by Mr. Sappanos                       32

SHERRELL MADRY
        Direct examination by Mr. Pheney                        35
        Cross-examination by Mr. Ronning                        62
        Cross-examination by Mr. Rodlund                        77
        Cross-examination by Ms. Dunfield                       82
        Cross-examination by Mr. Sappanos                       83
        Redirect examination by Mr. Pheney                      91
        Recross-examination by Mr. Ronning                      94
        Recross-examination by Ms. Dunfield                     98


Closing Argument by Attorney Pheney                            100

Closing Argument by Attorney Ronning                           101

Closing Argument by Attorney Rodlund                           102

Closing Argument by Attorney Dunfield                          102

Closing Argument by Attorney Sappanos                          103

Rebuttal Argument by Attorney Pheney                           105

EXHIBITS:

        None

Paw Paw, Michigan

Friday, March 12, 2009 - at 9:08 a.m.

(Court, counselors and all parties present)

(Volume II of II)

PROCEEDINGS

THE COURT: We're back on the record regarding the Ivory Shaver, Edward Foster, Scottie Shaver and Shevolier Gill matters. Folks, before we begin this morning I hope everybody had a pleasant evening. We're just starting a couple of minutes late here. I think most of the people that are still in the galley here today were here yesterday, however, I just want to remind everybody we did a wonderful job yesterday. Everybody has to be quiet, act properly, there will be no outbreaks in the court. If there's any kind of outbreaks I will either have security remove the individual or if it's too hard to tell who the individual is then I will clear the courtroom and proceed with a courtroom cleared at that time so that because of security issues that's the only way I can proceed in this matter for the safety of all individuals.

All people, I believe, have been checked coming in by metal detectors. If you leave the courtroom you will not be allowed back in until we have a break. If you--we are not going to be allowing people to come and go or come in until we have a break. So, those are the basic grounds rules, I believe I covered yesterday the same ground rules that I'm going to proceed with today.

I did the rearrangement of the tables is my doings for the

defense counsel to make it easier so we aren't sticking anybody over in the corner and we have better views and that we have better hearing, so that was a decision that I made and not courtroom personnel. I'd like to just put that on the record, too.

Are you ready to proceed, Mr. Pheney?

MR. PHENEY: I am, Your Honor.

THE COURT: And are you ready to proceed, Mr. Sappanos?

MR. SAPPANOS: Yes, Your Honor.

THE COURT: Ms. Dunfield?

MS. DUNFIELD: Yes, Your Honor.

THE COURT: Mr. Ronning?

MR. RONNING: Yes, Your Honor.

THE COURT: And Mr. Rodlund?

MR. RODLUND: Yes.

THE COURT: Does anybody have any preliminary matters I need to address prior to beginning?

MR. PHENEY: I don't, Judge.

THE COURT: I'm not seeing any we will allow you to call your next witness, sir.

MR. PHENEY: Thank you, Your Honor. Call Keith Nickerson.

THE COURT: Thank you. Mr. Nickerson, if you will do me a favor and come over to the chair. Do the best you can to raise your right hand. Do you swear or affirm that the testimony you will give today in regards to this proceeding will be the truth, the whole truth, and nothing but the truth?

5

MR. NICKERSON: Yes.

THE COURT: Thank you, you may have a seat, sir.

(Witness complies)

THE COURT: Once he's situated Mr. Pheney, you may inquire.

MR. PHENEY: All right.

KEITH NICKERSON

called by the People at 9:11 a.m., sworn by the Court, testified:

DIRECT EXAMINATION

BY MR. PHENEY:

Q    Mr. Nickerson, could you spell your name for the record, please?

A    K-e-i-t-h; N-i-c-k-e-r-s-o-n.

Q    Thank you, sir. Mr. Nickerson, are you currently awaiting sentencing on a federal charge of bank robbery?

A    Yes.

Q    You actually pled guilty to the bank robbery and now you're awaiting sentencing?

A    Yes.

Q    Do you have an attorney representing you in that case?

A    Yes.

Q    And what is that individual's name?

A    Craig Frederick.

Q    Craig Frederick. Now as well as the federal charge that you're awaiting sentencing for are you also on parole in the State of Michigan?

A    Yes.

Q Out of what county?

A Kent County.

Q Kent County. And is that the result of some convictions you and I discussed from, I believe, 1998?

A Yes.

Q And Mr. Nickerson as I indicated lets just put those on the record?

A Correct.

Q In 1998 you were convicted of, I'll just read the list. Felony firearm, assault with intent to do great bodily harm less than murder, home invasion/second degree, two counts of unlawful driving away of automobile, breaking and entering a building, and armed robbery?

A Yes.

Q And you ended up going to prison for a number of years, is that right?

A Yes.

Q Now Mr. Nickerson, while you were awaiting sentencing at some point did you end up in the Van Buren County Jail?

A Yes.

Q And why were you in the Van Buren County Jail?

A Way the federal system works is they have to house you somewhere close to your judge and my judge is out of Kalamazoo.

Q Kalamazoo Federal Court?

A Right.

Q And when approximately sir did you get to the Van Buren County Jail?

A Mid December, before the holidays.

Q December of 2009?

7

A Right.

Q Now at some point sir, well let me ask you, were you in the Van Buren Jail through at least part of February of 2010?

A Yeah.

Q And around that time, February of 2010, did you receive a new cellmate?

A Yes.

Q And who was that?

A Mr. Ed Foster.

Q Ed Foster. Do you see Mr. Ed Foster in the courtroom?

A Yes.

Q Could you tell us where he is and identify him and describe him, please?

A Second table right there with the glasses on.

Q Wearing what color?

A Green.

MR. PHENEY: Your Honor, if the record could reflect the identification of Ed Foster?

THE COURT: It will be so noted.

BY MR. PHENEY:

Q Now Mr. Nickerson, you had been there since December, when approximately did Mr. Foster make it to that cell?

A February.

Q February of 2010?

A Yeah.

8

Q How many other folks were in that cell?

A The cell housed the maximum of six people.

Q So that would have been you, Mr. Foster and then four others?

A Yeah.

Q Did you know any of these other people?

A Not before I arrived at that cell, no.

Q You got to know them when you were in the cell?

A Correct.

Q But these were not people that you knew from the past?

A No.

Q Mr. Nickerson are you familiar with Van Buren County?

A No.

Q Have you spent any time in Van Buren County?

A Never.

Q Have you ever been to Covert, Michigan?

A Never heard of it.

Q Okay. How about South Haven, Michigan?

A No.

Q Mr. Foster is that someone you'd ever met before him coming into your cell?

A No.

Q Mr. Nickerson, at some point did you write a letter to your attorney?

A Yeah.

Q And ultimately have contact with a Michigan State Police detective?

A Yes.

Q  What lead to that, sir?

A  He started talking about his crime.

Q  And who is he?

A  Mr. Foster.

Q  Started--and when you say started talking you mean just out loud or to anyone in particular?

A  Just out loud.  He was talking to my bunkee.

Q  And who was that person?

A  That's an older guy just a friend that he knew from the past.  You want to know his name that's fine, but you know.

Q  Do you know his name?

A  Tucker.

Q  Tucker?

A  Yeah.

Q  So he started talking to this Tucker?

A  Uh-huh.

Q  And you were present when this was happening?

A  Yeah, yeah, eventually you know we started talking, too.

Q  And you mean 'we' meaning you and Mr. Foster?

A  Mr. Foster, yeah.

Q  Were you aware of what he was in jail for?

A  Once he started talking about it.

Q  You didn't know before that?

A  No.

Q  What did he tell you he was in jail for?

10

A He was involved in a murder.

Q And at some point did he actually start discussing the details with you?

A Yeah.

Q Is that why you contacted your attorney?

A Yeah, definitely, yeah, it was a horrendous crime there was no way anybody doing something like that should get away with it. Twelve years, he said he had got away with it.

Q Okay. So he told you this was a crime from 12 years ago?

A Yeah.

Q Now Mr. Nickerson before we get into any details, at this point do you have any pending matters with my office, the Michigan Attorney General's Office?

A No.

Q We don't have a case against you?

A No.

Q You and I have discussed this matter and there's nothing I'm offering you for this, is that--

A No, uh-huh.

Q You're not receiving anything from me or my office as a result of your testimony?

A No, not at all. No.

Q Did you actually, in talking to Mr. Foster, did he indicate to you if there were other folks in the jail that were involved in his crime at the time?

11

A    Yeah.  Yeah, he said Scott Shaver was there, he mentioned him and he said some girl named Shevy was there and he was anticipating the arrival of somebody named Ivory.

Q    Now Scott Shaver, was that someone in your cell?

A    No, he wasn't in my cell.

Q    He wasn't in your cell.  Was that someone that you would see in the jail though?

A    Yeah, I seen him before.  I seen him before, yeah.

Q    Where did you see him?

A    Mr. Foster would go to church.  He would make contact with Scott and that's how I was able to figure out who he was.

Q    Okay.  And you say Mr. Foster would go to church were you there as well?

A    Yeah.

Q    So you were in church with Ed and this person named Scott Shaver?

A    Right.

Q    Do you see Scott Shaver in the courtroom?

A    Yeah.

Q    Could you tell us where he is and describe him for us, please?

A    Front row in the green right here with the beard and afro.

         MR. PHENEY:  Your Honor, if the record could reflect the identification of Scott Shaver?

         THE COURT:  It will be so noted on the record.

BY MR. PHENEY:

Q    Now did you ever discuss anything with Scott Shaver personally?

A No.

Q Did you ever overhear he and Mr. Foster talking?

A Yeah, yeah.

Q Do you recall what, if anything, you heard them saying?

A First time he talked it was just yelling down the hallway, uhm, because--

Q You say he, who is he that's doing the yelling?

A Okay, I've got to be more specific, right? All right.

Q Yes. When you say he was yelling, who is he?

A The first time I heard him speak Mr. Foster was aware that Scott Shaver was two doors down so he had to yell to talk to him. He yelled to him and he said, you know, what's going on, have you heard anything, you know. Scott said no, and he asked him to keep it 100. Mr. Foster yelled back, no, keep it 1,000.

Q What does that mean?

A It's like slang terms, you know, keep your truth, be honest, don't-- don't mess us, you know, keep the loyalty straight.

Q All right.

A For whatever that meant, you know.

Q Okay.

A Next time they talked they went to church. Went to church and they were just passing facts--he was testing his loyalty; Ed was testing Scott's loyalty, he wanted to see if he was going to hold up under pressure. He was worried about him cracking, you know, so he just had to keep checking with him. He kept telling us that he wasn't eating

13

enough, he looked like he was going to testify, he was getting weak, he wasn't sure.

Q And that's Ed Foster talking Scott Shaver?

A He's talking to us about Scott Shaver.

Q Now at some point when Mr. Foster came into your cell did he have any paperwork with him, police reports, what have you?

A Eventually he had them out, yeah.

Q Did he have them when he first came into the cell?

A I'm not sure I didn't see them, no.

Q At some point while you're in the cell with Ed Foster did he ever describe the specifics of his crime to you?

A Yeah.

Q And what did he tell you?

A He started out saying that he was there the night of the incident.

Q Okay.

A He said he smoked some marijuana; he had a couple drinks, before-- before he arrived at the club. Got to the club, was having a good time I guess and then he saw the victim show up. The victim confronted Ivory, Scott Ivory (sic) and after that I guess the girl Shevy must have addressed her and he said after that it just went crazy, bottles and punches, kicks, everything, it was mayhem. Well, I guess the fight went from inside the club to out in the parking lot where he said that Ivory was choking the girl and Shevy and Scott were punching her--

MS. DUNFIELD: Your Honor, I'm going to object at this time.

14

THE COURT: At this point in time I just made myself a note to advise the attorneys that what I'm going to do is use the statement made in this matter by Mr. Foster for Mr. Foster and keep it separate from the other three defendants in any decisions that I have to make.

MS. DUNFIELD: Thank you, Your Honor.

THE COURT: So hearsay against the three, only against--

MR. PHENEY: It's only being offered as an admission by a party opponent that being Mr. Foster. This is his version of the events.

MS. DUNFIELD: Thank you, Your Honor.

THE COURT: That's what I just made a note here and I wanted to state that no--

MR. RODLUND: And just for the record I want my objection in the record, too.

THE COURT: I note that yours is and I'm assuming Mr. Sappanos is.

MR. SAPPANOS: Please, Your Honor.

THE COURT: Thank you. And you may continue.

MR. PHENEY: Thank you.

BY MR. PHENEY:

Q    Mr. Nickerson, please could you pick up with what Mr. Foster was telling you about the details?

A    Yeah.

Q    I think you said it had moved outside. Could you tell us now what Mr. Foster was describing about outside?

15

A    Right, right.  Said that Ivory choked the woman, Scott and Shevy also assaulted her.  He remembered specifically kicking her in the head.

Q    Now you're saying he?

A    Ed Foster.

Q    So Ed Foster told you he specifically kicked--

A    Yeah, yeah.

Q    --the woman in the head.  Let me ask you, you keep referring to her as the victim, do you know her name?

A    He never mentioned her name.

Q    So Mr. Foster never told you the name of this person?

A    He made it a point to create space between him and victim.  He never wanted to say to her name, he just kept calling the white girl.

Q    The white girl?

