UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**FILED - GR**

September 30, 2024 12:58 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: KB   SCANNED BY: ول / ١٠-١

SCOTTIE BERNARD SHAVER,

      Petitioner,

v.

      Case No. 1:17-cv-809
      Honorable Robert J. Jonker
      Magistrate Judge Ray Kent

BONITA HOFFNER, Sub. Nom.,
BRYAN MORRISON,

      Respondent.

_____/

Scottie Bernard Shaver, #405867
In Propria Persona
Lakeland Correctional Facility
141 First Street
Coldwater, Michigan 49036

Scott R. Shimkus, (P77546)
Assistant Attorney General
Criminal Appellate & Parole Div.
Post Office Box 30217
Lansing, Michigan 48909

PETITIONER'S REPLY BRIEF TO RESPONDENT'S ANSWER
IN OPPOSITION TO THE HABEAS CORPUS PETITION

Dated: September 25, 2024

## TABLE OF CONTENTS

Table to Authority ....................................................................................................i,ii

Petitioner's Reply Statements to Respondent's Answer in Opposition
to the Habeas Claims Presented ...............................................................................iii

Statement of Facts ...................................................................................................1,4

Controlling Authority ..................................................................................................5

Reply to Respondent's Claim One .............................................................................6

Reply to Respondent's Claim Two .............................................................................7

Reply to Respondent's Claim Three .........................................................................8,9

Reply to Respondent's Claim Five ............................................................................10

Reply to Respondent's Claim Four ...........................................................................11

Reply to Respondent's Claim Five ............................................................................12

Reply to Respondent's Claim Six .............................................................................13

Reply to Respondent's Claim Seven .........................................................................14

Reply to Respondent's Claim Eighth .................................................................15,16,17

Conclusion ...............................................................................................................17

Relief Sought ...........................................................................................................18

Certificate of Mailing ................................................................................................--

Attachment-A ...........................................................................................................--

## TABLE OF AUTHORITY

Arizona v Fulminante, 499 US 279, 309; 111 S Ct 1246 (1991) ....................................16

Bell v Cone, 535 US 685, 694; 122 S Ct 1843 (2002) .......................................................5

Berger v United States, 295 US 78,88 (1935) .................................................................8

Brady v Maryland, 373 US 83; 83 S Ct 1194 (1963) .....................................................11

Bruton v United States, 391 US 123, 126 (1968) ...............................................5,12,15,16

Cary v Musladin, 549 US 70; 127 S Ct 649 (2006) ..........................................................5

Crawford v Washington, 541 US 36, 53, 54 (2004) .......................................................12

Herrera v Collins, 506 US 390, 400 (1993) ...................................................................14

House v Bell, 547 US  518; 126 S Ct 2064 (2006) ..........................................................14

In re Murchison, 394 US 133; 75 S Ct 623 (1955) .........................................................15

In re Winship, 397 US 358, 364 (1970) ...........................................................................7

Isom v Arkansas, 140 S Ct 342; 205 L Ed 2d 373 (2019) ..............................................16

Kimmelman v Morrison, 477 US 365; 106 S Ct 2574 (1986) ..........................................10

Lee v Illinois, 476 US 530, 574; 106 S Ct 2056 (1986) ..................................................12

Lilly v Virginia, 527 US 116; 19 S Ct 1887) (1999) ............................................12,15,16

Marshall v Jerico, Inc., 466 US 238, 240 (1986) ..........................................................16

Napue v Illinois, 360 US 264, 270 (1959)....................................................................8,9,

O'Sullivan v Boerckel, 526 US 838; 19 S Ct 1728 (1999) ...........................................6,11

Patterson v New York, 432 US 197, 210 (1977) ..............................................................7

Richardson v Marsh, 481 US 200, 209 (1987) .................................................................5

Schlup v Delo, 115 S Ct 851, 856  (1995) ......................................................................14

Strickland v Washington, 466 US 668, 696 (1984) ...............................................10,13,14

Trest v Cain, 522 US 87, 89 (1997) .................................................................................9

Turney v Ohio, 273 US 510, 535; 47 S Ct 437 (1927) ...................................................17

Williams v Taylor, 529 US 362, 280; 120 S Ct 1495 (2000) ...........................................5,6

Withrow v Larkin, 421 US 35, 47 (1975) .................................................................17

STATUTES:

28 USC § 2254(d)(1) ...................................................................5,9,10,13,17

28 USC § 2254(d)(2) .........................................................................12,17

MCL § 750.316 .......................................................................................7

COURT RULES:

MCR 6.500 ...........................................................................................9,17

MCR 6.502(G)(2) ....................................................................................13

MCR 7.205 .............................................................................................9

MCR 7.302 .............................................................................................9

<u>REPLY STATEMENTS TO RESPONDENT'S OPPOSITION CLAIMS PRESENTED</u>

(I)

PETITIONER'S REPLY TO RESPONDENT' CLAIM- I

(II)

PETITIONER'S REPLY TO RESPONDENT' CLAIM -II

(III)

PETITIONER'S REPLY TO RESPONDENT'S CLAIM -III

(IV)

PETITIONER'S REPLY TO RESPONDENT'S CLAIM -IV

(V)

PETITIONER'S REPLY TO RESPONDENT'S CLAIM - V

(VI)

PETITIONER'S REPLY TO RESPONDENT'S CLAIM - VI

(VII)

PETITIONER' S REPLY TO RESPONDENT'S CLAIM -VII

(VIII)

PETITIONER'S REPLY TO RESPONDENT'S CLAIM - VIII

## STATEMENT OF FACTS
### And Background History

Deborah Boothby died in 1998, in what was termed a motor vehicle accident by Medical Examiner, Dr. David Millard on April 26, 1998.  Her death was believed to be from a vehicle hit and run circumstance where Ms. Boothby was found on the side of the Star Highway, in Covert, Michigan.  She was taken to the Sparrow Hospital where she later died.  On an anonymous tip, police was led to a person who was present at the lounge on the night of April 25, 1998, and Ms. Adrianne Burnette, was investigated.  The initial cause of death was changed from a vehicle accidental death, to a homicide in 2007.  Ms. Boothby's body was never exhumed for additional examination supporting the change in the manner of death from vehicle accident to homicide.  This came as a result of the State Police investigation nine years later.

