UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

SCOTTIE BERNARD SHAVER,

               Petitioner,

v.

BONITA HOFFNER,

               Respondent.

_____/

Case No. 1:17-cv-809

Honorable Robert J. Jonker

## OPINION

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Scottie Bernard Shaver is incarcerated with the Michigan Department of Corrections at the Lakeland Correctional Facility (LCF) in Coldwater, Branch County, Michigan. On June 9, 2011, following an almost five-week jury trial in the Van Buren County Circuit Court, Petitioner was convicted of first-degree murder, in violation of Mich. Comp. Laws § 750.316. On July 11, 2011, the trial court sentenced Petitioner to life imprisonment without the possibility of parole.

On September 5, 2017, Petitioner filed his initial habeas corpus petition, raising eight grounds for relief. (§ 2254 Pet., ECF No. 1, PageID.20.) In an order (ECF No. 2) entered on September 25, 2017, the Court directed Respondent to file a response and the state court record within 180 days. Respondent did so on March 23, 2018. (ECF Nos. 5, 6.)

Subsequently, on April 10, 2020, counsel appeared on behalf of Petitioner and filed a motion to dismiss Petitioner's unexhausted claims, stay proceedings on the exhausted claims, and allow Petitioner to return to state court to exhaust his non-exhausted claims before proceeding on his § 2254 petition. (ECF No. 12.) In an order (ECF No. 15) entered on February 16, 2021, the

Court granted Petitioner's motion, dismissed his unexhausted claims without prejudice, stayed his exhausted grounds, and administratively closed this matter until Petitioner filed a timely motion to amend his habeas petition to include any subsequently exhausted claims.

On September 22, 2023, Petitioner, through counsel, returned to this Court with a motion to lift the stay and for an extension of time to file his amended § 2254 petition. (ECF No. 18.) In an order (ECF No. 20) entered on February 7, 2024, the Court granted that motion. Petitioner filed his amended petition (ECF No. 21) on April 8, 2024. In his amended petition, Petitioner asserts the following eight grounds for relief:

I.    Petitioner Shaver is entitled to habeas relief where there was insufficient evidence proven by the prosecutor beyond a reasonable doubt that he had the intent to commit first degree, or felony murder.

II.    Petitioner is entitled to a new trial where the state prosecutor knowingly allowed false and perjured testimony to gain an unconstitutional conviction. US Const. amend. XIV.

III.    Petitioner was the victim of a *Brady* violation where material evidence crucial to his guilt or punishment was withheld depriving him of his rights to a fair trial requiring habeas relief. US Const. amend. XIV.

IV.    Petitioner was denied his constitutional right to confront and cross-examine a crucial witness against him regarding the cause of death which was changed from accident to homicide requiring relief. US Const. amend. VI.

V.    Petitioner was denied his Sixth Amendment right to the effective assistance of counsel on his appeal of right requiring habeas relief. US Const. amends. VI and XIV.

VI.    Petitioner is entitled to a new trial where his trial attorney was constitutionally defective by failing to investigate the case, failing to utilize the compulsory process to obtain witnesses for the defense, and failed to move for an expert accident reconstructionist requiring relief. US Const. amend[s]. VI and XIV.

VII.    Petitioner is entitled to a new trial where new evidence which was unavailable for his jury trial establish[es] his actual innocence of murder requiring reversal or release from custody. US Const. amend. XIV.

VIII.    Petitioner is entitled to a new trial where the state trial judge abused his judicial discretion by circumventing a Sixth Amendment right to confront a specific witness displaying judicial bias against him. US Const. amends. VI and XIV.

(Am. § 2254 Pet., ECF No. 21, PageID.5870–5871.) Respondent asserts that Petitioner's grounds

for relief lack merit.[1] (ECF No. 26.) For the following reasons, the Court concludes that Petitioner

has failed to set forth a meritorious federal ground for habeas relief and will, therefore, deny his

petition for writ of habeas corpus.

## Discussion

### I.    Factual Allegations

The Michigan Court of Appeals described the events underlying Petitioner's conviction as

follows:

Defendants' convictions stem from the death of Deborah Boothby, hereafter the victim. Police responded to a call and discovered the victim's body on the Blue Star Highway at about 2:30 a.m. on April 26, 1998. The victim was almost on the center line of the roadway and there was a large amount of blood around her head. The victim's jacket was ripped and it appeared that she had been hit by a vehicle. The victim was still alive, and was rushed to the South Haven emergency room. However, the victim died during transport. Police assumed the victim's death was the result of a hit and run accident. After no significant progress was made, the case was eventually closed. The case was re-opened in September 2007 by the Michigan State Police. In the course of the new investigation of the victim's death, Adrienne Burnette admitted to her involvement in the murder and cooperated with police,

---

[1]  Respondent also contends that several of Petitioner's grounds for relief are procedurally defaulted. (ECF No. 26, PageID.5958–5959.) Respondent does recognize, however, that a habeas corpus petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *See* 28 U.S.C. § 2254(b)(2). Furthermore, the Supreme Court has held that federal courts are not required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *see also Overton v. Macauley*, 822 F. App'x 341, 345 (6th Cir. 2020) ("Although procedural default often appears as a preliminary question, we may decide the merits first."); *Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003) (citing *Lambrix,* 520 U.S. at 525*; Nobles v. Johnson*, 127 F.3d 409, 423–24 (5th Cir. 1997); 28 U.S.C. § 2254(b)(2)). Here, rather than conduct a lengthy inquiry into procedural default, judicial economy favors proceeding directly to a discussion of the merits of Petitioner's claims.

leading them to Ivory, [Petitioner], and Shevolier. Another break for police came in 2009, when Adrian Travier, an inmate who was incarcerated with Ivory, wrote a letter to the prosecutor indicating that Ivory confessed to the murder and stated that [Petitioner], Shevolier, and Ed Foster were involved.

Testimony at trial established that on April 25, 1998, the victim went to the Blue Star Lounge. The victim and Ivory had an on and off romantic relationship. Ivory was at the Blue Star Lounge that night with Shevolier. Witnesses described an argument between the victim, Ivory, and Shevolier, and testified that the victim threw her drink at Ivory and/or Shevolier. After the altercation between the victim, Ivory, and Shevolier, the lights came on at the lounge and everyone was asked to leave. Witnesses testified that the parking lot was crowded after the lounge was closed early, and a crowd of people formed around the victim, who was being hit, kicked, and stomped on. Witnesses specifically identified Ivory, [Petitioner], and Shevolier as among the people who were beating the victim. After the victim was apparently unconscious, several witnesses testified to observing Ivory and [Petitioner] lift the victim up and place her in the backseat of Shevolier's car.[3] Witnesses testified that Shevolier was in the driver's seat, and that Ivory got into the front passenger seat and Ed Foster got into the backseat with the victim.

Burnette testified to observing all the above-stated events, and then testified that as she was waiting in a line of cars to leave the lounge [Petitioner] got into the front passenger seat of her car and told her to follow Shevolier's car. Burnette, who knew [Petitioner] and was previously romantically involved with him, complied with his command and turned left toward Covert. She followed Shevolier's car into a park about a mile away from the lounge. The two cars drove through the park until they reached a turnaround area near an old pump house. At that point, [Petitioner] got out of Burnette's car and Ivory, Shevolier, and Ed got out of Shevolier's car. The victim was pulled out of the car and dragged to a grassy area. The victim was conscious again and was screaming for help and begging defendants to stop. Burnette testified that Shevolier choked the victim while the men continued to beat her. Eventually, the victim stopped moving. Shevolier asked if the victim was dead, and Ivory stated that they were going to take her back to the lounge, dump her on the side of the road, and run her over with the car so it would appear that the victim was killed in a hit and run accident.

Ivory, Ed, and Shevolier got back into Shevolier's car, and the victim was placed back in the backseat. Burnette testified that she was "numb," and scared of what would happen to her. [Petitioner] got back into Burnette's car and told her to follow Shevolier's car, which Ivory was now driving. Burnette testified that she followed Shevolier's car back toward the Blue Star Lounge, and that [Petitioner] explained to her that their plan was to run the victim over and make her death look like an accident. Burnette testified that Shevolier's car drove just north of the lounge, and that Ivory and Ed got out of Shevolier's car and placed the victim behind it. She testified that they put the car in reverse and ran over the victim and then rolled forward back over her. Ivory was the driver. [Petitioner] told Burnette to drive up to the Blue Star Lounge parking lot where he sold drugs to Keith Owens, a bouncer

at the lounge. After the drug transaction, [Petitioner] told Burnette that she was "going to leave this bar, you're going to run that bitch over and make sure she's dead this time." Burnette testified that she told [Petitioner] she did not want to run the victim over, and [Petitioner] said "you're going to run her over or else I'm going to pull you out and you're going to end up like her." So Burnette "did what [she] was told." The victim was still on the ground at this time, toward the side of the road with her upper body in the lane of traffic and her head toward the center line. Burnette testified that she was driving 25 or 30 miles per hour when she ran over the victim. After running over the victim she went back to her house with [Petitioner], who spent the night.

Burnette testified at defendants' trial pursuant to a plea agreement. Burnette pleaded guilty to second-degree murder and perjury. Pursuant to the deal, she agreed to provide truthful testimony at each and every court proceeding regarding the victim's murder. The plea deal also included a sentence agreement stating that Burnette would be sentenced to eight to 20 years' imprisonment for each count, and that the sentences would run concurrently. The entire agreement was admitted as evidence and read into the record during trial.

_____

[3] Some witnesses testified that Ed Foster was one of the people who placed the victim in Shevolier's car.

*People v. Shaver*, Nos. 305944, 305945, 306288, 2013 WL 4864204, at *1–2 & n.3 (Mich. Ct. App. Sept. 12, 2013).[2]

Petitioner's first trial, conducted in September and October of 2010, ended in a mistrial. (ECF No. 6-28, PageID.4994.) Jury selection for Petitioner's retrial occurred over the course of five days, from May 10, 2011, until May 17, 2011. (*See* Trial Trs. I through V, ECF Nos. 33-1 through 33-5.) Over the course of almost five weeks, the jury heard testimony from numerous witnesses. (Trial Trs. VI through XIX, ECF Nos. 33-6 through 33-19.) On June 9, 2011, following almost a full day of deliberation, the jury returned a guilty verdict. (Trial Tr. XXI, ECF No. 33-21, PageID.10746.) Petitioner appeared before the trial court for sentencing on July 11, 2011. (ECF No. 33-22.)

_____

[2] The Michigan Court of Appeals considered Petitioner's appeal along with the appeals filed by co-defendants Ivory Lee Shaver and Shevolier Jovon Gill.