A    Yeah.

Q    Sir, I'm going to turn your attention back to Mr. Foster's statement; I think you said that Mr. Foster had indicated that he kicked the woman--

A    Yeah.

Q    --in the head?

A    Right.

Q    How many times did he say he did that?

A    Uhm, a few.

Q    And was that the end or did he describe anything further?

A    He described more.  He said that after that it was Ivory's idea to move the body to--to make it look more random than it actually was.  He

said that he, Mr. Scott and Ivory they all helped pick the body up, put in the backseat of the car. Himself, the victim, Scott and somebody named Adrienne was in one car and then Ivory and Shevy was in another car and eventually they ended up at some dead-end road or something like that. So, he said a dead-end road.

Q Did he ever explain to you what happened at that location?

A Yeah, they pulled the body out and they ran over her. They ran over her body.

Q And that's what he told you?

A Yeah.

Q Did he tell you how many vehicles were involved in this running over the body?

A Two cars.

Q Two cars. Did he indicate who was driving the vehicles?

A Not specifically, no.

Q And did he indicate if the body was left in the location where it was run over or was it moved?

A I think he just said it was left.

Q And did he indicate to you what he did at that point after the body has now been run over?

A Yeah, well, he got back into the car. He went back to the club and got in his own vehicle and just left.

Q Now I think you mentioned the girl, Adrienne, did he ever discuss her?

A Yeah. He said that he knew she was going to testify and he wanted to discredit her on the stand. He was confident that even though she was

17

Q And that's--

A Facing her friends.

Q And that's specifically what he said?

A Yeah, looking at her friends, she wouldn't be able to look at--

Q But his statement to you was even though Adrienne is telling the truth she won't be able to hold on the stand?

A Right, yeah, yeah.

Q Okay. Now what you told us Mr. Foster told you was this just him talking to you or was he reading this off?

A He was just talking. Late nights he's goes over the details of the crime over, and over, and over, and over again. He talked about it constantly, constantly. After we'd eat he'd sit down and he would just go over the facts and try to figure out loopholes and create a fake timeline and just--he just never stopped talking about it.

Q This crime that he has described to you had you ever heard of it before?

A No.

Q Have you seen anything about this on television?

A Never.

Q Have you read any newspaper articles?

A Never.

Q At any point when Mr. Foster was in the cell with you sir, did he have any police reports or anything that he would refer to?

A He had some files but I never read them.

18

Q You never went through his files?

A Never, never. Never had the opportunity, never would, I don't do that. You can't do that with six people in the cell.

Q All right. So you're saying the times these conversations took place you were in the cell with Mr. Foster?

A Yes.

Q And his file was kept in the cell?

A Yes.

Q You never went through his file?

A No, no. I didn't have to.

Q You said he was talking about this a lot?

A Went through every detail.

Q Mr. Nickerson, I'm not going to keep you much longer. I'm sure there will be some folks that have some questions for you. But, you wrote that letter to your attorney and why was that?

A It was just, as he explained what happened, it was the brutality of it. It was insane for somebody to think they can get away with doing that to somebody. If you think back like 60 or 70 years, this was like reverse discrimination or something. You know black people, this was happening to them in the South all the time and they did it to some girl and just didn't care. You know.

Q And that disturbed you?

A Yeah, it disturbed me.

Q And that's why you contacted the authorities?

A Right.

19

Q   Thank you, sir.   That's all I have.

THE COURT:   We will start with Mr. Ronning?

MR. RONNING:   Thank you.

THE COURT:   You're welcome.

CROSS-EXAMINATION

BY MR. RONNING:

Q   Morning, Mr. Nickerson.

A   Good morning.

Q   We can begin by the same way the Attorney General's office says.   I want to talk to you about why it is you're in custody.   A great point was made to point out the fact that you don't have a deal worked out with the State of Michigan, that is correct, right?   You do not have a deal for cooperation worked out with the State of Michigan?

A   No.

Q   You are, however, awaiting sentencing on a federal case, correct?

A   Yes.

Q   When is your sentencing date?

A   April 19th.

Q   And so that is a shade over a month away from now?

A   I guess so.

Q   And who is your judge in the federal case?

A   Maloney.

Q   Now you had-"-I take it, you don't have to tell me what you discussed but I take it you've had an opportunity to talk to your attorney about how sentencings happen in federal court, correct?

20

A   Yes.

Q   And I'm sure he's spoken to you, you don't have to tell me the details, but I'm sure he's spoken to you about what it is you're facing for a bank robbery charge, correct?

A   Yes.

Q   What are you facing?

A   Right now?

Q   Yes.

A   I believe a minimum of 180 months.

Q   Why do you say right now?  Are you thinking something is going to change after today?

A   (No audible response)

Q   Do you think your minimum is going to change?

A   No.

Q   Well, why would you say right now?  What do you mean?

A   Because that's--

Q   I asked what was your minimum and you said, 'right now,' what did you mean?

A   As far as the math goes, okay.  I have a letter, I have to be able to talk to the judge myself and if I present myself in the best possible light he can be lenient on me.

Q   You are aware then that guidelines in federal court are not mandatory, right?  You can affect your possible sentence by how you act and how you represent yourself to the court, Judge Maloney and to the U.S. Attorney's Office?

A    Of course.

Q    And so doing something that would help law enforcement now that would qualify as presenting yourself in a good light to help yourself, correct?

A    Correct.

Q    And--well, you don't have anything worked out with the State of Michigan, do you have something worked out with the Federal Government?  Have you spoken or do you know, through your attorney, if you've spoke with the United States Attorney's Office?

A    Absolutely not.

Q    You do know though, however, that cooperating in an investigation, even in a state case, and you're able to go in front of Judge Maloney and say judge, here's what I did, you're expecting to get maybe a better sentence than your 180 or 188 months, correct?

A    I believe there's a far more important reason for somebody to do something like this.

Q    Well--

A    There's a moral content to it.  Okay.

Q    All right.  Well, then 25 percent of your reason lets say or 10 percent of your reason, 5 percent or 1 percent, it doesn't matter, you do expect to get benefits for this, correct?

A    There are no guarantees.

Q    But you expect it, don't you?

A    No.

Q    You'd be disappointed if you didn't get it, wouldn't you?

22

A   No.

Q   If you went through all this and then went in front of Judge Maloney and you still got the guidelines that--the guideline minimum you'd be disappointed?

A   No.

Q   If you went through all this trouble?

A   No, absolutely not.

Q   Now, I do want to ask you this, you--you notified your attorney through writing, correct, that, hey, you had some juicy information that you wanted to give, right?

A   Did I say it like that?

Q   Well, okay, you had some interesting information you wanted to give, is that correct?

A   Possibly.

Q   In fact when you wrote your attorney the very first line in your letter says, "Hey, I never thought I would have to write you so soon but something pretty big just fell in my lap." Now is that implying that you were planning on having to write him with something and it just happened quicker than you expected?

A   Again, I had been advised to write the judge on my own behalf and I would have wroten--would have written him later because I hadn't compiled that letter. So, I wrote him sooner because this new information was found.

Q   You wrote your attorney because new information was found?

A   I can't write the judge--I'm not supposed to write the judge directly

23

because he has to read over the letters that I write the judge to make sure I do it right.

Q Right. So in that letter you put, you know, a smaller version of what you testified today kind of running down with your attorney what it is you say you heard, correct? Letting him know what it was that you were talking about?

A Correct.

Q And you wrote that letter on February the 2nd, 2010, does that sound right?

A Possibly.

Q And was that soon after you say your heard the information from Ed Foster?

A (No audible response)

Q Meaning did you wait a long time between having these conversations and writing the letter?

A Not much. I don't--I'm not sure.

Q A few days?

A I'm not sure.

Q Well, you say you came into your cell in February, correct?

A (No audible response)

Q So it would have had to have been ten days or less, correct?

A I guess.

Q Okay. And when you wrote that letter did you try to be accurate to what you heard Mr. Foster say?

A I tried.

Q I note you didn't say anything today about the fact that they threw the body off an overpass, according to Mr. Foster, I didn't hear anything about that today, but you did put that in that letter. Where did that come from?

A I'm not sure.

Q Well, you wrote the letter, correct?

A Yeah.

Q And you wrote that they threw the body off an overpass, correct?

A May I see?

Q Certainly. Would it fresh your memory?

A Yeah.

MR. RONNING: May I approach the witness?

THE COURT: You may, sir.

(At 9:32 a.m., Attorney Ronning at witness stand)

BY MR. RONNING:

Q Just take a look at it and then when you're done reading it just acknowledge and let me know.

THE COURT: Just the one page.

THE WITNESS: Okay. Uhm.

BY MR. RONNING:

Q After reviewing the letter were you able to refresh your memory about what the contents of the letter?

A Yeah.

Q All right. Do you recall then writing the letter that they had thrown the body off an overpass?

25

A    Yeah.

Q    Okay.  Did Ed Foster ever tell you that?

A    Yeah.

Q    He told you he threw a body off an overpass?

A    He said it was a dead-end street.  Okay.  And I must have made a picture in my head that there was a hill at the end of the dead-end, you know, like--

Q    I don't know.  I don't understand.

A    Well, it was the design--it was just a bad wording.

Q    Well, overpass is very specific.  You're from the Kent County area, correct?

A    Yeah.

Q    There's lots of highways in the Kent County area, correct?

A    Right.

Q    I'm from Kent County, I know.

A    All right.

Q    There's lots of expressways--

A    Right.

Q    Lots of overpasses.

A    Right.

Q    Overpass is a highway that goes over say another road or--

A    Uh-huh.

Q    --a trail or something like that.  You used the word specifically overpass, that's very specific.

A    Uh-huh.

Q  Now did Ed Foster ever use the word overpass with you or did you just make that up?

A  It's just bad wording. I'm sorry.

Q  Did you just make it up?

A  No.

Q  Well, lets talk about that dead-end street. You say, I believe, that Mr. Foster told you that they went to a dead-end street, removed what you call the body from the car and then ran it over on the dead-end street, is that correct?

A  Yeah.

Q  That's what he told you, the body was run over on this dead-end street?

A  Just ran over.

Q  Did he tell you where?

A  He didn't name a streets--he didn't name the streets specifically.

Q  Well, not naming streets, you said specifically, I believe and correct me if I'm wrong, in your letter you say that "the body was taken to a dead-end street, dumped out of the car and then ran over."

A  Correct.

Q  Is that what he told you?

A  Something to that effect, yeah.

Q  Well, something to that effect and what he told you could be two totally different things, Mr. Nickerson--

A  Uh-huh.

Q  --you say you wrote these letters at least a few days after the

27

conversation took place--

A   Uh-huh.

Q   --not only once but he wouldn't stop talking about it?

A   Right.

Q   And so if he's not stopping talking about it you have approximately ten days or less, probably less, from which when you heard this to write your letter, lets be specific.

A   Okay.

Q   All right. Lets be specific. Were you being specific when you wrote your letter?

A   That letter was, it was very hard to be specific because the information was still coming in, you know.

Q   All right. So you wrote another letter making a statement to law enforcement, correct?

A   Yeah.

Q   And that was written on February, I believe, the 26th, the 24th of 2010, is that correct?

A   I guess, I don't know the dates.

Q   And in that letter you--and not a letter then, a written statement when you're talking directly to law enforcement, when you know that it's going or could have a very big impact on your near future you specifically said, "They drove down a dead-end, removed the victim's body from the car and ran her over with the car." What did that mean, does that mean that you heard Ed Foster say, "They ran the body over on the dead-end street?"

28

A    I heard dead-end street, yes.

Q    Okay. All right. Lets talk about some other specifics that you can recall, I know it's been a few days. Who was in whose car? Do you remember talking or hearing Mr. Foster talk about who got into which car?

A    Yeah, uh, he said he was in the backseat, uhm, I don't know who owned the car physically but Scott, Adrienne were in the same car with him.

Q    So you're saying Adrienne--

A    Yeah.

Q    Scottie?

A    Yeah.

Q    Ed Foster?

A    Yep.

Q    And who we know now to be Ms. Boothby were all in one car?

A    Yeah.

Q    And in the other car was?

A    Ivory and Shevy.

Q    All right. And are you certain that that's what he told you?

A    As far as I know, yeah.

Q    I want to go back briefly. You talked about what your minimum guideline sentence in federal court. You're aware of how federal guidelines work, correct? You had that conversation with your attorney?

A    Yes.

Q    Have you been classified or charged as a career criminal or are you

29

getting that guideline scoring in your federal guidelines?

A  Yes.

Q  And that's based upon your list of home invasions, armed robberies, great bodily harms, breaking and entering, things of that sort?

A  Yes.

Q  All right.  What is the maximum possible sentence you could receive in federal court?

A  (No audible response)

Q  I'd imagine that you've been told a number of times by the judge in your indictment?

A  I think it's something like 20 years or something like that.

Q  So you say you believe your maximum possible sentence for a bank robbery as a career criminal is 20 years?

A  I'm not sure.  I think it's something like 20 years.

Q  So you said your minimum sentence you believe to be 180 months, according to the guidelines?

A  One hundred eighty-eight months.

Q  One hundred eighty-eight months, according to the guidelines?

A  I think so, yeah.

Q  And you say you believe your maximum sentence would be approximately 20 years.  Now, that's--there's some, at least a little bit of range in that number there.  You could be sentenced anywhere within that range, correct?