In September 2007, the physical evidence gathered at the hit and run scene was examined by Michigan State Police.  The case files was brought to the attention of Detective Sergeant Diane Oppenheim of the MSP, South Haven Post, under complaint number 055-0001422-99.  This Detective made a supplemental report on September 26, 2007.  Detective Oppenheim conducted numerous investigations none of these were recorded.  There were no copies of the interviews in the police files of this case.  It is not known why, or by whom, the cause of death was changed.

Petitioner, Scottie Bernard Shaver was arrested, tried and convicted for the murder of Ms. Deborah Kay Boothby, along with several codefendants.  His first trial ended in a hung jury where the jury was unable to find guilt based on the evidence presented.  In the second trial, the jury returned a verdict of guilty of first degree murder and Petitioner was sentenced to life in prison without the possibility for a parole.  On direct appeal, the Court affirmed in an unpublished opinion.  See *People v Shaver*, COA No. 305945, (2013).  The Supreme Court denied relief in standard order form in (2014).  Petitioner filed a MCR 6.500 motion which the trial court denied without a hearing on December 04, 2015.  This Application for leave to appeal follows that denial.

### Trial Facts:

During the trial, testimony revealed that at 2:30 A.M. on April 25, 1998, police officers were dispatched to the Blue Star Highway on a report of a hit and run. (Tr VI pp 48-50; Tr VI pp 217-

1

218). The Police found a person who was still alive, face down in the middle of the roadway. (Tr VI pp 51-56); (Tr VI pp 138-141). The victim later died at a local hospital (Tr VI p 69).

In the initial police investigation, three women reported seeing the victim walking down the road at approximately 02:30 a.m., without injuries. Information also revealed that a white car may have been involved in the victim's death. (Tr VI pp 61-63). There ware no eyewitnesses to the hit and run incident and Police Officer Boling concluded it was a hit and run. (Tr VI p 154).

Ivory Shaver, the uncle of Petitioner Scottie Shaver, was interviewed by Officer Boling because he had information that Ivory and Ms. Boothby was involved in an argument at the bar and Boothby was escorted out. (Tr VI pp 78-79). Ivory claimed that Scottie, had broken up the verbal exchange which involved a former relationship between Ivory and Boothby, (Tr VI p 84).

Testimony further revealed that an anonymous tip led to an investigation of Ms. Adrianne Burnette, who was present at the bar and was driving a white car. Her car had a cracked turn signal and scratches that had been covered up with whiteout. (Tr VI pp 85-86). Ms. Burnette was evasive and uncooperative, (Tr VI p 236; VII p 135). She indicated that Boothby was having trouble with Shaver that night. (Tr VII pp 10-12). No arrests were made until 2007. (Tr VIII p 120).

State Police Detective, Diane Oppenheim, investigated the cold case, and interviewed Ms. Burnette who later charged with open murder and perjury in connection with the death of Ms. Boothby, (Tr XI p 14). Burnette entered a guilty plea on October 19, 2009 to second degree murder and agreed to testify in further proceedings against Petitioner and the codefendants for a sentence of (8 to 20) years. (Tr XI pp 16-17).

Dr. Palutke, the pathologist, determined that Boothby died of multiple blunt force injuries and internal bleeding. She had internal bleeding and fractures of her vertebra and pelvis, (Tr XVI pp 68-71). Her blood alcohol level was .27 percent. He opined that she would have been able to walk until the vertebrae in her spine was broken. He indicated that the manner of death was initially undermined. But when the investigators revealed additional information to him gleaned from their investigation, the medical examiner amended his findings and and changed the manner of death to homicide. (Tr XIV pp 62-64). Only Dr. Millard's name is affixed to the death certificate from May

2

05, 1998, listing the cause of death as vehicle accident. Dr. Millard did not testify in either trial.

Adrian Travier testified that Ivory Shaver confided in him while confined at the Lakeland Correctional Facility. Ivory allegedly told Travier that he and his nephew, along with Ed and Shevy were involved in the beating of a white girl and running he rover with an automobile to make it look like an accident, (Tr XV pp 93-95). He was transferred from the Correctional Facility by offering his cooperation to the Van Buren County Prosecutor's office, (Tr XV pp 97-99).

Defense witness, Dr. Brian Hunter, a forensic pathologist, testified that he examined and reviewed Dr. Palutke's report. He believed that all of the victim's injuries were consistent with a motor vehicle accident, but that he could not rule out that some of the injuries could have been inflicted by a berating, (Tr XVII pp 21-22). He believed that significant force, such as those involved in a mother vehicle accident, would have been necessary to produce the posterior rib fracture and less likely that these particular injuries were produced from a 'beat down.' (Tr XVII pp 25-27). He found that the spinal injury was not consistent with an assault, (Tr XVII pp 27-28). He believed the more plausible scenario was that the victim was walking along the road and was run over by a car. (Tr XVII p 30).