5

Petitioner, with the assistance of counsel, appealed his conviction and sentence to the Michigan Court of Appeals. In his counseled brief, Petitioner argued that the State had presented insufficient evidence to support his convictions and that the trial court erred by denying his motion for a separate trial. (ECF No. 6-29, PageID.5060.) Petitioner raised the following additional issues in a *pro per* supplemental brief: (1) the trial court erred by denying Petitioner's request for a mistrial based upon unfairness in the jury selection process; (2) the trial court knowingly allowed the prosecution to present false testimony and coerced witnesses; (3) the jury's verdict was not supported by sufficient evidence; and (4) the magistrate bound Petitioner over to the circuit court without the presence of probable cause. (*Id.*, PageID.5159–5164.) On September 12, 2013, the Michigan Court of Appeals rejected Petitioner's arguments and affirmed his conviction and sentence. *See Shaver*, 2013 WL 4864204, at *21. The Michigan Supreme Court denied Petitioner's application for leave to appeal on February 28, 2014. *See People v. Shaver*, 843 N.W.2d 517 (Mich. 2014).

Thereafter, Petitioner filed a § 2254 petition in this Court. *See Shaver v. McKee*, No. 1:14-cv-877, 2014 WL 5019905, at *1 (W.D. Mich. Oct. 7, 2014). On October 7, 2014, this Court dismissed that petition without prejudice for Petitioner's failure to exhaust his available state-court remedies. *See id.*

On March 9, 2015, Petitioner returned to the trial court and filed a motion for relief from judgment pursuant to Michigan Court Rule 6.502. (ECF No. 6-31, PageID.5380.) However, in an order entered on March 13, 2015, the trial court ordered that Petitioner's motion be returned to him because "it d[id] not substantially comply with the requirements of subchapter 6.500 of the Michigan Court Rules." (*Id.*)

On March 26, 2015, Petitioner filed a new motion for relief from judgment pursuant to Rule 6.502, raising 14 separate grounds for relief. (ECF No. 6-32.) On October 9, 2015, the trial court received from Petitioner a motion for leave to amend his Rule 6.502 motion. (ECF No. 6-36.) The trial court granted Petitioner leave to amend in an order entered on October 8, 2015. (ECF No. 6-37.) In an order entered on December 4, 2015, the trial court denied Petitioner's Rule 6.502 motion. (ECF No. 6-38.) The trial court subsequently denied Petitioner's motion for reconsideration. (ECF Nos. 6-39, 6-40.) The Michigan Court of Appeals and Michigan Supreme Court denied Petitioner's applications for leave to appeal on September 22, 2016, and July 25, 2017, respectively. (ECF No. 6-41, PageID.5600, ECF No. 6-42, PageID.5752.)

As noted *supra*, Petitioner filed his initial § 2254 petition in this Court on September 5, 2017. (ECF No. 1.) After Respondent filed the state court record and a response, counsel appeared for Petitioner and filed a motion to dismiss the unexhausted claims and stay proceedings on the exhausted claims so that Petitioner could return to state court and exhaust the unexhausted claims. (ECF No. 12.) The Court granted that motion in an order (ECF No. 15) entered on February 16, 2021. The Court also administratively closed this matter until Petitioner filed a timely motion to amend his habeas petition to include any subsequently exhausted claims.

Petitioner, through counsel, subsequently returned to the state court and filed a second motion for relief from judgment pursuant to Rule 6.502 on March 17, 2021. (ECF No. 27-2.) In an order entered on October 13, 2021, the trial court denied Petitioner's motion. (ECF No. 27-6.) The Michigan Court of Appeals and Michigan Supreme Court denied Petitioner's applications for leave to appeal on August 25, 2022, and May 2, 2023, respectively. (ECF No. 27-7, PageID.6180, ECF No. 27-8, PageID.6414.) Petitioner's amended § 2254 petition followed.

7

## II.    Request for an Evidentiary Hearing

In his amended § 2254 petition, Petitioner requests that the Court hold an evidentiary hearing. (Am. § 2254 Pet., ECF No. 21, PageID.5929.) Generally, habeas corpus actions are determined on the basis of the record made in the state court. *See* Rule 8, Rules Governing § 2254 Cases. The presentation of new evidence at an evidentiary hearing in the district court is not mandatory unless one of the circumstances listed in 28 U.S.C. § 2254(e)(2) is present. *See Sanders v. Freeman*, 221 F.3d 846, 852 (6th Cir. 2000). The Sixth Circuit Court of Appeals recently reviewed the requirements of the statute:

> As the Supreme Court recently recognized, [the Antiterrorism and Effective Death Penalty Act] "restricts the ability of a federal habeas court to develop and consider new evidence." *Shoop* [*v. Twyford*], 142 S. Ct. [2037,] 2043 [(2022)]. Specifically, the statute allows the development of new evidence in "two quite limited situations": (1) when the claim relies on a "new" and "previously unavailable" "rule of constitutional law" made retroactive by the Supreme Court, or (2) when the claim relies on a "factual predicate that could not have been previously discovered through the exercise of due diligence." *Id*. at 2044 (quoting 28 U.S.C. § 2254(e)(2)). And even if a prisoner can satisfy either of those exceptions, to obtain an evidentiary hearing, he still must show by "clear and convincing evidence" that "no reasonable factfinder" would have convicted him of the crime charged. *Shinn* [*v. Ramirez*], 142 S. Ct. [1718,] 1734 [(2022)] (quoting 28 U.S.C. § 2245(e)(2)(A)(i), (ii)). Mammone does not purport to satisfy any of these stringent requirements for obtaining discovery or an evidentiary hearing: he does not rely on a new rule of constitutional law, he does not contend that the factual predicate for his constitutional claims could not have been previously discovered, and he points to no clear and convincing evidence that would cast doubt on the jury's verdict.

*Mammone v. Jenkins*, 49 F.4th 1026, 1058–59 (6th Cir. 2022).

Petitioner, like Mammone, does not rely upon any new rule of constitutional law, nor does his claim rely on a factual predicate that could not have been previously discovered through the exercise of due diligence. Moreover, even if Petitioner cleared those hurdles, he does not show by any evidence, much less clear and convincing evidence, that no reasonable factfinder would have

convicted him. Under these circumstances, there is no basis to hold an evidentiary hearing. Accordingly, Petitioner's request for a hearing will be denied.[3]

### III.    AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This standard

---

[3] To the extent that Petitioner contends that the trial court erred by not holding an evidentiary hearing, such a claim is not cognizable on federal habeas review. *See Simpson v. Jones*, 238 F.3d 399, 406–07 (6th Cir. 2000) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Smith v. Phillips*, 455 U.S. 209, 221 (1982)). In addition, "the Sixth Circuit has consistently held that errors in post-conviction proceedings are outside the scope of federal habeas corpus review." *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) (citing *Kirby v. Dutton*, 794 F.2d 245, 246–47 (6th Cir. 1986); *Roe v. Baker*, 316 F.3d 557, 571 (6th Cir. 2002)). "[T]he traditional function of the writ is to secure release from illegal custody," *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973), but a due process claim with respect to post-conviction proceedings, even if resolved in Petitioner's favor, would not impact Petitioner's custody. In reviewing such a claim, the Court "would not be reviewing any matter directly pertaining to" that custody. *Cress*, 484 F.3d at 853 (quoting *Kirby*, 794 F.2d at 247). If this Court were to conclude that the trial court erred in denying Petitioner an evidentiary hearing, Petitioner would not automatically be released from custody or be granted a new trial.

is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in

10

their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id*. (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## IV.    Discussion

### A.    Ground I—Sufficiency of the Evidence

As his first ground for relief, Petitioner avers that there was insufficient evidence to prove beyond a reasonable doubt that "he had the intent to commit first degree, felony murder." (Am. § 2254 Pet., ECF No. 21, PageID.5870.) According to Petitioner, there was no evidence that he "intended to kill Ms. Boothby by plan or scheme with a premeditated intent." (*Id.*, PageID.5891.)

Petitioner raised his sufficiency claim on direct appeal, and the court of appeals rejected it, first applying the following standard for reviewing Petitioner's claim:

> We review de novo challenges to the sufficiency of the evidence. *People v. McGhee,* 268 Mich. App. 600, 622; 709 N.W.2d 595 (2005). The evidence is viewed in a light most favorable to the prosecution to determine whether a rational jury could find that each element of the crime was proved beyond a reasonable doubt. *People v. Ericksen,* 288 Mich. App. 192, 195–196; 793 N.W.2d 120 (2010).

*Shaver*, 2013 WL 4864204, at *8. Although the court of appeals cited state authority, the standard applied is identical to the constitutional "sufficiency of the evidence" standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979), which requires the court to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319.

The state court's application of the correct standard eliminates the possibility that the resulting decision is "contrary to" clearly established federal law. As the Supreme Court stated in *Williams v. Taylor*:

> The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." Webster's Third New International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court. The Fourth Circuit's interpretation of the "contrary to" clause accurately reflects this textual meaning. A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.

12

*Williams v. Taylor*, 529 U.S. at 405. The Court went on to offer, as an example of something that is not "contrary to" clearly established federal law, the following:

> [A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* [*v. Washington*, 466 U.S. 668 (1984),] as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent. Although the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not "mutually opposed" to *Strickland* itself.

*Id.* at 406. Therefore, because the Michigan Court of Appeals applied the correct standard—here *Jackson* rather than *Strickland*—Petitioner can only overcome the deference afforded state court decisions if the determination of regarding Petitioner's sufficiency of the evidence challenge is an unreasonable application of *Jackson* or if the state court's resolution was based on an unreasonable determination of the facts. 28 U.S.C. 2254(d).

The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Witness credibility remains the province of the jury, *see Herrera v. Collins*, 506 U.S. 390, 401–02 (1993), and an attack on witness credibility constitutes a challenge to the quality, but not the sufficiency of the government's evidence. *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002). The habeas court need only examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196–97 (6th Cir. 1988).

Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). This standard erects "a nearly insurmountable hurdle" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Davis*, 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

Here, the court of appeals followed *Jackson*'s command. The court of appeals first noted that Petitioner was "convicted of first-degree murder supported by two theories: premeditation and felony murder." *Shaver*, 2013 WL 4864204, at *8. The court of appeals then set forth the elements the prosecution must prove to establish both first-degree premeditated murder and first-degree felony murder, as well as what must be proven to convict a defendant under an aiding and abetting theory. *See id.* at *8–9. After doing so, the court of appeals considered the evidence in a light that favored the prosecution:

> In this case, the evidence demonstrated that [Petitioner] was more than merely present, and that he forcibly moved the victim with the purpose of kidnapping or murder. Several witnesses testified that [Petitioner] actively participated in the beating of the victim in the parking lot of the Blue Star Lounge, and that he assisted Ivory in picking the victim up and placing her in Shevolier's car. Burnette testified that [Petitioner] ordered her to follow Shevolier's car. The jury could have inferred from this testimony that [Petitioner] placed the victim in Shevolier's car for the purpose of kidnapping her or moving her to a more remote location in order to kill her. Moreover, this evidence shows that [Petitioner] was not merely present, but rather, was actively participating in beating and moving the victim. Further, Burnette testified that once they arrived at the park, [Petitioner] continued to beat the victim, and that after the victim appeared to be unconscious, [Petitioner] got back into Burnette's car and ordered her to run the victim's body over to ensure the victim was dead. This evidence also demonstrates [Petitioner's] intent and active participation in the victim's murder.
>
> We also reject [Petitioner's] argument that Burnette's testimony was untrustworthy and should not have been believed. It is the responsibility of the finder of fact to make decisions about the credibility of witnesses and the probative value of

14

evidence. *People v. Wolfe,* 440 Mich. 508, 514–515; 489 N.W.2d 748 (1992), amended 441 Mich. 1201 (1992); *People v. Harrison,* 283 Mich. App. 374, 378; 768 N.W.2d 98 (2009). Moreover, we must "draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v. Nowack,* 462 Mich. 392, 400; 614 NW2d 78 (2000). Thus, [Petitioner's] argument regarding the credibility of Burnette's testimony has no merit. Accordingly, when the evidence is viewed in the light most favorable to the prosecution, there was sufficient evidence to support [Petitioner's] conviction beyond a reasonable doubt.