A  I think so.

Q  So we're talking 180 months that's the guideline minimum, it could be

30

below that, it could be above that, you don't have the faintest idea?

A No.

Q And the only way you can affect that is by how you behave yourself from the date you entered your plea to the date of your sentencing, correct?

A I guess.

Q Well, you know that to be the case, correct? You've been sentenced a number of times--

A Well, this is--this is--

MR. RODLUND: Could the witness please speak up.

THE WITNESS: I'm sorry. This is a federal case it's my first federal case, my first dealing with the federal system at all and I don't know how this works. I'm learning as I go.

BY MR. RONNING:

Q Your attorney has talked to you about it, correct?

A Yeah.

Q You know what's going to happen?

A I don't know. I mean he's given me the idea. There's no guarantees in the federal system.

Q That's exactly right. There's no guarantees so you are one of the few people that can control what your next 15 to 20 years is going to be like, correct?

A "Only the judge can control what that does."

Q You can have an impact on that, correct?

A (No audible response)

31

Q You can have an impact on that, can't you?

A Possibly.

Q And even though to say you have this great spiritual revelation or you want to do the right thing for, for possibly the first time ever, you know that is a part of what you're doing here today? Is that you want to help yourself?

A I want to help the family of the victim. That's what I want to help.

MR. RONNING: All right. Thank you. I have no further questions.

THE COURT: Thank you, Mr. Ronning. Mr. Rodlund, do you have any questions of this witness?

MR. RODLUND: No questions for this witness.

THE COURT: Thank you. Ms. Dunfield?

MS. DUNFIELD: No questions, Your Honor.

THE COURT: Mr. Sappanos.

MR. SAPPANOS: A couple.

CROSS-EXAMINATION

BY MR. SAPPANOS:

Q Mr. Nickerson, with the exception of your violent crimes, the balance of your crimes have all been involving theft or dishonesty, correct?

A I'm not sure.

Q Bank robbery involves theft?

A Okay.

Q Dishonesty, correct?

A Okay.

Q Yes?

THE COURT: He said yes.

MR. SAPPANOS: Oh, sorry--

THE COURT: No problem, he said yes.

BY MR. SAPPANOS:

Q And then you've been charged with home invasion I think you said and convicted?

A (No audible response)

Q What are your charges that the Prosecutor named off?

A To be honest I'm not positive.

Q Most of them stem around robbery though, right?

A Yeah.

Q Okay. And then if I were to show up and watch your sentencing would you stand up in front of Judge Maloney, is that who you said your judge is going to be?

A Yes.

Q Are you going to mention what you did here today to the judge?

A No.

Q You're not going to mention it?

A I am not going to mention what happens here today.

Q Is your attorney going to mention it on your behalf?

A Quite possibly.

Q Okay. Are you asking that the judge take what you did today into consideration through your attorney?

A I'm not asking anything.

33

Q   Are you anticipating that?

A   No.

Q   Okay.  Thank you very much.

MR. PHENEY:  Mr. Pheney?

MR. PHENEY:  Nothing further, Judge.

THE COURT:  Anything more Mr. Ronning?

MR. RONNING:  No, Your Honor.

THE COURT:  Okay.  Thank you.  May this witness be excused, Mr. Pheney?

MR. PHENEY:  No objection, Your Honor.

THE COURT:  Anybody else have any objection to this witness being excused?

MS. DUNFIELD:  No objection, Your Honor.

THE COURT:  Okay.  Not hearing any objections this witness may be excused.  That means he's free to leave.

(At 9:41 a.m., witness excused)

THE COURT:  Do you have any other witnesses, Mr. Pheney?

MR. PHENEY:  One final witness, Your Honor.  Sherrell Madry.  If I could have a moment?

THE COURT:  You may.

(At 9:41 a.m., Ms. Madry enters courtroom)

THE COURT:  Ms. Madry, if you'd come up to the witness stand and before you have a seat would you stop and raise your right hand?

(Ms. Madry complies)

THE COURT:  Do you swear or affirm that the testimony you

34

will give today in regards to this proceeding will be the truth, the whole truth, and nothing but the truth?

MS. MADRY: I do.

THE COURT: Thank you. You may have a seat, ma'am. Ma'am, I forgot to tell the last witness but I'm going to tell you that that microphone just records, it does not amplify your voice so you need to speak loud enough to those sitting in front of the bar that they can hear as well as the people sitting at the table.

THE WITNESS: Okay.

THE COURT: Thank you, ma'am.

MR. PHENEY: Thank you.

SHERRELL MADRY

called by the People at 9:41 a.m., sworn by the Court, testified:

DIRECT EXAMINATION

BY MR. PHENEY:

Q    And Ms. Madry, when you and I chat you are very soft spoken so I think the Court just gave you permission pretty much to yell. So we're going to need you to really project.

A    Okay.

Q    Could you spell your name for us please for the record?

A    S-h-e-r-r-e-l-l.

Q    And your last name?

A    Madry, M-a-d-r-y.

Q    Okay, thank you. And that's a good volume if you can maintain that that would be great. Ms. Madry, turning your attention to April of

35

1998, were you working at some establishment?

A    Yes, I was.

Q    Where were you working, ma'am?

A    Blue Star Lounge.

Q    And where is that located?

A    In Covert.

Q    Covert.  Covert, Michigan?

A    Yes.

Q    And what did you do there?

A    Waitress.

Q    Was that a full-time job, part-time?

A    Part-time.

Q    Part-time.  Did you have a set schedule or just work as needed?

A    Uhm, basically on Fridays and Saturdays.

Q    And the owner of that establishment?

A    Glover Dandrich.

Q    Glover Dandrich.  And was there another lady that you would drive to the club with?

A    That I would drive with, yes.

Q    And who was that?

A    Jessie May.

Q    And did Ms. Jessie May work there as well?

A    Yes.

Q    All right.  Ma'am, you and I have discussed this matter but I'm going to turn your attention to a specific day.  It was a Saturday night,

36

Q April 25, 1998, I know that was a long time ago, but were you working at the club that night?

A Yes, I was.

Q What time did you get there?

A Probably between 10:00 and 11:00.

Q P.m.?

A Yes.

Q In the evening?

A Yes.

Q And how did you get there?

A I rode with Jessie May.

Q And when you folks got to the club was it crowded at the time or?

A No.

Q Did that usually happen later?

A That normally happened later.

Q When you get to the club at 10:00 or 11:00 did you have to start setting up and getting ready for the night?

A Basically it's already set up and they are normally playing pool so we would have a chance maybe to drink a beer or a drink of our choice before we got started.

Q Now you mentioned they played pool, where was the pool table kept?

A Sitting in the middle of the floor.

Q And did that floor double as something else when pool wasn't going on?

A Yes.

Q And what was that particular part used for?

37

A   Dance floor.

Q   After the pool was done was the table moved?

A   Yes, it was.

Q   And where was the table moved?

A   It was moved out of the way and it would, uh, slid underneath there like another little counter place.

Q   Okay. Allowing access to that space for folks to dance if they wanted to?

A   Yes.

Q   All right. Now Ms. Madry, could you indicate for us please did the crowd start to pick up, was it a light night or a crowded night?

A   It was a crowded night.

Q   What time did folks start breezing in?

A   Uhm, probably between 11:00 and 11:30.

Q   All right. And at least initially, were things going well?

A   Yes.

Q   People in good spirits?

A   Yes.

Q   At some point did that change?

A   Yes, it did.

Q   And was this inside the bar?

A   Yes.

Q   Could you indicate for us what's the first thing you noticed inside that caught your attention?

A   Uhm, a white female had walked up to Ivory Shaver and it was like a

confrontation between them two and I heard him say that he would talk to her later; whatever was going on I wasn't for sure what it was.

Q So a white female, do you know her name now to be Deborah Boothby?

A Yes.

Q Walked up to Ivory Shaver?

A Yes.

Q Okay. Before we go any further do you see Ivory Shaver in the courtroom?

A Yes, I do.

Q Could you tell us please where he is and what he's wearing?

A Uhm, blue with orange stripe on the top.

Q Thank you, ma'am.

MR. PHENEY: If the record could reflect the identification of Ivory Shaver?

THE COURT: It will be so noted.

BY MR. PHENEY:

Q This isn't the first time you've ever seen Ivory Shaver?

A No.

Q As a matter of fact, you've known Mr. Shaver for some time?

A Yes.

Q As a matter of fact you have children with Ivory Shaver?

A Two.

Q At some point were you and he in a long-time relationship?

A Yes, for 11 years.

Q Eleven years. Now at this time in April of 1998, were you and Mr.

Q Shaver still in your relationship?

A No.

Q The children that you and he had had they already been born at that point?

A Yes.

Q In 1998, April specifically, did you and Mr. Shaver stay in contact? Were you folks still, at least, cordial?

A Yes, as far as our kids go, yes.

Q As far as your kids go. Would you just call him up to talk?

A Not really.

Q You indicated that Deborah Boothby went up to Ivory, where was Ivory located in the bar?

A Uhm, sitting close to the dance floor right where the--where they would do the records sat.

Q Was he seated or was he standing?

A He was seated.

Q Was he at a table?

A Yes.

Q Were there other folks with him?

A Yes.

Q Did you recognize them?

A Yes.

Q Who else was sitting with him?

A His nephew, Scottie Shaver and Shevy.

Q Okay. Now you mentioned nephew, Scottie Shaver. Do you see Scottie

40

Q in the courtroom?

A Yes.

Q Could you tell us where he is, point him out and describe him?

A Sitting in the green jumpsuit with the facial hairs.

Q With the beard?

A Yes.

MR. PHENEY: If the record could reflect the identification of Scottie Shaver?

THE COURT: It will be so noted.

MR. PHENEY: Thank you very much.

BY MR. PHENEY:

Q And you indicated Shevy?

A Yes.

Q Who is Shevy, is that a male or female?

A Female.

Q Female. And Shevy was also at that table?

A Yes, she was.

Q And can you look around the courtroom for us please, and tell me do you see her in the courtroom?

A Sitting at the first table with the blonde and black hair.

MR. PHENEY: Your Honor, if the record could reflect the identification of Ms. Gill?

THE COURT: It will be so noted, also.

MR. PHENEY: Thank you.

BY MR. PHENEY:

41

Q So Debby came up, Ivory is sitting at a table with these other folks, was this just a verbal exchange between--

A Yes.

Q Did it appear to be pleasant?

A No.

Q Could you hear what was being said?

A No.

Q Could you hear, without knowing what they were saying, were the voices raised?

A Yes.

Q Let me ask you specifically, Deborah Boothby, the lady you described, did you notice anything about say how she was walking or talking?

A She was walking like she was, uh, had been drinking, had maybe a little too much and her demeanor I guess was somewhat wanted to probably get physical.

Q So she looked like she might be intoxicated?

A Yes.

Q And she appear to be hostile or in a bad mood?

A Probably in a bad mood.

Q She went up confronted Ivory. Did everyone remain seated or did anyone get up when Debby came over?

A Uhm, Shevy had got up. It was like probably going to be an altercation but they, uhm, they calmed that down and the white female went on about her way.

Q Shevy got up and you said you thought there was going to be a

Q confrontation?

A Yes.

Q But what happened?

A Uhm, I'm trying to think, uhm, it really--she I guess they had calmed it down and she just--the white lady had walked away.

Q Okay. And that calmed the situation down?

A Yes.

Q So Debby walked away. Did Ivory, Shevy and Scottie remain where they were?

A Yes.

Q Now was that the last altercation within the bar that evening?

A No.

Q Okay. Could you tell us what else happened?

A Uh, the second confrontation that I remember was Shevy and Ivory was on the dance floor, they was slow dancing and the white female had came back up to them and apparently Shevy had seen the white female before Ivory did and it was another confrontation on the floor with just words, wasn't no punches or nothing throwed.

Q And just to clarify. You're saying Ivory and Shevy were on the dance floor and they were dancing?

A Yes.

Q And Deborah approached them again?

A Right.

Q Was Ivory in a position to see her coming or say was she coming from his back?

43

A    She was coming towards his back.

Q    Towards his back and Shevy was then facing in the direction that Debby was coming?

A    Yes.

Q    And the same situation.  How much later from the first confrontation or the first situation did this happen?

A    Uhm, I'm not for sure because that time I was steady waiting on other people.

Q    Sure, you're working?

A    Yes.

Q    Did Debby seem any less intoxicated at this point?

A    No, she didn't.

Q    Did she seem more intoxicated?

A    She seemed more intoxicated to me.

Q    She approaches Ivory and Shevy and did she have to do anything to get anyone's attention or?

A    No, she didn't.

Q    And you described it, but what happened?  Did these folks just chat with each other?  Was it pleasant?  Was it hostile?

A    Uhm, it seemed like it was kind of hostile.

Q    And who actually was involved in this conversation?

A    Uhm, it was Ivory and Shevy.

Q    And Debby?

A    And Debby.

Q    They're having this confrontation, how did it end on this dance floor?

A It ended with Debby once again leaving, not saying too much just basically went on once again about her business.

Q Okay. And did she leave calmly or did she seem upset?

A She seemed upset.

Q And was there any further confrontations in the bar that night?

A Yes, there was.