Marie Black, Jeannine Black, and Danyale Jones testified that they were in the parking lot of the Blue Star Lounge around 12:30 a.m., on the night of April 25, 1998, but were too young to enter the lounge, (Tr XVII pp 142-144). They left the parking lot, and returned later when they observed a white lady walking down the road - staggering (Tr XVII pp 176-178). The lady fell and they turned into the parking lot to tell Keith Owens to call the police. Two cars left the lot while they were there. One of the cars was white. One of the women heard a 'bloop, bloop', but did not see a car run over the victim. (Tr XVII pp 148-150); (Tr VIII pp 223-225).

Shevolier Gill testified on her own behalf. She admitted she was at the lounge on April 25, 1998 with Ivory as she was dating him at that time. She saw Boothby come in stumbling around the bar. Boothby approached Gill and asked if she was with Ivory. Boothby poured a drink on her. (Tr XVIII p 5; p 11). Gill said there was only a verbal exchange and when the lights came on, she and Ivory went into the parking lot, (Tr XVIII pp 12-14). Gill observed a group of girls pour beer over

Boothby, but Boothby kept walking, and she went to her car, (Tr XVIII pp 16-18). Ivory talked to Boothby in the parking lot but got in her car and they went to her house, (Tr XVIII pp 21-23). She did not see any fight outside the lounge. (XVIII pp 55-56). She did not assault Boothby (Tr XVIII pp 35-37). Gill found out the next day that Boothby was dead. She said the police came to her house the next day and looked at her car and she never heard anything form them again until 2008 (Tr XVIII pp 57-59).

Robert Boyd, an inmate at Lakeland testified that Travier and Ivory were both there but he disputed that Travier and Ivory spent considerable time together. Boyd claimed that Travier only became interested in Ivory in November when he found out that Ivory had been implicated in a homicide in Van Buren County. He said Travier approached him with a proposal that the two of them should claim Ivory confessed to the murder in order to reduce their incarceration but he declined. (Tr XVIII pp 142-145). The jury returned a verdict of guilty on all defendants. Petitioner was sentenced to life without the possibility of parole. (St p 11).

<u>Facts Not of Record:</u>

In a sworn affidavit, from Thomas Investigative Services, by Thomas G. Bereza, an Accident Reconstructionist Consultant, reveals the following:

> On April 25, 1998, it was raining and visibility was low. Police Officer J. Allen responded to an accident on the Blue Star Highway, in Van Buren County, Covert Township, where Deborah Kay Boothby had been struck by an automobile.
>
> That the officers knew this was a 'hit and run' fatal car pedestrian accident. That as the Chief of Police, Winans of the Covert Police Department stated-It was very dark, raining very hard with low visibility. As a result, no assistance by trained accident reconstructionist was requested. The most telling in this sworn affidavit is page two regarding Dr. Cabaltica the Medical Examiner from Sparrow Hospital indicating the change of the cause of death of Deborah Kay Boothby, and the Investigation allegedly conducted by MSP Detective Diane Oppenheim.

---

Notably, there was nothing in the autopsy report indicating that parts of Ms. Boothby's body was smashed/flatten from being run over by a 3000 pound vehicle. Had the body been run over twice as indicated by witness Burnett, there would have been crushing/flattening evidence from the weight of the vehicle. The body was not exhumed for a second autopsy examination. The only facts which caused an investigation after nine years, came from Ms. Burnett who failed a polygraph test and provided false testimony about running over of the body of Ms. Boothby twice with her car. (See attached Police Report from Detective Diane Oppenheim).

## CONTROLLING AUTHORITY

Petitioner asserts that the controlling legal authority for his habeas petition are those cases decided by the US Supreme Court on clearly established law governing the federal constitutional claim. Embedded in that authority, a habeas petitioner must show that the state court's resolution on the claim resulted in an a contrary to, or an unreasonable application of clearly established law as determined by the US Supreme Court. Accord, *Williams v Taylor*, 529 US 362, 380; 120 S Ct 1495 (2000). The Court was explicitly clear that when deciding whether a state-court decision was "contrary to" or an "unreasonable application of clearly established federal law", a federal habeas court will generally consider only those Supreme Court opinions issued prior to the state court's denial of relief.

Therefore, the clearly established inquiry is not only a threshold question, it can be dispositive. Without clearly established federal law a federal habeas court need not determine whether a state court's decision was "contrary to" or involved an "unreasonable application" of such law. *Carey v Musladin*, 549 US 70; 127 S Ct 649 (2006). cf, *Williams v Taylor*, 529 US at 412. Id.

Petitioner asserts that the clearly established law on his habeas claims was clearly established and the State Courts of Michigan disregarded those ruling and failed to apply clearly US Supreme Court precedent to his claims. Specifically, his *Bruton* claim. cf *Bruton v United States*, 391 US 123, 126 (1968). See too, *Richardson v Marsh*, 481 US 200, 209 (1987).

The word "contrary" is commonly understood to mean "diametrically different", 'opposite in character or nature,' or 'mutually opposed'. *Bell v Cone*, 535 US 685, 694; 122 S Ct 1843 (2002). Thus, it is abundantly clear that the controlling authority in a habeas inquiry is whether or not the state courts applied both a contrary to, or an unreasonable application of clearly established law as determined by the US Supreme Court. Accord, *Williams v Taylor*, 529 US at 393.