*Shaver,* 2013 WL 4864204, at *9–10.

In his amended § 2254 petition, Petitioner now suggests that the court of appeals 'failed to fully address the claim . . . because [it] relied on perjured testimony of Adrianne Burnette to decide this claim." (Am. § 2254 Pet., ECF No. 21, PageID.5892.) Petitioner contends that Burnette "failed a polygraph examination, and her version of the events changed to add that Petitioner forced her to drive over the victim's body to make sure she was dead." (*Id.*) Petitioner argues that the "only link that [he] was involved in the alleged homicide . . . came from Adrianne Burnette, who changed her testimony several times." (*Id.*, PageID.5893.) He contends that "the only testimony linking Petitioner to the death or Ms. Boothby came from several perjurers." (*Id.*)

Petitioner's argument essentially boils down to the claim that it cannot be inferred that he aided and abetted his co-defendants in killing Boothby because the evidence suggesting that he did was perjured testimony. The state court of appeals concluded otherwise. To prevail, Petitioner must show that the inferences urged by the appellate court are unreasonable.

*Jackson* holds that it is the factfinder's province to draw reasonable inferences from basic facts to ultimate facts. *Jackson,* 443 U.S. at 319. In *Coleman v. Johnson,* 566 U.S. 650 (2012), the Supreme Court provided guidance "in determining what distinguishes a reasoned inference from 'mere speculation.'" *Id.* at 655. The *Coleman* Court described a reasonable inference as an inference that a rational factfinder could make from the facts. *See id.* at 654–55. The inferences

need not be compelled by those facts; the inferences may not even be more likely than not; they are simply rational. *Id*. at 656. Nothing more is required.

Petitioner has not demonstrated that the court of appeals' inference that he acted in concert with his co-defendants and shared their intent to commit the offense is irrational. Certainly, as Petitioner argues, it is possible that one could interpret Petitioner's actions differently and reach the opposite conclusions; but that does not render the court of appeals' inferences irrational. Thus, Petitioner has failed to meet his burden.

It is also worth noting that Petitioner's argument specifically challenges the credibility of the prosecution's witnesses—particularly Burnette—and suggests that none of them provided credible testimony because they perjured themselves. Petitioner, therefore, essentially invites this Court to reweigh the credibility of these witnesses and resolve all conflicts and make all inferences in his favor. However, it is up to the jury to decide issues of credibility, to decide between conflicting accounts, and draw inferences—so long as the inferences are rational. *See Herrera*, 506 U.S. at 401–02; *Martin*, 280 F.3d at 618. Petitioner's invitation turns the *Jackson* standard on its head.

Petitioner has failed to demonstrate that the court of appeals' determination that there was sufficient evidence to support the verdict is contrary to, or an unreasonable application of, clearly established federal law. Petitioner, therefore, is not entitled to relief on habeas ground I.

### B.    Grounds II and III—Prosecutorial Misconduct

In ground II, Petitioner alleges that the prosecutor committed misconduct by knowingly using "false and perjured testimony to gain an unconstitutional conviction." (Am. § 2254 Pet., ECF No. 21, PageID.5870.) In ground III, Petitioner faults the prosecution for committing a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (*Id.*)

For a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In evaluating the impact of the prosecutor's misconduct, a court should consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner. *See United States v. Young*, 470 U.S. 1, 11–12 (1985). The Supreme Court has described the *Darden* standard as "a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012). The *Parker* Court rejected an attempt to graft any additional requirements on the "very general" *Darden* standard.

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly*, 416 U.S. at, 645). Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker*, 567 U.S. at 47 (internal quotation marks omitted).

### 1.    Ground II—Presentation of False and Perjured Testimony

In his second ground for relief, Petitioner contends that the prosecution presented perjured testimony from inmate-informant Adrian Traveir, as well as false testimony from witnesses Sharlimar Thomas and Latonya Thurman. (Am. § 2254 Pet., ECF No. 21, PageID.5896–5897.) According to Petitioner, both Thomas and Thurman testified that they were intimidated by the State Trooper questioning them and so they just answered "yes" to his questions. (*Id.*) Petitioner argues further that this false testimony "was not enough, so the prosecution injected false testimonial evidence from Adrianne Burnette." (*Id.*, PageID.5897.) Petitioner contends that Burnette was convicted of committing perjury and "agreed that her statements to Detective Oppenheimer were modified on October 19, 2009[,] about her knowledge of the alleged crimes committed on April 25, 1998." (*Id.*) Petitioner believes that this false testimony was used "for two distinct purposes[:] (1) [t]o have the original autopsy report changed from accident hit and run, to murder, and (2) [i]t was used by the prosecution to secure an unconstitutional conviction." (*Id.*, PageID.5899.)

The Fourteenth Amendment's right to due process prohibits a state from knowingly and deliberately using perjured evidence to obtain a conviction. *See Napue v. Illinois*, 360 U.S. 264, 260 (1959). The Supreme Court repeatedly has recognized that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 153 (1972) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). Presentation of perjured testimony, without more, however, does not rise to the level of a constitutional violation. *See Briscoe v. LaHue*, 460 U.S. 325, 327 (1983). Rather,

> [t]he knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. In order to establish prosecutorial misconduct or denial of due process, the defendants must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. The burden is on

the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony.

*United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989) (citations omitted).

Petitioner raised this claim in his *pro per* supplemental brief on direct appeal, and the Michigan Court of Appeals rejected it, writing:

> Next, [Petitioner] raises an apparent prosecutorial misconduct claim because he alleges that the prosecution intentionally introduced perjury when it called Burnette to testify. This issue was not raised during trial and is accordingly reviewed for plain error affecting [Petitioner's] substantial rights. *Carines*, 460 Mich. at 752–753. We conclude that the record does not support [Petitioner's] claim. The record contains no evidence to support [Petitioner's] claim that the prosecution admitted known perjury or that any witnesses testified to events of which they had no personal knowledge, and [Petitioner] does not cite the record to support his argument. Moreover, questions regarding the truthfulness of witnesses are questions for the finder of fact. *Wolfe*, 440 Mich. at 514–515. Thus, because [Petitioner] simply fails to support his claim in any way, and because there is nothing in the record to suggest any prosecutorial misconduct, we conclude that [Petitioner] is not entitled to any relief.

*Shaver*, 2013 WL 4864204, at *21. Petitioner raised this claim again in his first Rule 6.502 motion, and the trial court rejected it, noting that the court of appeals had ruled against Petitioner and that Petitioner had not established "any retroactive change in the law which has undermined the Court of Appeals decision regarding the testimony of Ms. Burnette." (ECF No. 6-38, PageID.5567.)

In his amended § 2254 petition, Petitioner essentially reiterates the arguments that he raised in—and that were rejected by—both the court of appeals and the trial court. In his reply, Petitioner mentions that Burnette "had flunked her polygraph test and it was only after she flunked her test that Detective Sgt. Diane Oppenheim and she came up with the theory that Petitioner forced her to run over the victim twice with a 3000 pound vehicle." (ECF No. 30, PageID.6601.) Petitioner also mentions that Dr. Palutke falsely testified "that it was Dr. Millard who changed the death certificate from vehicle accident to homicide." (*Id.*)

19

Despite Petitioner's arguments, Petitioner fails to provide any evidence, much less clear and convincing evidence, to overcome the court of appeals' conclusion that the prosecutor was not aware of any falsities in any witnesses' testimony and presented them as witnesses regardless. The Court's review of the trial record indicates that there were inconsistencies between the testimony given by Burnette and testimony given by other witnesses. Moreover, Petitioner attached to his second Rule 6.502 motion an affidavit from his post-conviction investigator Thomas Bereza indicating that even though Dr. Millard's signature was on both death certificates, Dr. Millard never examined Boothby's body and was never consulted by anyone regarding Boothby's death. (ECF No. 27-2, PageID.6101–6102.)

However, as the Sixth Circuit has noted, "mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony," and it is Petitioner's burden to show that the prosecution knew any such testimony was false. *See Lochmondy*, 890 F.2d at 822. Simply put, Petitioner provides no definitive evidence to demonstrate that the inconsistencies between the testimony given by Burnette and the testimony given by other witnesses equate to a conclusion that the prosecutor was aware that several witnesses were testifying falsely. Likewise, despite Bereza's assertion that Dr. Millard never examined Boothby's body and was never consulted by anyone regarding Boothby's death, Bereza's affidavit also notes that Dr. Millard never testified in court, that all of Dr. Millard' records had been destroyed, and that Dr. Millard refused to sign an affidavit regarding the case or the two death certificates. (ECF No. 27-2, PageID.6102.) Nothing in Bereza's affidavit leads to a conclusion that the prosecutor was aware of any false testimony given by Dr. Palutke regarding Dr. Millard's involvement, if any, in changing the death certificate. Instead, Petitioner relies on his speculations and the inconsistencies in the testimony to support his arguments. That is insufficient for Petitioner to meet his burden on federal habeas review.

For the foregoing reasons, Petitioner has failed to demonstrate that the court of appeals' rejection of this claim is contrary to, or an unreasonable application of, clearly established federal law. Petitioner, therefore, is not entitled to relief with respect to ground II.

### 2.    Ground III—Alleged *Brady* Violation

In ground III, Petitioner contends that the government violated *Brady* "where the decade old cause of death was changed from accident to murder without the prosecution proving who changed it," and [where the prosecution] withheld the person and evidence that caused an accident to become a homicide." (Am. § 2254 Pet., ECF No. 21, PageID.5902.) In support of his claim, Petitioner claims that Dr. Patluke testified that Dr. Millard was the individual who changed the manner of death to a homicide. (*Id.*, PageID.5903.) Petitioner argues that the "death certificates and changed cause of death report [were] never provided to the defense." (*Id.*) He also suggests that there is no record of the existence of the amended death certificate or the changed cause of death report anywhere in the trial court record. (*Id.*) Petitioner contends that the state courts "all passed on this claim thus there was no decision on the merit[s]." (*Id.*, PageID.5904.)