Q And where did that take place?

A It took place up near the bar.

Q And who was involved in this one?

A Uhm, it was Scottie and Debby.

Q Scottie Shaver and Deborah Boothby?

A Yes.

Q So who came up to who?

A Uhm, I'm not for sure how that happened because my back was toward whatever was going on and I was talking to some other people that was sitting at the bar.

Q So you don't know who approached who?

A No, I don't.

Q But what made you aware of Deborah and Scottie?

A Something wet hit me.

Q Okay. Something wet hit you?

A Yes.

Q Okay. And what direction did that come from?

A From the back of me.

Q So something wet hit the back of you?

A    Yes.

Q    Did that cause you to then turn around?

A    Yes.

Q    And once you turned what did you see?

A    I seen that Debby had threw a drink in Scottie's face and apparently he must have slapped her and she hit the floor because she was very intoxicated.

Q    You say he slapped her?  Is this an open-hand slap?

A    Yes.

Q    Okay.  And what part of her body did he slap?

A    I really didn't see that neither.

Q    Okay.  But did you hear a slap?

A    Yes.

Q    And she fell?

A    And she fell.  Next thing I knew I looked down and she was on the floor.

Q    Okay.  Had Scottie said anything before the slap?

A    Not that I can remember.

Q    Debby is on the floor.  Did anyone else come up to her?

A    Yes.

Q    Who was that?

A    Ivory.

Q    And what happened?

A    He poured some beer on her.  He had a picture of beer in his hand.

Q    And you say she's on the ground and he just poured the beer on her?

A    Yes.

Q    How did Ms. Boothby respond to that?

A    Well, she kind of came to and she looked up and that's all I remember from there.

Q    As a result of all of that happening did something happen inside the bar, say by the owner?

A    Yes, he had turned the lights on and he had asked them to leave.

Q    Just them or everybody?

A    Everybody.

Q    Okay. Was the lights going on in the bar a signal for something?

A    Yes, it was actually almost time for it, uh, the bar to close.

Q    Okay. But that meant get out?

A    Yes.

Q    Do you know, did you see those folks--let me ask you, did you see Scottie leave?

A    No, I don't remember if I did or did (sic).

Q    Did you see Ivory leave?

A    No.

Q    Okay. How about Shevy?

A    No, I don't recall them at any time leaving.

Q    Did you see Debby leave?

A    No.

Q    But at some point did folks actually mill out, did they leave?

A    Yes.

Q    The entire place left but for the folks that were working?

47

A   Yes.

Q   Okay.  Now during this time that you're working in the bar did you see other folks inside the bar before everybody got kicked out that you recognized?

A   Uhm, it was the two bouncers that was in there, uhm, myself, Jessie and Glover.

Q   I'm talking about during the time the bar was open when folks were there and people were having a good time.  Did you recognize a lot of the patrons, a lot of the folks that were there?

A   Yes.

Q   Around this time, April of 1998, were you familiar with someone by the name of Ed Foster?

A   Yes.

Q   Had you seen him inside the bar?

A   I don't remember if I did or didn't.

Q   Okay.  You don't remember if you saw him inside?

A   No.

Q   Did you see him at some point that night?

A   Yes.

Q   We'll get to that later.  The lights have gone on and everyone leaves. Did you stay inside?

A   Yes.

Q   At some point did you go outside?

A   Yes, I did.

Q   And what brought you outside?

A Uhm, there was a crowd outside and Glover had asked me to go outside and see what was going on out there.

Q Were you able to look out windows into--are there windows that face the parking lot?

A Yes, it is.

Q Could you tell where the commotion or whatever the word you used was coming from?

A Yes.

Q Was it the parking lot?

A Yes, it was.

Q Before going outside did you look out the window?

A Yes, I did.

Q What did you see?

A Uh, a crowd of people.

Q Is that unusual in the parking lot?

A Sometime it is and sometime it isn't.

Q And I think you indicated Glover asked you to go out?

A Yes, he did.

Q He wanted you to do a little recon and find out what was happening?

A Yes, he did.

Q After you left the bar did you then go up to this crowd?

A Yes.

Q Could you tell us, please, what if anything did you notice?

A Uhm, I noticed that Debby was on the ground and she was like in a fetal position and there was a lot of kicking, and stomping and

49

hitting going on.

Q  Okay.  So Debby is on the ground?

A  Yes, she was.

Q  And curled up you say?

A  In a fetal position.

Q  Fetal position.  And I think you indicated there was a lot of kicking and stomping going on?

A  Yes, there was.

Q  And by that you mean Debby was being kicked and stomped?

A  Yes.

Q  And who specifically, if any one, did you see doing this?

A  I remember seeing Ivory and Scottie.

Q  Ivory and Scottie?

A  Yes.  And at one point I did see Ed.

Q  Okay.  You saw Ed do what?

A  Uh, he probably kicked her maybe once or twice.

Q  In what part of her body?

A  She--it was--it had to be the backside of her.

Q  Okay.  Now you mean, when you say backside, do you mean her buttocks or you mean her back?

A  Her back and her buttocks.

Q  Her back and buttocks.  This is when she's lying on the ground?

A  Yes.

Q  And you saw Ivory and Scottie doing the same when she was on the ground?

A Yes, I did.

Q We discussed Ed; I haven't asked you if you see him. Can you tell me if you see Ed Foster in the courtroom, please?

A He's sitting at the second table right--

Q What color?

A In green.

Q Green. Thank you.

MR. PHENEY: Your Honor, if the record could reflect the identification of Ed Foster?

THE COURT: It will be so noted, also.

BY MR. PHENEY:

Q So Ivory, Scottie, Ed, how many kicks are being--

A Well, I'm not for sure because I was kind of looking over other people to just actually see what was going on.

Q All right. But on the ground, how far were you from where Debby was lying?

A It was probably, maybe two or three other people in front of me.

Q Okay. Were you able to see--were you taller than these folks? Did you have to look around them, how were you able to see?

A I was kind of looking around them.

Q Do you have any idea how this started or how she ended up on the ground?

A No, I don't.

Q Other than Ivory, Scottie, and Ed you see kicking did you see anyone else kicking, or punching, or anything to this woman?

51

A Just one other person, but I don't think she really meant to do it I think it was just--something that probably struck (sic) at the time.

Q Okay and who was that?

A Falonda Shaver.

Q Falonda Shaver. Is that a relative of Scottie and Ivory?

A Yes.

Q You see this happen and how long did you stay in this crowd observing this?

A Just a few minutes.

Q And then what did you do?

A I went back up and pounded on the door and Jessie May let me in and I told Glover to call the police because I felt they was going to kill the girl. I don't know why I said it but it was just a reaction.

Q You were concerned that she was going to die?

A Yes.

Q You asked someone to call 9-1-1?

A Yes, I did.

Q Did they?

A Yes.

Q And were the folks outside made aware of that?

A I'm not for sure.

Q Okay. You don't know if anyone yelled out that that was happening?

A No, I don't.

Q So you're still inside. Did you resume working or did you continue to monitor what was going on outside?

52

A   I resumed working and also was monitoring what was going on outside.

Q   So you were doing both?  You're working and looking outside?

A   Yes.

Q   As you're now inside working and looking can you tell us what you saw going on in the parking lot?

A   Uh, eventually I seen the crowd leaving, cars and everything was leaving going out.  Debby was still laying on the ground and I noticed Ivory and Scottie had helped her--they had got her up.  I don't know if she was conscious or unconscious I couldn't tell from where I was at.  I seen them take her to Shevy's car and they got her in the car and they left going back towards South Haven.

Q   Now I'm going to stop your briefly.  Debby--when you look out people are beginning to leave and she's still on the ground?

A   Yes.

Q   Is she moving?

A   No.

Q   No.  And Scottie and Ivory--

A   Yes.

Q   --now did they have to physically pick her up?

A   Yes.

Q   And how did they do that?

A   One was on one side and one was on the other.

Q   Okay.  Were they using her arms?

A   Yes.

Q   And you say they took her to Shevy's car; was she walking along with

53

Q them, was she being carried, was she being dragged?

A Uhm, more like, you know, dragging position.

Q Now you indicated they went to Shevy's car; how did you know it was Shevy's car?

A Well, I, uhm, through a confrontation that I had with Ivory one time when he had her car I had broke the window out.

Q Let me get this straight. At some point before this evening you had a confrontation with Ivory?

A Yes.

Q And he was driving Shevy's car?

A Yes.

Q Was she in the car?

A No.

Q And you broke the window?

A Yes, on the driver's side.

Q And what did you use to break the window?

A I'm not for sure what I used. It was probably something that was laying in my yard at the time.

Q And you say you recognize the vehicle because the window had not been replaced?

A It was been replaced but it wasn't tinted like the other ones was.

Q So there is a window but it's different than the others?

A Yes.

Q All right. Did you actually see Shevy at the vehicle?

A She was already sitting in the vehicle.

Q    And what part of the vehicle was she sitting in?

A    In the driver's side.

Q    In the driver's side.  Could you tell if the car was already turned on?  Could you see any exhaust?

A    Yes.

Q    So it was turned on?

A    Yes, it was.

Q    Now, while this is all going on did you see Ed Foster anywhere?

A    He was, eventually when I seen him he was talking to Ivory and Scottie.

MR. RONNING:  Your Honor, I can't hear that.

THE COURT:  Could you speak up just a little bit louder again please, ma'am, so that we can hear.

MR. RONNING:  Thank you.

THE WITNESS:  Okay.  When I did see him he was talking to Ivory and Scottie and they was kind of like laughing like maybe whatever they had did was funny.

BY MR. PHENEY:

Q    And let me ask you, was this conversation between Ivory, Ed and Scottie before Debby was taken to the car, after she was taken to the car?

A    Before.

Q    Before.  So was Debby still lying on the ground?

A    Yes.

Q    And where were the individuals standing in relation to her body?

55

A    Uhm, not to far from where she was at.

Q    So you saw the conversation, you saw the laughter, do you know where Ed went at that point?

A    No, I don't.

Q    And how much time passed before Ivory and Scottie then got Debby to the vehicle in the manner you described?

A    I'm not for sure how much time had went past because I was busy doing other things.  I was trying--well, we was trying to finish getting cleaned up before we left.

Q    So you're not staring continuously out the window?

A    No.

Q    As a matter of fact, did you walk away from the window at times?

A    Yes.

Q    You weren't doing your work at the window and occasionally looking out?

A    No.

Q    You would do work in other parts of the bar as well?

A    Yes.

Q    And then come back?

A    Right.

Q    So you can't say what happened continuously--

A    No, I can't.

Q    --you can tell us what it is you saw?

A    Right.

Q    Debby is taken to that vehicle.  What part of the vehicle was she put

Q  in?

A  In the back passenger seat.

Q  Back passenger.  Did anyone get in that vehicle with her?

A  Uh, I seen Scottie and then I seen Ivory eventually get in the front on the passenger side.

Q  And was Shevy still in the vehicle?

A  Yes.

Q  Did you actually see that vehicle leave?

A  Yes, I did.

Q  Was this, in the time that you saw the body placed in the vehicle to the time that you saw the vehicle leave were you standing at the window watching the whole time?

A  No.

Q  Okay.  So you'd moved away?

A  Yes.

Q  How much time passed from when--and you may not know but I'll ask you to approximate--from the time you saw that Debby was placed in the vehicle until you saw the vehicle drive out?

A  I can't approximately say.

Q  Okay.  Was it seconds or was it minutes?

A  Could have probably been minutes.

Q  She's in the vehicle and you then walk away--

A  Yes.

Q  --from the window?

A  Yes.

57

Q You come back to the window at some point, now you look out and the vehicle is leaving?

A Yes.

Q Could you see who was actually inside the vehicle when it was leaving?

A No, I couldn't not at that point.

Q Okay. Same vehicle, though?

A Yes.

Q That window is still giving it away?

A Yes.

Q Now we've talked about the vehicle leaving, did it actually drive out of the parking lot onto Blue Star?

A Yes, it did.

Q Do you know which way it went on Blue Star?

A Uh, it went back towards South Haven.

Q Okay. So it would have taken a right out of the parking lot?

A Yes.

Q If we had testimony that it had gone left do you agree with that or?

A No.

Q Okay. It went right?

A Yes.

Q Any other vehicles leaving around that time?

A Uh, one other vehicle left, I'm not for sure what or who was in that vehicle.

Q It left in close timeline or proximity to Shevy's vehicle?

A Uhm, it might have been maybe a couple minutes before they had left

out of the driveway.

Q Were there other cars still in the driveway or in the parking lot at this point?

A Yes, it was.

Q Were those vehicles that belonged to folks working?

A Yes.

Q Were they vehicles that belonged to people that were still straggling in the parking lot?

A No.

Q So it was just staff vehicles that were there?

A Yes.

Q This vehicle has left, 9-1-1 had been called, did they ever show up at the bar?

A No.

Q You never saw an officer that night?

A No.

Q And how long did you continue working in the bar?

A I'm not for sure, but we normally try and get out of there anywhere between 2:15 and 2:30.

Q You had to finish up your work?

A Right.

Q And did you leave with Jessie May?

A Yes, I did.

Q She still driving?

A Yes.

Q    And did you notice anything in the parking lot at that point?