Because a state court's decision applying the correct legal rule from Supreme Court Cases to the facts of the particular case does not fit within the realm of Title 28 USC § 2254(d)(1)'s contrary to clause, this habeas Court must apply the 'unreasonable application clause' of the Supreme Court's decision in *Williams v Taylor*, 529 US at 406, to provide the appropriate standard of habeas inquiry.

5

REPLY TO RESPONDENT'S ISSUE-ONE

Respondent asserts that Petitioner did not exhaust his previously unexhausted claim. (Resp. Ans. p 23, (ECF # 26, p ID-5982). Contrary to Respondent's position, there were no unexhausted claim presented in his initial habeas petition. All claims presented in the initial habeas petition had been fully exhausted in the state courts. The assertion that he presented an unexhausted claim in his initial petition was erroneous asserted by his last attorney, Ms. Suzanna Kostovski, which the Court allowed and stayed the habeas petition for return to the state for complete exhaustion. Moreover, there was no claim from Respondent's submission to the initial habeas petition that there existed "unexhausted claims" and no argument in the initial reply from Respondent was presented on an unexhausted claim. Therefore, this assertion is contrary to clearly established US Supreme Court precedent on exhaustion as ruled in *O'Sullivan v Boerckel,* 526 US 838; 119 S Ct 1728 (1999), where the Court said: ... (The fact that petitioner has the right to raise the claim through discretionary review in the state supreme court is sufficient to require presentation of the claim to that court to exhaust. *O'Sullivan,* 526 US at 845-847).

Thus, because there was no unexhausted claim submitted in the initial habeas petition, and Respondent failed to argue that fact in the answer to the initial habeas petition, the assertion here is undoubtedly an unreasonable application to clearly established law as determined by the US Supreme Court under *Williams v Taylor,* supra.

The assertion that an 'unexhausted claim' in the initial habeas petition came from the Petitioner's then attorney, Suzanna Kostovski, after Petitioner submitted his "Traverse" to the answer and pointed out that there existed some false facts in the answer with respect to the unsigned death certificate where the state claimed that Dr. Millard issued the new death certificate changing the cause of death from vehicle accident, to homicide. Petitioner pointed out that Dr. Millard did not testify to this change and Respondent was a presenting a fraud upon the court. Attorney Kostovski sought an opportunity to obtain money from Petitioner's family, by submitting false pretenses to this Court, and thereafter, submitted the (1) page motion referenced by Respondent. (Resp. Ans. p 23, ¶ 2). Thus, this claim should be dismissed as "illusionary."

6

## REPLY TO RESPONDENT'S ISSUE-II

Contrary to Respondent's legal position, the Michigan Court of Appeals decision on Petitioner's claim of insufficient of the evidence was clearly a decision which resulted in a contrary to, and unreasonable application of clearly established law as determined by the US Supreme Court. The Respondent relies heavily on state law determinations to bolster its claim. It is unclear what Respondent actually means when assertion that the state does not have to prove the intent to kill for a conviction on first degree murder. (Resp. Ans. p 32, ¶ 3). This assertion is an unreasonable application of the US Supreme Court's ruling of *In re Winship*, 397 US 358, 364 (1970), where the Court clearly ruled that: "("the government must prove every fact necessary to constitute the crime, beyond a reasonable doubt").

Respondent would have this Court believe that the Supreme Court was judicially flawed when it opined: "The due process clause places on the prosecution the burden of persuasion for every element of the crime charged, and only in rare circumstances does this burden shift to defendant." The court went on to determine that any shifting of the burden of persuasion must withstand constitutional scrutiny. *Patterson v New York*, 432 US 197, 210 (1977). Because the state of Michigan failed to prove the elements of first degree murder, MCL § 750.316 as to Petitioner's involvement in the death of Ms. Boothby from a hit an run vehicle accident to murder, and relief on a convicted perjurer who flunked her polygraph examination regarding the incident, can and should be equated to the failure to prove each and every element of the crime charged.

Furthermore, the facts recorded by the Michigan Court of Appeals on this claim was adduced from perjured testimony from Ms. Burnett who claimed that Petitioner forced her to run over the victim more than once with a 3000 pound vehicle that left no distinguishing marks of a run over, but merely a hit an run as pronounced by Dr. Mallard when initially examining the body. Accordingly, the state court's decision on the claim was not only unreasonable, it was wrong, and under *Winship*, this case must be reversed. *In re Winship*, 397 US at 363. Petitioner asserts that no where in the Court of Appeals opinion does it reference *Winship*. Nor does Respondent answer in opposition cite to *Winship's* due process requirement. This meritless answer should be dismissed.

7

REPLY TO RESPONDENT'S ISSUE-III

This claim is not procedurally defaulted as claimed.  (Resp. Ans. p 36).  This claim was addressed by the state trial court on post conviction.  The trial court judge did not evaluate the claim under the US Supreme Court's ruling in *Napue v Illinois*, 360 US 264, 270 (1959), where the Court opined:

> "The principle that a state may not knowingly use false evidence, including false testimony, to obtain a conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes to the credibility of the witness.  The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." 360 US at 269.
>                          -*-

Respondent's position is that Ms. Adrian Burnett did not provide false testimony when she told the jury that Petitioner forced her to run over the victim's body on more than one occasion. However, Ms. Burnett had flunked her polygraph test and it was only after she flunked the test that Detective Sgt. Diane Oppenheim and she came up with the theory that Petitioner forced her to run over the victim twice with a 3000 pound vehicle, where no evidence supported such a theory from the pathologist report.  Dr. Millard signed the death certificate as being a "hit and run" accident.