In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. There are three components to finding a *Brady* violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Prejudice (and materiality) is established by a showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see also Cone v. Bell*, 556 U.S. 449,

469–70 (2009). A reasonable probability equates to a "probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.

Respondent contends that ground III "is procedurally defaulted because [Petitioner] never presented this claim to the state courts and cannot go back and do so now, rendering his claim inexhaustible." (ECF No. 26, PageID.6015.) This Court agrees with Respondent. The state court record reflects that while Petitioner did assert a *Brady* claim in his first Rule 6.502 motion, that *Brady* claim concerned the withholding of allegedly exculpatory material pertaining to prosecution witness Burnette and her credibility. (ECF No. 6-32, PageID.5406.) Moreover, while Petitioner's second Rule 6.502 motion concerned evidence regarding the death certificates, nowhere in that motion did Petitioner assert a *Brady* violation. Petitioner's *Brady* claim is, therefore, unexhausted. Nevertheless, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *See* 28 U.S.C. § 2254(b)(2).

Petitioner's *Brady* claim is wholly without merit. First, as an initial matter, the record does not reflect that the amended death certificate was withheld during the defense. Instead, the record reflects that during Petitioner's first trial (that ultimately ended in a mistrial), Dr. Palutke was shown a copy of the amended death certificate and identified it as such. (ECF No. 6-18, PageID.3691–3692.) Dr. Palutke extensively testified regarding the amended death certificate and cause of death report at Petitioner's retrial. (*See generally* Trial Tr. XIV, ECF No. 33-14.)

Moreover, Petitioner has not—and cannot—demonstrate that the amended death certificate and cause of death report were exculpatory. As noted above, Boothby's death was initially ruled as an accidental hit and run but was subsequently changed to a homicide. Petitioner fails to explain, and the Court fails to discern, how that change was favorable to the defense. Certainly, if

Boothby's death had initially been ruled a homicide and was later changed to be an accidental hit and run, that would be exculpatory and favorable, but that is not what occurred here.

Finally, Petitioner fails to demonstrate a reasonable probability that this evidence would have altered the outcome of his trial. *See Strickler*, 527 U.S. at 280 (quoting *Bagley*, 473 U.S. at 682). Numerous witnesses testified on behalf of the prosecution that they observed Petitioner and his co-defendants beating Boothby. Moreover, Burnette testified that she was instructed by Petitioner to run Boothby over with her vehicle. By convicting Petitioner (and his co-defendants), the jury clearly found these witnesses to be credible. Regardless of what the death certificate initially said and what it was amended to say, the jury was free to rely upon that testimony to establish Petitioner's guilt.

For the foregoing reasons, Petitioner has not demonstrated that a *Brady* violation occurred in the way he suggests. Petitioner, therefore, is not entitled to relief with respect to ground III.

## C.    Ground IV—Confrontation Clause Violation

In ground IV, Petitioner contends that he was denied his Sixth Amendment right to "to confront and cross-examine a crucial witness against him regarding the cause of death which was changed from accident to homicide." (Am. § 2254 Pet., ECF No. 21, PageID.5907.) In support of his assertion, Petitioner avers that "it was Dr. Millard who changed the autopsy report to read homicide." (*Id.*, PageID.5908.) Petitioner argues that Dr. Millard "did not testify at either the first or second trial and the only indication he was the Doctor who changed the autopsy report and death certificates came from Dr. Palutke." (*Id.*) Petitioner argues that the "changed medical reports were testimonial in nature." (*Id.*) Petitioner asserts that the "only opportunity to test the change in the cause of death[] was by way of confrontation—cross[-]examination—of the Medical Examiner [Dr. Millard] who actually changed the cause of death." (*Id.*, PageID.5909.) He goes on to state

that his right to confrontation was "crucial because it was the autopsy and medical reports which provided the evidence of a homicide, as opposed to hit-and-run accident." (*Id.*)

The Confrontation Clause of the Sixth Amendment gives the accused the right "to be confronted with the witnesses against him." U.S. Const. amend VI; *Pointer v. Texas*, 380 U.S. 400, 403–05 (1965) (applying the guarantee to the states through the Fourteenth Amendment). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). The Confrontation Clause, therefore, prohibits the admission of an out-of-court testimonial statement at a criminal trial unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. *See Crawford v. Washington*, 541 U.S. 36, 59 (2004).

Not every out-of-court statement at trial, however, implicates the Confrontation Clause. As the Supreme Court stated in *Crawford*:

> The text of the Confrontation Clause . . . applies to "witnesses" against the accused—in other words, those who "bear testimony." 2 N. Webster, An American Dictionary of the English Language (1828). "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.

*Id.* at 51. The *Crawford* Court had no need to decide whether the Confrontation Clause applies to nontestimonial statements, though the Court suggested, in *dicta*, that the clause does not apply to such statements. Subsequently, the Supreme Court considered the question left open in *Crawford* and explicitly decided that the Confrontation Clause applies only to testimonial hearsay. *See Davis v. Washington*, 547 U.S. 813, 823–24 (2006).

24

Dr. Palutke testified that he was the pathologist that performed Boothby's autopsy. (Trial Tr. XIV, ECF No. 33-14, PageID.9426.) Initially, he labeled Boothby's manner of death "to be undetermined" because he "did not have sufficient background information . . . to seriously consider homicide, accident or suicide." (*Id.*, PageID.9467.) Dr. Palutke testified further that the medical examiner's office later amended the death certificate to reflect homicide as the cause of death, and that he later changed his opinion with regard to the manner of death after learning more information "about the circumstances surrounding Miss Boothby's death." (*Id.*, PageID.9467–9468.)

The prohibition set forth in *Crawford* applies "in full to forensic evidence." *See Smith v. Arizona*, 602 U.S. 779, 783 (2024). Accordingly, "a prosecutor cannot introduce an absent laboratory analyst's testimonial out-of-court statements to prove the results of forensic testimony." *See id.* (citing *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 307 (2009)). With respect to medical reports, the *Melendez-Diaz* Court noted in a footnote that "medical reports created for treatment purposes" are not testimonial for purposes of the Confrontation Clause. *See Melendez-Diaz*, 557 U.S. at 312 n.2. Here, Respondent contends that the death certificate was not testimonial because it "is an administrative or ministerial document," rather than one prepared for and reflecting a medical examiner's opinion on the cause and manner of death for potential prosecution." (ECF No. 26, PageID.6029.)

Respondent, however, cites no authority in support of her assertion that the amended death certificate was not testimonial. Notably, other courts have held the opposite—that death certificates are testimonial for Confrontation Clause purposes. *See, e.g.*, *Corraspe v. People*, No. 2019-0054, 2024 WL 2969022, at *23 (Sup. Ct. V.I. Apr. 30, 2024); *United States v. Williams*, 740 F. Supp. 2d 4, 8–9 (D.D.C. 2010). Here, the Court need not conclusively determine whether

the amended death certificate and autopsy report were testimonial in nature because the record demonstrates that any violation of Petitioner's Confrontation Clause rights that may have occurred was harmless error and, therefore, did not prejudice Petitioner's defense.

Confrontation Clause violations are subject to review for harmless error. *See Bailey v. Morrison*, No. 23-1254, 2023 WL 7877830, at *3 (6th Cir. Aug. 11, 2023) (citing *Reiner v. Woods*, 955 F.3d 549, 555 (6th Cir. 2020)). The impact of an error on the outcome of the proceedings is also the focus of federal harmless error analysis. *See, e.g.*, *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (adopting as the standard for determining whether habeas relief is appropriate "whether the . . . error 'had substantial and injurious effect or influence in determining the jury's verdict.'"); *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (posing the question as "Do I, the judge, think that the error substantially influenced the jury's decision?"); *Brown v. Davenport*, 596 U.S. 118, 126 (2022) (stating that "a state prisoner . . . must show that the error had a 'substantial and injurious effect or influence' on the outcome of his trial" (quoting *Brecht*, 507 U.S. at 637)).

The Sixth Circuit has noted that when evaluating whether a Confrontation Clause error is harmless, the court should consider:

> "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, . . . and, of course, the overall strength of the prosecution's case."

*Hill v. Hofbauer*, 337 F.3d 706, 718 (6th Cir. 2003) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

Upon consideration of the record and the factors set forth above, the Court cannot agree with Petitioner that he was prejudiced in any way by the lack of testimony by Dr. Millard at trial regarding the amended death certificate and autopsy report. Even if Dr. Millard was the one who amended those documents to reflect homicide as the cause of death, Dr. Palutke was the pathologist

26

who conducted the autopsy, and Petitioner received ample opportunity to cross-examine him regarding his findings and conclusions. Moreover, contrary to Petitioner's argument, the amended documents were not the only evidence that Boothby's death was a homicide. Although Petitioner argues that Adrienne Burnette and several other witnesses were not credible, the jury chose to believe those witnesses and their testimony about how they observed Petitioner and his codefendants beating Boothby, as well as Burnette's testimony that she ran over Boothby twice at Petitioner's direction. In light of that overwhelming evidence of Petitioner's guilt, any testimony by Dr. Millard regarding amendment of the death certificate and autopsy report would not have changed the outcome of trial. Accordingly, Petitioner is not entitled to relief with respect to habeas ground IV.

### D.      Grounds V and VI—Ineffective Assistance of Trial and Appellate Counsel

In his fifth ground for relief, Petitioner avers that appellate counsel rendered ineffective assistance. (Am. § 2254 Pet., ECF No. 21, PageID.5871.) Specifically, Petitioner faults appellate counsel for failing to "challenge the change in the cause of death, failing to challenge the absent Dr. Millard at either trial, or failing to challenge the *Brady* violation under current case law." (*Id.*, PageID.5914.) In ground VI, Petitioner contends that trial counsel was ineffective by: (1) failing to investigate the case; (2) failing to "utilize the compulsory process to obtain witnesses for the defense"; and (3) failing to "move for an expert accident reconstructionist." (*Id.*, PageID.5871.)

### 1.      Standard of Review

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the [Petitioner] resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687.

A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The [Petitioner] bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the [Petitioner] is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

The *Strickland* standard that applies to trial counsel also applies to appellate counsel. However, a criminal appellant has no constitutional right to have every non-frivolous issue raised on appeal. Rather, "'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.*

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen*, 563 U.S. at 190; *Premo v. Moore*, 562 U.S. 115, 122 (2011). Scrutiny of counsel's performance is "highly deferential", per *Strickland*, to avoid the temptation to second guess a strategy after-the-fact and to "eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Furthermore, scrutiny of the state court's scrutiny of counsel's performance must also be deferential, per 28 U.S.C. § 2254(d). In light of that double deference, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . ." (citing *Harrington*, 562 U.S. at 102)).

Petitioner raised his ineffective assistance claims in his Rule 6.502 motion, and the trial court considered them under the following standard:

> In proving ineffective assistance of counsel, a defendant must overcome the presumption that the challenged action or inaction was a matter of strategy. *People v. Leonard*, 224 Mich. App. 569, 592; 569 N.W.2d 663 (1997). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686; 104 S. Ct. 2052 (1984). "Reasonably effective assistance" is the standard. *Id.* "A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690.