A    Uhm, another car--well, before we had actually finished another car had pulled back in and someone was pounding on the door; and Jessie May had let them in and it was Falonda Shaver and she had said there was an accident--

MR. RONNING: Objection, Your Honor.

BY MR. PHENEY:

Q    That's all right, ma'am.

MR. PHENEY: I agree. I don't--we don't need to know what Falonda Shaver said.

BY MR. PHENEY:

Q    But Falonda Shaver came up to the door?

A    Yes.

Q    All right. And she was allowed in?

A    Yes, she was.

Q    To use the bathroom?

A    Yes.

Q    And did you and Ms. Jessie May wait for Falonda to finish what she was doing or did you leave at that point?

A    We waited until she left.

Q    And then after Falonda left did you leave?

A    Yes, we did.

Q    Did you and Jessie May actually close the bar up or did anyone else remain behind?

A    We actually closed the bar up.

Q Okay. So Glover is gone?

A Uhm, he had left just before we did.

Q Okay. So you and Jessie May were the last two?

A Yes.

Q And when you got in her car, I assuming you drove out of the parking lot?

A Yes, we did.

Q And which way did you go?

A We went back towards Covert?

Q So you had taken a left?

A Yes.

Q And gone south to Covert?

A Yes.

Q When you turned on Blue Star at that point did you notice anything on Blue Star Highway?

A We noticed some lights, like police lights, but we didn't really pay no attention to it.

Q Okay. In what direction were those lights?

A Uhm, to the right going back towards South Haven.

Q Yes. So you turned left but the lights were on the other side heading towards South Haven?

A Right.

Q Bud you didn't go over there to see what was going on?

A No.

Q All right. Ma'am, thank you very much and these folks will have some

61

questions for you.

A   Okay.

THE COURT:   Mr. Ronning, would you like to inquire?

MR. RONNING:   Thank you.

CROSS-EXAMINATION

BY MR. RONNING:

Q   Ms. Madry you'll have to forgive me, I've got to bring up this binder so it might take me a moment to get ready to start asking you questions.  I went home last night and when I understood you were going to testify today and I went over your statement that you gave under oath in 2008 and I need to go over it again real quickly because some things are different.  So I want to talk to you about that, okay?

A   Okay.

Q   Luckily, I made some notes.  First thing, I want to talk to you more, I want to direct your attention to the person you know to be Ed Foster, okay.

A   Yes.

Q   Kind of direct your attention to him because that's who I represent.

A   Okay.

Q   And I'm sure the other fine folks will have questions for you about some other people.  But, I do want to ask you about your testimony today.  First, you were asked by the Attorney General, I'm sorry, the representative from the Attorney General's Office, that whether you knew Ed Foster and whether you saw Ed Foster there that night.  Do you remember that?

62

A I remember seeing him about the time that the bar had closed.

Q So outside?

A Yes.

Q All right. And now today you were asked whether Ed Foster had anything to do physically with what was happening to Ms. Boothby on the ground.

A Right.

Q And I believe today you just indicated that, yeah, Ed Foster came up and maybe kicked her a few times in the back?

A Right.

Q All right. Now you never said that before, have you?

A Well, as time went on some things were starting to come back.

Q So things got better for you as the years go on?

A Uhm, I wouldn't say better but a lot of things were coming back as.

Q That's kind of unusual, isn't it?

A Right.

Q To remember things better?

A Well, I don't remember them all better.

Q Okay. All right. Well, lets be specific now, whether you remember it better or you didn't remember it at all, lets talk about August 7, 2008. Do you remember giving a statement on that date under subpoena with Kenneth Bobo the Assistant Prosecuting Attorney for Van Buren County, Michigan and also present was Trooper Kyle Gorham. Do you remember that?

A Yes.

63

Q Okay. And do you remember you were--there was a bunch of conversation with Mr. Bobo about exactly what the physical layout was in the room, you were a few feet away from him so you guys weren't right face to face but you weren't 20 feet away and you established the physical parameters of the room. Do you remember all of that?

A Yes.

Q Okay. And you had what looks to be about a little over 100 pages, transcribed pages, of conversation with Mr. Bobo and the trooper, uh, I only want to focus on a couple of them which I have made notes of. When you're talking to Assistant Prosecutor Bobo you knew you were under oath, correct?

A Yes.

Q And in fact he went through a great detail to tell you that, hey, normally if you perjurer yourself it's a certain penalty but if you perjurer yourself today you're looking at the same penalty as if you committed a murder.

A Right.

Q Do you remember that?

A Yes.

Q Okay. So you knew that lying was going to or could get you a murder sentence?

A Right.

Q Okay. Now you're having this long conversation, you set it up with what happened that night, some conversation I believe about your relationship with Ivory Shaver, created some background and then you

64

Q   started discussing the matter with Mr. Bobo about how this incident went outside?

A   Right.

Q   All right, do you remember that?

A   Yes.

Q   Okay.  And the bar cleared and you were instructed by your boss to go kind of check it out?

A   Right.

Q   You indicated today that you went out there, you saw a crowd, Ms. Boothby was on the ground, and some people were striking her?

A   Yes.

Q   All right.  Today you said, and I don't want to go into too much detail, that a Falonda Shaver was involved, but maybe only accidentally?

A   Right.

Q   That's a little different than what you said before, correct?

A   Yeah.

Q   Okay.  Before you went so far as to say she was saying, "Kick that bitch" and that she was doing it?  I mean that's different, correct?

A   Yes.

Q   I'm not trying to bring Falonda Shaver into this but there's some differences.

A   Right.

Q   Okay.  And that's very specific, you said she physically said, "Kick that bitch."

A    Right.

Q    Now past that I think today you said that you saw the person you know to be Ed Foster kick one or two times Ms. Boothby in the back. Is that what you remember happening?

A    The back area.

Q    Okay. Now when you were asked this on August 7, 2008, a number of times you were asked, you gave names of people who were involved but you were asked whether anybody else was involved. Specifically Mr. Bobo asked you, "Did you see anyone else involved?" "Did you see anyone else involved in this incident here in the parking lot?" And your answer was, "No." Do you remember that?

A    No, I don't.

Q    You don't remember saying that or you didn't say that?

A    I don't remember saying that.

Q    Okay. Would it refresh your memory to take a look at the transcript of your conversation?

A    Yes.

Q    With Mr. Bobo?

A    Yes.

          MR. RONNING: All right. May I approach the witness, Your Honor?

          THE COURT: You may, sir.

          (At 10:12 a.m., Attorney Ronning at witness stand)

BY MR. RONNING:

Q    We're just going to focus on this one page. There's going to be some

66

other ones but, you're on page 61 and you can read the whole page but we're looking at mostly line 17 and beyond.  Go ahead and read that and when you're done just look up and let me know that you're done.

(At 10:13 a.m., witness finishes reading)

BY MR. RONNING:

Q    Have you read that transcript page?

A    Yes.

Q    And was it able to help you refresh your memory as to what your conversation was with Mr. Bobo?

A    Yes.

Q    Do you remember now saying that no, nobody else was involved in the incident in the parking lot?

A    Well, like I, uhm, when I first told him that I said I can't say for sure because it has been like 10 years ago.

Q    Well, you didn't say that--

A    Well, it's 10 or more years ago.

Q    You didn't say that, did you?

A    No.

Q    You didn't say I can't tell for sure, you said--

A    Right.

Q    Okay.  You're saying now that you couldn't tell for sure?

A    Right.

Q    But you didn't say that August 7, 2008, you were absolutely certain, two letters, one word, you said no, correct?

A    Well, it was like I told him it's been many years ago and a lot of

67

things, you know, uhm, are coming back so--

Q   Okay.  So things again are coming to you as time as goes on?

A   Right.

Q   But on that date you said no, lets just be clear on that?

A   Yes.

Q   Okay.  Thank you.  Later on in your conversation, you went through some conversation with Mr. Bobo about what you say happened to Ms. Boothby and how she was kicked, removed, or left the scene and you were talking about Mr. Foster's involvement in that.  Do you remember that?

A   Yes.

Q   Okay.  Do you remember in 2008 when you told Mr. Bobo specifically that, let me get the line here--

        MR. PHENEY:  I'm sorry, sir, page?

        MR. RONNING:  I'm sorry.  Page 70, start with line 8.

BY MR. RONNING:

Q   The question is a few lines back, lets start with the answer.  "Also, Ed Foster was walking with them as they were going to Shevy's car but he, before they got to Shevy's car, he went down a ways I guess that's where he parked at."

        The question now is, "So Foster broke off at this point and went somewhere his way?"  And you say, "Right, down the parking lot almost to the end."

        Question:  "Okay, he's not helping carry he's just walking by?"  And you said, "No, he's walking and talking."  "And then he goes

his own way?" "Yes."

All right. Do you recall that?

A  Yes.

Q  Is that what happened? Ed Foster left and went his own way and you didn't see him again that night?

A  Would you repeat that?

Q  The question?

A  Yes.

Q  Okay. Going back in your mind, not necessarily about what you said in '08--

A  Right.

Q  --let's go back to the night. Ed Foster is walking but he's not carrying, he's just walking and talking--

A  Right.

Q  --he breaks off before they get to, you say, is Shevy's car--

A  Yes.

Q  --and he goes his own way, that you believe is to his own vehicle?

A  Yes.

Q  And that's the last you see of him?

A  Right.

Q  You do not see him get into Shevy's vehicle?

A  No.

Q  You do not see him get into the vehicle with Adrienne Burnett?

A  No.

Q  Is that the last you see of him that night?

69

A    Yes.

MR. RONNING:  All right, counsel, now I'm turning to page 97.

BY MR. RONNING:

Q    You had further conversation with Assistant Prosecutor and the trooper about a number of other people.  They were reading off names to you and you were saying whether you knew them and what, if any, involvement.  Do you remember that?

A    Yes.

Q    Okay.  After that, the trooper was asking you some questions.

MR. RONNING:  And turning, counsel, to page 97, lines 2,3, and 4.

BY MR. RONNING:

Q    Trooper Gorham--do you recall Trooper Gorham asking you, "Did Clifton Hatter...", whoever that is, "...or Ed Foster ever get involved in this while you were there?"  And your answer was, "Not that I seen when I was there."

Trooper Gorham, "Did anybody else get involved in this?"  Your answer, "No."

Trooper Gorham, "Just those four individuals?"  You, the witness, "Just those four."

Do you remember that?

A    Somewhat.

Q    Okay.  You were specifically asked multiple times under oath whether, not whether anybody else was involved, but whether Ed Foster

70

specifically was involved. I mean that name was brought up to you. All right, it's not like, oh, wait, there's somebody else I didn't think of. You were asked about Ed Foster in 2008, more than once and every time you said he did not, when you watched, touch Ms. Boothby, is that correct?

A   I can't recall if I said that or not.

Q   All right. I'm not going to ask you to read the entire transcript, it's about 100 pages. But, do you--lets ask you this. In 2008 while you were under oath, giving sworn testimony about a murder that you say you were a witness to part of, did you ever indicate at that point that Ed Foster ever touched Deborah Boothby in any way?

A   I would have to say yes.

Q   You say you did say that Ed Foster touched her?

A   I believe I did.

Q   Okay. All right. And again, it's a 97 page transcript and I don't feel the need to go into it, but we'll just leave it at that.

I do want to also ask you, this incident happened at your place of employment, correct?

A   Yes.

Q   Near your place of residence?

A   No.

Q   Okay. Maybe not next to it but in the same general neighborhood or county?

A   Uh, in the same county.

Q   Okay. You don't have to tell me where you live. I don't want to know.

71

Q     And it happened a number of years ago?

A     Right.

Q     And it has been a topic of conversation off and on throughout the years, correct?

A     Uhm, no, not really.

Q     Nobody has talked about the fact that this woman ended up dead on the side of the--right next to the place that you worked?

A     Well, they have talked about it for a little while and then there was really nothing.

Q     It kind of disappeared?

A     Right.

Q     And as time goes on it kind of ramped back up again, the investigation?

A     Right.

Q     In '07, '08, was there a buzz generated around that time?  Were people starting to talk about it?

A     No.

Q     Did you ever talk to any of your co-workers about what happened?

A     No.

Q     Did--in between 2008 when you gave your testimony and today, did somebody ever come to you and ask you about Ed Foster?  Whether Ed Foster was involved?  In between these two times?

A     Uhm, since it have came back up someone did come and ask me.

Q     Who was that?

A     Oh, I can't remember who that was but it--if I'm not mistaken it was a

female. We were kind of talking about him and--

Q Law enforcement or just a citizen?

A Just a citizen.

Q All right. So in some conversation you had with somebody you can't identify talking about what happened, Ed Foster's name came up?

A Right.

Q Did you bring it up or did she bring it up?

A (No audible response)

Q If you can recall?

A No, I cannot recall.

Q But it just came up?

A Right.

Q And was there a discussion during this conversation, don't go into what was specifically said, but during this conversation about that if Ed Foster was in fact involved?

A Yes, it was.

Q Were you told by somebody else that Ed Foster was involved, ever?

A No, but the conversation that me and the person was having it was like that they felt that he was involved and had something to do with it.

Q Okay. So, somebody else inferred to you that they believed Ed Foster was involved?

A Yes.

Q Okay. And was that between 2008 and 2010 or was that before 2010?

A Before.