Not only did Ms. Burnett provide false testimony regarding the incident, Dr. Palutke  also told the jury that it was Dr. Millard who changed the death certificate from vehicle accident to homicide. Dr. Millard did not  testify at either trial to affirm this fact.  He would tell a Private Investigator later that he did not change the death certificate, not did he sign a second death certificate.  Therefore, Dr. Palutke's testimony was also false on this fact.  No where did the Court of Appeals, or the state trial court address this testimony under the *Napue* ruling.  Thus, the prosecutor sought only to convict on this (9) year old case, resulting in an unreasonable application of clearly established law by the US Supreme Court. cf. *Berger v United*, 295 US 78, 88 (1935).

Respondent's position  are  from facts from the first  trial which ended in a hung jury and therefore should not be reviewed by this Court, because Petitioner's claims are centered on his second trial where he was convicted. (Resp. Ans. pp 53-55). The Michigan Court of Appeals relied on the trial testimony from Ms. Burnett, who was convicted on perjury, and  failed her polygraph

8

testing, and thereafter changed her statements to which she provided testimony at the second trial. Moreover, three witnesses who testified at the first trial, did not testify at the second trial. This information was helpful to establish that Ms. Burnett was testifying falsely when she told the jury that Petitioner ordered her to run over the victim more than once. There is simply no medical or pathology evidence to support a theory that the victim was run over twice with a 3000 pound vehicle. Thus, Ms. Burnett's testimony was false, and under *Napue v Illinois*, this conviction cannot stand in light of the due process requirement. Respondent's answer on this claim should be dismissed a frivolous and contrary to simple logic. If a person is run over by a 3000 pound automobile, there would be evidence of bone or flesh smashing. Nothing in the autopsy reports by Dr. Millard, or anyone else suggest this factor. Accordingly, "a lie is a lie" and a conviction premised on such a lie should be reversed. cf. *Napue*, 360 US at 270.

Petitioner presented this claim to the state trial court and that court denied relief. Petitioner then appealed to the Michigan Court of Appeals which also denied relief. Thereafter, Petitioner sought review in the Michigan Supreme Court and that court denied relief. This set the stage for this habeas petition. Therefore, the claim was completely exhausted in the state courts and contrary to Respondent's posture, Petitioner complied with the state court rules in submitting this claim. Therefore, it is not procedurally defaulted, and he complied with the ruling announced in *Trest v Cain*, 522 US 87,89 (1997). No where in the state courts' rulings did it apply any procedural default on this claim under MCR 6.500 - (Trial Court procedure); MCR 7.205 - (Michigan Court of Appeals procedure), and MCR 7.302 - (Michigan Supreme Court procedure). Consequently, Respondent's reliance on Supreme Court authority governing the procedural default context, is misplaced and should be regarded as a meritless under 28 USC § 2254(d)(1), requirement.*

---

* It should be noted that Respondent's answer skips ISSUE-IV, and proceeds directly to ISSUE-V, from Pages 36 to 39. It should also be noted that three witnesses saw a white woman walking down the road and they then heard a bloop-bloop and asked the owner of the lounge to call the police. These witnesses puts Ms. Burnett's testimony in question. If the victim was walking down the road, she was not in the car with Ivory or Chevy. The state courts' records does not address this fact, doe did defense counsel explore this theory at trial.

REPLY TO RESPONDENT'S HABEAS CLAIM-V

Respondent list this claim as claim five on page 39 of the Answer. Therefore Petitioner will address it accordingly, notwithstanding that habeas claim four is set forth on another page of the Respondent's Answer in opposition. This claim is centered on Petitioner's claim of ineffective assistance of counsel for defense counsel's failure to move the trial court for an expert in accidental reconstruction. He asserts that this failure was prima facie ineffectiveness under the *Strickland* inquiry. Had defense counsel provided the trial court and the jury with expert testimony regarding the reconstruction of the accident, there is a reasonable probability that a different outcome would have rendered. *Strickland*, 466 US at 698.

In addition to this failure, defense counsel failed to call three witnesses who testified at the first trial and provided testimony indicating they observed the victim walking down the road staggering when they entered the area of the lounge. They also indicated that they immediately heard a sound like, "bloop", "bloop" and they asked the lounge owner to call the police. Defense counsel failed to summon these three witnesses for the second trial whose testimony could have assisted in impeaching the testimony of Ms. Burnett that Petitioner and Ivory forced the victim into a car, drove her down to a park and beat her. Thereafter, the Petitioner and Ivory placed her on the road and ordered Burnett to run over her numerous of times. Defense counsel failed to have these witnesses testify at the second trial which is ineffective assistance because their testimony collaborated that Burnett was testifying falsely. *Strickland*, 466 US at 687 - (denial of a fair trial).

Respondent asserts that Petitioner did not comply with the state's procedural rule. This assertion is misleading because as the US Supreme Court has explained. A criminal defendant will not know that his rights have been violated until long after his case has been reviewed. Accord, *Kimmelman v Morrison*, 477 US 365; 106 S Ct 2574 (1986). Thus, under the totality of the circumstances, defense counsel was constitutionally deficient in his representation. *Strickland*, 466 US at 690. The state trial court did not evaluate this claim under the *Strickland's* inquiry using the totality of the circumstances test. Respondent's reliance on circuit decisions is contrary to the habeas corpus statute and should be rejected. Title 28 USC § 2254(d)(1). (Resp. Ans. pp 51-54).