(ECF No. 6-38, PageID.5569.) Clearly, there is no question that the trial court applied the correct standard. This eliminates the possibility that the resulting decision is "contrary to" clearly established federal law. Therefore, because the court applied the correct standard, Petitioner can

only overcome the deference afforded state court decisions if the determinations regarding ineffective assistance of counsel are unreasonable applications of *Strickland* or if the resolutions were based on unreasonable determinations of the facts. *See* 28 U.S.C. § 2254(d).

### 2.    Ground VI—Ineffective Assistance of Trial Counsel

#### a.    Failure to Investigate

Petitioner first faults trial counsel for failing "to conduct a reasonable investigation into the ten-year-old case." (Am. § 2254 Pet., ECF No. 21, PageID.5916.) Specifically, Petitioner faults counsel for not investigating that the autopsy and death certificate had been changed without "exhuming the body for verification of new information." (*Id.*) Petitioner argues further that counsel did not challenge Dr. Palutke's testimony and instead "simply took" it as "facts supporting the change in the cause of death." (*Id.*, PageID.5916–5917.) According to Petitioner, counsel should have taken steps to inform the jury that the cause of death was changed due to Burnette's testimony, and that Burnette could not be believed. (*Id.*, PageID.5917.) Petitioner also mentions that counsel "failed to investigate the credibility of Adrian Traver who testified falsely regarding a statement allegedly made by codefendant Ivory Sha[v]er." (*Id.*)

The trial court rejected these arguments in its order denying Petitioner's first Rule 6.502 motion, stating:

> The record reflects trial counsel did investigate Ms. Burnette's testimony. Counsel used the readily available evidence to impeach her credibility by questioning her extensively about her investigative subpoena testimony that was the basis for her perjury conviction. TT Vol. 12, pgs. 82–170. This cross-examination included an admission from Burnette that she lied under oath. TT Vol. 12, Pg. 157. Defense counsel called witness Angela Goodwin to testify that when Burnette had made previous statements regarding the incident, she never implicated [Petitioner] in the death. TT Vol. 17, pgs. 106, 109–112.
>
> * * *
>
> As to Dr. Palutke, the record reflects defense counsel did cross examine him on his change of opinion from accidental death to homicide. TT Vol. 14, pgs. 62–67, 72,

77–78. Furthermore, defense counsel engaged the services of an expert forensic pathologist, Dr. Brian Hunter, who testified at trial on [Petitioner's] behalf and advanced the same theory of hit-and-run [Petitioner] asserts today. TT Vol. 17, pgs. 4–38, 83–89.

\* \* \*

As to Adrian Travier's testimony, the trial court ruled the testimony was admissible after hearing arguments from the parties on the Prosecutor's Motion in Limine to introduce this evidence and a co-defendant's Motion to Preclude it. The court noted at the hearing on these motions that defense counsel filed a written response to the prosecution's motion. Evidentiary Hearing Transcript, May 2, 2011, pg. 170, In 5–7. Defense counsel concurred with co-defense counsel's extensive arguments on this issue, and he vigorously argued against the motion. *Id.* pg. 209–214. As such, defense counsel did object to this evidence, and was not ineffective as [Petitioner] suggests. Furthermore, the Court of Appeals affirmed the trial court's decision to allow the evidence, which suggests any further defense counsel efforts to exclude the evidence would have been futile.

(ECF No. 6-38, PageID.5570–5572.)

The trial court's factual determinations are entirely consistent with the record, and Petitioner offers no evidence, much less clear and convincing evidence, to overcome the presumption of correctness afforded to those determinations. As noted *supra*, defense counsel thoroughly cross-examined Dr. Palutke regarding the autopsy and the change of cause of death from accidental to homicide. Counsel thoroughly cross-examined Burnette, focusing on the fact that she lied during administrative subpoena proceedings. Counsel also cross-examined Travier. Petitioner fails to explain, and the Court fails to discern, how any further investigation by counsel regarding these issues would have changed the outcome of his trial. Petitioner, therefore, is not entitled to relief with respect to this assertion of ineffective assistance of counsel.

### b.    Failure to Call Witnesses

Next, Petitioner faults counsel for not calling certain witnesses at trial. Petitioner first avers that Glover Dandridge, Evita Rivera, and Latisha Hollings should have been called to testify because they testified at Petitioner's first trial. (Am. § 2254 Pet., ECF No. 21, PageID.5917–5918.)

According to Petitioner, Dandridge, the bar owner, would have countered Burnette's testimony "that [Dandridge] came to the door with his shotgun and claimed that if the fight didn't stop he would start shooting." (*Id.*, PageID.5917.) Petitioner claims that Ms. Hollings would have testified that she pushed Boothby off of her car before leaving and "stated that she had probably run over Ms. Boothby, for which forensic tests proved her car hit Boothby." (*Id.*) Petitioner believes that Ms. Hollings "could have dispelled the prosecution's theory that Petitioner and his codefendants beat Ms. Boothby and put her in the car." (*Id.*, PageID. 5917–5918.) Finally, Petitioner argues that Ms. Rivera would have testified that she did not know Ms. Burnette and was not at the bar with Burnette that evening. (*Id.*, PageID.5918.)

The trial court thoroughly addressed Petitioner's arguments in its order denying his first Rule 6.502 motion, stating:

> As to the witnesses Glover Dandridge, Evita Rivera, and LaTisha Hollings who were not called, the court finds the decision not to call them to be a matter of trial strategy. As well, none of the witnesses' testimony would have been outcome determinative. The court notes that there is inherent risk in calling any witness, and counsel must engage in a risk benefit analysis of each potential witness. Here, the prosecution properly highlights the many risks associated with these witnesses, and the minimal benefit in their proposed testimony. Furthermore, [Petitioner's] portrayal of their testimony at the first trial is not complete, and omits testimony that would have been damaging to him had they been called at the second trial.

> [Petitioner] avers Mr. Dandridge testified there was no fight in the parking lot. However, Mr. Dandridge testified that there was a commotion in the parking lot and a group of 20 to 25 people on the north side of the parking lot, but that he could not see into the crowd. He also testified about the establishment's liquor license, and the importance of the liability attached to it. He testified it was important to get everyone off of the premises when the commotion started in the bar. He testified he knew the disturbance in the bar involved people fighting, pushing, and shoving, and knew about the commotion in the parking lot. However, he stated [he] never saw any of those involved in either incident nor did he see any actual punches thrown. He also stated he couldn't remember if [Petitioner], Ivory Shaver, Shevy Gill or Edward Foster were even at the bar that night. 2010 TT Vol. 7, 41–126.

> [Petitioner] avers Ms. Hollings testified that the victim was laying on her car after the altercation, and that she offered the victim a ride home that was rebuffed. While this is true, she only testified to this after being asked a leading question on cross-

examination. On direct examination she did not mention that she had any contact with the victim in the parking lot. She also testified that during the investigation she was extensively questioned about whether or not she may have hit the victim. She also testified as to having a poor memory of the evening, as she repeatedly answered "I don't remember" to specific questions about the night. She also testified that when she went outside, she saw a big crowd in the parking lot and saw [Petitioner], Ivory, and Shevy fighting and hitting the victim with fists in the center of the crowd. She testified she saw the victim fall to the ground more than once in the crowd. She was also asked about telling an officer the day after the incident that she didn't see any fight. 2010 TT Vol. 9, 164–199.

Ms. Holling[s'] testimony conflicts with [Petitioner's] portrayal of Mr. Dandridge's testimony. She clearly testified that there was a fight in the parking lot involving [Petitioner], Ivory, and Shevy fighting and hitting the victim. Mr. Dandridge didn't say there was "no fight" in the parking lot; he testified there was a commotion and a group of 20–25 people in the parking lot. His testimony is consistent with Ms. Holling[s'] testimony, as he would not have been able to see into the middle of the crowd. He also testified he was watching the people due to liability concerns, which is consistent with the several witnesses who testified that there was a fight in the parking lot.

Contrary to [Petitioner's] assertions, both Ms. Holling[s] and Mr. Dandridge had motive to portray themselves in a positive light. Testimony that Mr. Dandridge watched the crowd break up and leave with no reason to call the police, and that Ms. Holling[s] offered the victim a ride home after she was pushed off of her car, would insulate them from seeming indifferent to the violence that night. As well, it is clear they would have given testimony that would be damaging to [Petitioner]. Both would have generally corroborated Ms. Burnette's version of events, and Ms. Holling[s] would have confirmed that [Petitioner] was in the middle of the crowd fighting with the victim.

Ms. Rivera testified that she was wasted when the bar cleared and doesn't remember the night with clarity. She testified that she didn't know or recognize any of the Defendants. Her impeachment of Ms. Burnette was equivocal at best, as she testified that it was inaccurate but possible that she and Ms. Burnette went to the bar together that evening. She also corroborates that there was a big crowd in the parking lot. 2010 TT, Vol. 14, 26–47.

While her testimony provides some impeachment value, it is clear that she would also confirm that there was a crowd in the parking lot in direct contradiction to [Petitioner's] contention that there was no fight in the parking lot. Again, she also has a motive to avoid looking indifferent to the violence that night.

(ECF No. 6-38, PageID.5570–5571.)

Again, Petitioner offers no evidence, much less clear and convincing evidence, to overcome the presumption of correctness afforded to the state courts' factual determinations. Even if Dandridge would have testified that he never came to the door with a shotgun and threatened to start shooting if the fight did not stop, Petitioner fails to explain, and the Court fails to discern, how that testimony would have altered the outcome of his trial in light of the overwhelming evidence against him. Likewise, as set forth by the trial court, Hollings and Rivera would have provided unfavorable testimony that a fight did occur at the bar that night, and given Rivera's state of intoxication, any impeachment of Burnette's testimony by her would have been equivocal at best. Notably, Petitioner provides no evidence that these three individuals were even available to testify at his retrial, and he offers nothing but his own assertions to support a conclusion that a failure to present their testimony resulted in prejudice to his defense. *See Tinsley v. Million,* 399 F.3d 796, 810 (6th Cir. 2005) (affirming denial of an ineffective assistance claim based on counsel's failure to call witnesses where a petitioner did not "introduce [ ] affidavits or any other evidence establishing what they would have said"); *United States v. Ashimi,* 932 F.2d 643, 650 (7th Cir. 1991) ("[T]he testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit; [a] defendant cannot simply state that the testimony would have been favorable, [as] self-serving speculation will not sustain an ineffective assistance claim." (footnote omitted)).

Petitioner also contends that counsel should have called Dr. Millard "to tell the jury why he changed the cause of death from accident to homicide." (Am. § 2254 Pet., ECF No. 21, PageID.5918.) The trial court rejected this argument, stating:

> In his amendment, [Petitioner] also alleges defense counsel should have called Dr. M[i]llard to testify why he changed his findings from accidental to homicide. However, the record shows that it was Dr. Palutke who changed his opinion from accidental death to homicide as discussed above. It is unclear who Dr. M[i]llard is

34

> and how he is connected to this case from [Petitioner's] amendment and the record. As such, [Petitioner's] argument as to Dr. M[i]llard is without merit.