Q Before your investigative subpoena under oath?

73

A    Yes.

Q    Now lets talk to you about that. You're aware, again, we've went over that you were under oath at that point and you physically testified then that no, Ed Foster was not involved. Are you aware that that could be considered perjury compared to what you're saying today?

A    Yes.

Q    And you're aware that the alternative, what you're saying today could be considered perjury as well because it's different than what--

A    Yes.

Q    --you testified to before? Did anybody ever come to you from, in the last 24 to 48 hours and talk to you about what your testimony was going to be in this case?

A    No.

Q    You haven't spoken to anybody from the Michigan State Police or the Attorney General's Office about what you were going to say today?

A    No.

Q    Even in the back hallway?

A    Uhm, oh, okay, you're talking about since we started doing this since yesterday?

Q    Yes, since yesterday.

A    Oh, yeah.

Q    Okay. And who was that?

A    Uhm--

Q    Don't tell me what was said, who was that?

A    The two sitting at the table there.

Q Okay. And there's nothing wrong with that. I'm not saying there's anything wrong with anybody talking to you--

A Right.

Q --I just want to get clarifications. And were you instructed and told during that time that you were going to be under oath today?

A Yes.

Q And were you instructed that--was there any part, without going into details what was said, was there any conversation about the fact that what you said then is going to be different than what you're saying today?

A (No audible response)

Q Meaning did you ever say to them that, yeah, I saw Ed Foster kick Deborah Boothby in the back?

A No.

Q You never said that during your conversations leading up to--

A Well, well, repeat what you just said? You kind of make that sound--

Q There's nothing wrong with this, but I want to just get clarification. There is nothing improper about this. During your conversation with the State--

A Right.

Q --prior to coming on the stand today did you talk about what your testimony was going to be?

A Yes.

Q And did, at that point, did you inform them that Ed Foster did in fact kick Ms. Boothby or did they ask you about whether he was involved?

75

A   They asked me whether or not if he was involved.

Q   Okay. All right. So they brought up Ed Foster's name?

A   Right.

Q   You didn't bring it up?

A   No.

Q   And when they brought--when they asked you did that suddenly turn a light bulb off in your head, 'oh, yeah, I guess he was involved?'

A   Well, I kind of had a feeling within my own self that once they left the parking lot something else might have happened, but--

Q   Well, let's--we're not going there.

A   Okay.

Q   I'm just talking about what happened on the ground with Ms. Boothby that you say you saw today.

A   Uh-huh.

Q   That's all I'm talking about.

A   Okay.

Q   They brought up Ed Foster's name to you?

A   Yes.

Q   We've established that.

A   They had brought up a lot of names to me.

Q   Okay. Ed Foster was one of them?

A   Right.

Q   And you informed them that you--did you then inform them that, 'yeah, you know, now that I remember back, Ed Foster did in fact kick Ms. Boothby?'

76

A    Yes.

Q    Did they then tell you that, wait a minute that would mean that it's possible that you perjured yourself in 2008?

A    Right.

Q    And you have the potential for felony charges?

A    Yes.

Q    They told you that?

A.   Yes.

Q    Did they tell you that if you got on the stand today and said that he did not kick her that you would also be facing charges because you told them something different in the hallway?

A    Right.

Q    They told you that that would happen--that that's possible?

A    Yes.

            MR. RONNING:  Thank you, no further questions.

            THE COURT:  Thank you.  Mr. Rodlund?

                     CROSS-EXAMINATION

BY MR. RODLUND:

Q    You mentioned there were some arguments between Deborah and Ivory in the bar?

A    Yes.

Q    At one point you're very specific, there was also an incident between Scottie and Deborah?

A    Yes.

Q    And then it was your statement that she poured some beer in Scottie's

77

Q   face?

A   She threw--

Q   Threw a beer?

A   Yeah.

Q   And you're absolutely positive about that?

A   Yes.  Well, yes.

Q   Is there a reason that you paused before you answered that?

A   Well, it was kind of the way you worded it kind of threw me off.

Q   Okay.  How did I throw you off?

A   By the way you said, "are you sure" and I'm, you know, I kind of just had to stop and think.

Q   If I was to tell you you're the only witness who has told that version of the story would that change your mind?

A   No.

Q   And at some point you say Ivory did pour some alcohol on her?

A   Yes.

Q   When did that happen?

A   Up by the bar area.

Q   During the same period of time?

A   Uh, shortly after.

Q   I'm going to take you out to when you were out in the parking lot or when you were watching what was going on in the parking lot, okay?

A   Yes.

Q   Who was kicking Debby?  Can you go over those names again?

A   I seen Scottie, Ivory, and Ed.

Q  And you said Falonda Shaver but that--what did you say happened with her?

A  I'm nervous.

Q  That's okay.

A  I seen Falonda, uhm, but I don't think she really intended to do what she did.

Q  And you didn't see anyone else, just those three individuals?

A  Yes.

Q  And what--and she ended up on the ground at some point?

A  She was already on the ground when I had went out--when I went out there.

Q  She was already on the ground when you went out there?

A  When I went out there.

Q  Okay.  Did she ever move--after that point did you ever see her walking on her own?

A  No.

Q  She was assisted by a couple of people?

A  Yes.

Q  Who were they?

A  Ivory and Scottie.

Q  Okay.  Was she--do you know if she was conscious or unconscious?

A  I can't say.

Q  You don't know?

A  No, I don't.

Q  And you say they took her into a car, correct?

A    Yes.

Q    And whose car do you believe that to be?

A    Shevy's.

Q    And you said you knew that because there was a window--there was a window on the car that you had smashed out?

A    Yes.

Q    What kind of a car was that, do you remember?

A    I don't remember.

Q    Do you remember anything about--

A    It was a small car.

Q    Remember if it was light or dark colored car?

A    It was red color looking car.

Q    Red colored car?

A    Yes.  If I'm not mistaken. That's been many years ago.

Q    You don't remember what model of car it was?

A    No.

Q    You believe it was Shevy's car?

A    Yes.

Q    And it had some tinted windows on it?

A    Yes.

Q    Another statement you made was that you--well, what direction did you see the car leave the parking lot?

A    To the right going back towards South Haven.

Q    That car was heading towards South Haven?

A    Yes.

Q And you're positive about that?

A Yes.

Q And how do you remember that part so well?

A As I was working I was kind of still looking outside.

Q And you just happened to see it and it was headed towards South Haven?

A Yes.

Q Not towards Covert?

A No.

Q And you've indicated you don't know--you're not positive who was inside of that vehicle when it left, correct?

A No, I'm not. The whole time I wasn't watching the vehicle but as I was working I was steady looking outside.

Q Were there other people in the bar while you were in the bar working?

A Yes.

Q Who were those people?

A Uhm, Eddie--Jessie May, Glover, and uhm, well, we call him SamBam but his name is uh--

Q Keith?

A Keith Owens, yes and Philip Thornton.

Q Philip Thornton was in the bar?

A Yes.

Q And were any of these other individuals watching what was going on in the parking lot, to your knowledge?

A I can't say for sure.

MR. RODLUND: No further questions from this witness. Thank

81

you.

THE COURT: Thank you, Mr. Rodlund. Ms. Dunfield?

MS. DUNFIELD: Thank you.

CROSS-EXAMINATION

BY MS. DUNFIELD:

Q You say that you saw them in Shevy's car because of the window, correct?

A Yes.

Q You said the other windows were tinted. Were they lightly tinted or dark tinted?

A I can't really say.

Q Could you see through the tinted part of the window?

A I can't really say on that neither.

Q Okay.

A From where I was at.

Q Okay. And from where you were at you said you were working at that time, is that correct?

A Yes.

Q And you said that when they were putting Debby in the car Shevy was in the driver's side, is that correct?

A Yes.

Q Did you continuously watch until that car left or were you still working?

A Still working.

Q So anyone could have gotten out, moved around, gotten in different

82

Q cars going anywhere and you just saw what happened when they were actually putting Debby in the car, correct?

A Right.

Q So when that car was pulling away you don't know who was in the car, correct?

A No, I don't.

Q And you said that Shevy was in the driver's side, are you positive that Shevy was in the driver's side or are you assuming because it was Shevy's car that that would have been Shevy in the car?

A I'm not going to say I'm positive but I know that was her car and it did look like her from where I was at.

Q But you can't say positively?

A No, I can't.

Q All right. Thank you.

MS. DUNFIELD: No further questions.

THE COURT: Mr. Sappanos?

MR. SAPPANOS: Thank you.

CROSS-EXAMINATION

BY MR. SAPPANOS:

Q Are you tired of answering these questions?

A Yes, and I'm nervous.

Q It's very important and your memory is very important. Okay, ma'am?

A Yes.

Q It's already been pointed out that at least part of your investigative subpoena testimony wasn't accurate, would you agree with that?

A    (No audible response)

Q    In other words, if you said then that Ed Foster wasn't involved in the assault in the parking lot but now today you're saying that Ed Foster kicked them in the head that's very--

A    No, I didn't say the head.

Q    Or wherever, but that's a big difference, isn't it?

A    Yes.

Q    Any other big differences you want to tell us about before I ask you questions?

A    As I told them when I was doing that at the time I said it's a lot of things that I had forgot and it was slowly but surely coming back to me the more that they had talked to me.

Q    Okay.  The night in question, okay, Deborah Boothby came into the bar that night, correct?

A    Some point or another, yes.

Q    Did you know who Deborah Boothby was before that?

A    No.

Q    Had you ever seen her before that?

A    No.

Q    Okay.  So she comes in the bar, was she intoxicated when she got there?

A    I believe she was, I can't say for sure.

Q    Why do you believe she was?

A    Uhm, because anybody in their right frame of mind would not approach Ivory when he's with someone else.

84

Q Okay. How about her mannerisms? Was she wobbling, staggering?

A Kind of wobbling.

Q Cussing?

A Kind of wobbly, yeah, had like a high tone to her voice.

Q All right. And lets focus on her behavior. Was she the aggressor that night or was, when you first saw her and she was arguing with Shevy and Ivory, who was the aggressor, Shevy and Ivory or Ms. Boothby?

A Mrs. Booby--Mrs. Boothby.

Q All right. And to you, based on your observations, it didn't look like she had any beef with Scottie, is that correct?

A No.

Q Correct?

A Yes.

Q Because--now you have two children and dated Ivory for 11 years, correct?

A Yes.

Q And you had known Scottie throughout that time?

A Yes.

Q You didn't know Scottie to have any relationships with Ms. Boothby at all, did you?

A No.

Q All right. And so you testified that at some point you feel wetness hit your back?

A Yes.

Q So you have your back to the cause of the wetness, if you will?

A Right.

Q And you don't know, based on what you've saw, whether Mrs. Boothby threw a drink on Scottie, do you?

A No.

Q All right. And better yet, you certainly don't know whether Scottie slapped Mrs. Boothby, do you?

A No.

Q And you are just making that assumption, correct?

A Yes.

Q All right. Mrs. Boothby could have just as easy have fallen on the floor in her drunken condition, couldn't she?

A Possible.

Q Or somebody could have thrown a drink on Mrs. Boothby and it splashed on Mrs. Boothby and hit Mr. Shaver, too, correct?

A Correct.

Q Because you had your back to the whole thing?

A Right.

Q All right. And the lights on the bar didn't necessarily come on--in the bar didn't necessarily come on because of a dispute, they came on because it as closing time, correct?

A They came on because of the dispute.

Q And closing time?

A Yes.

Q Okay. How far from the entrance to the bar, the building, down the

parking lot towards the street, towards Blue Star, was Debby Boothby when you describe her laying on the ground in a fetal position?

A    I can't say for sure.

Q    Well, roughly?  A third of the way, half the way, three-quarters of the way, right up by the bar?

A    Uhm, could be possibly a third of the way.

Q    A third of the way between the door to the bar and the street?

A    Yes.

Q    Closer to the bar than the street?

A    Yes.

Q    All right.  And Glover, the man of the house, if you will, it was just you and Mrs. May left?

A    No, it was Keith Owens and Philip Thornton.

Q    So with those guys still there Glover sends you to go check on the fight?

A    Yes.

Q    Okay.  And you say that you walk out to it and kind of look through it and you say you see my client kicking and stomping on Ms. Boothby?

A    Yes.

Q    Okay.  And you go back to the bar and tell them to call the police?

A    Yes.

Q    Then you go back to your cleaning duties?

A    I'm--yes, I'm doing my cleaning, also I'm steady looking outside.

Q    Out a window?

A    Yes.

Q All right. And from the time that you go back in to the time you see Shevy's vehicle driving off how long time elapsed?

A I can't approximately say.

Q Couple of minutes?

A I'm not for sure.

Q Well, roughly?

A Could by possibly maybe a couple of minutes. I'm not for sure.

Q Less?

A Maybe more.

Q Maybe more?

A Yes.

Q Would you agree that the entire time that you were cleaning, looking out the window, cleaning, looking out the window as you described, Shevy's vehicle remained in the same spot?

A I can't say for sure.

Q How come you can't say for sure?

A Because I was basically all over the bar. I wasn't just where I could see directly out.

Q Well, I mean did it ever--did you always look back to the same spot to see the car?

A Every now and then I would glance and that's about it.

Q Now--but when you would glance and see the car was it in the same spot you looked the last time?