10

<u>REPLY TO RESPONDENT'S HABEAS CLAIM-IV</u>

Respondent styles this claim under habeas claim-III, alleging a violation under *Brady v Maryland*, as being procedurally defaulted. (Resp. Ans. p 56). However, Petitioner's claim under the *Brady* trilogy was that the State of Michigan by way of the prosecutor prior to either trial. The purported withheld *Brady* materials consist of the following: (1) The failed polygraph test from Adrian Burnett, where it was shown the she flunked the polygraph and was not truthful, and (2) the second issuance of the death certificate of Deborah Boothby, where testimony from Dr. Palutke testified that Dr. Millard changes the manner of death from vehicle accident to homicide. Under *Brady v Maryland*, 363 US 83 (1963), these withheld documents were material to Petitioner's guilt of punishment and would have altered the outcome of the second trial. Contrary to Respondent's posture on this claim, Petitioner exhausted his state court remedies under *O'Sullivan v Boerckel*, 526 US at 842. Therefore the issue is not procedurally defaulted and should be addressed.

Respondent's claim regarding the updated death certificate came to the fore front when the State by way of the Michigan Attorney General's office, submitted its answer in opposition to the initial habeas petition. It was argued that Dr. Millard changed the manner of death to homicide, based on the testimony of Dr. Palutke's trial testimony. However, Dr. Millard did not testify and no one knew who exactly changed the manner of death to homicide from vehicle accident. In fact, the updated death certificate clearly show that the signature on the updated death certificate was electronic entered with Dr. Millard's name affixed thereon. (Placed there by the County Clerk).

This information was unknown to Petitioner at the time of his second trial. Had it been known to defense counsel, and he did not use it to impeach Dr. Palutke's testimony that Dr. Millard changed the manner of death, then there exists prima facie ineffective assistance of counsel. Contrary to Respondent's position, this claim was completely exhausted in state court and the state courts ignored it under *Brady*. The attached police report clearly indicate that Ms. Burnett's testimony was fabricated after she failed the state's polygraph. At this point Detective Oppenheim discussed more details about the accident. This document clearly show that Burnett was falsifying her statements to match what Oppenheim wanted. This document was withheld under *Brady*.

11

## REPLY TO RESPONDENT'S HABEAS CLAIM-V

Petitioner asserts that this claim is styled by Respondent to habeas claim IV which is a violation of the confrontation clause and is procedurally defaulted and meritless. (Resp. Ans. p 66). The respondent styles its argument under *Crawford v Washington*, 541 US 36,5354 (2004). (Resp. Ans. p 67). However, Petitioner raised his confrontation claim under the US Supreme Court's decision in *Bruton v United States*, 391 US 123; 88 S Ct 1620 (1968); *Lilly v Virginia*, 527 US 116; 119 S Ct 1887 (1999), which was clearly established law at the time of Petitioner's trial, where the trial court judge allowed the alleged confession by codefendant to a jail house "snitch" to enter the case against Petitioner. This was a clear violation of the confrontation clause under *Bruton*, and the State Courts rejected it.

Respondent's attempt to mislead the Court should be questioned. Petitioner's claim centered around his codefendant's alleged statement to the jail house snitch. Under *Bruton*, *Lilly*, and *Lee v Illinois*, 476 US 530, 574; 106 S Ct 2056 (1986), was a clear violation of the right to confront one's accusers. The Respondent's re-styling the claim under *Crawford's* testimonial analysis is misplaced and should not be review under that theory. 28 USC § 2254(d)(2).

Respondent asserts that the issue - the death certificate and the changing from accident to homicide was not testimonial. (Resp. Ans. p 69). This is misleading because the confrontation violation asserted by Petitioner involves the out-of court statement from his codefendant, which was testified to by the jail house snitch which clearly violated the *Bruton* decision. The State courts' in analyzing this claim provided an unreasonable application of clearly established law from the US Supreme Court on the out-of-court statement from a non-testifying codefendant in violation of *Lilly v Virginia*, and the Respondent's reliance upon *Crawford* should be rejected. Accordingly, Petitioner is entitled to habeas relief on this claim under 28 USC § 2254(d)(1) and (d)(2).

Respondent's reasserting that the death certificate is not testimonial is misleading because it is not the gist of Petitioner's claim under the confrontation clause and the assertion by Respondent should be disregarded as meritless. Petitioner has satisfied the criteria for relief under both *Bruton v United*, and *Lilly v Virginia* on the out-of-court statement of a non-testifying codefendant .

12

<u>REPLY TO RESPONDENT'S HABEAS CLAIM-VI</u>

Respondent's claim six asserts an ineffective assistance of counsel claim. This claim has already been addressed. However, the state courts' resolution on this claim resulted in an unreasonable application of clearly established law from the US Supreme Court. Indeed, the State trial and appellate courts relied on typically state law determinations for its denial of relief, as Respondent points out. (Resp. Ans. pp 74-81). State law claims are not cognizable on federal habeas review. This claim must be reviewed under the two prong test announced in *Strickland v Washington*, 466 US 668 (1984). Under *Strickland*, it was unreasonable for defense counsel not to call the three witnesses referenced by Respondent, (Resp. Ans. p 74, ¶ 4). Those witnesses could have shed considerable light on the subject matter and would have dispelled Burnett's testimony. Accordingly, defense counsel was constitutionally deficient for not calling these witness for the second trial. There is no trial strategy for this failure. *Strickland*, 466 US at 696. The facts relied on by Respondent for this argument are deduced from the first trial which ended in a hung jury and are irrelevant to this habeas inquiry. (Resp. Ans. pp 76-78).