(ECF No. 6-38, PageID.5572.) This Court has already determined that Petitioner was not prejudiced by the lack of testimony from Dr. Millard at trial. Petitioner, therefore, cannot maintain his claim that counsel was ineffective for failing to call Dr. Millard as a witness.

In sum, Petitioner fails to demonstrate that he was prejudiced by counsel's decision not to call the identified individuals as witnesses as his second trial. Petitioner, therefore, is not entitled to relief with respect to this assertion of ineffective assistance.

### c.      Failure to Seek Expert Accident Reconstructionist

Finally, Petitioner contends that counsel was ineffective for not requesting funds to hire an expert accident reconstructionist. (Am. § 2254 Pet., ECF No. 21, PageID.5918.) According to Petitioner, such an expert would have provided information "supporting the theory that it was an accident as the Covert Police Chief, Mr. Winans[,] had written in his report that[] the crime scene was very dark as it was raining very hard with low visibility." (*Id.*, PageID.5918–5919.) Petitioner contends expert testimony would have "called into question the testimony of Burnette driving the white car in the rain and hit the victim." (*Id.*, PageID.5919.)

The trial court touched upon this assertion in its order denying Petitioner's first Rule 6.502 motion, stating:

> [Petitioner] presents a letter and affidavits from expert accident reconstructionist specialist Thomas Bereza. Mr. Bereza interviewed [Petitioner] and his trial counsel and reviewed the case and investigative materials he received from them. It is unclear whether he reviewed the transcripts of either trial and it appears he did not interview witnesses. From what he did review, he opines that the death was not a murder but rather a hit and run accident for which [Petitioner] is not responsible. . . .
>
> * * *
>
> [Petitioner] fails to explain how the evidence itself was newly discovered. As the prosecution illustrates, Mr. Bereza reviewed materials he obtained from trial defense counsel to form his opinion. Nothing in the letters or affidavits suggests

that the renewed materials were unknown to [Petitioner] prior to trial. In fact, it appears that they were known to [Petitioner] prior to trial. It cannot be said, therefore, that they are "newly discovered."

He also fails to explain how he could not, using reasonable diligence, have discovered and produced the evidence at trial. Certainly [Petitioner] could have engaged an accident reconstructionist to review the case prior to trial and the record supports that the court was willing to grant expert witness fees. In fact, [Petitioner] argues elsewhere in his pleading that defense counsel was inadequate for failing to produce such an expert based on these materials. [Petitioner] cannot logically argue that the evidence could not have been discovered using reasonable diligence and also argue that counsel was ineffective for failing to discover it. As well, based on the other evidence produced at trial, and considering the anticipated value of Mr. Bereza's testimony once tested by cross-examination, [Petitioner] cannot show that his opinion would have a different result probable on retrial.

(ECF No. 6-38, PageID.5564–5565.)

The trial court's determination tracks with clearly established federal law. The Supreme Court has recognized that "[t]he selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after a thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'" *Hinton v. Alabama*, 571 U.S. 263, 275 (2014) (quoting *Strickland*, 466 U.S. at 690). Here, there is no record evidence suggesting that Petitioner's counsel did not investigate the possibility of calling an expert accident reconstructionist to testify at trial. Absent such support, Petitioner cannot overcome the presumption that counsel's actions fell within "the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

Moreover, Petitioner provides no evidence that an expert was available to testify on his behalf. Although Petitioner submitted "newly discovered evidence" from Bereza in support of his Rule 6.502 motion, nowhere did Mr. Bereza indicate that he would have been available to testify on Petitioner's behalf at Petitioner's trial. "A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *Ashimi*, 932 F.2d at 650 (footnote omitted); *see also Lagrone v. Parris*, No. 23-5177, 2023 WL 5623279, at *4 (6th Cir. Aug. 7, 2023) ("Lagrone did not identify an expert his trial counsel

could have called or indicate what an expert could have testified that would have been relevant to his defense. The speculative impact of expert testimony is not enough to prove prejudice under *Strickland*."); *Pillette v. Berghuis*, 408 F. App'x 873, 887 (6th Cir. 2010) (stating that "[t]he salient point is that nobody knows what she would have said. Speculation cannot suffice to establish the requisite prejudice."). In any event, Petitioner also fails to demonstrate that, given the overwhelming evidence against him, testimony from an expert accident reconstructionist would have altered the outcome of his trial in any way. Petitioner, therefore, is not entitled to relief with respect to this assertion of ineffective assistance.

In sum, Petitioner has not demonstrated that the trial court's rejection of his ineffective assistance of trial counsel claims is contrary to, or an unreasonable application of, *Strickland*. Petitioner, therefore, is not entitled to relief with respect to habeas ground VI.

### 3.    Ground V—Ineffective Assistance of Appellate Counsel

Petitioner faults appellate counsel for failing to "challenge the change in the cause of death, failing to challenge the absent Dr. Millard at either trial, or failing to challenge the *Brady* violation under current case law." (Am. § 2254 Pet., ECF No. 21, PageID.5914.) He also suggests that appellate counsel should have asserted a claim of ineffective assistance premised upon trial counsel's failure to call Dr. Millard as a witness. (*Id.*, PageID.5913.)

The trial court rejected Petitioner's claim of ineffective assistance of appellate counsel in its order denying Petitioner's Rule 6.502 motion, stating:

> The court has found meritless the issues [Petitioner] claims appellate counsel should have raised. The court cannot fault appellate counsel for failure to present these non-meritorious issues to the Court of Appeals, and the decision not to do so falls squarely within appellate counsel's discretion. [Petitioner] has not established that counsel's performance was deficient or prejudicial. This issue too is without merit and [Petitioner] has failed to show either good cause or actual prejudice entitling him to relief.

(ECF No. 6-38, PageID.5575.) As thoroughly discussed *supra*, this Court determined that Petitioner's underlying arguments lack merit. Accordingly, "appellate counsel's failure to raise [any of those claims] on direct appeal cannot be deemed constitutionally deficient performance." *Willis v. Smith*, 351 F.3d 741, 746 (6th Cir. 2003); *see also Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001) ("If trial counsel performed adequately, our inquiry is at an end; by definition, appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit."). Thus, Petitioner has not demonstrated that the trial court's rejection of his ineffective assistance of appellate counsel claim is an unreasonable application of *Strickland*. Petitioner, therefore, is not entitled to relief with respect to habeas ground V.

### E.    Ground VII—Request for New Trial Premised Upon New Evidence/Actual Innocence

As his seventh ground for relief, Petitioner contends that due process requires that he receive a new trial premised upon newly discovered evidence. (Am. § 2254 Pet., ECF No. 21, PageID.5920.) Specifically, Petitioner contends that the cause of death listed on Boothby's death certificate was changed, and that Dr. Millard, the individual who signed the first death certificate, "was never consulted by anyone regarding Ms. Boothby's death, including police officers, the prosecuting attorney, defense attorneys[,] or investigators." (*Id.*) When Dr. Millard signed the initial death certificate, the death certificate ruled that Boothby's death was an accident. (*Id.*) Petitioner references newly discovered evidence in the form of an affidavit from investigator Thomas G. Bereza memorializing Dr. Millard's statements regarding the signature on the second death certificate. (*Id.*, PageID.5920–5921.)

To the extent Petitioner is attempting to assert a claim of actual innocence premised upon newly discovered evidence, he fails to state a cognizable federal claim. The Supreme Court has stated: "Claims of actual innocence based on newly discovered evidence have never been held to

state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). But the *Herrera* Court did not close the door completely, stating in dicta that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id.* at 417. Thus, even without the occurrence of any independent constitutional violation during the state criminal proceeding, federal habeas relief might be warranted for "truly persuasive demonstration of actual innocence," provided: (1) the habeas petition seeks relief in a capital case, in which case such a demonstration of actual innocence "would render the execution of a defendant unconstitutional"; and (2) there is "no state avenue open to process such a claim." *Id.* The Supreme Court emphasized that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.*; *see also House v. Bell*, 547 U.S. 518, 555 (2006) ("In *Herrera*, however, the Court described the threshold for any hypothetical freestanding innocence claim as 'extraordinarily high.'"); *Cress v. Palmer*, 484 F.3d 844, 854–55 (6th Cir. 2007).

Two years after *Herrera*, the Supreme Court held that a claim of actual innocence can be raised "to avoid a procedural bar to the consideration of the merits of [the petitioner's] constitutional claims." *Schlup v. Delo*, 513 U.S. 298, 326–27 (1995). "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). In *Schlup*, the Supreme Court held that a credible showing of actual innocence was sufficient to enable a court to reach the merits of an otherwise procedurally barred habeas petition. *Schlup*, 513 U.S. at 317. The actual

innocence claim in *Schlup* is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 315 (citing *Herrera*, 506 U.S. at 404). Thus, the Supreme Court distinguished between a procedural innocence claim, which can permit a petitioner to overcome procedural obstacles that would otherwise preclude review of underlying constitutional claims, and a substantive or "free-standing" claim of innocence discussed in *Herrera*.

This Court may grant habeas corpus relief only when the state court has violated or unreasonably applied a clearly established holding of the Supreme Court. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412. Recently, the Sixth Circuit acknowledged that the actual innocence "equitable-exception [to the AEDPA statute of limitations] doctrine is not a freestanding substantive claim for habeas relief. The Supreme Court has not decided whether actual innocence is a substantive ground for relief." *Hubbard v. Rewerts*, 98 F.4th 736, 742 (6th Cir. 2024); *see also Smith v. Nagy*, 962 F.3d 192, 206 (6th Cir. 2020) (citing *Schlup* and *Herrera* for the proposition that freestanding claims of actual innocence are not cognizable on habeas corpus review); *Cress*, 484 F.3d at 854 (citing cases for the same proposition). Accordingly, in the absence of clearly established Supreme Court precedent establishing a freestanding claim of actual innocence, Petitioner's claim is without merit. Even if Petitioner could invoke this exception and obtain habeas relief on his freestanding innocence claim, he would have to meet both of the requirements set forth above and then overcome the "extraordinarily high" threshold. Petitioner fails the first requirement. This is not a capital case, and, thus, the concern about the unconstitutionality of executing a defendant who has shown persuasive evidence of actual innocence is not implicated. *See Herrera*, 506 U.S. at 417 ("We first point out the obvious - that this is not, in fact, a capital

case.") Accordingly, for the reasons set forth above, Petitioner is not entitled to relief with respect to habeas ground VII.[4]

### F.    Ground VIII—Trial Court Error/Judicial Bias

As his eighth and final ground for relief, Petitioner contends that he is entitled to a new trial because the "trial judge abused his judicial discretion by circumventing a Sixth Amendment right to confront a specific witness displaying judicial bias." (Am. § 2254 Pet., ECF No. 21, PageID.5926.) Specifically, Petitioner takes issue with the trial court's determination that Adrian Travier could testify regarding statements made to him by Petitioner's co-defendant Ivory Shaver. (*Id.*) Essentially, Petitioner contends that Travier's testimony should not have been admitted because his testimony amounted to Ivory's "confession" to Travier, and Petitioner had no opportunity to confront Ivory about the statements because they were tried jointly, and Ivory exercised his Fifth Amendment right against self-incrimination. (*Id.*, PageID.5928.) According to Petitioner, Travier's "testimony was prejudicial to Petitioner because the term 'nephew' was easily recognized by the jury as Petitioner." (*Id.*, PageID.5929.)