A I would say so.

Q That makes sense, right?

88

A   Yes.

Q   All right. In your opinion based on you being there and us not, okay, and what you saw and heard, was there time for Mrs. Boothby to be loaded in the car, whoever get in that car, leave the parking lot, drive down a mile or two down the road, get Mrs. Boothby out, beat her some more, get back in the car, drive her back to out in front of the bar, unload her out in front of the bar, run over her several times and then get the car, get Shevy's car back in the exact same--

MR. PHENEY: Your Honor, I'm going to object. I believe this is calling for speculation if I heard the question correctly. I think what Mr. Sappanos--

MR. SAPPANOS: Timeline.

MR. PHENEY: --is proposing, is it possible that and that's causing this witness to speculate.

MR. SAPPANOS: Just asked her based on her time frame.

MS. DUNFIELD: Your Honor, if I could have a comment on this objection, also?

THE COURT: You may.

MS. DUNFIELD: I think it's a proper question because she's--I think he's asking her, it goes along with her how much time passed question as in could this amount of time have passed. And she'll know if that amount of time had passed in her opinion.

MR. PHENEY: If she speculates.

THE COURT: What I'm going to do is allow you to ask the question Mr. Sappanos, but if you would start back over at the

beginning so that maybe I can also understand the question too, please?

MR. SAPPANOS: All right.

THE COURT: Because I was a little confused.

BY MR. SAPPANOS:

Q    Ms. Modry--

A    Madry.

Q    Ms. Madry, do you believe, based on what you saw that night pertaining to Shevy's car, that Shevy's car left the parking lot twice while you were looking out the window at it or the time that it left that was the last time you saw it?

A    The time that it left that was the last time I saw it.

Q    Do you believe that it had left before that and come back?

A    I don't think it did.

Q    Okay.  And you're 100 percent positive, according to your earlier testimony, when asked that when you watched it pull out it went towards South Haven?

A    Yes.

Q    And you've lived in that area your entire life?

A    Yes.

Q    And you certainly, on the record here, know the difference between Covert and South Haven which direction you'd go out of the parking lot?

A    Yes.

MR. SAPPANOS:  No further questions.

THE COURT: Mr. Pheney?

MR. PHENEY: Yes, Your Honor, thank you.

REDIRECT EXAMINATION

BY MR. PHENEY:

Q    Ms. Madry, Mr. Ronning asked you if you spoke to anybody. Do you recall meeting with me Wednesday night and chatting?

A    Yes.

Q    Okay. And Mr. Ronning asked you specifically, and he showed you and this is thick, and as a matter of fact I think you and I discussed it that this is the investigative subpoena testimony?

A    Yes.

Q    That you provided August 7 of 2008?

A    (No audible response)

Q    That's what it says?

A    Oh, okay.

Q    Do you agree with that?

A    Yes.

Q    Okay. Prior to that statement ma'am, had you met with Michigan State Police troopers and given a statement and specifically, I'm referring to January 14, 2008, and actually write out a written statement?

A    Yes.

Q    Let me show you--

MR. PHENEY: If I could approach, Your Honor?

THE COURT: You may.

BY MR. PHENEY:

91

Q   Ma'am, I'm showing a full-page document and I'm just going to ask you to look at that and tell me if you recognize that?

A   Yes.

Q   And what do you recognize that as being?

A   What I had wrote.

Q   Okay.   And that was about this incident?

A   Yes.

Q   And that's dated January 14, 2008?

A   Yes.

Q   Okay.   Specifically ma'am, I'm going to ask you to look at the third page and just if you could review that half way down, from the middle down.

A   I can't read without my glasses.

Q   You need your glasses?

        DET./SGT. OPPENHEIM:   Does she need readers?

BY MR. PHENEY:

Q   Do you need reading glasses?

A   Yes.

        (At 10:41 a.m., Det./Sgt. Oppenheim gives glasses to witness)

Q   Hopefully this might help you.

A   Yes.

Q   Does that help?

A   Uh-huh.

        MS. DUNFIELD:   Your Honor, at this time I'm going to make an

objection. I don't think, first of all, there's been a question posed that says she can't remember that statement. Nor do we need her to review it as--

THE COURT: Stop reading for just a second.

MR. RONNING: I would also enter an objection. The question was asked whether she remembered or she doesn't remember and now he's bringing in hearsay, which I don't believe is admissible at this point to support his--a statement she made earlier.

MR. PHENEY: I didn't ask her to read it into the record. It's not hearsay. I'm asking if this refreshes her recollection of an earlier statement she made.

MR. RONNING: Did she--I don't believe she indicated she couldn't remember her earlier statement.

MR. PHENEY: And I'll handle it that way.

BY MR. PHENEY:

Q    Ma'am, do you remember the entire contents of that written statement?

A    Yes.

Q    Okay. I'm going to ask you ma'am, in this particular statement dated January 14, 2008, which took place before your investigative subpoena statement in your written portion did you write, I'm going to ask you if you wrote this. Give me a moment, "I seen Ed kick her about twice"?

A    Yes.

Q    Okay. So your earlier statement you mentioned Ed kicking Deborah Boothby?

A   Yes.

Q   Your second statement, the investigative subpoena, as Mr. Ronning pointed out you didn't mention that or at least that he showed you?

A   Yes.

Q   And you and I met on Wednesday and we talked about that?

A   Right.

Q   I mentioned to you specifically, I have these two statements what do you actually remember?

A   As time went on they came to me and I was remembering them a little bit better I guess cause--I guess I had been down there like three or four times to the state police post and everything just didn't come to me right then and there.

Q   Okay.  Thank you, ma'am.  That's all I have.

            THE COURT:  Mr. Ronning?

            MR. RONNING:  Thank you.

                    RECROSS-EXAMINATION

BY MR. RONNING:

Q   You made a number of statements to Michigan State Police regarding this incident?

A   Yes.

Q   And only as time went on after having your conversations with state police and this unnamed friend of yours did you recall Ed Foster was supposedly involved?

A   (No audible response)

Q   Is that correct?

MR. PHENEY: Your Honor, I object. I think that's a mischaracterization. We just established that her first statement he was mentioned. Second statement, not. So that's a mischaracterization and I object, Your Honor.

MR. RONNING: I don't believe you said that was the first, Your Honor.

MR. PHENEY: Okay. But the previous statement of the two that had been discussed.

THE COURT: Go ahead and ask your question again.

BY MR. RONNING:

Q    I don't remember what the question was.

THE COURT: Well then, we'll start all over again.

MR. RONNING: All right.

THE COURT: I don't either.

MR. RONNING: Okay. It probably wasn't a good one.

BY MR. RONNING:

Q    How many statements have you made to the Michigan State Police regarding the incident involving Deborah Boothby's death in 1998?

A    I think I've been down there three times at the Michigan State Police Post.

Q    And you made this written statement in January of 2008, do you remember was that your first time with Michigan State Police on this incident or was that one of the subsequent times?

A    I can't remember.

Q    Okay. Does it make sense to you and knowing yourself, I don't know

you, but knowing yourself, that you would remember something in January of 2008 and then forget it in August of 2008 and then suddenly remember it again in 2010. Is that something that you commonly do?

A No, I don't think I do.

Q Okay.

MR. RONNING: One second, Your Honor.

THE COURT: No problem.

BY MR. RONNING:

Q Can you recall, and I understand if you can't, how many different state police troopers you've spoken to regarding this incident?

A No, I can't.

Q Okay. Can you recall whether they were all men or all women?

A Outside of Diane, all men. I believe.

Q Were they the same man or were they different ones?

A (No audible response)

Q If you can't recall, I understand.

A I--not for sure.

Q Okay. And--

A I basically can remember faces more than I can names.

Q Do you remember when your very first statement was?

A (No audible response)

Q Was it in '98 when this happened or was it in 2008?

A I'm not for sure.

Q Okay. That's all right. Let me ask you this. It's been established that you had made a statement in January of 2008 that Ed Foster kicked

Deborah Boothby, and that you swore under oath in August of 2008 that he did not kick Deborah Boothby, and you're swearing under oath today that he did kick Deborah Boothby?

A   Yes.

Q   Were you informed by anybody in law enforcement before you came on the stand today that you were going to be charged with perjury because your statement under oath was obviously different than your other statement?

MR. PHENEY:   Your Honor, I'm going to object because Mr. Ronning is making legal arguments.   Frankly, there's an argument about what actually constitutes perjury and he's making a conclusion that inconsistent statements apparently are per se perjury.

MR. RONNING:   I only asked whether she was informed whether she was going to be charged, not whether what she did qualifies as perjury.   I only asked whether she was told.

THE COURT:   I believe we get into a whole question of these conversations.   I guess that the question is I'd start out--was a discussion about possible perjury and go from there.

BY MR. RONNING:

Q   Was there a discussion about perjury today before you came on the stand?

A   I don't think it was.

Q   Today or any day prior to today, in the last number of years, had anybody promised you that you would not be charged with perjury based on what you were going to testify today?

97

A    I don't believe so.

Q    Thank you.

        THE COURT:   Thank you, Mr. Ronning.   Mr. Rodlund?

        MR. RODLUND:   I have no further questions.

        THE COURT:   Ms. Dunfield?

        MS. DUNFIELD:   Just one, well, it's actually two but one
issue.

        THE COURT:   Go ahead.

        MS. DUNFIELD:   And I can just do it from right here.

                        RECROSS-EXAMINATION

BY MS. DUNFIELD:

Q    Ms. Madry, you said that the lights in the club went on because it
was--because of the altercation, is that correct?

A    Because of the altercation and also it was almost time for the bar to
close.

Q    Okay.   I just want to clarify that.   How early--what time does the bar
normally close?

A    Two.

Q    Okay.   And how much earlier from that did it actually close, like
minutes or hours or?

A    Probably minutes.

Q    Okay.   So it wasn't too much, it was almost two?

A    Right.

Q    All right.   Thank you.

        MS. DUNFIELD:   That's it.

98

THE COURT: Mr. Sappanos?

MR. SAPPANOS: Nothing, Your Honor.

THE COURT: Mr. Pheney?

MR. PHENEY: Nothing more, Judge. Thank you.

THE COURT: Thank you. Anybody have any objection to this witness being excused?

MR. PHENEY: No objection, Judge.

MR. RODLUND: No objection.

MS. DUNFIELD: No objection.

MR. RONNING: No objection.

MR. SAPPANOS: No objection.

THE COURT: Hearing them ma'am, that means you are free to leave and go about your business or your may remain, it's your choice. Thank you, you're excused.

(At 10:48 a.m., witness excused)

THE COURT: Mr. Pheney, do you have any further witnesses at this time?

MR. PHENEY: I do not.

THE COURT: Thank you. You rest?

MR. PHENEY: Yes.

THE COURT: Lets start with Mr. Ronning. Mr. Ronning, do you wish to present any testimony in this matter?

MR. RONNING: No, Your Honor.

THE COURT: Thank you. Mr. Rodlund?

MR. RODLUND: No, Your Honor.

99

THE COURT: Ms. Dunfield?

MS. DUNFIELD: No, Your Honor.

THE COURT: Mr. Sappanos?

MR. SAPPANOS: No, Your Honor.

THE COURT: Before we get into arguments I want to take a five-minute recess and then we will come back and I'll go over a few things in my notes and then we will come back and hear motions by Mr. Pheney, responses and then I'll make my decision. Thank you.

(At 10:49 a.m., Court in recess)

(At 11:02 a.m., Court reconvenes; all parties present)

THE COURT: Okay, we're back on the record with our preliminary examination here. All the defendants and their attorneys, Assistant Attorney General are in the courtroom and we're ready at this point in time.

I believe Mr. Pheney you've presented your testimony. I asked each of the defense attorneys if they wished to present any testimony and was advised no. So, at this point in time we're ready for motions. I do want to acknowledge that I have been provided in each one of the files, in this matter, what's been known and entitled People's Bench Brief which would read regarding bind over at this time. I took the opportunity to review that charge--or brief at the break and therefore I've had an opportunity to read that and review that and now if you have anything further you may make your arguments.

MR. PHENEY: Thank you, Judge. At this point, based on the evidence, I would ask this Court to bind all four defendants over on

100

both counts within the felony complaints that being First Degree Murder-Premeditated and Deliberated, Count I, and Count II, Felony Murder. I would argue, Your Honor, the proofs are certainly sufficient in regard to both counts and I would ask the Court to bind all four over.

THE COURT: Thank you. We will start in the back like I've been doing this morning and start with Mr. Ronning, please.

MR. RONNING: Thank you, Your Honor.

THE COURT: You're welcome.

MR. RONNING: Your Honor, I would just indicate in general we would oppose any bind over on Counts I or II and indicate that the testimony in this or during this preliminary examination does not support any premeditation on a part of any of the parties, in particular Mr. Foster. And specifically, in Count II regarding the Felony Murder, the underlying felony of kidnapping, we would argue that the testimony in this case did not support the idea that when Ms.--when the blow that ended Ms. Boothby's life or the injury that ended her life was perpetrated, kidnapping was by all accounts over if, indeed, there was a kidnapping. So, we would ask the Court to deny bind over on both Counts I and II for that reason.