As to Dr. Millard, his testimony was crucial to the state's evidence, and more crucial to Petitioner's defense because Dr. Millard was the Pathologist who examined the victim's body and determined it was an accident 'hit and run.' Furthermore, Dr. Millard did not change the death certificate, it was testified to by Dr. Palutke. The trial court did not know who Dr. Millard was and determined the claim to be without merit. (Resp. Ans. p 78, ¶ 4). Dr. Millard is the person who signed the first death certificate. For the State to suggest Dr. Millard was unknown to case is mind boggling. The State knew who Dr. Millard was and for defense counsel not to call him as a defense witness is prima facie ineffective assistance. Because his testimony would have made a difference in the outcome. *Strickland*, 466 US at 696. Petitioner is entitled to relief on this claim. 28 USC § 2254(d)(1). Because there exists a reasonable probability that a different outcome would have been rendered with Dr. Millard's testimony, Petitioner has satisfied the *Strickland* inquiry for relief. <u>cf.</u> 466 US at 695. Respondent's answer on this claim is meritless in light of the trial court's record and its erroneous ruling, denying relief on Petitioner's MCR 6.502(G)(2) motion.

13

<u>REPLY TO RESPONDENT'S HABEAS CLAIM-VII</u>

Respondent submits a claim of Petitioner's actual innocence which is not cognizable on habeas inquiry and is meritless. (Resp. Ans. p 88). Petitioner asserts that this claim is bolstered by the State evidence which, without perjured testimony, and ineffective assistance of his trial attorney, no jury would have voted to convict him of first degree murder. Indeed, his first trial ended in a hung jury where the jury was impressed with the evidence submitted by the prosecutor as to Petitioner's guilt. It was only after his second trial, where specific witnesses were not called to testify, and Dr. Palutke's testimony that the death certificate was changed from accident to homicide that the jury was able to convict. This The state ruling on this claim is contrary to the US Supreme Court's ruling in *Schlup v Delo,* 115 S Ct 851, 856 (1995), premised on new evidence.

Petitioner asserts that his Sixth Amendment right violation, and his Sixth Amendment right under the *Bruton* ruling is adequate to support his "actual innocence" claim on habeas review. See also, *Herrera v Collins*, 506 US 390, 400 (1993) as referenced by Respondent. (Resp. Ans. p 88). Petitioner also points to *House v Bell*, 136 S Ct 2068 (2006), where the US Supreme Court reversed a murder conviction from the State of Tennessee on the actual innocence claim with new submitted evidence that the blood found on his clothing was accidentally placed there by the police transporting the evidence to and from the evidence room. Here, sub judice, Petitioner Shaver relies on the facts that he was convicted on false testimony and the fact that his trial lawyer failed to provide him with adequate assistance as guaranteed by the Sixth Amendment of the US Constitution. cf. *Strickland v Washington,* 466 US 668 (1984). Had defense did his job, it is reasonable to assume the second trial outcome would have been different. 466 US at 668.

Petitioner Shaver, like *House* is entitled to habeas relief where he has shown that without the fabricated evidence from Ms. Burnett, his conviction for fist degree murder would not have been rendered by the jury. cf. *House,* 136 S Ct at 2086. Moreover, had defense counsel summoned Dr. Millard to testify about changing the death certificate from accident to homicide, the jury would have learned that somehow the State Actors were presenting them with fabrication and would have voted to acquit. cf. *Schlup,* 115 S Ct at 856. Respondent's argument must be dismissed as meritless.

14

## REPLY TO RESPONDENT'S HABEAS CLAIM VIII

Petitioner asserts that the facts for this argument by Respondent came from codefendant's appeal of right as admitted by Respondent. (Resp. Ans. p 90 - 95). Respondent suggests that because the Michigan Court of Appeals decision would apply equally to Petitioner Shaver case on habeas review, the facts and argument from codefendant Shevolier Gill is not implicated here and this issue should be disregarded by this Court as it applies to Petitioner Shaver. Furthermore, Petitioner presented this claim under the rulings of *Bruton* and *Lilly v Virginia*, and asserted that because the trial judge allowed the out of court statement from codefendant Ivory, the trial judge engaged in Judicial partiality knowing he was wrong under clearly established US Supreme Court precedent on the subject matter.

Indeed, when the subject matter arose as to the out-of-court statement by codefendant Ivory Shaver, the trial judge ruled that it was allowed because it was a statement against the penal interest of Ivory Shaver and it applied to all codefendants' after having ruled otherwise during the first trial where it was not allowed to enter the case. By allowing the out-of-court statement/confession by codefendant Ivory Shaver, violated the US Supreme Court's ruling in Lilly v Virginia, which based its ruling on *Bruton v United States*. Therefore, the trial judge displayed judicial bias toward Petitioner, violating his Sixth Amendment right to a fair/unbiased fact finder.

This claim was addressed by the US Supreme Court long ago and the Court determined that justice must satisfy the appearance of Justice. The Court in *In re Murchison*, 394 US 133; 75 S Ct 623 (1955), opined:

> "A fair trial in a fair tribunal is a basic requirement of the due process clause. Fairness, of course, requires an absence of actual bias in the trial of a case. But our system of law had always endeavored to prevent even the possibility of unfairness. To this end, no man can be a judge in his own case and no man is permitted to try cases where he had an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said however, that every procedure which would offer a possible temptation to the average man as a judge not to hold the balance nice, clean and true between the state and the accused, denied the latter due process of law. *Tumey v Ohio*, 273 US 510, at 532. Such a stringent rule may sometimes bar trial judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way, justice must satisfy the appearance of justice." cf. *Offutt v United States*, 348 US 11; *Murchison*, 394 US at 136.