Travier testified that he first met Ivory Shaver in 2004. (Trial Tr. XIV, ECF No. 33-15, PageID.9733.) He next saw Ivory again in 2009, when they were both incarcerated at the Lakeland Correctional Facility. (*Id.*, PageID.9737.) Travier testified that during his incarceration, he would see Ivory Shaver "pretty much day after day." (*Id.*, PageID.9743.) Ivory expressed concerns to Travier regarding a parole hearing, wondering if "his parole decision [was] being delayed

---

[4] Indeed, in his amended § 2254 petition, Petitioner expressly recognizes that "[c]laims of [a]ctual [i]nnocence only serve as a gateway" to procedural bars. (ECF No. 21, PageID.5923.) Despite that recognition, Petitioner has still raised this argument as a separate ground for relief. Petitioner, however, also asks that the Court find that actual innocence "compel[s] review [of any claims] regardless of any default." (*Id.*) As set forth *supra* in footnote 1, the Court has concluded that judicial economy favors proceeding directly to a discussion of the merits of Petitioner's claims. Accordingly, there is no need for the Court to consider whether Petitioner can overcome the procedural default of any of his other grounds for relief.

because—due to an investigation." (*Id.*, PageID.9745.) Travier testified that ultimately, he and Ivory had a conversation where Ivory mentioned "a white girl named Debbie that was beaten to death." (*Id.*, PageID.9747.) Ivory "would make mention of him, his nephew and Ed and somebody named Shevy, a female named Shevy." (*Id.*) Travier testified that at one point, Ivory "just flat out told [Travier] what he did." (*Id.*, PageID.9748.) When asked what Ivory said, Travier stated:

> He said that a female—white female named Debbie was beaten to death and ran over twice to make it look like a hit an[d] run. And he had told his nephew on numerous occasions that she shouldn't—that he should have been quit dealing with her and he kept getting into it with her. And she knew some things that she shouldn't have knew. And they had reason to get rid of her. So they tried to make it look like a hit-and-run. Beath her death. Ran over the body twice and threw it out the car on the way to Kalamazoo. That's what he told me. That's what he related to me.

(*Id.*) Travier testified that he never asked for the name of Ivory's nephew, and that he did not know Petitioner at that time. (*Id.*, PageID.9759.) Travier later "sent a letter to the Van Buren County Prosecutor's Office stating that he had information regarding the investigation of Deborah Boothby's death." *Shaver*, 2013 WL 4864204, at *17.

In his counseled brief on direct appeal, Petitioner contended that the trial court erred by denying his motion for a separate trial. (ECF No. 6-29, PageID.5104.) As part of his argument, Petitioner relied upon the trial court's ruling allowing Travier's testimony regarding Ivory Shaver's statements. (*Id.*, PageID.5107–5108.) In its opinion, the court of appeals rejected Petitioner's argument regarding the denial of his motion for a separate trial without mentioning the testimony provided by Travier. *See Shaver*, 2013 WL 4864204, at *11. The court of appeals went on to note, however, that Shevolier Gill "raise[d] two arguments raised by her co-defendants," including an argument that the trial court denied her motion for a separate trial. *Id.* at *12. The court of appeals rejected that argument, stating:

> Regarding the severance issue, Shevolier specifically argues that her substantial rights were prejudiced by the joint trial because she was forced to testify in response to the testimony of Adrian Travier that was offered against Ivory. Travier's

testimony constituted a compelling reason for severance because the jury was permitted to consider evidence that would not have been admissible against Shevolier if she were given a separate trial. Moreover, Shevolier argues that it was difficult for the jurors to determine what evidence was applicable to each of the defendants. Shevolier maintains that she was a "small fish" lost in a large and complex trial.

We do not find any of Shevolier's arguments persuasive. First, the trial court specifically ruled that Travier's testimony was admissible against all three defendants, and this ruling was not error, as discussed *infra*. Thus, Shevolier's argument that this evidence would not have been admissible if she had been granted a separate trial is without merit. Moreover, almost all of the witnesses who testified to the events on the night of the victim's death testified to defendants' actions as a unit, i.e., all three defendants were at the Blue Star Lounge, all three defendants were beating the victim in the parking lot, Shevolier and Ivory were seen in the car that the victim was placed in together, and Burnette testified that all three defendants were present at the second scene and were actively engaged in further beating the victim. Thus, the evidence submitted at the joint trial would have been submitted basically in its entirety at any separate trial held for Shevolier. Accordingly, the evidence presented during trial weighed in favor of a joint trial and did not support severance.

Similarly, there was no risk that Shevolier would be a "small fish" caught in the middle of a large trial. The testimony demonstrated that she was principally involved in the kidnapping and murder of the victim. Moreover, the jury was specifically instructed that it must determine each defendant's guilt individually, and must consider only evidence relevant to each particular defendant when making its determination. Jurors are presumed to follow their instructions. *Unger,* 278 Mich. App. at 227. Thus, Shevolier has not demonstrated any prejudice that resulted from the joint trial. Accordingly, we conclude that the trial court did not abuse its discretion by denying her motion for a separate trial.

*Shaver*, 2013 WL 4864204, at *12–13. The court of appeals also rejected Shevolier Gill's argument that the admission of Ivory's statements through Travier's testimony violated Michigan Rule of Evidence 804(b)(3), stating:

In this case, it is not disputed that the declarant, Ivory, was unavailable because he exercised his Fifth Amendment right not to testify. Moreover, Ivory's statement was clearly against his penal interest because he admitted to personally murdering a woman with the assistance of codefendants; he did not attempt to minimize his role in the murder. Finally, a reasonable person would recognize the incriminating nature of the statement and would believe that such a confession would be true. See *People v. Ortiz–Kehoe,* 237 Mich. App 508, 518; 603 N.W.2d 802 (1999). Thus, Ivory's statement to Travier satisfies the requirements for admission under MRE 804(b)(3), and is clearly admissible against Ivory.

> In order to be admissible against all defendants, including Shevolier, the statement must satisfy the requirements set forth by *Poole:* that the statement was made in narrative form, by the declarant's own initiative, and is reliable as a whole because it was against the declarant's own interest. *Poole,* 444 Mich. at 161. In this case, Travier testified that he and Ivory were friends while incarcerated together and often discussed parole. He testified that one day Ivory told him he was concerned about his parole being denied due to an investigation, and eventually that Ivory "flat out told" Travier what he had done. Ivory told Travier about the murder in a narrative form. Travier testified that he did not ask probing questions, only that he asked who was with Ivory after Ivory kept referring to "everyone." Travier explained they were just having a normal conversation and he was not trying to pull information out of Ivory. Finally, Ivory's statement was clearly incriminating. Thus, because Ivory was clearly incriminating himself in his statement, and he volunteered names when Travier asked for a number, and he clearly told the story in narrative form on his own initiative, the statements were properly admitted against both Ivory and his codefendants. Accordingly, the trial court did not abuse its discretion.

*Shaver*, 2013 WL 4864204, at *18. In a footnote, the court of appeals noted that Shevolier "concedes that under *Crawford v. Washington,* 541 U.S. 36; 124 S Ct 1354; 158 L.Ed.2d 177 (2004), Ivory's statements to Travier were not testimonial; thus, the Confrontation Clause is not implicated by their admission." *Id.* at *16 n.6.

As an initial matter, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). The court of appeals' conclusion that the trial court's admission of Travier's testimony under Michigan Rule of Evidence 804(b)(3) was proper is, therefore, axiomatically correct.

It is possible that an evidentiary ruling—even a ruling that is axiomatically correct under state law—still violates due process. State-court evidentiary rulings can rise to the level of due process violations if they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation marks omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000); *see also Stewart v. Winn*, 967 F.3d 534, 538 (6th Cir. 2020) (stating that, to obtain habeas relief based on an allegedly improper evidentiary ruling, a petitioner must identify "a Supreme Court case establishing a due process right with regard to the specific kind of evidence at issue"). Petitioner, however, has not met this difficult standard.

As noted above, Petitioner contends that the admission of Travier's testimony regarding Ivory's statements violated his Sixth Amendment Confrontation Clause rights because Ivory invoked his Fifth Amendment right against self-incrimination and because Petitioner was jointly tried with Ivory and so could not cross-examine him.

"Ordinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant." *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). The Supreme Court, however, has

held that a non-testifying defendant's statement cannot be admitted at a joint trial if it facially incriminates the co-defendant. *Bruton v. United States*, 391 U.S. 123, 135–36 (1968); *see also United States v. Ford*, 761 F.3d 641, 652 (6th Cir. 2014) ("In *Bruton*, the Supreme Court held that the Confrontation Clause is violated by the introduction of an incriminating out-of-court statement by a non-testifying co-defendant.").

However, "[b]ecause it is premised on the Confrontation Clause, the *Bruton* rule, like the Confrontation Clause itself, does not apply to nontestimonial statements." *United States v. Johnson*, 581 F.3d 320, 326 (6th Cir. 2009). Here, the Michigan Court of Appeals noted that the admission of Ivory's statements to Travier were not testimonial and, therefore, did not implicate the Confrontation Clause. *See Shaver*, 2013 WL 4864204, at *16 n.6. Petitioner offers no convincing argument otherwise.

While *Crawford* did not specify a "comprehensive definition" of what constitutes testimonial statements, the *Crawford* Court did note that "[s]tatements taken by police officers in the course of interrogations" certainly lie within the "core class of 'testimonial' statements." *Crawford*, 541 U.S. at 51–52. "In determining whether statements are testimonial, [a court must] ask whether the declarant 'intend[ed] to bear testimony against the accused.'" *Johnson*, 581 F.3d at 325 (quoting *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004). This determination depends on "whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime." *Cromer*, 389 F.3d at 675.