Furthermore, I would also specifically, turning to Mr. Foster's case, Your Honor, and would indicate that at this point the only credible testimony, that's not at least in some fashion being supported by the idea of a benefit of witness, would indicate Mr. Foster was not involved. That if he was involved, even according the

101

last witness, it only indicated a few kicks to the back which while bad does not qualify a murder and that he left the scene, he was not involved with anything to do with the car, Ms. Boothby after the incident in the parking lot or Ms. Boothby being injured or killed by the car running over her in the road. At that point, Mr. Foster was by all intents and purposes was gone, he can't be charged with assault and battery at this point. He was not aiding and abetting, he wasn't even near the scene. So, we would ask that based on the testimony of the credible witnesses the Court deny the bind over.

THE COURT: Thank you, sir. Mr. Rodlund, do you wish to be heard?

MR. RODLUND: Just briefly. Your Honor, I don't believe there was any credible evidence provided against my client in this case. I'm still baffled about what happened here, there's so many different versions told. I don't believe that's enough for probable cause in this case to bind this over or find my client guilty of any particular crime. So at this point, I would ask that you do not bind this case over and dismiss the charges against him. Thank you.

THE COURT: Thank you, sir. Ms. Dunfield?

MS. DUNFIELD: Thank you, Your Honor. Your Honor, I'd join the previous arguments. As far as premeditation goes, I don't think we see it here. I don't think there is premeditation. I think that, if anything, all the testimony says that the things that happened were an act of spontaneity.

Further, I agree that there's no evidence towards my lady

that she helped, participated, facilitated, anything in the kidnapping. She never once, did anyone testify, she touched the body, helped move it, did anything of that nature. She wasn't in the driver's seat, or couldn't be placed in the driver's seat definitively.

I'd ask the Court to consider that all and dismiss the charges against my client. Thank you.

THE COURT: Thank you. Mr. Sappanos?

MR. SAPPANOS: Judge, just briefly. As far as the Premeditated Murder, specifically as it relates to Mr. Shaver, Scottie Shaver, I don't see any plan, preparation; I see a girl coming in because she's mad at her ex-boyfriend that he's there with his current girlfriend. She's the aggressor, she by no means was killed by a group of people that planned, prepared for, took any acts, anything along those lines needed to complete the premeditated part of Homicide-Murder-First Degree. Especially as it relates to Scottie Shaver, he certainly wasn't mad at her when she went there. He certainly wasn't mad at her and if you compare the star witness in this case, Adrienne Burnett, who had a First Degree Murder reduced down to Second Degree with a sentence of eight to 20, uhm, obviously she's going say whatever she can and bolster her credibility in any way. I mean you've been a Judge a long time, we've all heard testimony by people that are looking for deals, if these people would have done additional violent acts Ms. Barnett (sic) who was by all accounts, by everybody's testimony, the closest to the assault within

103

10 feet would have said that these people did much more than they did. And specifically, as it relates to Scottie, she said that she saw Mr. Shaver punch the victim in the head one time while standing in the parking lot, never kicked, never stomped, never did anything while the victim was on the ground. Then, out on the abandoned road, if you even believe they went there, and that's a big stretch, she said she saw my client punch the victim one time out there, if you believe that even, but that's the star witness, she's got the most to gain, I guess that's what we're left to believe with because these other people are all over the place saying they went opposite directions out of the road--I mean out of the parking lot, it makes no sense. And you take what Ms. Barnett (sic) said, which I think if you're going to believe somebody you might as well believe her, she's 10 feet away, she's getting a First Degree Murder reduced down to basically a Manslaughter sentence and you compare to what the doctor said and nobody has mentioned the doctor. The doctor has no dog in this fight. He has no reason to lie. He was asked point blank by Ms. Benefield (sic), could the punches and/or kicks have caused the death. The testimony was crystal clear, no, the only thing that could have caused the death basically then is being run over by a car--

MR. PHENEY: Excuse me, Your Honor, I hate to object, I apologize. That was absolutely not the testimony of the doctor. As a matter of fact, he said specifically when Ms. Dunfield asked, the doctor said if the attack was violent enough and prolonged enough and given the strength of what was doing it yes, that could have been

104

sufficient. He did not say it was only a car. That wasn't the testimony.

THE COURT: At this point in time my position on this, I'm going to allow argument. I've taken copious notes in this matter and I recall all the testimony that was given and if somebody said something that was or was not testimony I know where I heard it and I will allow the parties to argue. And Mr. Sappanos, you may continue, sir.

MR. SAPPANOS: And the abrasions about the head were just that, they were abrasions and they were consistent with being dragged across the asphalt. Being dragged across asphalt is consistent with being hit by a car and the body being dragged from point A to point B. My client wasn't ever in the driver's seat by anybody's recollection and even looking--even taking the facts in the light most favorable to the Prosecuting Attorney there is certainly not enough on serious charges like this to bind over on First Degree-Premeditated Murder. If there was a Neg Hom or something like that possibly and as far as the felony I think they're claiming that there was a kidnapping. If there was a kidnapping it certainly was over when whoever dumped the body out on the street, dumped the body out on the street. My client had nothing to do with that, kidnapping is over at that point and the person is not dead, we know that because it doesn't die--the person doesn't die for almost an hour later. So, I ask that my client certainly not be bound over on anything.

THE COURT: Thank you. Mr. Pheney, do you have any further

105

argument, sir?

MR. PHENEY: Your Honor, just to indicate that, obviously, I disagree all four defense counsels. I think what we have here is an obvious and overwhelmingly example of a concerted effort by four individuals to achieve a desired result and they certainly did in this case.

The evidence is overwhelming in regard to premeditation and it's overwhelming in regard to the Felony Murder.

THE COURT: Thank you. Well, I've had an opportunity over the course of the last day, day and a-half, to hear the testimony of the seven witnesses that we have in this matter. I'm going to make my decision and it's going--it's basically it's a group decision. Each one of these findings technically apply to each one because I'm going to summarize it as I believe the testimony is.

Now, I've said over my time here as Judge, that credibility is an issue for the trier of fact. The trier of fact in this matter is if these matters get bound over and they do proceed to a jury trial. I have always taken the position that credibility is not in my position here. I determine if there's any evidence on each and every one of the elements in this matter and make my decision based on that.

This is a probable cause hearing. I've always done probable cause on a scale of one to ten and it's approximately a three. I have to have some evidence on each one of the elements with each one of these defendants in order to bind this matter over.

It's my belief that back on April 25, 1998 to April 26, 1998

106

according to the testimony that I have in this matter, that in Covert Township, in Van Buren County down at Bracken's or Blue Star Lounge that a Deborah Boothby was killed. There was an argument inside the bar that involved Ivory, Scottie Shaver, Ivory Shaver, Shevy-Shevolier Gill; this argument went outside. Outside there was testimony that there was a continued, I'm going to use the word, beating, there was a continued altercation and that both Ivory Shaver, Scottie Shaver, Ed Foster were involved in stomping, kicking, hitting, according to various testimony that I heard in this matter. That eventually Ms. Boothby was picked up, taken to a vehicle of Shevolier Gill, placed in that vehicle by at least both Shavers. Mr. Foster was with them. Mr. Foster got into a car that was driven by Ms. Burnett. Ms. Gill was in the car, they drove to another site where there was a continued beating of Ms. Boothby by Foster, Shaver and Shaver.

The idea was brought up by, I believe the testimony was, Ivory Shaver, let's make this look like an accident and take Ms. Boothby back to the Blue Star Lounge, placed upon Blue Star Highway, run over by a car with Ms. Gill, Mr. Shaver and Mr. Shaver and the second car of Adrienne Burnett with Mr. Foster.

This is--the thing that bothers me most in this is that after these brutal beatings and being run over by a vehicle that when Officer Boling arrived from Covert Police Department this individual was still alive. The suffering that went through in this matter, I think Mr. Nickerson summarized it, the most heinous crime, brutality.

I find in this matter that on or about April 25-26, 1998 in

107

Covert Township, Van Buren County that Scottie Shaver was involved in causing the death of Deborah Boothby. He formed the intent to kill by his actions and agreed to the running over with the vehicle. This was premeditated, thought out, it was deliberate, it was not justified, sufficient reason to bind over Count I.

Count II on or about the same date and time in Covert Township, Van Buren County, as I stated he was involved in causing the death of Deborah Boothby. He intended to either kill her or do great bodily harm and would create a very high of risk of death and that during that there was a kidnapping and that Ms. Boothby was forcibly confined without legal authority and moved to another place and that was willful and malicious. So, there's sufficient probable cause for Count II; and Count I and Count II are bound over. Arraignment date on Scottie Shaver is going to be March 19, 2010 at 10:30 in the morning.

Regarding Ivory Shaver, this Court makes the same findings that on or about April 25-26, 1998 in Covert Township of Van Buren County that Ivory Shaver did cause the death or is involved in causing the death of Deborah Boothby. There was an intent to kill, it was premeditated, thought out, there was a beating, there was two beatings, there was a run over with a car, he was involved, this was deliberate and not justified. Count I is bound over.

Count II that on or about the same date and time Covert Township, Van Buren County that Ivory Shaver was involved in causing the death of Deborah Boothby by his actions. He either intended to

kill or do great bodily harm or create a very high risk of death and during this there was a kidnapping or forcibly confining Ms. Boothby with no legal authority, moving her from one place and confining and this was willful and malicious and therefore Count II is bound over, also.

Bind over on Counts I and II there will be an arraignment date on March 19, 2010 at 10:30.

In the matter of Shevolier Gill. Count I on or about April 25-26, 1998, in Covert Township, Van Buren County that Ms. Gill was involved in causing the death of Deborah Boothby, aiding and assisting others. She intended to kill, this was premeditated, thought out when they ran her over with the car after these beating that were participated in. It was deliberate and not justified and therefore Count I is bound over.

Count II, also on or about the same time in Covert Township, Van Buren County, Ms. Gill was involved in causing the death of Deborah Boothby. There was an intent to either kill or do great bodily harm and create a very high risk of death committed during a kidnapping which Ms. Boothby was forcibly confined, no legal authority. Ms. Boothby was moved from one place to the other and confined and this was willful and malicious and therefore there is a sufficient basis to bind over on Count II.

Counts I and II, as far as Ms. Gill, are bound over. Circuit Court arraignment is going to be March 19, 2010 at 10:30 in the Circuit Court.

Regarding Mr. Foster. This Court will find probable cause that in Count I on or about April 25-26, 1998 in Covert Township, Van Buren County that Mr. Foster was involved in causing the death of Deborah Boothby. There was an intent to kill, this was premeditated, thought out for the beatings, participated and being involved in running her over with the motor vehicles. This was deliberate and not justified. Count I is bound over.

Count II, on or about the same date, time and location, that he was involved in causing the death of Deborah Boothby through an attempt to kill or great bodily harm or attempted to do great bodily harm or to create a very high risk of death and this was done during a kidnapping in which Ms. Boothby was forcibly confined with no legal authority. She was moved from one place to another confined, this was willful and malicious. Count II is bound over, also.

Arraignment on Count I and Count II is going to be on March 19, 2010 at 10:30 in the morning.

All these matters as I say are bound over. Bond which is no bond in all four cases is going to be continued.

MS. DUNFIELD: Your Honor, may I inquire as to the arraignment date is supposed to be on a Friday?

THE COURT: Judge Buhl is gone the next week and so he's doing them on that Friday.

MS. DUNFIELD: Thank you, Your Honor.

THE COURT: Yes, ma'am. I have a notice for each of the attorneys to provide for themselves and for their clients. I will put

110

those there for each of you and you can pass those out.

At this point in time unless there's anything further we're in recess.

MR. SAPPANOS: Judge, could we all approach?

THE COURT: You may.

(At 11:20 a.m., bench conference with all attorneys)

THE COURT: Just to clarify a matter that the attorneys have brought forth to me. Just to clarify my original statement of fact. It was not my intentions to, in any way, shape or form, believe that I misstated the fact. All four of these defendants who are involved in this are located in the two cars that were used to run over Ms. Boothby. And that is the intentions of what I meant to say. If I didn't state it that way that was my intentions.

MR. SAPPANOS: Thank you, Your Honor.

MR. PHENEY: Your Honor, if I could just for the record. And I agree with the Court, and I agree with what the Court did, thank you.

Pursuant to MCR 6.121, I will be filing joint informations.

THE COURT: Thank you. I'll let the defense attorneys handle it from that standpoint.

MR. PHENEY: Thank you.

THE COURT: Thank you. Anything further, Mr. Sappanos?

MR. SAPPANOS: No, Your Honor.

THE COURT: Ms. Dunfield?

MS. DUNFIELD: No, Your Honor.

111

THE COURT: Mr. Ronning?

MR. RONNING: No, Your Honor.

THE COURT: Mr. Rodlund?

MR. RODLUND: No, Your Honor.

THE COURT: Thank you.

MR. PHENEY: Thank you, Judge.

(At 11:21 a.m., Court proceedings concluded)

*   *   *

STATE OF MICHIGAN )
)
COUNTY FOF VAN BUREN)

I certify that this Volume II of II transcript consisting of 113 pages is a true, complete and correct transcript to the best of my ability of the proceedings taken in this matter on Friday, March 12, 2010, by Susan L. Klein, CER #3482, Certified Electronic Recorder.

Dated: April 23, 2010

Susan L. Klein CER #3482
Certified Electronic Recorder