15

Here, the trial judge had previously ruled on the out-of-court statement from Ivory and had ruled that it was not going to be allowed. This was during the first trial which ended in a hung jury. During the second trial, the trial judge allowed the statement into evidence, which was upheld by the Michigan Court of Appeals in codefendant Gill's case, which that Court implied was also applicable to Petitioner Shaver case. This violated the ruling in both *Bruton* and *Lilly v Virginia,* and the trial judge displayed bias in the second trial when he allowed the out-of-court statement by Ivory to be entered as evidence against Petitioner under MRE 804(b)(3). (Resp. Ans. p 93, ¶ 4).

Judicial bias was revisited by the US Supreme Court in *Isom v Arkansas,* 140 S Ct 342; 205 L Ed 2d 373 (2019), where justice Sotomayor, in her dissent, opined:

> "...At the same time, this Court has acknowledged that allowing a decision maker to review and evaluate his own prior decision raises problems. *Withrow,* 421 US at 58 n. 25. Perhaps because of the risk that a judge might be so psychologically weeded to his or her pervious position that s/he will consciously or unconsciously avoid the appearance of having erred or changed positions. *Williams,* 579 US at 9. Quoting *Withrow,* 421 US at 57. And it has warned that a judge personal knowledge and impression of a case may sometimes outweigh the parties arguments." *In re Murchison,* 349 US at 138. Id. 140 S Ct at 344.

No where in its opinion, did the Court of Appeals address this claim under the US Supreme Court's clearly established law under *Bruton* or *Lilly v Virginia.* Nor did the State Court apply the decision of *Lee v Illinois,* 476 US at 574. Thus, it can only be said that the state courts resolution on this claim resulted in an unreasonable application of clearly established law by the US Supreme Court. Therefore, contrary to Respondent's posture, (Resp. Ans. pp 93-98), the state trial judge displayed judicial bias against Petitioner Shaver by allowing the out-of-court statement of codefendant Ivory Shaver into the trial as evidence against him. Consequently, *Bruton* did apply to this case. This error was not harmless because it borders on "structural error" and under *Arizona v Fulminante,* 499 US 279, 309; 111 S Ct 1246 (1991), it is reversible error contrary to Respondent's posture. (Resp. Ans. p 99).

Due process entitles a criminal defendant to a proceeding in which he may present his case with assurance that no member of the court is predisposed to find against him. Accord, *Marshall v Jerico, Inc.,* 466 US 238, 240 (1980). This type of prejudice, by the state trial judge, was contrary

16

to the  in *Withrow v Larkin*,  421 US 35, 47 (1975), where the Court clearly stated:

> "Concededly, a fair trial in a fair tribunal is a basic requirement of due process. This
> applies to administrative agencies which adjudicate as well as to courts. Not only is
> a biased decision maker constitutionally unacceptable but our system of law has
> always endeavored to prevent even the probability of unfairness, in pursuit of this
> end, various situations have been identified in which experience teaches that the
> probability of actual bias on the part of a judge or decision maker is too high to be
> constitutionally tolerable." Id. 421 US at 47.

Therefore, Respondent's reliance on the Michigan Court of Appeals decision on this claim is

overshadowed by the US Supreme Court's ruling in *Withrow*, 421 US at 47. The error is structural

in nature and it mandates reversal of the conviction. *Tumey v Ohio*, 273 US 510, 535; 47 S Ct 437

(1927). Contrary to Respondent's analysis, this error is not harmless beyond a reasonable doubt,

and relief is required, Title 28 USC § 2254(d)(1)-(2). (Resp. Ans. pp 99-100)

## CONCLUSION

Inasmuch as Respondent claims that habeas issues II, III, IV,  VI, and  VIII should be barred,

this Habeas Court should disregard such an erroneous assertion. (Resp. Ans. p 100). No where in

the  state courts rulings did any court refer to the claims as being procedurally barred under the

state's regime.  In fact, the Michigan Court Rules allows the submission of those claims on post

conviction review under MCR 6.500 et seq.  Respondent is attempting to have his cake and eat it as

well.  Moreover, Title 28 USC § 2254(d)(1) authorizes this Court to review the claims on the merit

as they  were fully exhausted in the state courts' judiciary regime.  Consequently, this Court has the

inherent authority to review all the claims that Respondent wants to be procedurally defaulted.  cf

Title 28 USC § 2254(d)(1)-(d)(2).

17

## RELIEF SOUGHT

WHEREFORE, and in light of all the foregoing asserted in this Reply Brief, Petitioner prays that this Habeas Court will not be blind sided by Respondent's frivolous arguments and review the claim on their individual merit as the habeas corpus statute mandates. Petitioner yields to his initial and his amended habeas petition before this Court.

Respectfully submitted,

Dated: September 25, 2024

Scottie B. Shaver, #405867
In Propria Persona
Lakeland Correctional Facility
141 First Street
Coldwater, Michigan 49036

18



Clerk Office
U.S. District Court
Western District of Michigan
399 Fed. Building
110 Michigan NW
Grand Rapids, Mich 49053

Scottie B. Shaver #405867
      L.C.F
141 First St
Coldwater, Mi. 49036