Here, Petitioner offers no evidence, much less clear and convincing evidence, suggesting that Ivory anticipated that his statements to Travier would be used against Ivory and his co-defendants during investigation and prosecution of the incident. Ivory made his statements

regarding Boothby's death to Travier while discussing his parole hearing and his concerns that a decision regarding his parole was delayed because of an investigation into the matter. As noted above, Travier did not pry Ivory for more information, including full names of the others involved. While Travier did subsequently relay Ivory's statements to the Van Buren County Prosecutor's Office in a letter, the record is simply devoid of evidence from which the Court could conclude that Ivory anticipated use of his statements against him, Petitioner, Gill, and Foster. Rather, Ivory was simply an unwitting declarant. *Cf. United States v. Watson*, 525 F.3d 583, 589 (7th Cir. 2008) (noting that "a statement unwittingly made to a confidential informant and recorded by the government is not 'testimonial' for Confrontation Clause purposes"); *United States v. Johnson*, 440 F.3d 832, 843 (6th Cir. 2006) (concluding that an unwitting declarant's secretly recorded statements made to a friend were not testimonial in nature). In light of the foregoing, the admission of Travier's testimony, which included testimony regarding Ivory's statements, did not violate Petitioner's Confrontation Clause rights.

As noted *supra*, Petitioner also couches his claim in terms of "judicial bias." Actual judicial bias amounts to structural error that is not susceptible to harmless error analysis. *See Washington v. Recuenco*, 548 U.S. 212, 218 n.2 (2006) (citing *Tumey v. Ohio*, 273 U.S. 510 (1927) (holding that a judge with a direct, personal, substantial pecuniary interest in reach a conclusion against [the criminal defendant] in his case" was constitutionally disqualified)); *see also Neder v. United States*, 527 U.S. 1, 8 (1999) (same); *Bracy v. Gramley*, 520 U.S. 899, 904–905 (1997) (stating that "the Due Process Clause clearly requires a 'fair trial in a fair tribunal,' before a judge with no ***actual*** bias against the defendant or interest in the outcome of his particular case." (citations omitted, emphasis added)). But many circumstances that lead a criminal defendant to question a judge's impartiality do not involve "actual bias:"

> [M]ost questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828, 106 S.Ct. 1580, 1588–1589, 89 L.Ed.2d 823 (1986). Instead, these questions are, in most cases, answered by common law, statute, or the professional standards of the bench and bar. *See, e.g., Aetna, id.*, at 820–821, 106 S.Ct., at 1584–1585; *Tumey v. Ohio*, 273 U.S. 510, 523, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927); 28 U.S.C. §§ 144, 455; ABA Code of Judicial Conduct, Canon 3C(1)(a) (1980)

*Bracy*, 520 U.S. at 904.

A judge's conduct at trial may be "characterized as 'bias' or 'prejudice'" only if "it is so extreme as to display clear inability to render fair judgment." *Liteky v. United States*, 510 U.S. 540, 551 (1994). However, because of the difficulty in determining "whether a judge harbors an actual, subjective bias," the courts look to "whether, as an objective matter, the average judge in [that judge's] position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Williams v. Pennsylvania*, 579 U.S. 1, 9 (2016) (internal quotation marks omitted); *see also Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 883 (2009) ("The difficulties of inquiring into actual bias . . . simply underscore the need for objective rules.").

The Supreme Court has recognized constitutionally impermissible, objective indicia of bias in the following types of cases: (1) those cases in which the judge "has a direct, personal, substantial pecuniary interest in reaching a [particular] conclusion," *Tumey*, 273 U.S. at 523; (2) certain contempt cases, such as those in which the "judge becomes personally embroiled with the contemnor," *Offut v. United States*, 348 U.S. 11, 17 (1954); *see also Taylor v. Hayes*, 418 U.S. 488 (1974); and (3) cases in which a judge had prior involvement in the case as a prosecutor, *Williams*, 579 U.S. at 8. Beyond that, the courts indulge "a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). As the Sixth Circuit has noted:

48

> The presumption of impartiality stems not merely from the judicial-bias caselaw, *see* [*Withrow*], but from the more generally applicable presumption that judges know the law and apply it in making their decisions, *see Lambrix v. Singletary*, 520 U.S. 518, 532 n.4 (1997), and the even more generally applicable presumption of regularity, *see Parke v. Raley*, 506 U.S. 20, 30–31 (1992); *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926).

*Coley v. Bagley*, 706 F.3d 741, 751 (6th Cir. 2013).

Petitioner's bias claim does not implicate the indicia of bias set forth in *Tumey*, *Offut*, and *Williams*. Nothing in the record suggests that the trial judge had a pecuniary interest in Petitioner's case, that the trial judge became embroiled with Petitioner, and that the judge had prior involvement in the matter as a prosecutor. Rather, a liberal construction of Petitioner's argument suggests that he is asserting that the type of "bias" displayed by the trial judge is akin to the type of bias the Supreme Court defined in *Liteky*.

The petitioners in *Liteky* had been charged with willful destruction of United States property. *Id.* at 542. Prior to trial, they moved to disqualify the judge based upon "events that had occurred during and immediately after an earlier trial, involving petitioner Bourgeois, before the same District Judge." *Id.* Specifically, the petitioners argued that, during that earlier case,

> the judge had displayed "impatience, disregard for the defense and animosity" toward Bourgeois, Bourgeois' codefendants, and their beliefs. The alleged evidence of that included the following words and acts by the judge: stating at the outset of the trial that its purpose was to try a criminal case and not to provide a political forum; observing after Bourgeois' opening statement (which described the purpose of his protest) that the statement ought to have been directed toward the anticipated evidentiary showing; limiting defense counsel's cross-examination; questioning witnesses; periodically cautioning defense counsel to confine his questions to issues material to trial; similarly admonishing witnesses to keep answers responsive to actual questions directed to material issues; admonishing Bourgeois that closing argument was not a time for "making a speech" in a "political forum"; and giving Bourgeois what petitioners considered to be an excessive sentence. The final asserted ground for disqualification—and the one that counsel for petitioners described at oral argument as the most serious—was the judge's interruption of the closing argument of one of Bourgeois' codefendants, instructing him to cease the introduction of new facts, and to restrict himself to discussion of evidence already presented.

*Id.* at 542–43.

The Supreme Court rejected the petitioners' arguments that the judge should have recused himself. In its analysis, the Court noted that "[t]he judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person." *Id.* at 550–51. The Court cautioned, however, that "the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task." *Id.* at 551. The Court then set forth the showing petitioners needed to make to succeed on a judicial bias claim:

> First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. *See United States v. Grinnell Corp.*, 384 U.S. [563, 583 (1966)]. In and of themselves (*i.e.*, apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States*, 255 U.S. 22 (1921), a World War I espionage case against German-American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Id.*, at 28 (internal quotation marks omitted). *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Liteky*, 510 U.S. at 555–556 (emphasis in original).[5] Overall, the Court concluded, the comments made by the judge during the prior proceeding did not "display[] deep-seated and unequivocal antagonism that would render fair judgment impossible." *Id.* at 556.

Notably, in *Railey v. Webb*, 540 F.3d 393 (6th Cir. 2008), the Sixth Circuit conducted an exhaustive analysis of Supreme Court precedent governing judicial bias. *See id.* at 393–407. The Sixth Circuit provided the following summary following its analysis:

> In sum, one *could* read the Supreme Court precedent in this area as holding that the probability of bias—based on a likelihood or appearance of bias—can be sufficient to disqualify a judge and violate a party's constitutional right to due process. But, one *could also* read these cases as holding that, other than in cases of contempt arising in a closed (secret) hearing, only actual bias or pecuniary-interest-based probability is sufficient—and, moreover, that a matter of mere kinship has, as of yet, never been acknowledged as a sufficiently biasing interest. Regardless of the preferred reading—or the merits of one reading over the other—the fact that there are two or more reasonable readings compels the conclusion that this precedent is not "clearly established."

*Id.* at 407.

The Sixth Circuit has further noted that judicial bias may be established when "the judge's remarks clearly indicate a hostility to one of the parties, or an unwarranted prejudgment of the merits of the case, or an alignment on the part of the [c]ourt with one of the parties." *United States v. Blood*, 435 F.3d 612, 629 (6th Cir. 2006) (internal quotation marks and citations omitted). Moreover, a judge may commit misconduct when he "abandons his proper rule and assumes [the role] of [an] advocate" when questioning a witness. *Id.* (alteration in original). The Sixth Circuit has set forth the following considerations when analyzing a claim of judicial misconduct or bias: "(1) 'the nature of the issues at trial,' including how lengthy and complex the trial is; (2) 'the

---

[5] *Liteky* is a case that addresses the statutory recusal standard for federal judges. The Sixth Circuit has, nonetheless, relied on *Liteky* to provide the standard for assessing judicial bias claims under the Due Process Clause. *See Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002); *Lyell v. Renico*, 470 F.3d 1177, 1187 (6th Cir. 2006).

conduct of counsel,' and whether the attorneys are 'unprepared or obstreperous,'; and (3) 'the conduct of witnesses.'" *United States v. Smith*, 706 F. App'x 241, 254 (6th Cir. 2017) (quoting *United States v. Hickman*, 592 F.2d 931, 933 (6th Cir. 1979). Moreover, the Sixth Circuit "has considered the tone of the judicial interruptions, the extent to which they were directed at one side more than the other, and the presence of any curative instructions at the close of the proceedings." *McMillian v. Castro*, 405 F.3d 405, 410 (6th Cir. 2005). "[T]he rule concerning judicial interrogation is designed to prevent judges from conveying prejudicial messages to the jury. It is not concerned with the damaging truth that the questions might uncover." *United States v. Martin,* 189 F.3d 547, 554 (7th Cir. 1999).[6]

Here, Petitioner's claim of judicial bias is entirely based upon Petitioner's disagreement with the trial judge's ruling allowing Travier to testify regarding co-defendant Ivory Shaver's statements. As set forth above, judicial rulings alone are not a sufficient basis for a claim of judicial bias. Petitioner's speculation that judicial bias existed is insufficient for him to maintain a judicial basis claim. *See Barnes v. Warden, Ross Corr. Inst.*, No. 19-3389, 2019 WL 5576345, at *4 (6th Cir. Sept. 16, 2019); *see also Smith v. Caterpillar, Inc.*, 304 F. App'x 391, 396 (6th Cir. 200*) (noting that "subjective speculation alone is insufficient to support . . . allegation[s] of judicial bias"). Accordingly, for the foregoing reasons, Petitioner is not entitled to relief with respect to the judicial bias aspect of ground VIII.

In sum, the admission of Travier's testimony regarding Ivory Shaver's statements did not violate Petitioner's Confrontation Clause rights. Furthermore, the trial judge's ruling upon the

---

[6] The Court recognizes that decisions from the circuit courts do not constitute clearly established federal law for purposes of AEDPA. *See Parker v. Matthews*, 567 U.S. 37, 48 (2012). However, these decisions provide insight into the factors that appellate courts take into consideration when analyzing a defendant's claim regarding judicial bias.

admissibility of Travier's testimony does not amount to judicial bias. Petitioner, therefore, is not entitled to relief with respect to habeas ground VIII.

## V.    Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal

would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## **<u>Conclusion</u>**

The Court will enter a judgment denying the petition, as well as an order denying a certificate of appealability.

Dated:    February 14, 2025                              /s/ Robert J. Jonker
                                                        Robert J. Jonker
                                                        United States District Judge